**No. 26-1861**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MINORITY VETERANS OF AMERICA,

*Petitioner*,

v.

SECRETARY OF VETERANS AFFAIRS,

*Respondent*.

On Petition for Review Pursuant to 38 U.S.C. § 502

## OPENING BRIEF FOR PETITIONER MINORITY VETERANS OF AMERICA

CARRIE FLAXMAN
KAITLYN GOLDEN
ROBIN F. THURSTON
SKYE PERRYMAN
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043

MICHELLE BANKER
KATIE O'CONNOR
LUCY ZHOU
JAMIE FLOYD
NATIONAL WOMEN'S LAW CENTER
1350 I Street NW, Suite 700
Washington, DC 20005

AILEEN M. MCGRATH
DARALYN J. DURIE
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-6153
AMcGrath@mofo.com

ALISSANDRA MCCANN
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037

ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

*Counsel for Petitioner*

OCTOBER 30, 2026

# CERTIFICATE OF INTEREST

Counsel for Minority Veterans of America certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

Minority Veterans of America

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

None.

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

No.

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not applicable.

Dated: October 30, 2026

/s/ Aileen M. McGrath
Aileen M. McGrath

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ v

STATEMENT OF RELATED CASES ........ ix

JURISDICTIONAL STATEMENT ........ ix

INTRODUCTION ........ 1

STATEMENT OF THE ISSUES ........ 4

STATEMENT OF THE CASE ........ 4

A. VA's Statutory Authority To Provide Medical Care ........ 4

B. VA Exercises Its Statutory Authority To Provide Abortion Care And Abortion Counseling ........ 7

C. Three Years Later, VA Reverses Course By Eliminating Abortion Care And Abortion Counseling ........ 12

D. Petitioner Minority Veterans of America Brings This Action On Behalf Of Its Members Who Are Adversely Affected By The Final Rule ........ 17

SUMMARY OF ARGUMENT ........ 19

STANDARDS OF REVIEW ........ 23

ARGUMENT ........ 23

I. VA ABUSED ITS DISCRETION IN CONCLUDING IT LACKS STATUTORY AUTHORITY TO PROVIDE ABORTION CARE ........ 23

A. VA Has Statutory Authority To Provide Any Medical Care That It Determines To Be "Needed," Including Abortion Care ........ 24

B. Section 106 Of The VHCA Does Not Prohibit VA From Providing Abortion Care ........ 27

1. The plain text of section 106 prohibits only certain types of care administered "under this section"—not under other statutory provisions ....27

2. Regardless, VHCERA's comprehensive regime overrides any prohibition section 106 may have previously imposed on abortion care ....31

II. VA'S DISCRETIONARY DECISION NOT TO PROVIDE ABORTION CARE IS ARBITRARY AND CAPRICIOUS ....35

A. VA Failed To Justify Its Change In Position ....36

1. VA failed to provide a reasoned explanation for its change in position ....36

2. VA failed to weigh the profound reliance interests engendered by VA's prior policy ....42

B. VA Failed To Adequately Consider And Respond To Significant Public Comments Explaining Why Abortion Care Is Needed Care And Exposing The Flaws In VA's Reasoning ....45

1. The Final Rule failed to respond to abundant comments explaining why abortion to preserve health and in cases of rape or incest is critically "needed" care ....46

2. The Final Rule is unworkably ambiguous and will chill the provision of permitted and medically necessary care ....49

3. VA relied on a fundamentally flawed Regulatory Impact Analysis ....52

III. VA'S DISCRETIONARY DECISION NOT TO PROVIDE ABORTION COUNSELING IS ARBITRARY AND CAPRICIOUS ....55

A. VA Failed To Justify Its Change In Position ....56

B. VA Failed To Adequately Consider And Respond To Significant Public Comments Explaining The Harms Caused By The Ban On Abortion Counseling ....57

CONCLUSION ........................................................................................................59

## TABLE OF AUTHORITIES

### Cases

*Bloomberg L.P. v. Sec. & Exch. Comm'n*,
45 F.4th 462 (D.C. Cir. 2022)....55

*Brown v. Gardner*,
513 U.S. 115 (1994)....30

*Carlson v. Postal Regul. Comm'n*,
938 F.3d 337 (D.C. Cir. 2019)....45

*Chan Healthcare Grp., PS v. Liberty Mut. Fire Ins. Co.*,
844 F.3d 1133 (9th Cir. 2017)....28

*City of Portland v. EPA*,
507 F.3d 706 (D.C. Cir. 2007)....45

*Comité de Apoyo a los Trabajadores Agricolas v. Perez*,
774 F.3d 173 (3d Cir. 2014)....22, 39

*Ctr. for Biological Diversity v. EPA*,
141 F.4th 153 (D.C. Cir. 2025)....54

*Ctr. for Investigative Reporting v. U.S. Dep't of Just.*,
982 F.3d 668 (9th Cir. 2020)....34

*Daiichi Sankyo Co. v. Lee*,
791 F.3d 1373 (Fed. Cir. 2015)....23

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)....42, 43, 44

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022)....8, 44, 45

*Duncan v. Walker*,
533 U.S. 167 (2001)....29

*E. Paralyzed Veterans Ass'n v. Sec'y of Veterans Affs.*,
257 F.3d 1352 (Fed. Cir. 2001)....25

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)....................23, 39, 44

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)....................36, 37, 42, 57

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025)....................35, 36, 40, 42

*Foreman v. United States*,
60 F.3d 1559 (Fed. Cir. 1995)....................33

*Griffin v. Sec'y of Veterans Affs.*,
288 F.3d 1309 (Fed. Cir. 2002)....................51

*Hikvision USA, Inc. v. Fed. Commc'ns Comm'n*,
97 F.4th 938 (D.C. Cir. 2024)....................51

*HMTX Indus. LLC v. United States*,
156 F.4th 1236 (Fed. Cir. 2025)....................45

*Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*,
626 F.3d 84 (D.C. Cir. 2010)....................40, 46, 59

*Inv. Co. Inst. v. Commodity Futures Trading Comm'n*,
720 F.3d 370 (D.C. Cir. 2013)....................55

*Lackey v. Stinnie*,
604 U.S. 192 (2025)....................27

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................23, 36

*Metro. Area EMS Auth. v. Sec'y of Veterans Affs.*,
122 F.4th 1339 (Fed. Cir. 2024)....................23, 28, 29-30

*Mid Continent Steel & Wire, Inc. v. United States*,
941 F.3d 530 (Fed. Cir. 2019)....................39, 57, 58

*Muscogee (Creek) Nation v. Hodel*,
851 F.2d 1439 (D.C. Cir. 1988)....................32

*Nat'l Ass'n of Home Builders v. EPA*,
682 F.3d 1032 (D.C. Cir. 2012)....................52

*Nat'l Ass'n of Mfrs. v. U.S. Sec. & Exch. Comm'n*,
105 F.4th 802 (5th Cir. 2024)....................39

*Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*,
48 F.4th 1307 (Fed. Cir. 2022)....................51

*Paralyzed Veterans of Am. v. Sec'y of Veterans Affs.*,
345 F.3d 1334 (Fed. Cir. 2003)....................23

*Perry v. First Nat'l Bank*,
459 F.3d 816 (7th Cir. 2006)....................28

*Posadas v. Nat'l City Bank*,
296 U.S. 497 (1936)....................34

*Pulsifer v. United States*,
601 U.S. 124 (2024)....................29

*Sharp v. United States*,
580 F.3d 1234 (Fed. Cir. 2009)....................29

*SW Gen., Inc. v. NLRB*,
796 F.3d 67 (D.C. Cir. 2015)....................28

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
588 U.S. 504 (2019)....................34

*Tineo v. Ashcroft*,
350 F.3d 382 (3d Cir. 2003)....................33, 34

*Wayside Church v. Van Buren Cnty.*,
847 F.3d 812 (6th Cir. 2017)....................28, 29

*Young v. Cmty. Nutrition Inst.*,
476 U.S. 974 (1986)....................31

**Statutes**

5 U.S.C. § 706....................23

28 U.S.C. § 2401....................ix

38 U.S.C. § 502 ....................ix

38 U.S.C. § 1701 ....................6, 25

38 U.S.C. § 1710 ....................6, 19, 25, 28, 32, 34

38 U.S.C. § 1781 ....................7

38 U.S.C. § 7301 ....................4

38 U.S.C. § 7310 ....................31

Pub. L. No. 102-585, 106 Stat. 4947 (1992)....................5, 27, 28, 29, 55

Pub. L. No. 104-262, 110 Stat. 3177 (1996)....................32

Pub. L. No. 114-223, 130 Stat. 857 (2016)....................31

**Regulations**

38 C.F.R. § 17.38 ....................6, 7, 19, 26, 37, 40

64 Fed. Reg. 54207 (Oct. 6, 1999)....................5, 20, 26, 37, 40

90 Fed. Reg. 36416 (Aug. 4, 2025)....................58

**Other Authorities**

1992 U.S.C.C.A.N. 4186 ....................30

H.R. Rep. No. 104-690 (1996).................... 4, 6, 19, 24, 25, 32, 40

## STATEMENT OF RELATED CASES

Petitioner is aware of no related cases.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to review the Final Rule under 38 U.S.C. § 502. The Final Rule was promulgated on December 31, 2025, and became effective on January 30, 2026; petitioner timely filed its petition for review on May 21, 2026. Appx1; Dkt. 1-2; 28 U.S.C. § 2401(a).

## INTRODUCTION

Veterans who have served this country are entitled by law to receive healthcare that is "needed." In establishing that standard, Congress made clear that whether healthcare is "needed" for veterans turns on medical judgment—not political, economic, or other considerations. In 2022, the Department of Veterans Affairs (VA) determined that abortion care is medically "needed" when it is necessary to preserve a pregnant person's life or health or in cases of rape or incest. VA also determined that abortion counseling is medically "needed" to enable fully informed healthcare decisions. In exercising its statutory mandate to provide this care, VA relied on extensive medical evidence and related data about the risks that pregnancy imposes. Those risks are particularly acute for veterans; indeed, it is often the very injuries or illnesses that veterans suffer during their service that cause the pregnancy-related risks triggering the need for abortion care or counseling. After 2022, veterans and other enrollees in VA healthcare relied on the availability of abortion care and counseling at VA in making what may have been some of the most consequential decisions of their lives. But in 2025, VA eliminated that care with no reasoned explanation for why it was no longer medically "needed." VA's action abuses its discretion, is arbitrary and capricious, and will cause unnecessary suffering and risks to the health—if not lives—of veterans and their loved ones who depend on VA for care. Its rule should be set aside.

VA's threshold justification for its action was that it lacks statutory authority to provide abortion care. That is wrong as a matter of statutory interpretation. VA relies on an isolated provision that prohibits "abortions" "under this section." But that language does nothing to limit VA's authority to provide medically "needed" healthcare, including abortion, under other statutes. That result is particularly clear given Congress's stated intent to replace the prior patchwork regime of veterans' healthcare—of which the isolated abortion prohibition had been a part—with a uniform, comprehensive healthcare regime tied to medical judgment. Regardless, nothing in the statutory provision on which VA relies prohibits abortion counseling.

Nor did VA come close to meeting its steep burden to justify its elimination of abortion-related care as an appropriate exercise of discretion. To change its policy consistent with the Administrative Procedure Act, VA was required to provide "good reasons." And to change policy in the face of serious reliance interests, VA was required to provide even more: a "detailed justification." Those requirements are designed to protect individuals from constantly changing agency rules that can derail their lives. But VA never cited any evidence suggesting that abortion care and counseling are not medically "needed" under the factors VA must consider. Instead, all VA said was that it was reverting to its pre-2022 coverage regime. A description is not an explanation, no matter how many times it is repeated. To the extent VA

gestured at any reasoning, that reasoning turned on political and economic factors that VA may not consider when deciding whether care is "needed."

VA also shirked its legal obligation to consider the profound reliance interests at stake. Those interests go to what can be some of the most intimate and profound decisions a veteran makes about their life and health. Indeed, they are inextricably bound up in the very conduct that triggers VA's obligation of care: veterans often need abortion care and counseling precisely because of harms they have suffered as a result of their military service. It is not just arbitrary and capricious, but cruel, to deny the existence of reliance interests under those circumstances.

Perhaps most troubling, VA ignored the thousands of public comments explaining the devastating harms its new policy will inflict, comments that reflect VA's own prior findings. Medical professionals, expert organizations, and veterans' groups alike sounded the same warning: denying abortion care and abortion counseling will cause preventable deaths, irreversible physical and mental harm, and lasting economic deprivation. VA brushed these warnings aside by again simply insisting it could return to pre-2022 policy. And it suggested commenters' warned-of harms were overstated because VA's rule would not prohibit life-saving care. But as commenters also explained to VA, that exception is far too narrow and ambiguous to ensure that lives will actually be protected.

## STATEMENT OF THE ISSUES

1. Whether VA's determination that it lacks statutory authority to provide abortion care violates the Administrative Procedure Act.

2. Whether VA's discretionary decision to cease providing abortion care violates the Administrative Procedure Act.

3. Whether VA's discretionary decision to cease providing abortion counseling violates the Administrative Procedure Act.

## STATEMENT OF THE CASE

### A. VA's Statutory Authority To Provide Medical Care

VA, acting through the Veterans Health Administration (VHA), provides "a complete medical and hospital service for the medical care and treatment of veterans." 38 U.S.C. § 7301. Before 1996, "VA healthcare was subject to a patchwork of eligibility criteria, and care was largely linked only to service-connected conditions." Appx623; *accord* H.R. Rep. No. 104-690, at 4 (1996) (describing the "complex array of standards" previously "governing access to VA hospital and outpatient care"). One discrete authorization of care appeared in section 106 of the 1992 Veterans Health Care Act (VHCA). Section 106 gave VA discretion to provide pap smears, breast examinations, and "[g]eneral reproductive health care" for eligible veterans but restricted VA from offering "under this section infertility

services, abortions, or pregnancy care (including prenatal and delivery care)." Pub. L. No. 102-585, § 106, 106 Stat. 4947 (1992).

Given the "under this section" limitation, until last year, VA never interpreted section 106 as restricting VA's authority to provide those specified types of care under *other* statutory sections. In a 1993 VHA Directive discussing section 106, VA explained that its "General Counsel … clarified … that the exclusions in the law do not constitute a ban on the Secretary's authority to provide infertility or abortion services as otherwise authorized under 38 United States Code (U.S.C.) Chapter 17." Appx564. That interpretation is borne out by VA's longstanding coverage decisions. For instance, from 1977 to 1999, VA policy authorized "therapeutic … abortion" in certain circumstances, including as "treatment for, or correction of, a disability" and when "necessary to save the patient's life or health." Appx576. And in 1999, VA determined that "pregnancy and delivery services … should be included" and that "infertility services … should not be excluded" from the healthcare provided to veterans, notwithstanding section 106's prohibition on such services. Enrollment—Provision of Hospital and Outpatient Care to Veterans, 64 Fed. Reg. 54207, 54210 (Oct. 6, 1999).

In 1996, Congress passed the Veterans' Health Care Eligibility Reform Act (VHCERA). VHCERA replaced the former limited, patchwork healthcare-benefits regime with a comprehensive healthcare-provision regime. It required the Secretary

to "furnish hospital care and medical services which the Secretary determines to be needed" to any veterans with service-connected disabilities meeting various criteria. 38 U.S.C. § 1710(a)(1)-(2). Even outside of a service-connected disability, VHCERA granted the Secretary broad authority to "furnish hospital care, medical services, and nursing home care which the Secretary determines to be needed." *Id.* § 1710(a)(3). "Medical services" includes, in relevant part, "medical examination, treatment," "[s]urgical services," and "[p]reventive health services." *Id.* § 1701(6).

Congress intended VHCERA to be a complete overhaul of the veterans' healthcare system. It explained that VHCERA would "substitute a single, streamlined eligibility provision—based on clinical need for care—for the complex array of disparate rules currently governing veterans' eligibility for hospital and outpatient care." H.R. Rep. No. 104-690, at 13. That "clinically appropriate 'need for care' test" would "ensur[e] that medical judgment rather than legal criteria will determine when care will be provided and the level at which that care will be furnished." *Id.* at 4.

Starting in 1999, VA promulgated a regulation stating that a broad range of care, including but not limited to inpatient and outpatient "medical" and "surgical" care and "prescription drugs," would constitute a "medical benefits package." 38 C.F.R. § 17.38(a). Consistent with section 1710's textual directive, care listed in the medical benefits package would be provided "if it is determined by appropriate

health care professionals that the care is needed to promote, preserve, or restore the health of the individual and is in accord with generally accepted standards of medical practice." *Id.* § 17.38(b).

Finally, Congress has also authorized VA to provide medical care to the spouses and dependents of veterans who meet certain eligibility criteria. Under this beneficiaries program, known as CHAMPVA, VA must provide medical care "in the same or similar manner and subject to the same or similar limitations as medical care is furnished to certain dependents and survivors of active duty and retired members of the Armed Forces." 38 U.S.C. § 1781(a)-(b).

### B. VA Exercises Its Statutory Authority To Provide Abortion Care And Abortion Counseling

Beginning in 1999, VA excluded abortion care and abortion counseling from both the medical benefits package and the services provided through CHAMPVA. Appx623. VA "did not explain the rationale behind the exclusion of abortions and abortion counseling from the medical benefits package when it was established in 1999." Appx622. That said, "VA was aware that veterans of reproductive age enrolled in its health care system could access abortion services in their communities" consistent with *Roe v. Wade*. Appx622.

On September 9, 2022, VA issued an interim final rule amending its regulations to provide, for both veterans and CHAMPVA beneficiaries: (1) abortions when the life or health of the pregnant veteran or beneficiary would be

endangered if the pregnancy were carried to term, or when the pregnancy is the result of an act of rape or incest; and (2) abortion counseling. Appx621-630; Appx621. VA concluded that unless it "remove[d] its existing prohibitions on abortion-related care and ma[de] clear that needed abortion-related care is authorized, these veterans will face serious threats to their life and health." Appx622. While VA invited public comment on the interim final rule, it determined the rule should be implemented with immediate effect. It explained that, especially in light of the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 264 (2022), and ensuing "abortion bans and restrictions on care," delaying abortion care during the notice-and-comment period "would increase the risk to" individuals' "health and lives and put care out of reach for some pregnant veterans and CHAMPVA beneficiaries entirely." Appx622, Appx630.

VA determined that abortion care and counseling were both "needed" based on a comprehensive review of medical evidence regarding the serious health risks pregnancy can impose and the accepted standards of care. VA cited national survey data showing the high "U.S. mortality rate associated with live births"—a mortality rate that had "increased staggeringly" over the years. Appx625. That data "identified the factors that likely contributed to this rising maternal mortality rate" as "including reduced access to family planning and reproductive health services through abortion clinic closures and legislation restricting abortions based on

gestational age." Appx625. VA also noted the multiple conditions or diseases that pregnancy can either cause or exacerbate, such as "severe preeclampsia," "intrauterine infections," and "renal or cardiac disease." Appx625. And it cited evidence from the American College of Obstetricians and Gynecologists and Physicians for Reproductive Health supporting the conclusion that under some circumstances, "abortion[] is the only medical intervention that can preserve a patient's health or save their life." Appx625.

VA emphasized the health risks that veterans in particular often face in pregnancy. Among other things, "[v]eterans of reproductive age … have high rates of chronic medical and mental health conditions that may increase the risks associated with pregnancy," including "chronic post-traumatic stress disorder, severe hypertension, and chronic renal disease." Appx625. Those conditions can heighten the risk of pregnancy-induced harms such as "hemorrhage, placenta accreta spectrum, and peripartum hysterectomy"—some of which can impact future fertility. Appx625. For all those reasons, VA concluded, "research supports the conclusion that an abortion may be needed to save the life or preserve the health of a veteran" under the governing statutory and regulatory standards. Appx625.

VA further explained why abortions are "needed" care when a pregnancy is the result of rape or incest. It noted that "[t]here are severe health consequences associated with being forced to carry a pregnancy that is the result of rape or incest

to term, including constant exposure to the violation committed against the individual which can cause serious traumatic stress and a risk of long-lasting psychological conditions such as anxiety and depression." Appx626. VA found that "[t]hose mental health consequences have a unique impact on veterans, who report higher rates of sexual trauma compared to their civilian peers." Appx626. "Moreover, veterans are also more likely to have preexisting mental health conditions that would be compounded by the mental health consequences of being forced to carry a pregnancy to term if that pregnancy is the result of rape or incest." Appx626.

VA also explained why abortion counseling was needed as "a component of comprehensive, patient-centered, high quality reproductive health care both as a responsibility of the provider and a right of the pregnant veteran." Appx626. Again relying on prevailing research, VA identified three purposes served by abortion counseling: "(1) to aid a pregnant individual in making a decision about an unwanted pregnancy, (2) to help the pregnant individual implement the decision, and (3) to assist the pregnant individual in controlling their future fertility." Appx626. It found that "[s]tudies have shown that individuals have limited knowledge about the safety and risks of abortion" and that "[p]roviding veterans with accurate information about abortions is needed to ensure that they can make informed decisions about their health care." Appx626.

VA likewise determined that it was medically necessary and appropriate to provide the same abortion-related care to CHAMPVA beneficiaries, particularly given VA's mandate to provide similar care to such beneficiaries. Appx622-625.

VA grounded its authority to issue the interim final rule in section 1710's instruction to furnish eligible veterans with medical services that the Secretary "determines to be needed." Appx622. VA explained that section 106 of the VHCA did not limit its authority to provide that care. Section 106 "limited only the services provided 'under this section,' meaning that while section 106 barred the provision of any abortion or infertility service under section 106 of the VHCA, it did not limit VA's authority to provide such services under any other statutory provision such as 38 U.S.C. 1710 or 38 U.S.C. 1712." Appx623. VA observed that it had "consistently interpreted section 106 in this fashion." Appx623. VA further stated that section 1710's broad grant of treatment authority, enacted through VHCERA in 1996, "effectively overtook section 106" because the purpose of section 1710 "was to replace the old system with a system where an enrolled veteran could receive whatever medical care and services are deemed needed." Appx623. VA pointed to the fact that after VHCERA, pregnancy and infertility services were included in the medical benefits package, notwithstanding that section 106 excluded that care. Appx623. VA also noted that Congress had ratified this interpretation of section 106: in 2020, Congress passed the Deborah Sampson Act, which defined "health

care" for women veterans by reference to the "medical benefits package"—a package that "included services that were excluded from the coverage of Section 106." Appx623.

Shortly after publication of the interim final rule, the Department of Justice's Office of Legal Counsel (OLC) issued an opinion confirming VA's statutory authority to provide abortion-related care. Appx631-640. OLC explained that VA has "broad discretion" to determine what care is "needed" under section 1710, and that VA had "reasonably exercised its discretion in the rule." Appx639. OLC also confirmed that section 106 did not limit that authority because its prohibitions applied only to services "under [that] section." Appx637 (alteration in original).

On March 4, 2024, VA finalized the interim final rule without changes. Appx641-664. VA considered and addressed comments asserting that it lacked statutory authority to provide abortion-related care. Among other things, VA reiterated that section 106 did not limit its authority to provide abortion care, relying on the text of section 106 and section 1710 as well as past congressional and VA actions. Appx644-647.

### C. Three Years Later, VA Reverses Course By Eliminating Abortion Care And Abortion Counseling

Less than three years later, VA abruptly reversed course and proposed a rule that would eliminate virtually all abortion care and counseling—even in cases of rape or incest, and even when such care would be necessary to preserve the health

of the pregnant person. Appx1097-1099. VA did not address the medical and scientific evidence discussed in the 2022 interim final rule and 2024 final rule supporting the medical necessity of abortion care and abortion counseling. Instead, VA repeatedly stated that it was reverting to pre-2022 policy, without citing any evidence supporting that earlier policy. Appx1097-1099. In certain respects, VA appeared to interpret section 1710's "needed" standard as tied to taxpayer funding: "[c]onsiderations about whether abortion is 'needed' for purposes of VA-provided services necessarily involves the question of whether taxpayers should pay for abortion." Appx1098. VA also suggested that abortion care was not "needed" because of the purportedly low number of abortions administered by VA in 2023 and 2024. Appx1098.

The proposed rule expressed doubt as to whether VA had statutory authority to provide abortion care in light of section 106. Appx1098. At the same time, however, VA acknowledged that "the wholesale revision of Chapter 17 in 1996 and the specific limitations of section 106 may limit the continued force and effect of section 106." Appx1098. Accordingly, VA did not purport to rely on statutory authority or lack thereof for its proposed rule.

The public—individuals and organizations alike—submitted over 20,000 comments, the clear majority of which opposed the proposed rule. Appx1496 (12,086 out of 18,395 relevant comments from unique non-employee senders with

an identifiable stance opposing proposed rule); *e.g.*, Appx1100-1461. Many commenters explained that VA was incorrect to suggest that section 106 bars all abortion care. *E.g.*, Appx1126-1127; Appx1234-1238; Appx1240-1241; Appx1272-1275; Appx1262-1264; Appx1350-1351; Appx1375-1376. They also noted that VA had failed to meet its legal obligation to provide a reasoned explanation for its drastic change in policy. *E.g.*, Appx1129-1131; Appx1242-1246; Appx1277-1279; Appx1233-1234; Appx1263; Appx1340-1342; Appx1118; Appx1149; Appx1392-1393. And they argued that VA had similarly failed to meet its legal obligation to weigh the profound reliance interests at stake: countless individuals and families had depended on VA's prior policy to inform some of the most consequential and personal decisions of their lives. *E.g.*, Appx1221-1222; Appx1156-1157; Appx1279; Appx1144-1145; Appx1118.

Beyond highlighting VA's legal errors, commenters explained the severe harms that would result from a ban on abortion care and counseling. In the words of a coalition of 21 state attorneys general, the inevitable "delays or denials of care" resulting from such a ban "will be a death sentence for some veterans and their family members." Appx1342. Professional medical organizations explained that distinguishing between a life-saving abortion and a health-saving abortion was often impossible, such that a prohibition on the latter will cause pregnant people to needlessly die—and indeed already has caused those preventable deaths in states

with parallel bans. *E.g.*, Appx1292-1293; Appx1383-1384; Appx1199; Appx1253-1254; Appx1161-1162; Appx1362-1363. "Even when life is not immediately threatened, delayed or denied access" to needed abortion care can result in lifelong harms like "permanent organ damage, loss of fertility, chronic pain, psychiatric morbidity, and functional impairment." Appx1261; *accord* Appx1304-1305; Appx1203-1204.

As to the ban on abortion in cases of rape or incest, commenters explained that forcing someone to carry such a pregnancy to term would "compound the trauma stemming from the sexual assault, as well as compound existing mental conditions or cause new mental health consequences, such as anxiety, depression, or PTSD." Appx1225. Those harms would be widespread, particularly given that a staggering one in three women veterans experience military sexual trauma during their service. Appx1153. And commenters described the economic havoc that would be wrought by the proposed rule. "When people are denied the abortion care they seek, they can face devastating consequences to their financial well-being, job security, workforce participation, and earnings"; indeed, people denied abortions are more likely to live in poverty even years after the denied abortion. Appx1282; *accord* Appx1204. Those economic harms spread to the children and families of affected individuals. Appx1204; Appx1282-1283; Appx1117; Appx1140.

Undeterred, VA finalized the proposed rule without changes on December 31, 2025 (Final Rule). Appx1-19; *see* Appx563-1096; Appx1462-1516 (documents VA relied on in its rulemaking). In that Final Rule, VA relied heavily on an OLC opinion that had been published two weeks earlier (2025 OLC opinion), which reversed course from the 2022 OLC opinion by concluding that section 106 prohibited VA from providing abortion care. Appx1-2; *see* Appx20-32. The 2025 OLC opinion was silent on VA's statutory authority to provide abortion counseling.

The Final Rule also stated that even if VA had statutory authority to provide abortion care, "the Secretary has determined that VA will not provide abortion or abortion counseling under that authority." Appx2. Like the proposed rule, the Final Rule cited no medical or scientific evidence suggesting that abortion care or abortion counseling was not "needed." Nor did it discuss any of the medical evidence regarding the health risks of pregnancy and benefits of abortion counseling that VA's prior rule had relied on. Instead, VA repeatedly justified its action—and responded to concerns raised in comments—by stating that it was simply reverting to pre-2022 policy. Appx1-19.

In both the proposed rule and the Final Rule, VA took the position that its new policy did not prohibit procedures that were necessary to save the life of a pregnant veteran or beneficiary. Citing only the 2025 OLC opinion, the Final Rule's preamble stated that "procedures necessary to save the life of the pregnant veteran (such as

treatment for ectopic pregnancies or miscarriages) are not considered 'abortions' within the meaning of section 106 and therefore remain permissible."[1] Appx2. VA codified this life-endangerment exception in the CHAMPVA regulation, but despite commenters' objections, did not codify the same exception in the veteran medical benefits package. Appx2, Appx4.

### D. Petitioner Minority Veterans of America Brings This Action On Behalf Of Its Members Who Are Adversely Affected By The Final Rule

Petitioner Minority Veterans of America (MVA) is a non-profit organization whose mission is to create belonging and advance equity and justice for the nation's most marginalized and historically underserved veterans, including by ensuring that minority veterans receive comprehensive and equitable access to VA healthcare and benefits worthy of the profound sacrifices they have made in service to this country. Decl. of Lindsay Church (Church Decl.), Pet. for Review, Dkt. 1-2, ¶¶7-11.

MVA has over 3,600 members across 49 states and the District of Columbia. Church Decl. ¶¶5-6. Many of those members would have standing to challenge the Final Rule in their own right: they have suffered or will suffer an injury traceable to the Final Rule that will be redressed by a favorable decision, because they currently are seeking, or in the future may seek, abortion care or counseling. *Id.* ¶¶17-22. For

[1] The 2025 OLC opinion does not rely on medical evidence and cites only a single academic article for the proposition that life-saving measures should not be defined as "abortions." Appx22.

instance, several MVA members receive medical care through VA and suffer from chronic injuries or illnesses such that pregnancy would pose severe risks to their health. *Id.* ¶¶18-20, 22. Yet they remain unable to discuss their pregnancy options with VA providers and would be unable to obtain the care they need to preserve their health should those risks arise. *Id.* ¶¶18-20, 22. These risks are especially acute for MVA members who are currently pursuing fertility treatment to become pregnant. *E.g.*, *id.* ¶21.

Many MVA members are particularly vulnerable to harm from the Final Rule given the well-documented increased risks in adverse pregnancy outcomes for certain minority women. Appx1220-1224. For instance, the maternal mortality rate for Black women is over three times higher than that for white women, and their severe maternal morbidity rate—that is, "unexpected outcomes of labor and delivery that can result in significant short- or long-term health consequences"—is over twice as high. Appx1222. Overall, Black veterans have 69% higher odds of experiencing an adverse maternal event than white veterans. Appx1329.

The Final Rule is germane to MVA's mission to secure comprehensive and equitable healthcare for its members. MVA pursues this mission through legal advocacy, engagement in the rulemaking process, and congressional testimony—including advocacy opposing the Final Rule. Church Decl. ¶¶9, 15-16; *see* Appx1220-1230; Minority Veterans of America, *Legislative Priorities of Minority*

*Veterans of America for the 119th Congress* (Mar. 3, 2026).[2] Neither MVA's claim nor the relief requested requires participation of individual MVA members.

## SUMMARY OF ARGUMENT

In issuing the Final Rule, VA violated the Administrative Procedure Act in multiple respects. The Final Rule should be set aside.

I. VA abused its discretion because its threshold determination that it lacks statutory authority to provide abortion care rests on an erroneous interpretation of law. In 1996, Congress enacted VHCERA to replace the prior patchwork structure of veterans' healthcare coverage with a single, comprehensive regime under which VA furnishes any "hospital care" or "medical services" the Secretary "determines to be needed." 38 U.S.C. § 1710(a). Congress was explicit that under this standard, "medical judgment rather than legal criteria" should govern care decisions. H.R. Rep. No. 104-690, at 4. VA's regulations thus provide that a broad range of care in the medical benefits package will be provided to individuals if healthcare professionals determine that care "is needed to promote, preserve, or restore the health of the individual" and is "in accord with generally accepted standards of medical practice." 38 C.F.R. § 17.38(a)-(b). And VA has expressly stated that "medically needed" should be interpreted according to this "promote, preserve or

---

[2] https://perma.cc/4TJB-R4KA.

restore" standard. 64 Fed. Reg. at 54210. As VA found in 2022 based on extensive medical evidence, abortion care plainly satisfies that standard.

Section 106 of the 1992 VHCA does not limit that authority. By its plain text, section 106 restricts only care provided "under this section"—not care provided under other statutory provisions such as section 1710. That conclusion is compelled by the statutory text, multiple canons of construction, and legislative history. Congress has repeatedly ratified the understanding that VA may, under other sections, provide care that section 106 purported to exclude, such as fertility treatment and prenatal services. Moreover, VHCERA's comprehensive regime overtakes any force that section 106 may have previously had beyond its bounds, because it covers the entire subject matter of section 106 and was expressly intended to replace the piecemeal statutory framework that preceded it.

II. In addition to VA's threshold legal error, the Final Rule's wholesale elimination of abortion care is arbitrary and capricious for multiple independent reasons.

First, VA offered no reasoned explanation—much less the "good reasons" it must provide—for its drastic reversal. In 2022, VA made extensive factual findings, grounded in medical evidence and related data, that abortion care is critically needed to preserve veterans' health and, often, to save their lives. The Final Rule cites no medical or scientific evidence to the contrary. Instead, VA states over and over that

it is reverting to pre-2022 policy. But a description of agency action is not an explanation for it. To the extent VA gestured at other justifications—including political divisiveness and taxpayer-funding concerns—those are legally irrelevant under section 1710's medically focused "needed" standard.

Second, VA shirked its obligation to weigh the profound reliance interests engendered by its prior policy. Countless veterans structured their intimate relationships, family-planning decisions, and healthcare around the availability of abortion care and counseling. That care touches on what may be the most sensitive and consequential aspects of veterans' lives—and is often required precisely because of the physical and mental burdens that veterans incur during their service. Yet VA deemed those interests categorically irrelevant based on: a legally unsupported view that VA's prior policy was not in place long enough to establish reliance; purportedly low utilization rates that inaccurately measure the true scope of reliance; and the Supreme Court's unrelated *stare decisis* analysis in *Dobbs*. Each rationale fails.

Third, VA failed to adequately respond to the thousands of public comments explaining the legal and factual problems with VA's new policy—not to mention the devastating harms it would cause. Most saliently, commenters (including leading medical organizations, veterans' groups, and members of Congress and state government) warned the Final Rule would cause pregnant veterans to needlessly suffer permanent harms and even to die. Again, VA brushed those comments aside

by invoking prior policy; again, that is not enough. At times, VA responded to comments by stating that the Final Rule would not prohibit life-saving measures. But as commenters made clear, that "life-saving" exception is ambiguous, unworkable, and will not prevent deaths or permanent harms. And regardless, such an exception does nothing to explain why health-saving abortions, or abortions in the case of rape or incest, are not medically "needed." Commenters also pointed out fundamental problems in VA's reasoning, including a flawed Regulatory Impact Analysis. VA's only response was to describe what it had done. But it is "hardly sufficient" to "merely explain[] what has been done, not why it was done." *Comité de Apoyo a los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 188 (3d Cir. 2014).

III. The Final Rule's elimination of abortion counseling independently violates the APA. The Final Rule never concluded—nor could it—that VA was statutorily prohibited from providing abortion counseling. Yet VA eliminated abortion counseling with no reasoned explanation, no engagement with its prior factual findings that such counseling is a medically necessary component of healthcare, no consideration of reliance interests, and no meaningful response to significant comments. As those comments explained, the ban on counseling violates medical ethics, precludes informed decisionmaking, harms mental-health outcomes, and creates dangerous ambiguity that will chill even allowed care. VA made no

effort to account for those harms, much less tie its determination to section 1710's medically focused "needed" standard.

## STANDARDS OF REVIEW

This Court reviews petitions under 38 U.S.C. § 502 "in accordance with the standard set forth in the Administrative Procedure Act" (APA). *Metro. Area EMS Auth. v. Sec'y of Veterans Affs.*, 122 F.4th 1339, 1343 (Fed. Cir. 2024). Under the APA, courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Paralyzed Veterans of Am. v. Sec'y of Veterans Affs.*, 345 F.3d 1334, 1339 (Fed. Cir. 2003); 5 U.S.C. § 706(2). The Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016). In deciding whether an agency has exceeded its statutory authority, the Court reviews the agency's statutory interpretation without deference. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024).

## ARGUMENT

### I. VA ABUSED ITS DISCRETION IN CONCLUDING IT LACKS STATUTORY AUTHORITY TO PROVIDE ABORTION CARE

VA's determination that it lacks statutory authority to provide abortion care is an abuse of discretion because it rests on an erroneous statutory interpretation. *Daiichi Sankyo Co. v. Lee*, 791 F.3d 1373, 1379 (Fed. Cir. 2015) ("An agency abuses

its discretion when its decision is based on an erroneous interpretation of the law."). VHCERA's statutory text, accompanying regulations, and legislative history all point to one conclusion: VA has the authority to provide any healthcare that it deems "needed"—an inquiry that turns on medical judgment, not legal, political, economic, or other factors. VA properly applied that standard, and lawfully acted within its statutory authority, when previously determining that abortion care was "needed."

Section 106 of the VHCA does not limit that authority. Section 106 restricts only care provided "under this section." Whether this Court looks to section 106's plain text, applies well-settled canons of construction, or consults precedent and legislative history, the result is the same: section 106 does not limit VA's authority to provide care under other statutory sections, such as section 1710. Were that not enough, 1996's VHCERA overtakes any limiting force section 106 might have previously had because it covers the entire subject matter of section 106 and Congress intended VHCERA to be a comprehensive overhaul of the veterans' healthcare scheme.

### A. VA Has Statutory Authority To Provide Any Medical Care That It Determines To Be "Needed," Including Abortion Care

Congress enacted VHCERA to replace the "complex array of disparate rules" that had previously governed veterans' eligibility for healthcare with "a single, streamlined eligibility provision" that is "based on clinical need for care." H.R. Rep. No. 104-690, at 13. Congress's stated goal was to ensure that "medical judgment

rather than legal criteria will determine when care will be provided and the level at which that care will be furnished." *Id.* at 4.

To accomplish that goal, Congress granted VA authority to furnish to all veterans (subject to criteria not relevant here) any "hospital care, medical services, and nursing home care which the Secretary determines to be needed." 38 U.S.C. § 1710(a)(3). That obligation becomes mandatory in the case of veterans with service-connected disabilities, for whom VA "shall" furnish any care the Secretary determines to be "needed." *Id.* § 1710(a)(1)-(2). The scope of the "medical services" VA may or must provide is not limited: it broadly includes any "medical examination, treatment," "[s]urgical services," and "[p]reventive health services." *Id.* § 1701(6). "Hospital care" is similarly expansive, covering any "medical services rendered in the course of the hospitalization of any veteran." *Id.* § 1701(5). There is no dispute that abortion care falls under these definitions of "medical services" or "hospital care." As this Court has recognized, VHCERA thus gives VA "broad discretion to determine the precise hospital or medical services to be supplied." *E. Paralyzed Veterans Ass'n v. Sec'y of Veterans Affs.*, 257 F.3d 1352, 1362 (Fed. Cir. 2001).

Consistent with that sweeping—yet medically focused—statutory grant of authority, VA regulations state that care will be provided to individuals whenever a healthcare professional determines it "is needed to promote, preserve, or restore the

health of the individual and is in accord with generally accepted standards of medical practice." 38 C.F.R. § 17.38(b). And VA has expressly tied that criterion to the statutory "needed" standard, explaining that "medically needed constitutes care that is determined by appropriate healthcare professionals to be needed to promote, preserve, or restore the health of the individual and to be in accord with generally accepted standards of medical practice" and that "[t]he care included in the proposed 'medical benefits package' is intended to meet these criteria." 64 Fed. Reg. at 54210. Thus, abortion care is "needed," and therefore properly provided under VHCERA, so long as healthcare professionals deem such care necessary for an individual's health and that care is in accordance with prevailing standards of care.

As VA has already determined, both those requirements are amply met for abortion when the life or health of a pregnant veteran is in danger or in cases of rape or incest. In its 2022 interim final rule, VA thoroughly surveyed medical evidence and other relevant data and concluded that abortion care is critically necessary to preserve veterans' health, particularly given the high and rising U.S. maternal mortality rate and the vulnerability of veterans with chronic medical and mental health conditions that exacerbate the health risks associated with pregnancy. Indeed, sometimes "abortion[] is the *only* medical intervention that can preserve a patient's health or save their life." Appx625 (emphasis added). VA further found that abortion care is "needed" when a pregnancy results from rape or incest, given the

severe and long-lasting psychological consequences of being forced to carry such a pregnancy to term—consequences that are compounded by veterans' higher rates of sexual trauma and preexisting mental health conditions. And VA determined that abortion counseling was "needed" as a component of comprehensive, patient-centered reproductive healthcare to ensure that veterans can make fully informed decisions about their healthcare. *Supra* pp.9-10. In making those decisions, VA acted well within its statutory authority.

### B. Section 106 Of The VHCA Does Not Prohibit VA From Providing Abortion Care

The Final Rule concluded that VA's "discretionary authority" to provide abortion care "is constrained by section 106 and cannot be exercised to override the statutory prohibition." Appx2. That misinterpretation of law is an abuse of discretion.

#### *1. The plain text of section 106 prohibits only certain types of care administered "under this section"—not under other statutory provisions*

The plain text of section 106 precludes VA's sweeping interpretation of it. *Lackey v. Stinnie*, 604 U.S. 192, 199 (2025) ("When interpreting a statute, we begin with the text."). On its face, section 106 prohibits only abortion care that is administered "under this section." § 106, 106 Stat. 4947. That language does not limit VA from providing abortion care under other statutory sections, including section 1710's broad authorization for VA to provide any "needed" medical care.

38 U.S.C. § 1710(a)(3). Multiple courts interpreting similar statutory language have reached the same conclusion: references to "this section" describe the section at issue—no more and no less. *See, e.g.*, *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 74 (D.C. Cir. 2015) ("the phrase 'this section' plainly refers to section 3345 in its entirety"); *Chan Healthcare Grp., PS v. Liberty Mut. Fire Ins. Co.*, 844 F.3d 1133, 1138-39 (9th Cir. 2017) ("[B]ecause the statute uses the phrase 'under *this* section,' it refers to the statutory section in which the language appears, namely, § 1453. This approach fits with the way the word 'section' is used in common parlance and the normal meaning that legal dictionaries ascribe to it.") (emphasis in original); *Wayside Church v. Van Buren Cnty.*, 847 F.3d 812, 819 (6th Cir. 2017) ("It is clear from the text that the Michigan legislature used the term 'act' to refer to the entire GPTA and the term 'section' to refer to the more specific provisions in the act."), *overruled on other grounds by Knick v. Twp. of Scott*, 588 U.S. 180, 204-05 (2019); *Perry v. First Nat'l Bank*, 459 F.3d 816, 820 (7th Cir. 2006) ("It is only logical to assume, then, that Congress was referring to section 1681m when it used 'this section' in § 1681m(h)(8).").

Beyond the plain text, ordinary "canons of statutory construction" confirm this straightforward result. *See Metro. Area*, 122 F.4th at 1345. Section 106 begins by listing the types of women's health services that VA may provide "[i]n furnishing hospital care and medical services under chapter 17 of title 38." § 106, 106 Stat.

4947. It then goes on to carve out "*under this section* infertility services, abortions, or pregnancy care." *Id.* (emphasis added). And it instructs the Secretary to identify and assess opportunities to "expand the availability of, and access to, health care services for women veterans under sections 1710 and 1712 of title 38." *Id.* By using the three distinct phrases "chapter 17," "section[] 1710," and "this section," Congress signaled that the phrase "this section" meant something different than either "chapter 17" or "section 1710." *See Pulsifer v. United States*, 601 U.S. 124, 149 (2024) (describing "meaningful-variation" canon instructing that "different terms usually have different meanings"); *cf. Wayside*, 847 F.3d at 819.

VA's reading of "under this section" violates another rule of statutory construction: the duty to "give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001). If section 106's prohibition on care were read to extend to other "section[s]" of chapter 17, the statutory phrase "under this section" would improperly be rendered "meaningless" or "mere surplusage." *Sharp v. United States*, 580 F.3d 1234, 1238 (Fed. Cir. 2009).

This Court has applied these interpretive principles to set aside a similarly erroneous VA statutory construction. In *Metropolitan Area EMS Authority v. Secretary of Veterans Affairs*, VA promulgated a rule that relied on interpreting the statutory language "to or from a Department facility" as extending to transportation to or from non-Department facilities—even though a separate subsection of the

relevant statute used the broader phrase "to or from a Department facility or other place." 122 F.4th at 1344-45. The Court held that Congress's decision to use the narrower phrase "to or from a Department facility" was deliberate and that VA's conflation of those two phrases exceeded its statutory authority. *Id.* at 1345-46. The same logic applies here: VA may not read section 106's phrase "under this section" as barring care under other provisions of chapter 17, including section 1710, when section 106 expressly describes that chapter and that section using different terminology. And to the extent there is any interpretative doubt, such "doubt is to be resolved in the veteran's favor." *Brown v. Gardner*, 513 U.S. 115, 117-18 (1994).

The legislative history confirms this statutory reading. *See Metro. Area*, 122 F.4th at 1345 (court considers "legislative history" in addition to statutory text). In the Joint Explanatory Statement on 1992's VHCA, Congress laid out the "compromise agreement" that resulted in section 106 and explained that "[t]he inclusion of the phrase 'under this section' underscores the intent of the Committees not to limit such authority as the Secretary may have to provide any infertility services under Chapter 17." 1992 U.S.C.C.A.N. 4186, 4189-90. Because section 106's prohibition on infertility services is phrased the same way as its prohibition on abortion care, it follows that Congress similarly intended not to limit VA's authority to provide abortion care under chapter 17. *See also supra* p.5 (describing VA's similarly limited interpretation of section 106).

Finally, Congress has repeatedly ratified VA's prior, consistent position that section 106 does not limit its authority to provide certain types of medical care. Starting in 2016, Congress authorized VA to use medical services funds to provide "fertility counseling and treatment using assisted reproductive technology"—treatment that section 106 expressly prohibits. *See* Pub. L. No. 114-223, § 260, 130 Stat. 857, 897 (2016). And in 2020, Congress passed the Deborah Sampson Act, which defined "health care" for women veterans by reference to VA's "medical benefits package"—a package that included services that were excluded from the coverage of section 106, such as prenatal and delivery services. 38 U.S.C. § 7310 note. Had Congress believed section 106 prohibited VA from providing that care under all circumstances, it would not have endorsed the scope of healthcare set out in the medical benefits package, would not have authorized funds for those services, or would have repealed section 106 when passing legislation approving of those services. Congress's repeated choice to not "revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Young v. Cmty. Nutrition Inst.*, 476 U.S. 974, 983 (1986).

#### ***2. Regardless, VHCERA's comprehensive regime overrides any prohibition section 106 may have previously imposed on abortion care***

The conclusion that section 106 does not preclude VA's authority under section 1710 is bolstered by the fact that VHCERA—the Act that amended section

1710 to authorize VA to provide any "needed" healthcare—was designed to be a comprehensive overhaul of veterans' healthcare. In passing VHCERA, Congress sought to "substitute a single, streamlined eligibility provision—based on clinical need for care—for the complex array of disparate rules currently governing veterans' eligibility for hospital and outpatient care." H.R. Rep. No. 104-690, at 13. VHCERA's preamble reflects this purpose: "To amend title 38 … to reform eligibility for health care provided by the Department of Veterans Affairs … , to improve administration of health care … , and for other purposes." Veterans' Health Care Eligibility Reform Act, Pub. L. No. 104-262, 110 Stat. 3177 (1996) (preamble).

The text of post-VHCERA section 1710 thus gives VA broad authority to provide veterans with any "medical services" or "hospital care" that the Secretary determines to be "needed," without limitation. 38 U.S.C. § 1710(a). When Congress expresses the "intent that … piecemeal legislation … be done away with and a uniform law passed," and when that later uniform law covers the entire subject matter of the earlier legislation, courts will deem the later law to have overtaken the earlier law. *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1445-46 (D.C. Cir. 1988) (holding that where a statute "cover[ed] the whole subject of … earlier legislation," it "would be absurd to hold that isolated portions of" earlier statutes "survive[d]"). That is precisely what VA concluded in 2022: that VHCERA "overtook section 106." Appx623.

This Court has recognized that a comprehensive statutory regime covering the entire subject of an earlier statute displaces that earlier statute. In *Foreman v. United States*, a taxpayer claimed entitlement to an unlimited exclusion for foreign earned income under section 11(c) of the Revenue Act of 1962. 60 F.3d 1559, 1562-63 (Fed. Cir. 1995). The problem for the taxpayer was that in 1978, Congress enacted the Foreign Earned Income Act, which "completely revamped the way foreign earned income was taxed" by replacing the prior exclusion framework with an entirely new regime. *Id.* at 1563. Although that act did not expressly repeal section 11(c), this Court held that section 11(c) was implicitly repealed because the 1978 Act "cover[ed] the whole situation of the earlier one and [was] clearly intended as a substitute." *Id.*

The Third Circuit has held the same. In *Tineo v. Ashcroft*, the court considered whether section 101(a)(13) of the Immigration and Nationality Act, under which lawful permanent residents could avoid "entry" classification if their departure was "innocent, casual, and brief," survived the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). 350 F.3d 382, 384-85 (3d Cir. 2003). It concluded the answer was "no." The court explained that the IIRIRA "made sweeping changes to the immigration laws" and represented "a new and comprehensive statutory regime intended to replace § 101(a)(13) of the INA." *Id.* at 385, 393. Of particular importance to the court was that "the presumption of entry

which was a central feature of the prior statute" was reversed by the IIRIRA in favor of the lawful permanent resident, who would not be regarded as seeking entry unless specifically delineated criteria applied. *Id.* at 386.

Other courts of appeals have similarly treated an earlier statute as inoperative when a later statute covers its entire subject matter and is intended as a substitute for the earlier one. *See*, *e.g.*, *Ctr. for Investigative Reporting v. U.S. Dep't of Just.*, 982 F.3d 668, 682-84 (9th Cir. 2020) (holding that a later appropriations rider implicitly repealed earlier ones when it "'cover[s] the whole subject of the' matters discussed in" the earlier riders). Underscoring the point, the Supreme Court has reiterated the "established" nature of the "rule that a later adopted provision takes precedence over an earlier, conflicting provision of equal stature." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 519 (2019) (citing *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936)).

The same conclusion follows here. Section 106 was enacted in 1992 as part of a patchwork regime under which VA's authority to provide medical care was fragmented and subject to various limitations and exceptions. *Supra* pp.4-6. In 1996, VHCERA replaced that regime with a comprehensive new system authorizing VA to furnish any "medical services" or "hospital care" that the Secretary "determines to be needed"—an authority that necessarily encompasses and substitutes for section 106's more narrowly described types of care. 38 U.S.C. §

1710(a). And, like in *Tineo*, VHCERA reversed the earlier presumption of limited care with a broad presumption that any and all "needed" care could (or must) be provided. Continuing to apply section 106's blanket prohibition on certain types of care would run afoul of Congress's instruction, reflected in both section 1710's text and history, that medical judgment should determine individual care decisions under all circumstances.

## II. VA'S DISCRETIONARY DECISION NOT TO PROVIDE ABORTION CARE IS ARBITRARY AND CAPRICIOUS

The Final Rule concluded that "[e]ven if such discretion" to provide abortion care "were available, the Secretary has determined that VA will not provide abortion[s] … under that authority." Appx2. That conclusion cannot survive APA review either, for multiple independent reasons.

The "well-worn arbitrary-and-capricious standard ensures that an administrative agency examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025) (quotation marks and alterations omitted). VA fell far short of these basic requirements. It failed to justify its drastic change in position, both by offering no reasoned explanation for that change and by ignoring the weighty reliance interests engendered by the former policy. And it failed to meaningfully respond to the abundance of public comments that not only pointed out the numerous

flaws in VA's reasoning, but also explained that VA's proposed rule would cause devastating harms—including the preventable deaths of pregnant people. VA's cavalier actions violated the APA and abandoned the agency's obligation to provide care to some of the most vulnerable members of this country.

### A. VA Failed To Justify Its Change In Position

When an agency changes its position, it must (1) "provide a reasoned explanation for the change"; (2) "display awareness that" it is "changing position"; and (3) "consider serious reliance interests." *White Lion*, 604 U.S. at 568 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). These requirements "orbit around" the "basic concern" that "an agency should not mislead regulated entities." *Id.* at 567. In particular, they are designed to protect "ordinary people" from "suffer[ing] … regulatory whiplash" from ever-shifting agency policies, *Loper Bright*, 603 U.S. at 438-39 (Gorsuch, J., concurring)—a concern that carries special force here. In failing to meet these requirements, VA failed to protect the veterans it is obligated to serve from those harms.

#### *1. VA failed to provide a reasoned explanation for its change in position*

To satisfy the "reasoned explanation" requirement, "the agency must show that there are good reasons for the new policy." *Fox Television*, 556 U.S. at 515. The standard is even higher when a "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has

engendered serious reliance interests." *Id.* In that circumstance, the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* Yet at each point VA was required to explain its reasoning, it simply stated that it was reverting to pre-2022 policy. A description of agency action, even if repeated a dozen times, does not satisfy the explanation requirement.

In the 2022 interim final rule and 2024 final rule, VA made extensive factual findings as to why abortion care was medically "needed" under section 1710. *Supra* pp.8-10. Yet the 2025 Final Rule fails to provide any explanation for VA's departure from those findings—much less "good reasons." VA cited no relevant data, such as medical or scientific evidence, suggesting that abortion care was not "needed to promote, preserve, or restore the health of" veterans and beneficiaries or was not "in accord with generally accepted standards of medical practice." 38 C.F.R. § 17.38(b); Appx1-19. Nor did it indicate whether or why it was departing from its longstanding determination that "medically needed constitutes care that is determined by appropriate healthcare professionals to be needed to promote, preserve, or restore the health of the individual and to be in accord with generally accepted standards of medical practice." 64 Fed. Reg. at 54210. And VA did not even attempt to rebut the ample evidence cited in the 2022 interim final rule and 2024 final rule explaining that health-saving abortion care and abortion care in cases of rape or incest are

needed under those governing standards, particularly post-*Dobbs* and particularly for veterans.

VA's lack of reasoned explanation is made worse by the fact that VA was put on notice of this problem by the public. As VA acknowledged, a multitude of comments "alleged that the proposed rule failed to provide a reasonable explanation" for VA's policy change "that considered prior evidence," such as the 2022 interim final rule's citation of medical evidence about the health risks of pregnancy. Appx9. Worse yet, VA recognized that the law requires it to establish "good reasons" for a change in position. Appx9 (citing *Fox Television* and *White Lion*). Yet VA patently failed to comply with that law, instead stating that it satisfied that demanding standard on the following perfunctory basis:

> VA explained in its proposed rule that it was rescinding the 2022 and 2024 rules pursuant to its authority in 38 U.S.C. 1710 to furnish hospital care and medical services that the Secretary determines to be needed and to restore VA's medical benefits package to its pre-September 9, 2022 state. Similarly, VA explained in its proposed rule that it was rescinding the 2022 and 2024 rules pursuant to its authority in 38 U.S.C. 1781 and to restore its CHAMPVA coverage to its pre-September 9, 2022 state. This rationale provided for these proposed changes to the medical benefits package and CHAMPVA conforms to the standard under which an agency may subsequently change its position on prior rulemakings.

Appx9.

That statement just describes VA's action; it does not explain it. As this Court has held, that is insufficient to satisfy the APA's reasoned-explanation requirement: "[a]n agency's statement of what it 'normally' does or has done before … is not, by itself, an explanation" of why its action complies with statutory requirements. *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 537-38 (Fed. Cir. 2019) (vacating and remanding for failure to provide adequate explanation). That commonsense rule applies equally when an agency reverts to prior policy without any explanation for that reversion: it is not enough for an agency's reasoning to boil down to "[t]hat was then—this is now." *Nat'l Ass'n of Mfrs. v. U.S. Sec. & Exch. Comm'n*, 105 F.4th 802, 812 (5th Cir. 2024) (holding that unexplained position change violated APA); *accord Comité de Apoyo*, 774 F.3d at 188 (agency explanation for return to prior policy was "hardly sufficient" when "it merely explains what has been done, not why it was done"). VA's exclusive reliance on its pre-2022 practice is particularly problematic because it identifies no factual findings (and the record contains none) that VA made in connection with that pre-2022 practice supporting the conclusion that abortion care is not "needed" under section 1710. In other words, even if this Court could search beyond the Final Rule's reasoning for some justification for reverting to prior policy (*but see Encino*, 579 U.S. at 224), it would find none. Because VA's decision is entirely "unexplained,"

it is "arbitrary and capricious." *Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*, 626 F.3d 84, 93 (D.C. Cir. 2010).

To the extent the Final Rule mentioned any factors that might have motivated VA's change in policy, those factors do not qualify as the "relevant data" that VA was required to consider under section 1710 and its accompanying regulations. *White Lion*, 604 U.S. at 567. VA observed that abortion was a "politically divisive and morally charged issue[]" and that VA's "decision to return to its prior regulatory position reflects a cautious and legally grounded exercise of discretion." Appx2. It also stated that it was relying on "constitutional separation of powers and the limits of agency authority under administrative law." Appx6 (invoking major-questions doctrine). But as Congress explained, VHCERA's "'need for care test' … ensur[es] that medical judgment rather than legal criteria will determine when care will be provided and the level at which that care will be furnished." H.R. Rep. No. 104-690, at 4. Consistent with that, VA has determined that "needed" care is care that is necessary to promote, preserve, or restore health and is consistent with prevailing standards of care. 38 C.F.R. § 17.38(b); 64 Fed. Reg. at 54210. That precludes VA's reliance on political or legal considerations to determine whether medical care is "needed."

In fact, VA recognized the "needed" standard must turn on such medical considerations. It acknowledged comments arguing that "the Secretary's discretion

to determine what care is needed under 38 U.S.C. 1710 must be based on medical standards and judgment and a clinical need for care." Appx6. And it never disagreed with that reading of section 1710. Instead, it insisted that section 1710 "does not mandate the perpetual approval of any care that VA at one time found to be needed" and does not prohibit "establishing limitations and exclusions as to whether care is needed under section 1710." Appx7. While true, those facts do not eliminate VA's statutory obligation to ensure that any decision about the scope of care—including a decision *not* to provide care—turns on the medical "needed" standard as opposed to other considerations. VA's deflective response falls far short of an explanation for why abortion care is not "needed" from a medical perspective.

Finally, even if VA's earlier proposed rule could supply the missing explanation, it does not. Appx11 (embracing purported "rationale" in proposed rule). Like the Final Rule, the proposed rule simply stated that VA was returning to the pre-2022 regime. Appx1097-1099. Worse still, the proposed rule improperly ties section 1710's "needed" determination to financial considerations, opining that "[c]onsiderations about whether abortion is 'needed' for purposes of VA-provided services necessarily involves the question of whether taxpayers should pay for abortion." Appx1098. And it misinterprets VA's 2022 interim final rule as a pure "reaction" to *Dobbs* rather than a judgment grounded in medical evidence (Appx1098)—an ironic mistake given that the 2025 Final Rule improperly cited

political concerns with providing abortion care. Thus, to the extent the Final Rule imports the proposed rule's reasoning, that only exacerbates VA's multiple APA violations.

#### 2. *VA failed to weigh the profound reliance interests engendered by VA's prior policy*

The Final Rule fails to satisfy a second requirement for changing agency policy: accounting for the uniquely personal reliance interests veterans had in VA's prior policy. *White Lion*, 604 U.S. at 568. As commenters explained (and as common sense confirms), countless "veterans and CHAMPVA beneficiaries may have structured their lives, intimate relationships, and healthcare decisions over the last several years in reliance on the availability of abortion care and abortion counseling through" VA. Appx1279. Those reliance interests often arise *because of* veterans' service to their country that triggers VA's obligation of care: veterans frequently require abortion care and counseling due to service-related physical and mental harms that increase the risks of pregnancy. Such deeply held reliance interests require VA to provide more than just "good reasons" for its changed policy, but rather a "detailed justification" for it. *Fox Television*, 556 U.S. at 515. In doing so, VA must balance those reliance interests against competing policy concerns. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). Yet VA did not even attempt to identify, much less weigh, those reliance interests—even though they go to the core of VA's mandate of serving veterans. Instead, VA

concluded reliance interests were categorically lacking for three reasons: (1) abortion "services have been available for a short period of time (that is, only since September 9, 2022)"; (2) "very few veterans and CHAMPVA beneficiaries have been provided such services by VA"; and (3) *Dobbs* held that "traditional reliance interests are lacking when it comes to abortion." Appx10. Each of these theories fails.

First, the Supreme Court has squarely rejected the notion that reliance interests cannot manifest within a three-year period—or indeed that there is any bright-line rule about when reliance manifests. In *Department of Homeland Security v. Regents of the University of California*, the agency argued that "DACA recipients have no legally cognizable reliance interests because," among other things, DACA "provided benefits only in two-year increments." 591 U.S. at 31 (quotation marks omitted). But as the Court explained, while that duration might inform the "strength" of reliance interests, there is no "legal authority establishing that" it "automatically preclude[s] reliance interests." *Id.* A three-year reliance period thus still requires the agency to weigh those interests against competing concerns, which VA failed to do. *Id.* at 31-32.

Second, VA took an artificially narrow view of the relevant reliance interests. Even if veterans did not actually obtain abortions during the years the prior rule was in effect, they made family-planning and other major life decisions in reliance on the

availability of that care should risks to their health arise during pregnancy. *Cf. Regents*, 591 U.S. at 31 (recognizing argument that "DACA recipients have enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance on the DACA program") (quotation marks omitted); *see, e.g.*, Appx1279; Appx1147; Appx1124; Appx1107. Rather than account for that population, VA myopically focused on the purportedly small number of individuals who obtained abortions from VA in 2023 and 2024. But that represents only a fraction of the individuals who relied on the prior *availability* of abortion and abortion counseling. Regardless, VA's citation to purportedly low utilization rates is self-contradictory in light of its acknowledgement that "low volume of provision of a medical service should not be a basis to exclude such service" and that "VA would not deny" veterans care for a particular injury "even if most other veterans do not sustain such injuries." Appx5.

Third, *Dobbs*' conclusion that weak reliance interests did not justify maintaining what the Supreme Court deemed an incorrect constitutional precedent says nothing about an agency's unflagging obligation to weigh reliance interests under the APA. *Encino*, 579 U.S. at 221-22. *Dobbs* also relied on the proposition that "traditional reliance interests were not implicated because getting an abortion is generally unplanned activity." 597 U.S. at 288 (quotation marks omitted). But MVA's members have explained that the opposite is true for them in this context:

they are and had been well aware that abortion care and counseling may become necessary for them due to their preexisting health conditions. *Supra* pp.17-18. Lastly, *Dobbs* eschewed consideration of "intangible" reliance interests, such as how people have "organized intimate relationships," in favor of "concrete" reliance interests such as those based on "property and contract rights," in part because it believed courts were ill-equipped to consider the former type of reliance. *Id.* But agencies have the experience and expertise that the *Dobbs* majority deemed lacking among courts—and there is no authority suggesting that an agency may ignore a certain category of reliance interests in the way the *Dobbs* majority did.

### B. VA Failed To Adequately Consider And Respond To Significant Public Comments Explaining Why Abortion Care Is Needed Care And Exposing The Flaws In VA's Reasoning

The Final Rule is arbitrary and capricious in another way: it fails to adequately "consider and respond to significant comments received during the period for public comment." *HMTX Indus. LLC v. United States*, 156 F.4th 1236, 1256 (Fed. Cir. 2025). "Significant comments are those which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule." *Id.* (quoting *City of Portland v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007)). To be adequate, an agency's response "must be sufficient to enable the courts to see what major issues of policy were ventilated" and "why the agency reacted to them as it did." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337,

344 (D.C. Cir. 2019) (quotation marks omitted). "Conclusory" responses to comments are "fatal" to an agency's defense. *United Mine Workers*, 626 F.3d at 94. Here, VA received over 12,000 comments identifying serious problems with its proposed rule—yet failed to offer non-conclusory responses to any of them.

***1. The Final Rule failed to respond to abundant comments explaining why abortion to preserve health and in cases of rape or incest is critically "needed" care***

Dozens of commenters—including the nation's leading medical organizations, veteran-service groups, and a coalition of attorneys general—explained why abortion care in health-threatening situations satisfies section 1710's medically oriented "needed" standard. In doing so, they also explained that veterans face unique pregnancy risks relative to their civilian counterparts because of conditions arising from their service—including but not limited to military sexual trauma, mental-health conditions, toxic exposures, and physical trauma from training and active duty. *E.g.*, Appx1383; Appx1356; Appx1220-1221; Appx1145-1146; Appx1174. VA expressly acknowledged these comments. For instance, it noted commenters' assertions that "abortion was evidence-based and part of medically accepted standards of care for pregnant women"; publications showing "increased maternal and infant mortality rates or other worsened physical and mental health outcomes of pregnant women in states with restrictive abortion laws"; evidence that abortion bans "could have negative, non-medical impacts, such as

long-term economic hardship and financial harm to women and their children and that it may encourage women to stay with abusive partners"; and that such "bans can disproportionately impact women veterans." Appx3. VA brushed those concerns aside with a single sentence: "the regulatory determination that abortion is not a 'needed' service for veterans was accepted by every VA Secretary and Presidential administration for over 20 years." Appx3.

That sentence is not enough. Again, baldly describing an agency's prior policy is insufficient to justify the return to that policy, absent any citation to good reasons supporting it. *Supra* pp.39-40. VA's total failure to engage with the overwhelming evidence of the need for abortion care to preserve the health of a pregnant person is arbitrary and capricious.

VA also failed to adequately respond to comments objecting to the abortion ban even in cases of rape or incest. Multiple commenters stated the obvious: "denying abortion care to survivors of military sexual assault is cruel, dangerous, and a betrayal of those who have already sacrificed for this nation." Appx1266; *see also* Appx1217-1218; Appx1173-1174 (explaining how the absence of a rape or incest exception is inconsistent with other federal healthcare programs). In the words of a veteran and survivor of military sexual assault, "[t]o have a policy that bans exceptions for rape is to be re-victimized by the very country" veterans "swore to protect." Appx1111. These profound harms are and will be widespread and

severe. Nearly 70% of post-9/11 women veterans receiving VA reproductive healthcare reported military sexual trauma, with nearly half reporting military sexual assault. Appx1165-1166. Forced continuation of a pregnancy arising from sexual assault causes and exacerbates severe mental-health conditions, including those already more prominent among veterans. Appx1385; Appx1224-1225. These comments echo the factual findings VA had made in 2022: being forced to carry a pregnancy arising from rape or incest could "cause serious traumatic stress and a risk of long-lasting psychological conditions such as anxiety and depression"—consequences that are more acute and pervasive for veterans, who suffer higher rates of sexual trauma and are more likely to have preexisting mental health conditions that would be compounded by that situation. Appx626.

In response, VA repeated its tactic of reciting that the policy it was adopting was the same as the pre-2022 policy:

> As explained previously in the proposed rule and throughout this final rule, VA is returning to its pre-September 9, 2022 position, which did not include an exception for rape or incest. VA will, as always, support veterans and CHAMPVA beneficiaries facing difficult circumstances in regard to pregnancy by ensuring such individuals receive needed and medically necessary and appropriate care through VA. VA provides treatment to those who may experience domestic/intimate partner violence and military sexual trauma.

Appx15. At the risk of repetition: merely announcing that an agency is rejecting significant comments is not an explanation for *why* it is rejecting those significant

comments (or rejecting the agency's own prior factfinding). And VA's vague platitudes regarding other types of "support" or "treatment" it may provide to pregnant victims of rape or incest cannot, without more, suffice as an explanation for why other types of support or treatment—namely, abortion care—are not similarly "needed" under section 1710.

#### *2. The Final Rule is unworkably ambiguous and will chill the provision of permitted and medically necessary care*

VA repeatedly responded to concerns raised in public comments by expressing the position that the Final Rule does not prohibit "providing care to pregnant women in life-threatening circumstances." Appx3. But this "life-saving" exception not only fails to cure VA's lack of reasoned explanation; it underscores the Final Rule's unworkability.

To start, a "life-saving" exception does nothing to explain why abortion to protect a pregnant person's *health* is not "needed" care. That omission is made worse by the fact that VA expressly discussed comments focusing on health risks specifically. For instance, it recognized the "serious but not immediately fatal medical conditions that a pregnant woman may have—such as severe preeclampsia, certain cardiac diseases, or cancers requiring urgent treatment—that could require an abortion to avoid additional harm to the pregnant woman as the pregnancy develops." Appx3. VA dismissed those concerns on the following logic:

> If VA did have discretion, VA still would not address every specific potential medical condition a pregnant woman may have or complication that could be experienced during pregnancy or otherwise further delineate the conditions under which care may be provided or allowed pursuant to this rulemaking. These are clinical matters that will need to be determined by health care providers with their patients, and VA will issue further related guidance.

Appx4. Although VA's reasoning is—to put it mildly—cryptic, its position appears to be that healthcare providers will be able to make patient-specific determinations about what care is permitted under the Final Rule: that is, whether a particular pregnant person's life is under threat or whether it is merely their health that is under threat.

But, as multiple medical professional organizations explained, "there is no bright line in medicine to determine when a condition goes from endangering a patient's health to jeopardizing her life." Appx1171; *accord* Appx1383 ("No clinical bright line necessarily defines when a condition transitions from merely health-threatening to life-threatening."). Serious pregnancy complications such as severe preeclampsia, kidney disease, and other issues can, "if left untreated … rapidly become life-threatening with little or no warning." Appx1171. That is why doctors are trained to intervene before a condition becomes life-threatening—but the Final Rule will now force physicians to guess "how close to death the patient must be before they are permitted to intervene." Appx1135; *see also* Appx1171-1172;

Appx1383-1384; Appx1173-1174; Appx1297-1299; Appx1103 (VA provider explaining same). The very documents VA relied on in its rulemaking process confirmed that commonsense reality, explaining that similar "exceptions to bans have often proven to be unworkable, except in the most extreme circumstances, and have sometimes prevented physicians from practicing evidence-based medicine." Appx987.

Because this aspect of VA's rulemaking "fails to provide comprehensible guidance about what falls within the bounds of" its prohibitions, it violates the APA's reasoned-decisionmaking requirements. *Hikvision USA, Inc. v. Fed. Commc'ns Comm'n*, 97 F.4th 938, 950 (D.C. Cir. 2024); *see also Griffin v. Sec'y of Veterans Affs.*, 288 F.3d 1309, 1330 (Fed. Cir. 2002) (agency regulation is invalid if it "fail[s] to provide persons of ordinary intelligence a reasonable opportunity to know what is prohibited"); *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 48 F.4th 1307, 1314 (Fed. Cir. 2022) (vacating "ambiguous" VA regulation regarding whether certain treatment was covered). That ambiguity has real consequences. It will chill providers from administering necessary and permissible medical care "for fear of facing professional and criminal penalties," including prosecution and the loss of jobs and licenses. Appx1346; Appx1254. That will cause pregnant people to die. Appx1292-1293; Appx1382; Appx1199. This is not mere speculation: at least seven women have died as a result of denied or delayed

care under parallel state abortion laws that carry only a "life-saving" exception. *E.g.*, Appx1253-1254; Appx1162; Appx1362-1363.

The problems created by VA's life-saving exception do not end there: VA's decision to codify that exception only for CHAMPVA beneficiaries but not for veterans—even though the Final Rule asserted that the exception is equally available for both groups—defies any non-arbitrary explanation. Appx2, Appx4. Indeed, commenters observed this discrepancy would sow confusion among providers and patients, leading to delayed care, denied care, and disparate care between veterans and CHAMPVA beneficiaries. Appx10-11. Yet once again, VA's only justification for this inconsistency is that it mirrors the pre-2022 scheme, which is no justification at all. Appx10-11.

#### ***3. VA relied on a fundamentally flawed Regulatory Impact Analysis***

The Final Rule is also "unreasonable" because it relies on a Regulatory Impact Analysis (RIA) that suffers from "serious flaw[s] undermining that analysis." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). Throughout the RIA, VA made unwarranted assumptions, or assumptions contradictory to evidence, that underestimated the quantitative and qualitative costs of the Final Rule. Although commenters once again pointed out those flaws, VA did nothing to correct them—further demonstrating why the Final Rule fails APA review.

The RIA projects that reinstating the pre-2022 abortion restrictions will produce net savings. For that conclusion, VA assumed that 60% of veterans who would have obtained abortions from VA would obtain them elsewhere, and that just 50% of veterans unable to obtain abortions would then rely on VA for maternity care. Appx1513. But those assumptions are either unfounded or rest on erroneous facts. For instance, VA never explained why so many veterans would obtain maternity care outside VA. And VA's conclusion that 60% of women would successfully receive abortions through another care provider depends on a particular count of veterans who live in states with "high abortion" restrictions—but that collection does not include Florida and Georgia, which have six-week abortion bans (and high female veteran populations). Appx1244. Even for the veterans in states with broader abortion care, VA never justifies its silent assumption that those veterans would have the financial resources to pay out-of-pocket for abortion care.

The RIA also omits additional categories of foreseeable social and economic costs associated with the proposed rule, such as costs associated with delayed care. Appx1243-1244. On the other side of the ledger, VA appears to have undercounted the number of veterans who obtained abortion care in 2023 and 2024, fundamentally undermining its cost-benefit analysis. *Compare* Appx1094 ("The average number of abortions provided by VA in 2023 and 2024 was 100 per year and the average

number of abortions provided through CHAMPVA was about 40."), *with* Appx1495 (documenting 113 abortions in 2023 and 187 in 2024 for veterans).

Commenters highlighted those analytical problems. Appx1243-1244; Appx1294-1296. And VA acknowledged the comments that the RIA "fails to adequately assess the additional costs related to lack of access or delayed receipt of abortions caused by strict abortion laws in states"; "underestimated the proposed rule's cost to society by not estimating the additional costs in care that can occur the longer an individual may have to wait to obtain an abortion"; and erred "as to the number of states that have restrictive abortion laws (or the types or impact of state restrictions), or the percentage of abortion procedures estimated in the RIA to be medication abortions, or the percentage of veterans that would use VA's maternity care benefits if VA did not provide an abortion procedure." Appx11.

Yet, continuing the trend, VA mistook description for explanation. It parroted the standards under which it had prepared the RIA and the sources the RIA relied on, but that does not suffice to reasonably explain an incorrect methodological decision. *Cf. Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 173 (D.C. Cir. 2025) (agency's statement that it relied on certain documents did not qualify as reasonable explanation in the face of methodological flaws). VA also contended it was permitted to consider certain costs "qualitatively" because of data limitations. Appx12. But failing to "explain *why* certain costs could not be quantified" does not

satisfy the reasoned-decisionmaking standard. *Bloomberg L.P. v. Sec. & Exch. Comm'n*, 45 F.4th 462, 472 (D.C. Cir. 2022) (emphasis added). And even had VA provided that explanation, it was still required to discuss those unquantifiable costs, rather than simply ignore them. *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 379 (D.C. Cir. 2013).

## III. VA'S DISCRETIONARY DECISION NOT TO PROVIDE ABORTION COUNSELING IS ARBITRARY AND CAPRICIOUS

Even if the Final Rule's elimination of abortion care does not violate the APA, VA separately violated the APA by eliminating abortion counseling. The Final Rule never concluded that VA was prohibited by statute—section 106 or otherwise—from providing that counseling. Appx1-19. And there is no conceivable basis for any such conclusion. Section 106 speaks only to "abortions" themselves. § 106, 106 Stat. 4947. Regardless of whether section 106 prohibited VA from providing abortion care (which it does not), abortion counseling is a distinct type of care, potentially encompassing "medical and procedural information" such as discussing "risks, alternatives, and implications of various reproductive-health choices"; emotional support for processing "feelings, values, and concerns related to reproductive decisions"; and facilitating "consideration of moral, spiritual, or cultural dimensions." Appx1335-1336. Thus, the only question is whether VA acted arbitrarily and capriciously in determining that abortion counseling was not "needed" care under section 1710. It did.

### A. VA Failed To Justify Its Change In Position

In the 2022 interim final rule, VA determined that abortion counseling was "needed" care because it served several critical purposes: "(1) to aid a pregnant individual in making a decision about an unwanted pregnancy, (2) to help the pregnant individual implement the decision, and (3) to assist the pregnant individual in controlling their future fertility." Appx626. It also found that "[s]tudies have shown that individuals have limited knowledge about the safety and risks of abortion" and that "[p]roviding veterans with accurate information about abortions is needed to ensure that they can make informed decisions about their health care." Appx626.

VA's legal obligation to provide a reasoned explanation for a changed policy, and to weigh serious reliance interests, applies equally to its elimination of abortion counseling. *Supra* pp.36-37. Yet VA's justification of its decision was limited to this sentence: "The Secretary has used his authority to determine that abortion counseling is not needed or medically necessary." Appx14. VA supplied no medical evidence (or any evidence at all) supporting that conclusion. Nor did it engage with the agency's earlier factfinding that abortion counseling *is* needed and medically necessary, much less explain why that factfinding was wrong or superseded by later developments. And VA again failed to even mention the deep reliance interests veterans had on the availability of abortion counseling to make fully informed

decisions about their lives, families, and health. *Supra* pp.42-44; *see also, e.g.*, Appx1109. VA's change in policy with respect to abortion counseling is thus arbitrary and capricious for all the reasons stated above. *Fox Television*, 556 U.S. at 515; *Mid Continent Steel*, 941 F.3d at 537-38.

### B. VA Failed To Adequately Consider And Respond To Significant Public Comments Explaining The Harms Caused By The Ban On Abortion Counseling

VA failed not only to justify its change in position with respect to abortion counseling, but also to consider and adequately respond to significant public comments. In opposing the elimination of abortion counseling, commenters echoed VA's 2022 findings and went even further. They explained that prohibiting that counseling runs afoul of medical ethics obligations and precludes informed decisionmaking, a cornerstone of the patient-provider relationship. Appx1138-1139; Appx1279; Appx1171; Appx1383-1385; Appx1197-1198; Appx1170. It further harms mental-health outcomes by barring providers from helping sexual-assault survivors fully process trauma. Appx1335-1336. Prohibiting abortion counseling also poses multiple workability problems. First, commenters observed that "[b]y forbidding abortion counseling in any circumstance, providers will not be able to comprehensively advise their patients, even when a lifesaving abortion is needed." Appx1139. And second, commenters warned that VA's failure to define "abortion counseling" would create ambiguity about what conversations are

permitted—chilling conversations between patients and providers, eroding trust, and blocking what might be permissible care. Appx1335-1337. Indeed, that ambiguity in the Final Rule invalidates it without more. *Supra* p.51.

VA was acutely aware of these concerns, but responded by saying only that "abortion counseling is not needed or medically necessary and appropriate for those reasons stated in the proposed rule." Appx14 (citing 90 Fed. Reg. 36416, 36416-17 (Aug. 4, 2025)). Yet the proposed rule says absolutely nothing about why abortion counseling is not "needed" care under section 1710; indeed, it never discusses abortion counseling separately at all. Appx1097-1099. As to commenters' concerns that providers would not be able to provide abortion counseling even in life-threatening circumstances, VA asserted that it would "ensure that veterans and CHAMPVA beneficiaries receive information necessary to provide informed consent in such situations," without clarifying whether an exception to the ban on abortion counseling therefore exists in such situations. Appx14. And as to commenters' concerns about the uncertainty created by the lack of definition of abortion counseling, VA's sole rejoinder was that it "did not have a definition of abortion counseling prior to the September 2022 IFR and is not adopting one through this rulemaking." Appx14. But an agency cannot defend a defect in its rulemaking by pointing to the same defect in prior rulemaking. *Mid Continent Steel*, 941 F.3d

at 537-38. VA's conclusory response is, yet again, arbitrary and capricious. *United Mine Workers*, 626 F.3d at 94.

## CONCLUSION

The petition should be granted and the Final Rule should be vacated and set aside.

Dated: October 30, 2026

Respectfully submitted,

/s/ Aileen M. McGrath

AILEEN M. MCGRATH
DARALYN J. DURIE
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-6153
AMcGrath@mofo.com

ALISSANDRA MCCANN
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037

ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

CARRIE FLAXMAN
KAITLYN GOLDEN
ROBIN F. THURSTON
SKYE PERRYMAN
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043

MICHELLE BANKER
KATIE O'CONNOR
LUCY ZHOU
JAMIE FLOYD
NATIONAL WOMEN'S LAW CENTER
1350 I Street NW, Suite 700
Washington, DC 20005

*Counsel for Petitioner*

## CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the relevant type-volume limitations and typeface and type-style requirements of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally spaced typeface in 14-point Times New Roman font and includes 13,587 words, excluding the parts of the brief exempted by the Rules.

Dated: October 30, 2026

/s/ Aileen M. McGrath
Aileen M. McGrath

# ADDENDUM

**ADDENDUM**
**TABLE OF CONTENTS**


| Record/Document /Comment No. | Document | Page |
|---|---|---|
| Rec. 37 / Doc. VA-2025-VHA-0073-20987 | Department of Veterans Affairs, Final Rule, "Reproductive Health Services," 90 Fed. Reg. 61310 | Appx1 |
| Rec. 35 | OLC Opinion re: Reconsidering the Authority of the Department of Veterans Affairs to Provide Abortion Services | Appx20 |
| N/A | 38 U.S.C. § 1710(a) | A1 |
| N/A | Pub. L. No. 102-585, §106, 106 Stat. 4947 (1992) | A3 |

zone without permission of the COTP, HRCP, or designated representative.

(ii) *Requirements.* All mariners attempting to enter or depart the Hampton Creek Approach Channel or the Phoebus Channel in the vicinity of the North Island must proceed with extreme caution and maintain a safe distance from construction equipment.

(5) *Zone 5, South Highway Bridge Trestle and South Island*—(i) *Location.* All waters, from surface to bottom, located within 300 feet from the east or west side of the Hampton Roads Bridge-Tunnel's south highway bridge trestle, including South Island, to the shore of the City of Norfolk.

(ii) *Requirements.* No vessel or person may enter or remain in the safety zone without permission of the COTP, HRCP, or designated representative. HRCP may establish and post visual identification of safe transit corridors that vessels may use to freely proceed through the safety zone. All mariners attempting to enter or depart the Willoughby Bay Approach Channel in the vicinity of the South Island shall proceed with extreme caution and maintain a safe distance from construction equipment.

(6) *Zone 6, Willoughby Bay Bridge*—(i) *Location.* All waters, from surface to bottom, located along the Willoughby Bay Bridge highway trestle and extending 50 feet to the north side of the bridge and 300 feet to the south side of the bridge along the length of the highway trestle, from shore to shore within the City of Norfolk.

(ii) *Requirements.* No vessel or person may enter or remain in the safety zone without permission of the COTP, HRCP, or designated representative, except that vessels are allowed to transit through marked safe transit corridors that HRCP shall establish for the purpose of providing navigation access for residents located north of the Willoughby Bay Bridge through the safety zone. All mariners attempting to enter or depart residences or commercial facilities north of the Willoughby Bay Bridge through the safe transit corridors or other areas of the safety zone when granted permission shall proceed with caution and maintain a safe distance from construction equipment.

(c) *General requirements.* (1) Under the general safety zone regulations in subpart C of this part, no vessel or person may enter or remain in any safety zone described in paragraph (b) of this section unless authorized by the COTP, HRCP, or designated representative. If a vessel or person is notified by the COTP, HRCP, or designated representative that they have entered one of these safety zones without permission, they are required to immediately leave in a safe manner following the directions given.

(2) Mariners requesting to transit any of these safety zones must first contact the HRCP designated representative, the on-site foreman, via phone at 7577036060 or VHF–FM channels 13 and 16. If permission is granted, mariners must proceed at their own risk and strictly observe any and all instructions provided by the COTP, HRCP, or designated representative to the mariner regarding the conditions of entry to and exit from any location within the fixed safety zones.

(d) *Enforcement.* The Sector Virginia COTP may enforce the regulations in this section and may be assisted by any Federal, state, county, or municipal law enforcement agency.

(e) *Enforcement period.* The safety zones in this section will be in effect from December 25, 2025 until December 20, 2030. If the Captain of the Port, Sector Virgina determines this rule, or any of the safety zones established by this rule are no longer necessary, we will provide notice by marine broadcasts and local notice to mariners that the rule, or individual safety zones established by the rule, are no longer subject to enforcement.

**Peggy M. Britton,**

*Captain, U.S. Coast Guard, Captain of the Port, Sector Virginia.*

[FR Doc. 2025–24070 Filed 12–30–25; 8:45 am]

BILLING CODE 9110–04–P

## DEPARTMENT OF VETERANS AFFAIRS

### 38 CFR Part 17

**[Docket No. VA–2025–VHA–0073]**

**RIN 2900–AS31**

## Reproductive Health Services

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Final rule.

**SUMMARY:** The Department of Veterans Affairs (VA) adopts as final, without changes, a proposed rule to reinstate the exclusions on abortions and abortion counseling from the medical benefits package, which were removed in 2022. Before 2022, these exclusions had been firmly in place since the medical benefits package was first established in 1999. VA is also adopting as final, without changes, the reinstatement of exclusions on abortion and abortion counseling for the Civilian Health and Medical Program of the Department of Veterans Affairs (CHAMPVA) that were also removed in 2022. VA takes this action to ensure that VA provides only needed and medically necessary and appropriate care to our nation's heroes and CHAMPVA beneficiaries.

**DATES:** *Effective Date:* This rule is effective January 30, 2026.

**FOR FURTHER INFORMATION CONTACT:** John Figueroa, Senior Advisor to the Secretary of Veterans Affairs performing the duties of Under Secretary for Health, (202) 461–0373.

**SUPPLEMENTARY INFORMATION:** Today, VA finalizes its proposed rule published in the **Federal Register** (FR) on August 4, 2025. 90 FR 36415. In that proposed rule, VA proposed to return VA's medical benefits package and CHAMPVA coverage to where they were on September 8, 2022, before VA issued an interim final rule (IFR) that removed long-standing restrictions against abortions. Id.

As explained in the proposed rule, it was VA's long-standing interpretation that abortions were not ''needed'' under section 1710 of title 38 of the United States Code (U.S.C.) and thus were excluded from the medical benefits package for veterans. 90 FR 36416. This determination was accepted by every Secretary and Presidential administration for over 20 years. Id. This determination did not prohibit providing life-saving care to pregnant veterans. Id. Similarly, it was VA's long-standing interpretation that abortions were not medically necessary and appropriate for CHAMPVA beneficiaries except when a physician certifies that the life of the mother would be endangered if the child were carried to term. 90 FR 36416–36417.

Congress has never mandated or legislated that VA provide abortions. Instead, Congress gave the Secretary discretion to determine what care may be furnished to veterans (under 38 U.S.C. 1710) and CHAMPVA beneficiaries (under 38 U.S.C. 1781). If Congress intended for VA to provide abortions in a manner other than VA's long-standing regulatory position, it could have amended VA's authorities. However, it never has, even though Congress has done so for other Federal agencies.

Since publication of our proposed rule, the Department of Justice's Office of Legal Counsel (OLC) issued a formal opinion concluding that VA does not have statutory authority to provide abortion or abortion counseling under 38 U.S.C. 1710. See *Reconsidering the Authority of the Department of Veterans Affairs to Provide Abortion Services,* 49 Op. O.L.C._(Dec. 18. 2025) (hereinafter referred to as ''DOJ Opinion''), *https://*

GOV-VA 000566

*www.justice.gov/olc/media/1421726/dl?inline.* The DOJ Opinion explains that section 106 of the Veterans Health Care Act of 1992 (VHCA), Public Law (Pub. L.) 102–585, expressly prohibits VA from furnishing abortion when providing hospital care and medical services under Chapter 17 of Title 38. Id.

The DOJ Opinion further clarifies that procedures necessary to save the life of the pregnant veteran (such as treatment for ectopic pregnancies or miscarriages) are not considered ''abortions'' within the meaning of section 106 and therefore remain permissible. VA has historically interpreted its authority in this manner, and the DOJ Opinion affirms that such life-saving care is consistent with federal law.

As a Federal agency, VA is bound by the DOJ Opinion and relies on it as the primary legal basis for this final rule. Accordingly, this rule reinstates the longstanding exclusion of abortion and abortion counseling from VA's medical benefits package and CHAMPVA coverage, consistent with the statutory limitations imposed by section 106.

In addition to section 106, VA previously relied on its discretionary authority under 38 U.S.C. 1710 and 1781 to justify the provision of abortion services. In light of the DOJ Opinion, VA now recognizes that this discretionary authority is constrained by section 106 and cannot be exercised to override the statutory prohibition. Nevertheless, VA addresses VA's discretionary authority as a supporting and additional rationale for this rulemaking. Even if such discretion were available, the Secretary has determined that VA will not provide abortion or abortion counseling under that authority.

If VA's authority under sections 1710 and 1781 remained the primary basis for this rule, the absence of clear congressional direction regarding abortion is particularly relevant in light of the major questions doctrine. That doctrine, as articulated in *West Virginia* v. *EPA,* 597 U.S. 697 (2022), instructs that agencies must identify clear statutory authority before regulating in areas of profound political consequence. Abortion is one of the most politically divisive and morally charged issues in American public life, a fact the Supreme Court recognized in *Dobbs* v. *Jackson Women's Health Organization,* 142 S. Ct. 2228 (2022), which returned the issue to the people and their elected representatives. In this context, VA's decision to return to its prior regulatory position reflects a cautious and legally grounded exercise of discretion; not an expansion of authority. VA did not in its proposed rulemaking, does not now, and has never interpreted the regulatory bar against abortions to be a bar against providing life-saving treatment. VA has simply never used the term ''abortion'' to refer to life-saving treatment provided to a pregnant woman. VA's proposal and final action today do not change this long-standing understanding of the difference between an abortion and a medical intervention necessary to save the life of a pregnant woman.

After publishing the proposed rule on August 4, 2025, VA provided a 30-day comment period, which ended on September 3, 2025. VA received 20,984 document submissions, which included approximately 24,333 total comments. The vast majority of comments were duplicated form responses. This final rule addresses all relevant and significant comments received, regardless of how many individuals submitted the same (or even identical) comment. Some commenters solely expressed support or opposition or made comments that were beyond the scope of the proposed rule. These comments are not addressed in this final rule, except to the extent that they also requested clarifications or suggested substantive revisions.

Section I. below addresses comments that generally challenged the proposed rule related to the medical benefits package or CHAMPVA. This section also includes comments that may not have specifically mentioned either program but that expressed general opposition to all changes in the proposed rule.

Section II. below addresses comments that specifically challenged VA's rationale in the proposed rule. This section addresses VA's more specific rationale related to the number of abortions provided by VA, comparison to other Federal laws related to abortion, and VA's legal authorities.

Section III. below addresses comments that raised other legal issues, to include assertions that the proposed rule did not meet certain administrative law standards.

Sections IV. through VIII. below address all other comments.

## I. Comments That Generally Challenged the Proposed Rule

### *A. Comments That Asserted Abortions Were Needed Medical Services for Veterans or Were Medically Necessary and Appropriate Treatment for CHAMPVA Beneficiaries*

VA proposed to remove the exceptions to the general exclusion of abortions in § 17.38(c)(1)(i) and (ii) of title 38, Code of Federal Regulations (CFR), that, pursuant to an IFR published on September 9, 2022 (see 87 FR 55296) and a final rule published on March 4, 2024 (see 89 FR 15473), established that abortions could be provided when: (i) the life or the health of the pregnant veteran would be endangered if the pregnancy were carried to term; or (ii) the pregnancy was the result of an act of rape or incest. Part of the rationale in the proposed rule for removing these exceptions to the general exclusion of abortions was that they are not needed and, as to the first exception, from 1999 through 2022, VA had never understood the exclusion of abortions to prohibit VA from providing care to pregnant women in life-threatening circumstances. 90 FR 36416. Since the creation of the medical benefits package and for nearly 23 years, VA had consistently interpreted that abortions were not needed medical services under 38 U.S.C. 1710 and furnished care in life-threatening circumstances to pregnant veterans as a needed medical service. Moreover, the DOJ Opinion concludes that VA lacks statutory authority to exercise discretion to provide abortion services under 38 U.S.C. 1710, thereby foreclosing reliance on discretionary judgment to justify the exceptions previously established in 38 CFR17.38(c)(1)(i) and (ii).

VA also proposed to revise the exceptions to the general exclusion of abortions in CHAMPVA in 38 CFR 17.272(a)(58) to similarly revert back to regulatory language in existence prior to September 9, 2022, so that there would be a single exception for abortion for CHAMPVA beneficiaries in cases when a physician certifies that the life of the mother would be endangered if the fetus were carried to term, versus broader exceptions in cases of life or health endangerment or when the pregnancy is the result of rape or incest. VA's rationale for these proposed changes in CHAMPVA was that abortions were not ''medically necessary and appropriate for the treatment of a condition'' (pursuant to the definition of CHAMPVA-covered services and supplies in 38 CFR 17.270(b)) under the broader exceptions for the same reasons that abortions were not ''needed'' (pursuant to 38 U.S.C. 1710(a)(1)–(3)) in the veteran's program. 90 FR 36417. VA notes that for the comment summaries and responses that follow and for the remainder of the discussion in the final rule, it will use the shorthand of ''needed'' care in the context of 38 U.S.C. 1710, and ''medically necessary and appropriate'' care in the context of 38 U.S.C. 1781 (as interpreted in 38 CFR 17.270(b)). Again, the DOJ Opinion

concludes that VA lacks statutory authority to exercise discretion on this issue, but for the purposes of addressing comments, VA provides analysis under section 1710 as a secondary basis for our rulemaking.

Multiple commenters asserted that abortion was a needed medical service, or that the broader exceptions to permit abortion were medically necessary and appropriate for the treatment of a condition for CHAMPVA beneficiaries. Many of these commenters made general statements that abortion was evidence-based and part of medically accepted standards of care for pregnant women and therefore was needed or medically necessary and appropriate. Some of these commenters referenced publications from medical or other organizations to support these statements or further provided examples of specific procedures that could be considered needed or medically necessary and appropriate in particular circumstances.

Other commenters generally challenged the proposed rule by asserting that abortion bans or abortion restrictions were harmful to pregnant women. Many of these commenters referenced publications from medical or other organizations that indicate increased maternal and infant mortality rates or other worsened physical and mental health outcomes of pregnant women in states with restrictive abortion laws. As stated in comments, these publications suggest that states with restrictive laws create uncertainty for healthcare providers, a chilling effect for fear of legal consequences for abortion providers and pregnant women, or additional administrative requirements to furnish or receive care, all of which can result in delays in or denial of abortion. Additionally, these commenters referenced publications showing that bans could have negative, non-medical impacts, such as long-term economic hardship and financial harm to women and their children and that it may encourage women to stay with abusive partners. These commenters also claimed that bans can disproportionately impact women veterans, who are particularly vulnerable due to unique issues they may face (such as a history of military sexual trauma and increased risks for certain health conditions), which is even more pronounced among various groups of veterans, such as women of color and women in rural areas.

VA does not make changes from the proposed rule based on these comments. The DOJ Opinion addresses all comments referencing VA's authority to provide abortions. See *Reconsidering the Authority of the Department of Veterans Affairs to Provide Abortion Services,* 49 Op. O.L.C._(Dec. 18. 2025), *https://www.justice.gov/olc/media/1421726/dl?inline.* Given that VA lacks statutory authority to provide abortion services, policy arguments that VA should have that authority are inapposite. In addition, under 38 U.S.C. 1710(a)(1), the Secretary has discretion to determine what hospital care and medical services are needed. As stated in the proposed rule, the regulatory determination that abortion is not a ''needed'' service for veterans was accepted by every VA Secretary and Presidential administration for over 20 years, under the recognition that VA was not prohibited from providing care to pregnant women in life-threatening circumstances under the medical benefits package. 90 FR 36416. Therefore, separate and apart from DOJ's opinion that VA lacks statutory authority, the Secretary is exercising discretion under 38 U.S.C.1710(a)(1) to reaffirm VA's longstanding determination that abortion is not a ''needed'' service.

Consistent with such determination, care to pregnant women in life-threatening circumstances will continue to be covered under the medical benefits package. Subject to the DOJ Opinion, VA similarly has discretion under 38 U.S.C. 1781 (as interpreted in 38 CFR 17.270(b)) to determine what is ''medically necessary and appropriate for the treatment of a condition'' in CHAMPVA and finds that the single exception for life endangerment when certified by a physician meets that standard.

VA will publish additional guidance regarding care that is not barred by this rule. VA will also ensure its health care providers are trained to provide life-saving care. Such guidance is consistent with both the DOJ Opinion and the Secretary's discretionary authority.

*B. Comments That Asserted Exceptions for Abortions Were Needed or Were Medically Necessary and Appropriate in Cases of Health Endangerment or When the Pregnancy Is the Result of Rape or Incest*

Some commenters asserted that abortions were needed or were medically necessary and appropriate not only when a pregnant individual might experience life-threatening or endangering circumstances, but also when such an individual's health may be threatened or endangered, or in any case when such an individual was pregnant as a result of rape or incest. Particularly, multiple commenters acknowledged VA's continued ability to furnish care in life-threatening circumstances without an explicit exception to the abortion exclusion in 38 CFR 17.38(c)(1), or with the limited exception for life endangerment in § 17.272(a)(58) as proposed, but additionally asserted that abortion can be needed to preserve health, not solely to prevent imminent death. Some of these commenters referenced publications from medical or other organizations to support these assertions or provided examples of serious but not immediately fatal medical conditions that a pregnant woman may have—such as severe preeclampsia, certain cardiac diseases, or cancers requiring urgent treatment—that could require an abortion to avoid additional harm to the pregnant woman as the pregnancy develops.

Other commenters stated more generally that restricting care to life-endangering or life-threatening circumstances would force delays, increase complications, and endanger the long-term health of a pregnant individual. Some of these commenters raised concerns that there is a lack of clarity regarding when there is life-endangering and life-threatening circumstances versus endangerment or threat to health, as there is not necessarily a bright line when a condition is health-threatening or endangering versus life-threatening or endangering. In those cases, these commenters noted that a patient's condition can deteriorate quickly, and clinicians rely on their medical training, judgment, and expertise to determine when to intervene, which is typically before a condition becomes life-threatening or endangering. Some commenters provided examples of conditions in which a patient's life may not be considered endangered or threatened in the short term, but their health is. Some commenters also referenced publications to show how a lack of clarity in states with similar restrictions impacts health care providers and pregnant women.

Some commenters asserted that health care providers will hesitate to rely on their expertise, training, and medical judgment to make any required certifications and provide care, even when permitted under this rule.

Lastly, a commenter noted that the medical benefits package included services recognized as needed health care (such as bereavement counseling, prosthetics, and a wide range of outpatient care and prescription drugs) that have an impact on the quality of life of patients but in many cases the life of the patient would not be at risk without them. This commenter noted that

restricting abortion to life-threatening circumstances, but not health-threatening circumstances, is therefore inconsistent with VA's interpretation of needed care by comparison.

VA does not make changes based on these comments. The DOJ Opinion renders any discussion of medical necessity moot. If VA did have discretion, VA still would not address every specific potential medical condition a pregnant woman may have or complication that could be experienced during pregnancy or otherwise further delineate the conditions under which care may be provided or allowed pursuant to this rulemaking. These are clinical matters that will need to be determined by health care providers with their patients, and VA will issue further related guidance. As such guidance is more appropriate for elaborating VA policy, VA does not make changes to its regulations based on these comments.

VA notes that there are other medical interventions that can be used to preserve the life of the mother in a life-threatening or endangering circumstance, which would be available under the medical benefits package. There is a subspecialty of obstetrics and gynecology, maternal-fetal medicine, that focuses on managing risk to the life of the mother before, during, and after pregnancy. These services are and will continue to be provided to veterans and CHAMPVA beneficiaries.

VA also does not make changes based on concerns that other services included in the medical benefits package do not have a threshold to be life-threatening to be considered needed. VA acknowledges that 38 U.S.C. 1710 allows the Secretary to provide care in other-than-life-threatening situations and that from the time that the medical benefits package was originally promulgated in 1999 and through the 2022 IFR, abortions were excluded generally while these other services were included, without any inherent conflict. VA is merely returning to that longstanding regulatory framework. VA is not establishing a threshold of life-threatening for services to be considered ''needed'' to be included in the medical benefits package.

*C. Exception To Permit Abortion When the Life of Mother Would Be Endangered if the Fetus Were Carried to Term*

In the context of discussing whether care is needed under 38 U.S.C. 1710, the proposed rule explained that VA had never understood its policy prior to September 9, 2022, to prohibit providing care to pregnant veterans in life-threatening circumstances, including treatment for ectopic pregnancies or miscarriages, which were covered under VA's medical benefits package prior to the 2022 IFR. 90 FR 36416. The DOJ Opinion reached the same conclusion.

The proposed rule further stated ''[f]or the avoidance of doubt, the proposed rule would make clear that the exclusion for abortion does not apply 'when a physician certifies that the life of the mother would be endangered if the fetus were carried to term'.'' Id. VA clarifies today that this statement in the proposed rule referred to the language related to CHAMPVA and not to the medical benefits package. It was not intended to convey that a life endangerment exception for abortion would be expressly codified in the medical benefits package. The comment summaries and responses below address concerns and issues raised in these comments, distinct from some similar comments in section III.F. of this final rule as related to allegations of Administrative Procedure Act (APA) violations.

1. Confusion if Exception for Life of Mother Is Not Codified for Veterans in the Medical Benefits Package Regulation

Some commenters stated that the proposed rule was not clear as to whether there would be an express exclusion in the medical benefits package to permit abortion if the life of the mother would be endangered if the child were carried to term, and that there would be confusion among patients and health care providers by not including such an exception in the medical benefits package. Some commenters opined that such confusion could lead to delayed or denied care, with commenters referencing publications regarding abortion exceptions for life of the mother in states such as Texas. Some commenters further explained that VA providers may hesitate to provide care if the exception is not codified in the medical benefits package regulation because the regulatory text, not the preamble, controls. Many of these commenters further suggested that VA codify the life exception in the medical benefits package to avoid these issues.

VA makes no changes based on these comments. As explained in the proposed rule, VA is returning to pre-September 9, 2022 position. VA is reverting the regulatory text of 38 CFR 17.38 to the same language that was in place at that time. Although some commenters may have been confused by the language in the preamble, the amendatory text of the proposed rule clearly indicated that the explicit exception was included only in the regulatory section that related to CHAMPVA, consistent with the language of that regulatory text prior to September 9, 2022. That pre-September 9, 2022 language was applied to allow for life-saving procedures that resulted in termination of a pregnancy, and there is no reason to believe that it will be hard for VA providers to apply that language now just as they did for over 20 years before the September 9, 2022 change.

2. Difference Between the Medical Benefits Package and CHAMPVA

Some commenters raised concerns that the regulations for the medical benefits package would not include an express exception to permit abortion if the life of the mother would be endangered if the child were carried to term while the CHAMPVA regulations would include such an exception. Commenters were concerned that this could result in ambiguity and confusion, leading to delayed or denied care. One commenter asserted that VA failed to provide any explanation for the difference between the changes being made to the medical benefits package and CHAMPVA regulations, since the former does not codify a life endangerment exception.

VA makes no changes based on these comments. As explained in the proposed rule, VA is reverting the regulatory text of 38 CFR 17.38 and 17.272 back to the same language that was in place prior to September 9, 2022. Moreover, the CHAMPVA and medical benefits package authorities apply to wholly different groups of beneficiaries and are operationalized in entirely different contexts. The differences between these regulations did not cause confusion before September 9, 2022, and will not now.

**II. Comments That Specifically Challenged the Rationale in the Proposed Rule**

*A. Number of Abortions Provided by VA*

The proposed rule explained that the exceptions to VA's longstanding general exclusion of abortions (as created by the 2022 and 2024 rulemakings) were a reaction to *Dobbs,* which itself was intended to prevent Federal overreach and return to States control over the provision of abortions. 90 FR 36416. The proposed rule further explained that the 2022 and 2024 rulemakings did the opposite of preventing such overreach and instead created a Federal entitlement based in part on an anticipated high demand for VA abortions that never materialized. Id.

These statements in the proposed rule highlight the flawed reasoning in the 2022 and 2024 rulemakings in the post-*Dobbs* context that supported those rulemakings.

Some commenters challenged what they perceived to be VA's premise that the low volume of abortions provided by VA actually reflects a low demand for veterans or CHAMPVA beneficiaries to receive these services from VA. These comments offered that such low volume could instead indicate barriers to accessing abortions (such as excessive travel from states with restrictive abortion laws, the chilling effect of restrictive State laws on VA provider decision making, or lack of knowledge that these services are available from VA) or could be due to a delayed ramp up inherent in the nature of VA offering new services. Other commenters challenged what they perceived to be VA's assertion that low demand supports the Secretary's determination that services are not needed or are not medically necessary and appropriate, correctly stating that low need is irrelevant as other medical services covered by VA do not have any threshold of utilization to be considered needed under 38 U.S.C. 1710 or medically necessary and appropriate under 38 U.S.C. 1781 (as interpreted in 38 CFR 17.270(b)). Lastly, some commenters more generally stated that the low volume of abortions furnished by VA supports that such services were only offered within the confines of the exceptions created and finalized in the 2022 and 2024 rulemakings, and as such, demonstrates that abortions were needed or were medically necessary and appropriate and otherwise do not constitute overreach.

VA does not make changes based on these comments. VA's proposed rule did not rely on the low volume of abortions as a justification for rescinding the 2022 and 2024 rulemakings, and neither does this final rule. VA agrees that low volume of provision of a medical service should not be a basis to exclude such service; indeed, some veterans sustain significant and unique injuries during their service, and VA would not deny them medical procedures to treat such injuries even if most other veterans do not sustain such injuries. Rather, in the proposed rule, VA cited the low demand for abortions to point out the flawed reasoning in the 2022 and 2024 rulemakings regarding the post-*Dobbs* landscape. The 2022 and 2024 rulemakings provided that it was critical to change VA's long-standing policies because the demand for abortions would be high. However, the low utilization demonstrates that the reasoning was flawed. They also highlight the relatively small impact of the proposed rule, which addresses comments that this final rule would have significant or broad impacts on society. In short, the 2022 and 2024 predictions of high demand reflect the overall flawed reasoning of that rulemaking, which unnecessarily reversed more than 20 years of settled regulatory policy.

*B. Comparison to Other Federal Programs and the Hyde Amendment*

Commenters raised concerns that the proposed rule referenced other Federal programs, including Medicaid, the Children's Health Insurance Program (CHIP), TRICARE, and the Federal Employee Health Benefits (FEHB), to demonstrate that Congress generally does not favor the use of Federal funds to furnish abortions without also recognizing that these same programs use Federal funding for some abortions. Multiple commenters asserted that these statements from the proposed rule either misinterpret or misapply the laws regarding the funding under these other programs, noting that each of the programs provides broader exceptions than the proposed rule to furnish abortions. Particularly, commenters asserted that Medicaid and CHIP are both subject to the Hyde Amendment, and that the Hyde Amendment has exceptions for abortions when the life of the pregnant patient is in danger and in cases of rape and incest. Relatedly, some commenters incorrectly asserted that VA is subject to the Hyde Amendment.

Commenters also asserted that the TRICARE program and the FEHB program both include abortion coverage bans with the same exceptions as the Hyde Amendment. Some commenters were also concerned that servicemembers who transition from active-duty service to civilian life would not be eligible for, and receive from VA, the same benefits they were previously eligible for under the Department of Defense (DoD).

While not addressed in the proposed rule, some commenters further asserted that individuals in Federal prisons have access to care veterans will be ineligible for under this rulemaking.

Some commenters construed the proposed rule to say that consideration of whether abortion is ''needed'' necessarily involves the question of whether taxpayers should pay for abortion. These commenters asserted that whether taxpayers should fund certain care for veterans is irrelevant to whether such care is considered needed, or otherwise stated that there is no support in either the statutory text of 38 U.S.C. 1710 or in VA's previous interpretations of section 1710 to suggest that taxpayer funding has been the basis for determining health care that is provided by VA.

VA does not make changes based on these comments. The statements in the proposed rule related to Congressional expressions of intent for funding of abortions, and taxpayer funding of abortions, to demonstrate that Congress has repeatedly articulated restrictions on abortion and VA's actions to restrict abortion are consistent with the fact that other Federal programs restrict abortions. This rationale similarly applies to the regulatory restriction under CHAMPVA. The statements were not intended to suggest that VA is bound by those non-VA restrictive authorities, or that VA should emulate them. Rather, VA must apply the specifically applicable authorities in title 38, U.S.C.

VA's provision of health care to veterans and CHAMPVA beneficiaries is governed by 38 U.S.C. 1710 and 1781, respectively. Pursuant to these authorities, the Secretary has discretion to determine what care is needed or medically necessary and appropriate. VA is not subject to the same statutory authorities as other Federal agencies programs, such as CHIP, Medicare, Bureau of Prisons, the FEHB Program, and TRICARE. For example, Federal funds available to the Departments of Labor, Health and Human Services, and Education are subject to the Hyde Amendment. Congress has included the Hyde Amendment in those agencies' annual appropriations legislation for more than forty years, but Congress has not subjected VA to the Hyde Amendment. VA is, however, subject to the conclusion in the DOJ Opinion that it may not provide abortions.

VA also recognizes that, like VA, some agencies are also not subject to the Hyde Amendment, and such agencies have different statutory authorities than VA. For example, DoD is subject to 10 U.S.C. 1093, which establishes that DoD may not use funds or facilities ''to perform abortions except where the life of the mother would be endangered if the fetus were carried to term or in a case in which the pregnancy is the result of an act of rape or incest.''

To the extent commenters asserted that servicemembers who transition from active-duty service to civilian life would not be eligible for, and receive from VA, the same benefits they were previously eligible for DoD, VA acknowledges that veterans would not be eligible for, or receive, the same benefits relating to abortions and abortion counseling. As explained above, DoD and VA are subject to

different statutory authorities. VA also reiterates the point made earlier that veterans and CHAMPVA beneficiaries may seek care outside of the VA system, and would be subject to different authorities in those circumstances as well. This rulemaking impacts only the furnishing of VA care to veterans and CHAMPVA beneficiaries. VA is not regulating the care provided or funded by other Federal agencies and other health care, through private insurance or otherwise, that is available outside of that provided by, and through, VA.

VA also acknowledges that having an explicit exception for ''life'' in the Hyde Amendment and other statutory authorities but not in VA's regulations might lead to the (inaccurate) conclusion that VA intends to bar life-saving procedures that result in a termination of pregnancy. VA recognizes that there may be a semantic aspect to exempting life-saving procedures by not calling them ''abortions.'' However, the opposite is also true, *i.e.,* that allowing ''abortions'' in some cases can lead to broader interpretations of what is intended to be authorized by VA as needed care. Moreover, VA is reestablishing regulatory language that directed Department practice for decades. VA has been abundantly clear in the proposed rule and this final rule that the bar against abortions does not apply to life-saving procedures that could result in the termination of a pregnancy and any arguments that VA's providers will read the regulation differently are hypothetical and without factual basis. If such misapplications of regulation occur, VA will address them through training and management of its workforce—not by changing the language of the regulation. Thus, to the extent that VA's discretionary authorities apply in light of the DOJ Opinion, VA's final rule is appropriate and consistent with such discretion.

*C. Competing Provisions of Section 106 of VHCA and 38 U.S.C. 1710*

The proposed rule explained that VA's exclusion against abortions was legally established in 1999 and was observed until the 2022 revisions, and further that the 2022 IFR was legally questionable given that Congress has only specifically addressed VA's authority to provide abortions in section 106 of VHCA, which authorized VA to provide under chapter 17 of title 38, U.S.C., ''[p]apanicolaou tests (pap smears),'' ''[b]reast examinations and mammography,'' and ''[g]eneral reproductive health care'' but excluded ''under this section infertility services, abortions, or pregnancy care (including prenatal and delivery care), except for such care relating to a pregnancy that is complicated or in which the risks of complication are increased by a service-connected condition.'' 90 FR 36416. As explained in the proposed rule, Congress extensively revised chapter 17 in 1996, but also did not expressly repeal section 106. Id. The proposed rule discussed these competing legal provisions to demonstrate that VA's authority to provide abortions is, at least, dubious and, at most, nonexistent; and, that VA's determination to restore the abortion exclusion was in any case consistent with VA's decades-long interpretation of the applicable law. Id. VA did not intend to interpret or opine on the continuing authority of section 106 because VA decided to bar abortions under 38 U.S.C. 1710 and 1781. Notwithstanding the DOJ Opinion, which concludes that VA lacks discretion in this area, VA would still decline to provide abortions under that discretionary authority.

Multiple commenters challenged VA's statements in the proposed rule regarding the potential competing authorities of section 106 of the VHCA and 38 U.S.C. 1710. These commenters generally stated that, although the proposed rule did not take a position on the force or effect of section 106 of the VHCA, the proposed rule relied on section 106 to introduce that there was uncertainty as to the authority of VA to furnish abortions, despite the analysis VA put forward in the prior 2022 and 2024 rulemakings to support that section 106 and the limitations therein were legally inoperable. Some commenters further asserted that the proposed rule's failure to specifically address any potential change in analysis from these past rulemakings regarding the effect of section 106 was grounds to find the proposed rule arbitrary and capricious. Lastly, some commenters additionally asserted that VA's acknowledgement in the proposed rule that there could be uncertainty regarding the interpretation of applicable authority related to VA's provision of an abortion was similar grounds to find that the proposed rule was arbitrary and capricious, or otherwise grounds to find that the proposed rule did not meet requirements under the APA to provide a reasoned basis explaining the proposed regulatory revisions.

VA does not make changes from the proposed rule based on these comments. Since the publication of the proposed rule, the DOJ Opinion has clarified this issue. Moreover, to the extent that VA's authority under section 1710 serves as a secondary basis for this rule, the major questions doctrine provides an alternative framework for evaluating the limits of agency discretion in areas of significant political and moral consequence. As articulated in *West Virginia* v. *EPA,* the doctrine requires agencies to identify clear congressional authorization before regulating in domains of extraordinary national importance. If, as some commenters suggest, the provision of abortion services exceeds the scope of VA's delegated authority, then any such limitation must arise from statute—not from medical or ethical arguments advanced in the public comments. In this context, the only specific statutory provision addressing abortion is section 106 of the VHCA, which broadly prohibits it. Thus, even under a major questions analysis, the result would not be to expand abortion access based on medical discretion, but to apply the statutory constraint and return to the prior observation of the prohibition. In this context, VA's return to its long-standing exclusion of abortion services is not only consistent with the DOJ Opinion and its statutory mandate under 38 U.S.C. 1710 and 1781, but also reflects a prudent exercise of discretion that respects the constitutional separation of powers and the limits of agency authority under administrative law. Furthermore, as reflected throughout this final rule, VA does not consider this ban to bar the provision of life-saving treatment to pregnant women.

*D. Determination of ''Needed'' Under 38 U.S.C. 1710 and the Promote, Preserve, or Restore Standard in 38 CFR 17.38(b)*

The proposed rule explained that from 1999, when VA established the medical benefits package in 38 CFR 17.38, until September 8, 2022, abortions were excluded because they were not ''needed'' medical services under 38 U.S.C. 1710—that for decades, VA had consistently interpreted abortions as not ''needed'' medical services and therefore they were not covered by the medical benefits package. 90 FR 36415–36416. Multiple commenters asserted that the Secretary's discretion to determine what care is needed under 38 U.S.C. 1710 must be based on medical standards and judgment and a clinical need for care. Some supported these assertions by citing Congressional reports related to the passage of the law that became section 1710 (Pub. L. 104–262). These commenters primarily referenced language from H.R. Rep. No. 104–690 as indicating legislative intent that a singular clinical need for care standard would replace the multiple legal

eligibility standards when determining those veterans who would receive care and what care would be furnished. Some of these commenters further cited VA's IFR and final rules from 2022 and 2024 to demonstrate that VA at one point determined that abortions could be considered needed under section 1710, and stated that the proposed rule did not establish how abortions were not clinically needed. Ultimately, these commenters concluded that VA could not reasonably determine that abortions were not needed under section 1710 as a matter of statutory interpretation, given Congressional intent and VA's own statements in prior rulemakings.

Other commenters asserted that the criteria for furnishing care under the medical benefits package in 38 CFR 17.38(b), if such care is determined by appropriate health care professionals ''to promote, preserve, or restore the health of the individual,'' were Congressionally mandated standards that are separate from and replace the Congressionally mandated requirement that the Secretary must determine that care is needed under 38 U.S.C. 1710. Others fell short of alleging that the promote, preserve, or restore criteria were Congressionally mandated, but nonetheless asserted that these criteria articulated how VA as a matter of practice assesses whether care is needed and should be used to decide whether care is included in the medical benefits package.

All of the above-described comments generally concluded that abortions must be included in the medical benefits package because abortions could be found by VA to promote, preserve, or restore the health of an individual.

VA does not make changes from the proposed rule based on these comments. VA first clarifies that the promote, preserve, or restore criteria in 38 CFR 17.38 are regulatory only; these criteria are not present in 38 U.S.C. 1710. Regarding comments about the Congressional intent behind section 1710, VA agrees that section 1710 was intended to streamline care decisions based on clinical need for care in place of formerly stratified legal criteria for different types of care that existed before the enactment of section 1710. However, to the extent commenters assert that this focus on clinical need means the Secretary cannot reevaluate an interpretation of what is needed under section 1710, VA disagrees. The text of section 1710 does not mandate the perpetual approval of any care that VA at one time found to be needed. Further, the text of section 1710 does not prohibit the Secretary from establishing limitations and exclusions as to whether care is needed under section 1710.

Regarding the comments related to the promote, preserve, or restore criteria in 38 CFR 17.38(b), VA did express in the original promulgation of its medical benefits package that ''[t]he Secretary has authority to provide healthcare as determined to be medically needed. In our view, medically needed constitutes care that is determined by appropriate healthcare professionals to be needed to promote, preserve, or restore the health of the individual and to be in accord with generally accepted standards of medical practice. The care included in the medical benefits package is intended to meet these criteria.'' 64 FR 54207, at 54210. However, VA does not believe this statement from VA, or the criteria in 38 CFR 17.38(b), apply to Secretarial determinations of ''needed'' care under 38 U.S.C. 1710. Rather, the promote, preserve, or restore criteria were put in place by the Secretary to govern how VA providers make individualized clinical determinations of care; those individualized determinations can only provide care that the Secretary has already determined to be needed under section 1710. This is evidenced in the regulation at 38 CFR 17.38(b), which states that ''care referred to in the medical benefits package will be provided to individuals only if it is determined by appropriate health care professionals that the care is needed to promote, preserve, or restore the health of the individual and is in accord with generally accepted standards of medical practice.'' In fact, adopting the commenters' position would seem to undercut the Secretary's authority to restrict any care at all, and the medical benefits package contains both the above-quoted restriction in § 17.38(b) as well as other excluded types of care in § 17.38(c). These cannot be authorized even if a provider determines that they might promote, preserve, or restore health.

Therefore, to the extent that VA's discretionary authorities apply in light of the DOJ Opinion, VA makes no changes based on these comments.

## III. Comments That Raised Other Legal Concerns

### *A. Compliance With State Laws Post-Dobbs*

Several commenters raised concerns that post-*Dobbs,* VA must or should follow state laws regarding abortion, particularly in states where abortion is legal or less restrictive than the proposed rule. Some commenters were concerned that the proposed rule would negate or violate states' rights and that VA should not restrict women's ability to access abortions at VA in states that do not have restrictions or bans on abortions. Some commenters specifically asserted that veterans and CHAMPVA beneficiaries should have the same right to an abortion as other women in their same state and other citizens, generally.

VA makes no changes based on these comments. There is no Federal law that guarantees a right to abortion. In *Dobbs,* the U.S. Supreme Court concluded that there is no constitutional right to abortion and returned the issue to the states to decide. 142 S. Ct. 2228.

As a Federal agency, VA must follow Federal laws, such as 38 U.S.C. 1710 and 1781, which provide it with the authority and discretion to determine the care that may be furnished to veterans and CHAMPVA beneficiaries. The Supremacy Clause of the U.S. Constitution, U.S. Const. art. VI, cl. 2., generally prohibits states from interfering with or controlling the operations of the Federal government, and therefore immunizes the Federal government from state laws that directly regulate it. As such, VA is not subject to state laws that purport to regulate, prohibit, or burden VA's furnishing of needed or medically necessary and appropriate care.

Furthermore, VA has consistently asserted such supremacy in its provision of health care to beneficiaries in all states. In 38 CFR 17.419, VA explicitly preempts any state laws, rules, regulations, or requirements that conflict with a VA health care professional's practice within the scope of their VA employment. Similarly, in § 17.417, implementing 38 U.S.C. 1730C, VA explicitly preempts any state laws, rules, regulations, or requirements that conflict with a VA health care professional's practice of telehealth within the scope of their VA employment. In both regards, VA is able to establish a uniform approach to the provision of VA health care by its health care professionals. VA has an interest in ensuring that it provides consistent and equitable care and services to its beneficiaries in all states regardless of where they may receive care or reside. See 38 CFR 17.417(c) and 17.419(c).

VA's rule is no more restrictive than the state laws that permit an abortion to save the mother's life. As explained in the proposed rule, no state law entirely bans abortions, as exceptions to preserve the life of the mother exist in all 50 states.[1]

[1] *https://www.justia.com/constitutional-law/50-state-survey-on-abortion-laws/.*

GOV-VA 000572

To the extent that VA's rulemaking is in direct conflict with state laws, rules, regulations, or requirements, such laws, rules, regulations, or requirements are without any force or effect pursuant to the Supremacy Clause of the U.S. Constitution and 38 CFR 17.419 and 17.417. As explained previously, VA, as a Federal health care system, has an interest in ensuring that it provides consistent and equitable care and services to all veterans and CHAMPVA beneficiaries in all states regardless of where they may receive care or reside. See 38 CFR 17.419(c). This rulemaking ensures that veterans and CHAMPVA beneficiaries continue to receive the same care in all states.

To the extent that commenters contend that veterans and CHAMPVA beneficiaries should receive the same care as other citizens or women in their state, VA notes that pursuant to 38 U.S.C. 1710 and 1781, VA is required to furnish care to veterans and CHAMPVA beneficiaries, respectively. That care is not required to be the same as that available to any other citizen or woman in their state. For example, VA does not provide certain elective procedures that may be widely available in the private sector unless they are medically necessary or connected to a service-related condition. VA is subject to a unique set of laws enacted by Congress and carried out by the Secretary, who has the authority and discretion to determine what care VA will provide.

*B. Delegation*

One commenter asserted that the proposed rule allows state laws to determine whether veterans and CHAMPVA beneficiaries can receive abortions, which is an inappropriate delegation for a Federal program. This commenter asserted that because Congress instructed VA to provide coverage to veterans and CHAMPVA beneficiaries based on clinical necessity, VA cannot delegate this responsibility to the most restrictive state law.

Pursuant to 38 U.S.C. 1710 and 1781, Congress appropriately delegated to the Secretary the discretion to determine what care may be furnished to veterans and CHAMPVA beneficiaries, respectively. To the extent that the Secretary retains discretionary authority on the issue of abortion, the Secretary's exercise of that discretion would not be a delegation of his authority and responsibility pursuant to section 1710 and 1781 to states, even if it superficially coincides with certain state laws. However, VA acknowledges that VA's rule is generally consistent with those state laws, or sections of state laws, that permit abortion to save the mother's life. As explained in the proposed rule, no state entirely bans abortions, as exceptions to preserve the life of the mother exist in all 50 states.[2] VA makes no changes based on this comment.

*C. Emergency Medical Treatment and Labor Act (EMTALA) and 38 U.S.C. 1784A*

Several commenters raised concerns about the proposed rule in light of the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. 1395dd, and VA's related authority, 38 U.S.C. 1784A. In particular, some commenters were concerned whether VA would meet requirements under EMTALA and 38 U.S.C. 1784A because they stated that the Federal government refuses to enforce EMTALA and has rescinded related guidance. Other commenters equated the proposed rule with eliminating VA's obligations under EMTALA and 38 U.S.C. 1784A, especially as commenters opined that EMTALA and 38 U.S.C. 1784A require the provision of stabilizing care, which may include an abortion, to a pregnant patient whose health is in serious jeopardy.

VA makes no changes based on these comments. VA is not subject to EMTALA, but has adopted some of its requirements through policy. Instead, VA has its own similar authority. Section 1784A of title 38 U.S.C. requires that in the case of a VA hospital with an emergency department, if any individual comes to the hospital or its campus and a request is made on behalf of the individual for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition exists. It further requires that if any such individual has an emergency medical condition, the VA hospital must provide medical examination and treatment required to stabilize the medical condition or transfer the individual to another medical facility in accordance with specified requirements. VA complies with these requirements of 38 U.S.C. 1784A and will continue to do so. This rule will not impact VA's responsibilities and obligations under section 1784A. Furthermore, as explained in the proposed rule, VA will continue to provide care to pregnant women in life-threatening circumstances under the medical benefits package. 90 FR 36416–17.

*D. Sex or Gender Discrimination*

Commenters asserted that the proposed removal of the exceptions to furnish abortions amounted to gender or sex discrimination as such changes necessarily only affect veterans that can get pregnant, or women veterans. Other commenters alleged that the proposed removal of the abortion exceptions was discriminatory because VA would still provide all reproductive care for veterans who were men; particularly, some of these commenters noted that VA would still provide male veterans medication to treat erectile dysfunction, or would still perform vasectomies for male veterans, despite these services not being needed to save the lives of male veterans. Lastly, some comments more specifically opined that removal of the exceptions to furnish abortions would potentially violate specific laws related to preventing sex discrimination (*i.e.,* Title IX of the Education Amendments of 1972, or section 1557 of the Affordable Care Act), or otherwise would conflict with Congressional intent to ensure equality in the provision of health services to women veterans under the Deborah Sampson Act of 2020, Title V of Public Law 116–315.

VA does not make changes from the proposed rule based on these comments. VA's interpretation in the proposed rule and as made final in this rule is that abortions are not needed care in general, and that VA is not prohibited from providing care to pregnant women in life-threatening circumstances (under the medical benefits package), even if such treatment may result in the termination of a pregnancy. Standards of medical care and treatment, including with respect to reproductive health care, necessarily involve different protocols based on the clinical needs and biology of the individual patient, including their sex. That this regulatory change necessarily impacts the care and services available to veterans and CHAMPVA beneficiaries who are women does not alone amount to discrimination on the basis of sex or gender.

To the extent section 1557 of the ACA applies to VA, it does not require VA to maintain the abortion exclusions established by VA in the 2022 and 2024 rulemakings. Section 1303(c)(2) of the ACA specifically states that ''[n]othing in this Act shall be construed to have any effect on Federal laws regarding . . . willingness or refusal to provide abortion [or] discrimination on the basis of the willingness or refusal to provide,

[2] *https://www.justia.com/constitutional-law/50-state-survey-on-abortion-laws/.*

GOV-VA 000573

pay for, cover, or refer for abortion or to provide or participate in training to provide abortion.'' In its regulations implementing section 1557, the Department of Health and Human Services (HHS) emphasized this point, stating that ''nothing in section 1557 shall be construed to have any effect on Federal laws regarding . . . willingness or refusal to provide abortion . . . and discrimination on the basis of the willingness or refusal to provide, pay for, cover, or refer for abortion or to provide or participate in training to provide abortion.'' 45 CFR 92.3(c). Although not applicable to VA, HHS's regulation informs VA's interpretation of section 1557 and its inapplicability to abortion as a form of discrimination.

Finally, title IX is inapplicable in this context because title IX was enacted to prevent discrimination on the basis of sex in educational programs and activities that receive Federal financial assistance. See 20 U.S.C. 1681(a). To the extent title IX would apply to health programs, title IX also contains an abortion neutrality provision, where ''nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion.'' 20 U.S.C. 1688. Accordingly, VA disagrees with commenters' assertions that VA's proposed changes violate section 1557 or title IX.

### *E. Constitutional Rights*

Commenters alleged that the proposed rule violates multiple Federal Constitutional rights. These commenters stated that removing the exceptions to furnish abortion in certain circumstances imposes specific moral and religious views on all veterans, violating religious freedom protections under the First Amendment; deprives individuals of life, liberty, or property, violating due process protections under the Fifth Amendment; or otherwise violates fundamental bodily autonomy rights. Other commenters alleged that the proposed rule violated the Ninth or the Fourteenth Amendments without further explanation, and one commenter alleged a violation of the Fourth Amendment because medical history should be private.

VA does not make changes from the proposed rule based on these comments. In *Dobbs,* the Supreme Court determined that there is no Constitutional right to abortion, and VA's removal of exceptions to furnish abortion in certain circumstances is therefore not violative of any Constitutional right. Further, removal of the exceptions is not based on religious ideology, and it will not endanger the lives of veterans and CHAMPVA beneficiaries as VA will continue to furnish needed and medically necessary and appropriate care to a veteran or CHAMPVA beneficiary, respectively, even if such care might result in the termination of a pregnancy.

### *F. APA Violations*

Multiple commenters alleged that the proposed rule failed to provide a reasonable explanation that considered prior evidence and consequences of policy reversal, and reliance interests in removing the exceptions to furnish abortions and abortion counseling, and that the rule if finalized as proposed would therefore be arbitrary and capricious under administrative law standards under the APA. Some of these commenters more specifically asserted that portions of the rationale in the proposed rule were confusing or presented flawed reasoning to also allege that the rule if finalized as proposed would be arbitrary and capricious. VA addresses these comments below as applying to both the medical benefits package as well as CHAMPVA, unless otherwise indicated.

#### 1. Consideration of Prior Evidence Related to Whether Abortions Are Needed or Medically Necessary and Appropriate, and Consequence of Policy Reversal

Commenters asserted that the proposed rule fails to address the facts and circumstances presented in VA's 2022 IFR, and that rule's prior conclusion that abortions were needed or medically necessary and appropriate when the life or health of the pregnant veteran is at risk or in cases of rape and incest. Commenters stated that the proposed rule mischaracterized the 2022 IFR's rationale as only relating to an anticipated rise in demand for abortion as a result of the *Dobbs* decision, although the 2022 IFR and 2024 final rule were additionally based on evidence regarding the health consequences of carrying certain pregnancies to term. Commenters further asserted that the proposed rule did not address documented evidence of harm that results from abortion bans or restrictive abortion laws, and therefore that VA did not conduct the required consideration of harmful consequences in reversing policy from the 2022 and 2024 rules. Many of these commenters cited multiple medical or scientific studies or other publications which show increased maternal mortality rates or other worsened physical and mental health outcomes of pregnant individuals in states with restrictive abortion laws. Commenters asserted that these studies suggest that states with restrictive laws create uncertainty for healthcare providers, a chilling effect for fear of legal consequences for healthcare providers and pregnant individuals, or additional administrative requirements to furnish or receive care, all of which can result in delays in or lack of needed care being furnished. Commenters further stated that the proposed rule did not present any evidence to rebut or undercut the studies on which VA previously relied, or the factual findings that it made, in 2022 and reaffirmed in 2024. Commenters ultimately opined that because the proposed rule disregards VA's previous factual findings, any final rule that would also do so would be arbitrary and capricious.

VA does not make changes from the proposed rule based on these comments. The APA change-in-position doctrine states that ''agencies are free to change their existing policies as long as they provide a reasoned explanation for the change,'' ''display awareness that [they are] changing position,'' and consider ''serious reliance interests.'' *Encino Motorcars, LLC.* v. *Navarro,* 579 U.S. 211, 221–222 (2016); *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515–516 (2009). Change in position doctrine asks (1) whether agency changed its existing policy, and (2) whether the agency displayed awareness that it is changing its policy and offered good reasons for the new policy. *FDA* v. *Wages & White Lion Invs., LLC,* 604 U.S. 542, 569–570 (2025).

The standard described above does not require VA to respond to every factual consideration made in its prior rulemaking or show ''that the reasons for the new policy are better than the reasons for the old one.'' See *Fox Television,* 556 U.S. at 515. VA explained in its proposed rule that it was rescinding the 2022 and 2024 rules pursuant to its authority in 38 U.S.C. 1710 to furnish hospital care and medical services that the Secretary determines to be needed and to restore VA's medical benefits package to its pre-September 9, 2022 state. Similarly, VA explained in its proposed rule that it was rescinding the 2022 and 2024 rules pursuant to its authority in 38 U.S.C. 1781 and to restore its CHAMPVA coverage to its pre-September 9, 2022 state. This rationale provided for these proposed changes to the medical benefits package and CHAMPVA conforms to the standard under which an agency may subsequently change its position on prior rulemakings. See *Motor Vehicle Mfrs. Ass'n of the U.S.,*

*Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983) (an agency's rule may not be set aside if it is ''rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute.'') Moreover, the DOJ Opinion is controlling legal authority for VA and forecloses discretionary authority in this area.

2. Reliance Interests

Some commenters raised concerns that the proposed rule disregarded reliance interests from VA's prior policy. In particular, some commenters noted that agencies are required to assess whether there are reliance interests in its existing policy, whether they are significant, and weigh any such interests against competing policy concerns.

VA makes no changes based on these comments. VA acknowledges that when an agency changes course, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account. See *Dep't of Homeland Sec.* v. *Regents of the Univ. of Cal., 591 U.S. 1, 30 (2020).* For purposes of abortions when the health of the pregnant mother would be endangered if the pregnancy were carried to term, in the case of rape or incest, and for abortion counseling provided to veterans under the medical benefits package and to CHAMPVA beneficiaries, VA has concluded there are no serious reliance interests because such services have been available for a short period of time (that is, only since September 9, 2022). Additionally, VA has concluded there are no serious reliance interests because very few veterans and CHAMPVA beneficiaries have been provided such services by VA, as explained in the proposed rule. Further, as explained in *Dobbs,* traditional reliance interests are lacking when it comes to abortion. *Dobbs,* 597 U.S. at 287–91.[3] Moreover, *Dobbs* made clear that there is no Federal constitutional right to abortion and no compelling government interest in promoting abortion.[4] Thus, VA finds that veterans and CHAMPVA beneficiaries will not have serious reliance interests that must be taken into account as part of this rulemaking. VA further acknowledges that this rulemaking is a two-stage rulemaking that had a proposed rule that, once final, will have a 30-day delayed effective date, which have provided veterans and CHAMPVA beneficiaries advance notice and sufficient time to identify other sources available for these services. Moreover, the DOJ Opinion governs VA's interpretation of applicable law and forecloses discretionary authority in this area.

3. Other Administrative Law Issues

Commenters asserted that the proposed rule's failure to specifically address any change in analysis from the 2022 and 2024 rulemakings regarding the effect of section 106 was grounds to find the proposed rule arbitrary and capricious. Some commenters further asserted that VA's mere acknowledgement in the proposed rule that there could be uncertainty regarding the applicable authority related to VA's provision of abortions was itself grounds to find that the proposed rule was arbitrary and capricious.

VA makes no changes based on these comments. Even if the DOJ Opinion did not overrule any exercise of discretion to allow abortion, VA would rely on the determination that abortions are not needed under 38 U.S.C. 1710. Acknowledging uncertainty about the applicability of a separate authority not relied on to promulgate a regulation change does not render a rule arbitrary and capricious. Instead, it reflects consideration of both the legal and policy context behind developing the rule. Under the arbitrary and capricious standard, as traditionally interpreted, a reviewing court would consider whether the agency ''relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for the decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'' *State Farm,* 463 U.S. at 43. The proposed rule was not arbitrary and capricious since the discussion of section 106 did none of these things. Moreover, VA's decision to bar abortion but continue to provide life-saving care is consistent with section 106 and the DOJ Opinion.

Some commenters asserted that although the preamble of the proposed rule stated that, ''[f]or the avoidance of doubt, the proposed rule would make clear that the exclusion for abortion does not apply 'when a physician certifies that the life of the mother would be endangered if the fetus were carried to term,' '' the proposed amendment to the medical benefits package does not include any such language, making it unclear whether a life endangerment exception exists for veterans in the medical benefits package. One commenter stated that because the preamble does not have the force of law, the exception for life of the mother for the medical benefits package appears to be illusory, and that this inconsistency itself renders the rule arbitrary and capricious. Another commenter noted that the preamble of the proposed rule as referenced above incorrectly describes the text of the rule with regards to the medical benefits package, and the preamble is insufficient assurance that such a life endangerment exception exists to adequately justify the proposed change. Lastly, multiple commenters opined that the proposed rule failed to explain why CHAMPVA would have a life endangerment exception in regulatory text while the medical benefits package would not, where one of these comments more specifically asserted that the rule if finalized as proposed will be arbitrary and capricious for failing to provide a reasoned explanation for where the life endangerment exception applies.

VA makes no changes based on these comments. The proposed rule repeatedly stated that VA was returning to its pre-September 9, 2022, restrictions on abortion within the medical benefits package and CHAMPVA. The regulatory revisions previously proposed and now finalized within this rule reinstates the prior restrictions on abortion within the medical benefits package as well as CHAMPVA, and the interpretation of that language, as it was applied by VA before September 9, 2022. The preamble of the proposed rule explained how the regulatory text was interpreted and will be interpreted once finalized through this rulemaking. As VA's statutory authorities for the medical benefits package and CHAMPVA are 38 U.S.C. 1710 and 1781, respectively, pursuant to such authorities, VA may determine

[3] In *Dobbs,* the U.S. Supreme Court concluded that there is no constitutional right to abortion and found that there are no serious reliance issues for such a constitutional right, stating ''Traditional reliance interests arise 'where advance planning of great precision is most obviously a necessity.' *Casey,* 505 U.S. at 856 (joint opinion); see also *Payne,* 501 U.S. at 828. In *Casey,* the controlling opinion conceded that those traditional reliance interests were not implicated because getting an abortion is generally 'unplanned activity,' and 'reproductive planning could take virtually immediate account of any sudden restoration of state authority to ban abortions.' 505 U.S. at 856. For these reasons, we agree with the *Casey* plurality that conventional, concrete reliance interests are not present here.'' *Dobbs,* 597 U.S. at 287–88.

[4] Before *Dobbs,* even during the entire time when the U.S. Supreme Court recognized a fundamental right to abortion, the U.S. government was under no obligation to subsidize or to facilitate abortion. *See Harris* v. *McRae,* 448 U.S. 297, 326 (1980) (''[W]e hold that a State that participates in the Medicaid program is not obligated under Title XIX to continue to fund those medically necessary abortions for which federal reimbursement is unavailable under the Hyde Amendment.'').

which exceptions to abortion are appropriate for each program independently based on applicable law and programmatic objectives—subject to the limitations articulated in the DOJ Opinion. The absence of a life endangerment exception in the regulatory text for the medical benefits package, while included in CHAMPVA, does not render the proposed rule arbitrary and capricious.

Furthermore, in the case of CHAMPVA, allowing abortions when a physician certifies the life of the mother would be endangered if the child were carried to term aligns with the requirement under 38 U.S.C. 1781(b) to provide CHAMPVA benefits in a similar manner as TRICARE. The rescission of the 2022 and 2024 rulemakings restores both the medical benefits package and CHAMPVA to its pre-September 9, 2022 policy, in which CHAMPVA had an explicit life endangerment exception while the medical benefits package did not. As such, the differential treatment is merely a return to the regulations that were in place prior to September 9, 2022, and satisfies the APA's requirements for reasoned decision making.

One commenter asserted that the proposed rule fails to adequately explain how VA is changing course, which the commenter stated requires clearer statements of VA's understanding of both the status quo and the changes that would be made by the proposed rule. This commenter offered that the proposed rule framed the exceptions to furnish abortion (the status quo at the time the proposed rule was published) as permitting elective abortion, by way of VA's reference to other Federal programs as evidence that Congress does not fund elective abortion, and opined that this was a misrepresentation of the status quo and therefore VA could not properly explain the effect of the changes in the proposed rule, making the rule arbitrary and capricious.

VA makes no changes based on this comment. Consistent with the requirements of the APA, the proposed rule clearly articulated both the prior rule and the reasons underlying its decision to rescind the rule. The preamble identified the relevant provisions of 38 CFR 17.38(c)(1) and 17.272(a)(58) and explained how the proposed rule would restore VA's regulations to its pre-September 9, 2022, regulatory text. The discussion of other Federal programs provided context and a point of comparison. VA's explanation accurately reflected the status quo and the rationale for its proposed change. Accordingly, the proposed rule satisfied VA's legal obligation to provide a reasonable explanation for its change in position and is not arbitrary and capricious.

One commenter asserted that VA's interpretation in the proposed rule of "similar, not identical" in relation to CHAMPVA coverage for abortion being different from TRICARE was arbitrary and capricious because deviations from TRICARE should be based on the needs of the CHAMPVA population and medically necessity, and VA provides no evidence that offering coverage more similar to TRICARE is harmful or unnecessary.

VA makes no changes based on this comment. As previously stated, and discussed in more detail below, CHAMPVA benefits should be similar to, but not necessarily identical to, those provided under TRICARE. VA is afforded discretion to determine the extent to which it aligns CHAMPVA with TRICARE benefits, subject to its policy determinations and program objectives. VA is not required to justify deviations from TRICARE solely by referring to medical necessity or demonstrable harm to CHAMPVA beneficiaries. VA may adopt distinctions that reflect its own administrative considerations or differences in program purpose or population. Adopting such distinctions does not make the rule arbitrary and capricious. For a more detailed discussion of "same or similar" in relation to TRICARE, see further below.

One commenter asserted that the proposed rule failed to provide a reasonable explanation for why only physicians can certify an exception to permit abortion versus other types of clinical providers in CHAMPVA and therefore introduces an administrative burden in an arbitrary and capricious manner.

VA makes no changes based on this comment. Pursuant to 38 U.S.C. 1781, VA has the authority to determine the scope of CHAMPVA benefits and to establish reasonable procedures for their administration. VA's requirement that only physicians certify an exception to permit abortion is a permissible exercise of this discretion. This physician certification requirement is a return to VA's pre-September 9, 2022 regulatory text. This is not arbitrary and capricious as VA reasonably determined that physician certification ensures appropriate clinical oversight, is consistent with program objectives, and does not place an undue burden on CHAMPVA beneficiaries as it reinstates its former regulation.

One commenter asserted that changes occurred to a comment submission feature on the General Services Administration's *Regulations.gov* website during the comment period for the proposed rule without adequate notice, which the commenter stated impinged the public's ability to comment. This commenter opined that this change was a violation of the spirit of the APA to permit the public a meaningful opportunity to comment, to render the rule if finalized as proposed to be arbitrary or capricious.

VA makes no changes based on this comment. VA considers this outside the scope of the rulemaking since the General Services Administration (GSA), not VA, is responsible for *regulations.gov.*

4. Regulatory Impact Analysis (RIA) Insufficiencies

Commenters asserted that the RIA that accompanied the proposed rule underestimates the cost to society because it fails to adequately assess the additional costs related to lack of access or delayed receipt of abortions caused by strict abortion laws in states. These commenters cited increased monetary costs of abortion procedures performed later in pregnancy, as well as increased costs to travel to states with less strict laws, or lost wages in taking leave from work. Other commenters alleged that the RIA underestimated the proposed rule's cost to society by not estimating the additional costs in care that can occur the longer an individual may have to wait to obtain an abortion, citing to increased costs of emergency care or other required critical care as health outcomes of a pregnant individual worsen. Some comments also stated more generally that some assumptions in the RIA were flawed or not supported, such as statements in the RIA as to the number of states that have restrictive abortion laws (or the types or impact of state restrictions), or the percentage of abortion procedures estimated in the RIA to be medication abortions, or the percentage of veterans that would use VA's maternity care benefits if VA did not provide an abortion procedure.

VA is not making any changes to the rule or RIA based on these comments. VA developed the RIA in line with the Office of Management and Budget (OMB) Circular A–4 principles and applied methods consistent with OMB Circular A–4 and VA's RIA that accompanied the September 9, 2022 IFR. The RIA follows current Circular A–4 guidelines as it identifies the impacted population of female veterans, applies the appropriate baseline, and demonstrates the segregation of transfers, costs, and reliably measurable

GOV-VA 000576

societal impacts. VA's assumptions are based upon impacts that are reasonably predictable and are supported by available data at the time the analysis was developed. While commenters favor wider ranges of estimates, the key elements highlighted in the RIA remain the same as were present in the IFR.

The RIA relied on publicly available sources to characterize the state restrictions to develop the rulemaking's analytical baseline. While VA recognizes that state policies evolve and can be categorized in different ways, the RIA's baseline appropriately reflects the legal environment at the time the analysis was conducted, as required by Circular A–4. Alternative classifications of state restrictions examined during review do not alter the direction of findings and any quantitative differences lie within the qualitative bounds presented in the RIA. Additionally, the RIA used the best available published estimates at the time of drafting to allocate abortions between medication and procedural methods. VA acknowledges that these can vary over time and between jurisdictions. However, any variations in the method of abortion does not alter the policy conclusions of the analysis.

The RIA qualitatively discussed access constraints and acknowledged that individuals in some jurisdictions may face longer travel and wait times for procedures or determinations. VA chose not to monetize these impacts due to the current data limitations at the veteran level, both enterprise-wide and within CHAMPVA, which would make any estimates on this cohort insufficiently reliable for specific monetization. For this reason, VA treated these impacts qualitatively. Consistent with Circular A–4, the RIA focused the measurable impacts on reasonably certain resource changes and treated broader incidence effects qualitatively, as is the case for all VA RIAs that are unable to provide reliable estimates.

VA agrees with the commenters that any delays or reliance on later gestation care, including emergency care, can affect the type of care that may be provided to a veteran or beneficiary as well as increase the potential for financial impacts. The RIA discussed these concerns qualitatively and acknowledges the potential increases in utilization of this level of care. VA did not monetize these impacts in the RIA, both enterprise-wide and within CHAMPVA, because reliable specific probabilities and unit cost inputs are not currently available without imposing questionable assumptions that could greatly alter the estimates, either by under or over stating those impacts. The absence of the estimation of these impacts does not imply VA's belief that these impacts will not exist. Rather, it reflected consistent judgment to avoid speculative quantification in VA RIAs, as required by Circular A–4. Importantly, even if higher later gestation or emergency care costs were included in the RIA, they would not change the overall characterization or the necessity for the rulemaking.

Some commenters questioned VA assumptions regarding the proportion of beneficiaries who would use VA maternity benefits if VA did not provide abortions. The RIA distinguished between the services furnished by VA, services obtained outside VA, and the potential of foregone care. In this instance, where shifts largely reflect payer transfers rather than new resource use, Circular A–4 directs agencies to present those effects transparently but not to treat them as social costs. VA followed this approach in the RIA and finds no basis to revise these assumptions.

VA has carefully considered all comments on the RIA, and after a thorough review, has concluded that the existing RIA remains sufficiently informative and analytically sound based off the best available data.

5. Artificial Intelligence

One commenter, relying on the APA for support, stated that VA must disclose information related to any use of artificial intelligence (AI) as part of this rulemaking (including developing substantive policy, producing supporting analysis, or responding to public comments). This commenter stated that under the APA, when an agency uses a computer model, it must explain the assumptions and methodology used in preparing the model. This commenter further stated that to the extent use of AI is significant, an agency must provide an additional opportunity for public comment.

VA makes no changes based on this comment. There is no statutory or regulatory requirement under the APA that mandates such disclosure. While OMB guidance and Executive Order 14110 direct agencies to promote transparency and responsible artificial intelligence use, they do not impose a legal obligation to identify or describe the tools used during drafting or promulgating a rule.

VA further notes that this comment relies on a misunderstanding of the usage of ''computer model'' in *Owner-Operator Independent Drivers Ass'n* v. *Federal Motor Carrier Safety Administration,* 494 F.3d 188 (D.C. Cir. 2007). In *Owner-Operator,* the ''computer model'' at issue was used in determining the agency's cost-benefit analysis and was an integral component to its regulatory conclusions. Id. at 204–205. In its decision, the D.C. Circuit held that the Federal Motor Carrier Safety Administration erred in not explaining whole aspects of the use of this model in developing the methodology under which it created the rule. Id. at 205. In neither the proposed rule published on August 4, 2025, nor this final rule was AI used to the degree described regarding the model in *Owner-Operator;* therefore, this principle does not apply, and no additional disclosure is required.

*G. Deborah Sampson Act of 2020*

Some commenters opined that the Deborah Sampson Act of 2020 prohibits VA from providing abortion and abortion counseling while other commenters disagreed. At least one commenter opined that such legislation was Congressional endorsement of VA's ability to provide care, including care that would save the life of a pregnant mother when endangered, that was in the medical benefits package at that time (that is, January 5, 2021) pursuant to 38 U.S.C. 1710 and without reference to section 106 of the VHCA.

VA makes no changes based on these comments. As explained previously, the Secretary has discretion to determine what care is needed for veterans pursuant to 38 U.S.C. 1710. Prior to September 9, 2022, VA consistently interpreted abortions to not be needed, but did not consider this policy to prohibit VA from providing care to pregnant women in life-threatening circumstances (and thus, such care was covered under the medical benefits package). 90 FR 36416. The Deborah Sampson Act of 2020 created a central office to monitor and encourage the activities of the Veterans Health Administration with respect to the provision, evaluation, and improvement of health care services provided to women veterans by the Department. 38 U.S.C. 7310(b)(1). As part of that Act, Congress defined ''health care'' as the health care and services included in the medical benefits package provided by the Department as in effect on the day before the date of the enactment of this Act (that is, Jan. 5, 2021). 38 U.S.C. 7310 note.

VA considers that Congress, through the Deborah Sampson Act of 2020, ratified VA's policy and interpretation in place prior to September 9, 2022. This included VA's policy and interpretation that needed care in the medical benefits package included the

GOV-VA 000577

provision of care to pregnant women in life-threatening circumstances. Additionally, the Deborah Sampson Act of 2020 is further example of Congress's ratification of the bar against abortions affirmed by the DOJ Opinion (because it did not authorize the provision of abortions) and of the Secretary's discretion and authority under 38 U.S.C. 1710 to establish what care (other than abortions) is needed pursuant to such authority.

*H. International Law*

Several commenters opined that access to abortion, especially in cases of rape and incest, is a basic human right as reflected by the United Nations and global human rights organizations. One commenter stated that the proposed rule is a de facto abortion ban, and as such, violates the United States' obligation as a State Party to the International Covenant on Civil and Political Rights.

VA makes no changes based on these comments. International human rights organizations and global norms regarding abortion access do not impact VA's authority to provide health care under 38 U.S.C. 1710 or 1781. The United States' participation as a State Party to the International Covenant on Civil and Political Rights does not create or impose binding obligations on domestic Federal agencies. As such, the referenced international standards are not controlling in this rulemaking.

**IV. Comments Specific to CHAMPVA**

*A. Inconsistent With TRICARE (Select)*

Some commenters raised concerns that VA's rule would be inconsistent with, and stricter than, TRICARE by excluding abortions in cases of rape and incest and abortion counseling and would result in a difference in treatment for two classes of Federal beneficiaries. Some commenters expressed their belief that Congress intended for families of veterans to receive comparable care to families of active servicemembers; and that excluding rape and incest in CHAMPVA undermines that. One commenter urged VA to consider "similar" to mean comparable in scope and fairness and that VA could maintain or expand coverage since 10 U.S.C. 1093 limits TRICARE, but not VA. Some commenters acknowledged that while CHAMPVA coverage need not be identical to that offered under TRICARE, the proposed rule did not address or acknowledge the significant differences that would be created between these two programs.

One commenter noted that TRICARE's limitation on abortion counseling is not a limitation on medical communication, but rather a limitation on billing, as abortion counseling in TRICARE is not reimbursed as a separate covered service unless medically necessary.

VA makes no changes based on these comments. VA acknowledges that pursuant to this rulemaking, CHAMPVA coverage for abortion will differ from TRICARE, particularly as TRICARE allows abortions in cases of rape and incest. As previously explained in this rulemaking, TRICARE is subject to a different authority from VA (that is, 10 U.S.C. 1093). The DOJ Opinion clearly forecloses the provision of abortion in CHAMPVA. Moreover, pursuant to 38 U.S.C. 1781(a), VA is not required to provide identical coverage to TRICARE. 90 FR 36417; 87 FR 55290; 89 FR 15459; 38 U.S.C. 1781(b); see 32 CFR 199.1(r), 199.17(a)(6)(ii)(D). Instead, VA provides similar coverage to TRICARE. See 38 CFR 17.270(b) (defining CHAMPVA-covered services and supplies) and 17.272 (setting forth benefits limitations and exclusions); 87 FR 55290; 89 FR 15459.

As explained in the proposed rule, prior to September 9, 2022, CHAMPVA coverage excluded abortions except when a physician certified that the abortion was performed because the life of the mother would be endangered if the fetus were carried to term, and VA is restoring the pre-September 9, 2022, abortion restrictions within CHAMPVA, just as it proposed to restore the long-standing restrictions to the medical benefits package. 90 FR 36416–17.

This language is consistent with the language VA promulgated in 1998 for purposes of CHAMPVA. 63 FR 48102 (Sept. 9, 1998). On February 10, 1996, 10 U.S.C. 1093 was amended by Congress to prohibit any DoD facility from performing an abortion except where the life of the mother would be endangered if the fetus were carried to term or in a case in which the pregnancy is the result of an act of rape or incest. See section 738 of Public Law 104–106. Despite this amendment to 10 U.S.C. 1093, when VA updated its CHAMPVA regulations in 1998, VA did not amend them to allow for abortions in situations involving rape or incest. Instead, VA continued to prohibit abortions except when a physician certifies that the life of the mother would be endangered if the fetus were carried to term and abortion counseling in 38 CFR 17.272. Thus, VA's long-standing policy and practice was not identical to TRICARE in this regard, which continued to be VA's policy and practice until September 9, 2022. 63 FR 48102 (Sept. 9, 1998); 87 FR 55296. As explained in the proposed rule and throughout this final rule, the Secretary has determined that, pursuant to 38 U.S.C. 1781 and 38 CFR 17.270(b), VA will return to its pre-September 9, 2022 abortion and abortion counseling exclusions for purposes of CHAMPVA coverage.

How TRICARE's limitation on abortion counseling is implemented is not relevant to this rule.

*B. Other Care That Is Covered Under CHAMPVA*

One commenter raised concerns about VA determining abortions are not needed when VA provides other care that the commenter believes is not needed and further identified services and procedures provided under CHAMPVA that they consider not needed.

VA makes no changes based on these comments. First, they are mooted by the DOJ Opinion. Second, VA understands that the commenter may consider certain care provided in CHAMPVA as not needed, but VA has determined such care was medically necessary and appropriate pursuant to its authority in 38 U.S.C. 1781 and 38 CFR 17.270(b). Section 1781, 38 U.S.C. (as interpreted in 38 CFR 17.270(b)) provides the Secretary with the discretion to determine what care is medically necessary and appropriate for CHAMPVA beneficiaries. As explained in the proposed rule, the Secretary determined that it is not medically necessary and appropriate for abortions to be provided as part of CHAMPVA except when a physician certifies that the life of the mother would be endangered if the pregnancy were carried to term.

*C. Suggested Changes to 38 CFR 17.272*

One commenter suggested VA revise the proposed language in § 17.272 regarding the certification by a physician that a mother's life would be endangered if the child were carried to term to refer to a qualified provider rather than a physician, as there may be instances where a patient is receiving treatment from a nurse practitioner or other qualified clinician, or a physician is not available; that limiting this to only physicians could lead to unnecessary delays in treatment that could jeopardize the life of the mother; and that this suggested change would be consistent with current VA guidance. Another commenter stated that other health care providers, such as physicians' assistants and nurse practitioners, should be included as providers that can make the certification required in the life endangerment exception because they provide care, including care covered under this rule.

Relatedly, other commenters suggested VA exclude the proposed exception for the mother's life in § 17.272 because they opined that care covered under this rule is not an abortion. One of these commenters further stated that if VA includes this life endangerment language, then it should require that two physicians certify that a mother's life would be endangered if the child were carried to term, and mental health and stress-related concerns should not fall under this life endangerment exception.

VA makes no changes based on these comments. As explained in the proposed rule, VA is returning to its pre-September 9, 2022 position, and VA is reverting the regulatory text of § 17.272 in place at that time (that is, abortions are excluded from CHAMPVA, except when a physician certifies that the life of the mother would be endangered if the fetus were carried to term), which used the term physician and only requires certification from one physician. Consistent with that position, VA is not expanding to include health care providers other than physicians and is not requiring two physicians certify that a mother's life would be endangered if the child were carried to term.

**V. Comments Specifically Concerning Abortion Counseling**

Many commenters opined that abortion counseling is needed or medically necessary and appropriate care for veterans and CHAMPVA beneficiaries, respectively, and should be provided by VA, including in instances when VA cannot provide an abortion itself. Reasons provided by commenters included that women should have access to all information regarding their options and associated risks; abortion counseling is a necessary part of comprehensive, evidence-based treatment; restricting abortion counseling impacts the patient-provider relationship by limiting what can be discussed, especially regarding potential and appropriate treatment options, and violates a health care provider's medical ethics and obligations; and abortion counseling is a necessary component of informed consent and informed decision-making. By not providing abortion counseling, these commenters opined that the lives and health of veterans and CHAMPVA beneficiaries will be put at risk, pregnant women will not receive necessary emotional support, there will be increased confusion about what can be discussed with a patient, there will be inequities in care outside VA, and trust with VA and health care providers will be eroded. Some commenters opined that removing abortion counseling replaces medical judgment with political ideology and allows the government to interfere with an individual's health care decisions. Some commenters further referred to cited studies or data to support these comments.

VA makes no changes to the regulations based on these comments. As stated in the proposed rule, VA has the authority to determine what care is needed or medically necessary and appropriate for veterans and CHAMPVA beneficiaries, respectively. The Secretary has used his authority to determine that abortion counseling is not needed or medically necessary and appropriate for those reasons stated in the proposed rule. 90 FR 36416–17. However, VA acknowledges that informed consent is critical for veterans and CHAMPVA beneficiaries in obtaining needed and medically necessary and appropriate health care. This includes when such individuals are receiving care covered under this rule. As a result, VA will ensure that veterans and CHAMPVA beneficiaries receive information necessary to provide informed consent in such situations, as informed consent is a necessary component of receiving care, including care covered by this rulemaking.

One commenter was particularly concerned about the impact of restricting abortion counseling on therapeutic dialogue, which could lead to fragmented care, undermining mental health outcomes, and conflict with trauma-informed care. This commenter opined that the lack of definition for abortion counseling in the proposed rule creates uncertainty regarding what discussions are permitted during therapy. Specifically, this commenter was concerned about whether patients can discuss incidents that occurred prior to military service and instances where a patient received reproductive health services outside of VA. This commenter suggested that abortion counseling should exclude general discussions of reproductive health as part of comprehensive mental health treatment, trauma-focused therapy that may include discussion of pregnancy resulting from assault, and post-abortion mental health care.

VA makes no changes based on these comments. VA did not have a definition of abortion counseling prior to the September 2022 IFR and is not adopting one through this rulemaking. The ban on abortion counseling will not impact VA's provision of mental health care.

Some commenters raised concerns that abortion counseling may not be provided in circumstances in which the life of the mother would be endangered if the child were carried to term or in life-threatening circumstances. These commenters were concerned that clinicians may provide abortions without discussion with their patients.

VA makes no changes based on these comments. As explained above, VA will ensure that veterans and CHAMPVA beneficiaries receive information necessary to provide informed consent in such situations, as informed consent is a necessary component of receiving care, including care covered by this rulemaking.

Some commenters opined that VA should be able to offer referrals to veterans and CHAMPVA beneficiaries for abortions outside VA and discuss options for care outside VA. These commenters were concerned the restriction on abortion counseling would limit such referrals and discussions.

VA makes no changes based on these comments. As explained in this rule, VA can provide care to pregnant women in life-threatening circumstances under the medical benefits package, and allow abortions to CHAMPVA beneficiaries when a physician certifies that the life of the mother would be endangered if the fetus were carried to term. In all other circumstances, VA will not discuss options for abortions outside VA and will not refer veterans and CHAMPVA beneficiaries to abortions outside VA. Instead, VA will explain to such individuals that if they are interested in receiving more information about such care, they should seek such information and care outside of VA.

One commenter found it notable that since September 9, 2022, there is no evidence of abuse or misconduct related to the provision of abortion counseling and referrals. Thus, this commenter stated that the abortion counseling ban serves no rationale purpose and is contrary to VA's patient-centered mission.

VA makes no changes based on this comment. While it may be true that there is no evidence of abuse or misconduct related to the provision of abortion counseling and referrals, that is not the standard VA uses to determine whether to provide certain care to veterans and CHAMPVA beneficiaries. As stated in the proposed rule, VA has the authority to determine what care is needed or medically necessary and appropriate for veterans and CHAMPVA beneficiaries, respectively. Under VA's authorities, the Secretary has determined that abortion counseling is not needed or medically necessary and appropriate for those reasons stated in the proposed rule.

GOV-VA 000579

**VI. Comments Related to VA Mission and Funding**

Some commenters opined that the proposed rule conflicts with VA's mission, commitment, and duty to serve veterans and other beneficiaries. One commenter opined that the Secretary's priority of suicide prevention is undermined by the proposed rule as they referred to a study that restricting abortion access is linked to increased suicide risk for women of reproductive age. Commenters also opined that it is appropriate for VA to use taxpayer funding to provide abortions while others disagreed.

VA makes no changes to the regulations based on these comments. VA serves veterans and other beneficiaries, in part, by providing needed and medically necessary and appropriate care pursuant to its statutory authorities. As noted in the proposed rule with respect to other Federal health programs, ''. . .Congress has consistently drawn a bright line between elective abortion and health care services that taxpayers would support.'' 90 FR 36416. Pursuant to the DOJ Opinion and 38 U.S.C. 1710, the Secretary has determined that abortions are unlawful and not needed. However, VA is not prohibited from providing care to pregnant women in life-threatening circumstances under the medical benefits package. Pursuant to 38 U.S.C. 1781 and 38 CFR 17.270(b), the Secretary has determined that an abortion is only medically necessary and appropriate when a physician certifies the life of the mother would be endangered if the fetus were carried to term. Finalizing the proposed rule will restore VA's previous, longstanding scope of needed and medically necessary and appropriate care. This rulemaking thus aligns with VA's mission, duty, and responsibility to serve veterans and other beneficiaries. VA further notes that suicide prevention is VA's top clinical priority, and nothing in this rulemaking changes that.

**VII. Rape and Incest Exception and Military Sexual Trauma**

Several commenters opposed removing the exception for abortion in cases of rape or incest, particularly as one-third of women veterans experience military sexual trauma and are at greater risk for sexual assault and domestic/intimate partner violence, with commenters providing related data and articles as support. Some of these commenters alleged that excluding an exception for rape or incest is cruel and will further harm these veterans who deal with related stigma, shame, and unnecessary barriers to care. Some of these commenters also raised concerns that military sexual trauma survivors will be forced to continue pregnancies resulting from sexual assault, which can exacerbate trauma and cause long-term health consequences. Some commenters provided data to support that women who are pregnant are significantly more likely to be killed by intimate partner violence, and an inability to obtain an abortion increases risk for domestic/intimate partner violence.

VA makes no changes based on these comments. VA understands and acknowledges these concerns raised by the commenters. As explained previously in the proposed rule and throughout this final rule, VA is returning to its pre-September 9, 2022 position, which did not include an exception for rape or incest. VA will, as always, support veterans and CHAMPVA beneficiaries facing difficult circumstances in regard to pregnancy by ensuring such individuals receive needed and medically necessary and appropriate care through VA. VA provides treatment to those who may experience domestic/intimate partner violence and military sexual trauma. Nothing in this rulemaking impacts the care VA provides to those who experience domestic/intimate partner violence or military sexual trauma.

**VIII. Other Matters**

For the comment summaries and responses below, VA notes that many commenters did not distinguish whether the issues they raised related to the provision of care to veterans under 38 CFR 17.38, or the provision of care to CHAMPVA beneficiaries under 38 CFR 17.272. Unless specifically indicated in the summaries and responses below, VA treated the issues raised in comments as related to both the medical benefits package and CHAMPVA.

*A. Rule Would Limit Access to Care*

Some commenters asserted that the rulemaking will or may result in veterans

and CHAMPVA beneficiaries no longer having access to abortion and abortion counseling, since such individuals may live in states with bans and restrictions on such care and, for various reasons (*e.g.,* financial, geographic, logistical), may not be able to obtain such care from non-VA providers in states with less restrictions. Commenters were particularly concerned as such care is often time sensitive. Some commenters stated that for some women, VA may be their sole health care provider, and even that care can be limited in areas throughout the country (VA notes that all CHAMPVA beneficiaries receive care from non-VA providers which is then reimbursed by VA, unless they receive care from a VA provider under the CHAMPVA In-house Treatment Initiative, (CITI)). Some commenters stated that such limitation on access can result in greater costs to these women, delays in receiving treatment, or foregoing treatment entirely. Commenters asserted that such effects would be more pronounced within certain groups of women veterans, such as those experiencing housing instability, those of color, those in underserved and rural communities, those with disabilities including mental health disorders, those with limited financial means, and survivors of military sexual trauma and sexual assault. Furthermore, these commenters asserted that women veterans face unique issues that make such limited access more detrimental. Some of these commenters cited studies or other publications to support their contentions.

VA understands these concerns, but makes no changes based on these comments. As explained in the proposed rule and in this final rule, VA believes it is appropriate to return to its pre-September 9, 2022 position. Pursuant to that position, veterans and CHAMPVA beneficiaries will be able to receive care covered by this rulemaking and any other care in the medical benefits package and under CHAMPVA from VA, but VA does not believe it is appropriate to continue the current policy that became effective on September 9, 2022. Moreover, to the extent commenters are concerned about limited access to this care, as explained previously in the proposed rule and in this final rule, this rulemaking is expected to have a relatively small impact given the low volume of abortions furnished by VA.

*B. Effect on Care and Erosion of Trust in VA*

Some commenters asserted that the rulemaking will or may result in women leaving VA's health care system, which would fragment care and disrupt continuity of care; and prevent women from receiving care from familiar, trusted, and knowledgeable VA providers. Some of these commenters raised concerns that this rule will thus erode trust in VA.

VA makes no changes based on these comments. VA will continue to provide veterans and CHAMPVA beneficiaries with needed and medically necessary and appropriate care, respectively. As VA is returning to its pre-September 9,

2022 position, VA will continue to provide care to veterans and CHAMPVA beneficiaries in the same manner as it did at that time. VA does not believe this rulemaking will result in fragmented care or disrupt continuity of care, particularly as VA had this same policy in place prior to September 9, 2022. VA notes that commenters did not provide data to show that the prior policy resulted in fragmented care or disrupted continuity of care for veterans or CHAMPVA beneficiaries. VA is and continues to be a trusted provider and payer of health care to veterans and CHAMPVA beneficiaries, and VA does not expect that to change as a result of this rulemaking.

One commenter appeared to allege that since this rulemaking limits care classified as reproductive health care, other reproductive health care, such as cervical cancer screening, fertility treatments, and mammograms, could be restricted.

VA makes no changes based on this comment. This rule does not address other reproductive health care and does not restrict or otherwise impact such care.

*C. Life-Threatening or Life-Endangering Circumstances and Conditions*

Some commenters suggested VA clarify or define what is meant by ''life-threatening,'' including describing what conditions or circumstances would fall under such language and creating a definition of ''life-threatening.'' Commenters identified various conditions, such severe preeclampsia, infections, certain cancers, lupus, depression, and heart disease, that could be emergency situations and exacerbated by pregnancy and suggested that VA include those conditions under a definition for life-threatening. Some commenters were concerned about having a list of life-threatening circumstances or a list of what would qualify under the life endangerment exception, as such list would be impossible to create, and suggested VA defer to health care providers' judgment. Some commenters were specifically concerned that the rule would remove or impede treatment for miscarriages and ectopic pregnancies. Some commenters urged VA to clarify that the care covered under this rule would not be limited to certain situations but rather all life-threatening medical emergency situations.

VA makes no changes based on these comments. VA does not address every specific potential medical condition a pregnant individual may have that could be an emergency situation or exacerbated by pregnancy. As VA stated in the proposed rule and reiterated in this final rule, VA is not prohibited from providing care to veterans in life-threatening circumstances under the medical benefits package. 90 FR 36416. As stated in the proposed rule and reiterated in this final rule, VA will allow CHAMPVA beneficiaries to receive abortions when a physician certifies that the life of the mother would be endangered if the fetus were carried to term. Id. VA specifically referenced ectopic pregnancies and miscarriage in the rulemaking because treatment for these conditions is always required. Consistent with how VA addressed this care prior to September 9, 2022, VA is not regulating the conditions under which such care, as covered by this rule can be provided. Such matters require a clinical determination and are more appropriately addressed in policy. VA will publish guidance regarding the provision of care covered by this rule.

*D. Medication as Part of Care Provided Under This Rule*

Commenters raised concerns that access to medication needed for other services could be affected, as certain medications may have multiple uses in addition to abortions, such as managing miscarriages or treating chronic diseases. A few commenters were particularly concerned by any restrictions on the use of mifepristone and misoprostol in managing miscarriages and providing needed and medically necessary and appropriate care to pregnant women. One of these commenters encouraged VA to formally recognize that such treatment will continue to be available to patients. Some commenters opposed VA providing any type of abortion, including through medication.

VA makes no changes based on these comments. VA acknowledges the concerns expressed by commenters on the availability of specific medications based on this regulation. Neither this rulemaking nor the regulatory text stipulate any changes to the VA formulary. Currently available medications used for managing a variety of conditions including miscarriage and care as covered under this rule to pregnant women will remain available for use as clinically appropriate.

*E. CHAMPVA Certification Requirement*

One commenter raised concerns that the requirement for certification that the life of the mother would be endangered if the child were carried to term runs contrary to procedures under the Hyde Amendment. Another commenter asserted that the certification requirement is more limiting than other similar exemptions, which can have a chilling effect on willingness to make such certification. Such commenter recommended VA grant deference to its health care providers.

VA makes no changes based on these comments. These commenters did not necessarily distinguish between the care provided under the medical benefits package or the care allowed under CHAMPVA, as covered by this rule. Regardless of whether these commenters meant to refer to either or both programs, as explained previously in this rule, the Hyde Amendment does not apply to VA.

With regards to the certification requirement, VA clarifies that the certification requirement is included in the life endangerment exception, which only applies to CHAMPVA as it is only explicitly stated in CHAMPVA regulations, as amended by this rule. VA does not intend the certification requirement under the life endangerment exception for CHAMPVA to be a burden on VA or authorized non-VA physicians, and VA notes that this certification requirement was in place prior to September 9, 2022 for CHAMPVA. VA will follow the same standards it had in place prior to September 9, 2022.

One commenter suggested VA clarify in 38 CFR 17.272(a)(58), as proposed, whether the determination of when the life of the mother would be endangered if the child were carried to term is limited to only certain physicians (instead of the physician of the individual's choice).

VA makes no changes based on this comment as VA does not find it appropriate to specify the type of physicians who may certify when the life of the mother would be endangered if the child were carried to term. However, VA acknowledges that it will be the treating physician or physicians that will certify this life endangerment exception.

One commenter suggested VA allow veterans to receive abortions when a physician certifies that the fetus is not viable. Another commenter raised concerns that the rule did not include an exception for fatal fetal abnormality or fetal conditions that are catastrophic but not immediately fatal.

VA makes no changes based on this comment. As previously explained, VA is returning to its pre-September 9, 2022 position. As such, VA will provide care to pregnant women in life-threatening circumstances under the medical benefits package, and will allow abortions under CHAMPVA when a physician certifies that the life of the

mother would be endangered if the fetus were carried to term. Such care may be provided even if it may require an intervention that would end a pregnancy. VA will, as always, support veterans and CHAMPVA beneficiaries facing difficult circumstances in regard to pregnancy complications by ensuring such individuals receive, through VA, needed and medically necessary and appropriate care.

One commenter asserted that the proposed rule failed to articulate what is required for a physician to ''certify'' that an emergency pregnancy complication is sufficiently life threatening to permit an abortion, which this commenter contends will result in confusion and lead to delays in care.

VA makes no changes based on this comment. This certification requirement only applies to CHAMPVA and acknowledges that it will be the treating physician or physicians that will make this certification.

*F. Proposed Rule Undermines Patient-Provider Relationship and Violates Medical Ethics*

Several commenters raised concerns that the proposed rule undermines the patient-provider relationship by imposing non-medical restrictions on health care decisions. These commenters stated that this is a health care decision that should be made between a health care provider and their patient; not the government. Some commenters further alleged that the proposed rule is in direct violation of a health care provider's oath to do no harm and generally violates their responsibilities and medical ethics and obligations, particularly as they are required to ensure patients receive care that they need and provide informed consent for care. Commenters explained that the restrictions in the proposed rule can result in the health care provider's judgment being compromised and foster mistrust and confusion with their patient.

Some commenters raised these concerns specifically with regards to the ban on abortion counseling. Such commenters stated that it is a violation of medical ethics to ban abortion counseling as that prevents health care providers from providing complete medical information, which can harm patients, and undermines informed consent, particularly as a patient will not be able to fully understand necessary medical information in life-threatening or life-endangering circumstances and make an informed decision about their care.

VA makes no changes based on these comments. As stated in the proposed rule, VA has the authority to determine what care is needed or medically necessary and appropriate for veterans and CHAMPVA beneficiaries, respectively. Under this authority, the Secretary has determined that abortions and abortion counseling are not needed or medically necessary and appropriate for those reasons stated in the proposed rule. VA acknowledges that informed consent is critical for veterans and CHAMPVA beneficiaries in obtaining needed and medically necessary and appropriate health care. This includes when such individuals are receiving care covered by this rule. As a result, VA will help ensure that veterans and CHAMPVA beneficiaries receive information necessary to provide informed consent in such circumstances, as informed consent is a necessary component of receiving care, including care covered by this rulemaking.

*G. Concerns Regarding Legal Ramifications and Risks to Health Care Providers, and Employee Protections*

Some commenters raised concerns that health care providers will prioritize considerations of criminal or civil penalties over patient health, which can result in delays in care and harm to patients, including in states where there are life exceptions and in instances involving ectopic pregnancies and miscarriages. Commenters were concerned about the legal ramifications for providers. One commenter suggested that the rule clearly articulate that physicians have the authority to make determinations relating to care covered by this rule and questioned whether VA would represent physicians from Federal or state actions taken against them for making such determinations.

VA makes no changes based on these comments. To the extent a VA employee provides care consistent with this rule and within the scope of their VA employment as authorized by Federal law, they could not legally be subject to adverse state actions. Consistent with 38 CFR 17.419, state and local laws, rules, regulations, and requirements that unduly interfere with health care professionals' practice will have no force or effect when such professionals are practicing health care while working within the scope of their VA employment. As explained previously, if and when there is a conflict between Federal and state law, Federal law would prevail in accordance with the Supremacy Clause under Article VI, clause 2, of the U.S. Constitution. Thus, if states attempt to subject VA employees to legal action for appropriately carrying out their Federal duties, subject to the requirements and procedures set forth in 38 CFR 50.15(a), Department of Justice representation is available to Federal employees in civil, criminal, and professional licensure proceedings where they face personal exposure for actions performed within the scope of their Federal duties.

*H. Gestational Limits*

One commenter suggested that in any case in which VA provides abortions, such care must be provided within the first trimester of pregnancy. Another commenter opined that it is the government's job to ensure the life of the mother since a fetus cannot maintain its own existence until approximately the third trimester.

VA makes no changes based on this comment. As previously explained, VA is returning to its pre-September 9, 2022 position. As such, VA will provide care to pregnant women in life-threatening circumstances under the medical benefits package and, in the case of CHAMPVA beneficiaries, prohibit abortions except when a physician certifies that the life of the mother would be endangered if the fetus were carried to term. VA will not place any time limit on when such care may or must be provided.

In addition, VA affirms that nothing in this rule alters or diminishes the conscience rights of VA or CHAMPVA-authorized health care providers. Employees may request to opt out of providing, participating in, or facilitating any aspect of clinical care based on sincerely held moral or religious beliefs, observances, or practices. These requests, often referred to as conscientious objections or conscience-based exceptions, will be honored in accordance with applicable Federal law and VA policy.

*I. Specific Suggestions Not Already Addressed Above*

One commenter suggested VA make clear in the CHAMPVA regulation that it intends to prohibit elective abortion.

VA makes no changes based on this comment. As previously explained, VA is returning to its pre-September 9, 2022 position. This means that VA will revise its regulatory text for 38 CFR 17.272 to return to the same regulatory text in place at that time which clearly prohibits elective abortions.

One commenter suggested VA clarify what provisions are made for a ''second opinion'' of a VA physician's determination regarding whether the life of the mother would be endangered if the child were carried to term. That same commenter suggested VA identify what procedures will be in place to

make whole women who suffer any harm due to delay or refusal by a physician to make such determination.

VA makes no changes based on this comment. VA considers these matters outside the scope of this rulemaking because they deal with clinical decisions and tort claims. VA assumes this commenter was referring to a CHAMPVA beneficiary receiving care from a VA physician, as the commenter referenced the proposed changes to 38 CFR 17.272. If a CHAMPVA beneficiary were receiving care from a VA physician, it would only be through the CHAMPVA In-House Treatment Initiative at a VA facility. In such instance, if the CHAMPVA beneficiary wanted a second opinion of the VA physician's determination regarding the life endangerment exception, they could seek such opinion through VHA's clinical appeal process. CHAMPVA beneficiaries may file a tort claim against the United States based on a negligent or wrongful act or omission of a VA employee. More information can be found at *https://www.va.gov/OGC/FTCA.asp.* To the extent this commenter was referring to a veteran receiving care from a VA physician, they would also follow VHA's clinical appeal process and may file a tort claim, as referenced above.

Two commenters suggested VA interpret the term ''needed'' through clinical judgment that is based on current medical standards, as care may be medically warranted in many specific situations. Another commenter suggested VA reconsider the definition of ''needed'' medical services to include mental health-related pregnancy risks.

VA makes no changes based on these comments. The term ''needed'' as used in 38 U.S.C. 1710 is not defined in law or regulation. To the extent consistent with the DOJ Opinion, the Secretary has discretion to determine what care is needed. As explained earlier in section II.D. of this final rule, while VA has interpreted, for purposes of care in the medical benefits package (see 38 CFR 17.38(b)), such language to refer to care determined by appropriate healthcare professionals to be needed to promote, preserve, or restore the health of the individual and to be in accord with generally accepted standards of medical practice (see 64 FR 54210), VA does not believe that the ''promote, preserve, or restore'' criteria serves to replace or strictly articulates how the Secretary determines that care is ''needed'' under 38 U.S.C. 1710. VA does not believe it is necessary to define or interpret ''needed'' as the commenters suggest, as ''needed'' is specifically left to the discretion of the Secretary in section 1710.

To the extent one of the commenters suggested VA consider mental health-related pregnancy risks to be included under the term ''needed,'' VA declines to do so as VA is not defining the term ''needed'' in this rulemaking. VA further notes that to the extent mental health-related pregnancy risks would result in a life-threatening circumstance, care to treat such life-threatening circumstance could be provided under medical benefits package.

Some commenters asserted that life-saving treatment is never considered an abortion, and thus, VA should not include language in VA regulations to codify an exception for life to the prohibition on abortions. One commenter recommended VA clarify that treating certain conditions (*e.g.,* ectopic pregnancies, miscarriage, sepsis, severe preeclampsia) is not abortion. Other commenters recommended defining the term abortion and included recommendations on how to define it.

VA makes no changes based on these comments. VA is not defining abortion, consistent with how VA did not define abortion before September 9, 2022, and with how VA currently does not define abortion in its regulations. VA will publish policy that provides guidance to its health care providers regarding the provision of care covered by this rulemaking. Furthermore, as explained in the proposed rule and throughout this final rule, VA will continue to provide care to pregnant women in life-threatening circumstances pursuant to the medical benefits package, even if such care may result in the termination of a pregnancy. For purposes of CHAMPVA, VA will prohibit abortions except when a physician certifies that the life of the mother would be endangered if the fetus were carried to term.

Based on the rationale set forth in the SUPPLEMENTARY INFORMATION to the proposed rule, the DOJ Opinion, and this final rule, VA is adopting the proposed rule as final without changes.

**Executive Orders 12866, 13563 and 14192**

VA examined the impact of this rulemaking as required by Executive Orders 12866 (Sept. 30, 1993) and 13563 (Jan. 18, 2011), which direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits. The Office of Information and Regulatory Affairs has determined that this rulemaking is a significant regulatory action under section 3(f) of Executive Order 12866. VA also examined the impact of this rulemaking as required by Executive Order 14192 (Jan. 30, 2025), which directs agencies to ensure that the cost of planned regulations is responsibly managed and controlled through a rigorous regulatory budgeting process. The Office of Information and Regulatory Affairs has determined that this final rule is a regulatory action under Executive Order 14192. The Regulatory Impact Analysis associated with this rulemaking can be found as a supporting document at *www.regulations.gov.*

**Regulatory Flexibility Act**

The Secretary hereby certifies that this final rule will not have a significant economic impact on a substantial number of small entities as they are defined in the Regulatory Flexibility Act (5 U.S.C. 601–612). This final rule will only impact veterans and CHAMPVA beneficiaries, who are not small entities. Therefore, pursuant to 5 U.S.C. 605(b), the initial and final regulatory flexibility analysis requirements of 5 U.S.C. 603 and 604 do not apply.

**Unfunded Mandates**

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any one year.

**Paperwork Reduction Act**

This final rule contains no provisions constituting a collection of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3521).

**Congressional Review Act**

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs has designated this rule as not a major rule, as defined by 5 U.S.C. 804(2).

**List of Subjects in 38 CFR Part 17**

Administrative practice and procedure, Health care, Health records, Mental health programs, Veterans.

**Signing Authority**

Douglas A. Collins, Secretary of Veterans Affairs, approved this document on December 23, 2025, and authorized the undersigned to sign and submit the document to the Office of the Federal Register for publication

GOV-VA 000583

electronically as an official document of the Department of Veterans Affairs.

**Jennifer Williams,**

*Alternate Federal Register Liaison Officer, Department of Veterans Affairs.*

For the reasons stated in the preamble, the Department of Veterans Affairs amends 38 CFR part 17 as set forth below:

## PART 17—MEDICAL

■ 1. The authority citation for part 17 continues to read, in part, as follows:

**Authority:** 38 U.S.C. 501, and as noted in specific sections.

* * * * *

■ 2. Amend § 17.38 by revising paragraph (c)(1) and removing paragraphs (c)(1)(i) and (ii) to read as follows:

### § 17.38 Medical Benefits Package.

* * * * *

(c) * * *

(1) Abortions and abortion counseling.

* * * * *

■ 3. Amend § 17.272 by:

■ a. Revising paragraph (a)(58).

■ b. Removing paragraphs (a)(58)(i) and (ii).

■ c. Adding paragraph (a)(78).

The revision and addition read as follows:

### § 17.272 Benefits limitations/exclusions.

* * * * *

(a) * * *

(58) Abortions, except when a physician certifies that the life of the mother would be endangered if the fetus were carried to term.

* * * * *

(78) Abortion counseling.

* * * * *

[FR Doc. 2025–24061 Filed 12–30–25; 8:45 am]

BILLING CODE 8320–01–P

## POSTAL SERVICE

## 39 CFR Part 111

## Claims Filing Date for Insured Mail

**AGENCY:** Postal Service.

**ACTION:** Final rule.

**SUMMARY:** The Postal Service is amending the *Mailing Standards of the United States Postal Service,* Domestic Mail Manual (DMM®) subsection 609.1.4 to change the claims filing date for insured mail.

**DATES:** *Effective Date:* January 18, 2026.

**FOR FURTHER INFORMATION CONTACT:** Abdul Bah at (314) 452–2844 or Garry Rodriguez at (202) 268–7281.

**SUPPLEMENTARY INFORMATION:** On November 26, 2025, the Postal Service published a notice of proposed rulemaking (90 FR 54247–54248) to change the claims filing date for insured mail. The Postal Service did not receive any formal comments.

The Postal Service is re-establishing the ''No Sooner Than'' filing date of 15 days for filing insured mail claims to re-align the filing thresholds with other mail service and bulk claims.

The Postal Service adopts the described changes to *Mailing Standards of the United States Postal Service,* Domestic Mail Manual (DMM), incorporated by reference in the *Code of Federal Regulations.* We will publish an appropriate amendment to 39 CFR part 111 to reflect these changes.

**List of Subjects in 39 CFR Part 111**

Administrative practice and procedure, Postal Service.

Accordingly, the Postal Service amends *Mailing Standards of the United States Postal Service,* Domestic Mail Manual (DMM), incorporated by reference in the Code of Federal Regulations as follows (see 39 CFR 111.1):

## PART 111—GENERAL INFORMATION ON POSTAL SERVICE

■ 1. The authority citation for 39 CFR part 111 continues to read as follows:

**Authority:** 5 U.S.C. 552(a); 13 U.S.C. 301–307; 18 U.S.C. 1692–1737; 39 U.S.C. 101, 401–404, 414, 416, 3001–3018, 3201–3220, 3401–3406, 3621, 3622, 3626, 3629, 3631–3633, 3641, 3681–3685, and 5001.

■ 2. Revise *Mailing Standards of the United States Postal Service,* Domestic Mail Manual (DMM) as follows:

**Mailing Standards of the United States Postal Service, Domestic Mail Manual (DMM)**

* * * * *

**600 Basic Standards for All Mailing Services**

* * * * *

**609 Filing Indemnity Claims for Loss or Damage**

**1.0 General Filing Instructions**

* * * * *

**1.4 When To File**

File claims as follows:

* * * * *

WHEN TO FILE (FROM MAILING DATE)

No Sooner Than No Later Than

MAIL TYPE OR SERVICE

* * * * *

*[Revise the ''No Sooner Than'' timeframe for ''Insured Mail'' line item to read as follows:]*

Insured Mail (including Priority Mail under 503.4.2) 15 days

* * * * *

*[Delete the footnote at the bottom of the table in 1.4 in its entirety.]*

* * * * *

**Daria Valan,**

*Attorney, Ethics and Legal Compliance.*

[FR Doc. 2025–24094 Filed 12–30–25; 8:45 am]

BILLING CODE 7710–12–P

## ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 423

**[EPA–HQ–OW–2009–0819; FRL–8794.3–04–OW]**

**RIN 2040–AG54**

## Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category—Deadline Extensions

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The U.S. Environmental Protection Agency (the EPA or Agency) is finalizing a Clean Water Act (CWA) rule to extend deadlines promulgated in the 2024 ''Supplemental Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category'' (2024 rule), update the 2024 rule's transfer provisions to allow facilities to switch between compliance alternatives, and create authority for alternative applicability dates and paperwork submission dates, based on site-specific factors.

**DATES:** The final rule is effective on March 2, 2026. In accordance with 40 CFR 23.2, this regulation shall be considered issued for purposes of judicial review at 1 p.m. Eastern time on January 14, 2026. Under section 509(b)(1) of the CWA, judicial review of this regulation can be had only by filing a petition for review in the U.S. Court of Appeals within 120 days after the regulation is considered issued for purposes of judicial review. Under section 509(b)(2), the requirements in this regulation may not be challenged later in civil or criminal proceedings brought by the EPA to enforce these requirements.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID

**GOV-VA 000584**

(Slip Opinion)

# Reconsidering the Authority of the Department of Veterans Affairs to Provide Abortion Services

The Department of Veterans Affairs may not provide abortion services under any provision of chapter 17 of title 38 of the U.S. Code.

The portions of our opinion in *Intergovernmental Immunity for the Department of Veterans Affairs and Its Employees When Providing Certain Abortion Services*, 46 Op. O.L.C. __ (Sept. 21, 2022), that held to the contrary are withdrawn and superseded by this opinion.

December 18, 2025

MEMORANDUM OPINION FOR THE SECRETARY
DEPARTMENT OF VETERANS AFFAIRS

In 2022, this Office advised that federal law authorizes the Department of Veterans Affairs ("VA") and its employees to provide abortion services. *See Intergovernmental Immunity for the Department of Veterans Affairs and Its Employees When Providing Certain Abortion Services*, 46 Op. O.L.C. __, at *4 (Sept. 21, 2022) ("*Abortion Services*"). Our opinion, which memorialized and expanded on earlier advice, interpreted federal law as conferring "broad discretion" on the Secretary of Veterans Affairs in this area. *Id.* at *9 (citation omitted). And its logic suggested the unprecedented conclusion that VA could lawfully provide taxpayer-funded abortions for any reason and at any stage of pregnancy—including after fetal viability and until birth. *See id.* at *7–9.

In response to our advice, VA issued an interim final rule that departed from longstanding practice. For the first time, it expressly authorized VA to provide abortions to veterans and certain other VA beneficiaries as part of its medical authority under chapter 17 of title 38 of the U.S. Code. *See* Reproductive Health Services, 87 Fed. Reg. 55,287, 55,296 (Sept. 9, 2022) (codified as amended at 38 C.F.R. § 17.38(c)(1)(i)–(ii)). It also enabled VA to provide abortion counseling. *See id.* at 55,288. Although VA exercised its newfound authority to provide abortions sparingly, the scope of the rule and our Office's subsequent opinion supporting it swept more broadly. *See Abortion Services* at *9.

In August 2025, VA proposed a new rule "to reinstate the full exclusion on abortions and abortion counseling from the medical benefits package, which was removed in 2022." Reproductive Health Services, 90 Fed. Reg.

36,415, 36,415 (Aug. 4, 2025). That proposed rule observed that the 2022 interim final rule "was legally questionable." *Id.* at 36,416. You have now asked us to reconsider whether federal law authorizes VA to provide abortion services under any provision of chapter 17 of title 38 of the U.S. Code. It does not, so we withdraw in part our prior opinion.[1]

## I.

Federal law requires VA to "furnish" qualifying veterans with "hospital care and medical services which the Secretary determines to be needed." 38 U.S.C. § 1710(a)(1). VA implements this treatment scheme through regulations defining the contours of its "medical benefits package." 38 C.F.R. § 17.38(a). VA also "is authorized to provide medical care" to certain spouses, children, and caregivers of veterans as part of the Civilian Health and Medical Program of the Department of Veterans Affairs—commonly known as "CHAMPVA" beneficiaries. *See* 38 U.S.C. § 1781(a). Medical care provided to CHAMPVA beneficiaries must be provided "in the same or similar manner," and is "subject to the same or similar limitations," as medical care furnished to family members of active-duty personnel and others under the Department of War's TRICARE (Select) program. *Id.* § 1781(b). VA regulations implementing CHAMPVA specifically limit the provision of abortion. *See* 38 C.F.R. § 17.272(a)(58).

In 1992, Congress amended title 38 "to improve health care services for women veterans" and for other purposes. Veterans Health Care Act of 1992, Pub. L. No. 102-585, 106 Stat. 4943, 4943 ("VHCA"). With respect to VA's authority to furnish hospital care and medical services, section 106 of the VHCA made clear that VA could provide "[g]eneral reproductive health care" to women. *Id.* § 106(a)(3), 106 Stat. at 4947. But Congress carved out from that authority "infertility services, abortions, or pregnancy care (including prenatal and delivery care), except for such care relating to a pregnancy that is complicated or in which the risks of complication are increased by a service-connected condition." *Id.* This

[1] Our earlier opinion also offered advice about federal immunity derived from the Supremacy Clause. *See Abortion Services* at *1–4, *9–10. While we now reconsider VA's statutory authority to provide abortions, you did not ask us to, and therefore we do not, reconsider the portions of the opinion relating to intergovernmental immunity.

statutory language thus barred VA's provision of abortions and limited its provision of pregnancy care to situations that were "complicated."

Consistent with section 106 of the VHCA, VA's regulations for decades provided that "the 'medical benefits package' does not include . . . [a]bortions and abortion counseling" for veterans. 38 C.F.R. § 17.38(c) (2008); *accord id.* (2011); *id.* (2019); *id.* (2021); *see also* 87 Fed. Reg. at 55,288 (explaining that the abortion exclusion had existed since 1999, the year during which VA first established the medical benefits package). VA regulations applicable to CHAMPVA beneficiaries likewise consistently excluded abortion services and clarified that physicians could perform an abortion only if they "certifie[d] that the life of the mother would be endangered if the fetus were carried to term." 38 C.F.R. § 17.272(a)(67) (2008); *see also id.* § 17.272(a)(68) (excluding "[a]bortion counseling"); *accord id.* § 17.272(a)(67)–(68) (2022). That life-of-the-mother exception was substantially similar to federal law governing TRICARE, which prohibits the use of Department of War funds for abortions "except where the life of the mother would be endangered if the fetus were carried to term." 10 U.S.C. § 1093(a).[2]

VA changed course in 2022. When promulgating an interim final rule, VA explained that it was

> amend[ing] its medical regulations to remove the exclusion on abortion counseling and establish exceptions to the exclusion on abortions in the medical benefits package for veterans who receive care set forth in that package, and to remove the exclusion on abortion counseling and expand the exceptions to the exclusion on abortions for [CHAMPVA] beneficiaries.

---

[2] VA had never understood the VHCA or its regulations "to prohibit providing care to pregnant women in life-threatening circumstances, including treatment for ectopic pregnancies or miscarriages, which were covered under the VA's medical benefits package prior to the 2022 [regulation]." 90 Fed. Reg. at 36,416. VA's 2025 proposed rule "make[s] clear that the exclusion for abortion [for CHAMPVA beneficiaries] does not apply 'when a physician certifies that the life of the mother would be endangered if the fetus were carried to term.'" *Id.* We conclude that VA's longstanding approach to life-saving medical interventions accords with the plain meaning of "abortion," as informed by common legal and medical usage. *See* Nicholas Colgrove, *Defining 'Abortion': A Call for Clarity*, Theoretical Med. & Bioethics, No. 46, 137–69 (2025). Nothing in our opinion today prohibits VA from providing care to pregnant women in life-threatening circumstances.

87 Fed. Reg. at 55,287. VA left no doubt that provision of such services would have been impermissible under its then-existing regulations: "Unless VA remove[d] its existing prohibitions on abortion-related care," it said, the Department would be unable to provide the specified services. *Id.* at 55,288.

VA's medical benefits package was thus amended to include express authorization for abortions when "[t]he life or the health of the pregnant veteran would be endangered if the pregnancy were carried to term" or "[t]he pregnancy is the result of an act of rape or incest." 38 C.F.R. § 17.38(c)(1)(i)–(ii) (2022); *accord id.* (2023). VA's regulations for CHAMPVA beneficiaries were also amended to allow for abortion in cases where "[t]he life or the health of the pregnant beneficiary would be endangered if the pregnancy were carried to term" and where "[t]he pregnancy is the result of an act of rape or incest." *Id.* § 17.272(a)(58) (2022); *accord id.* (2024).

Before VA issued its interim final rule, we considered, among other questions, whether the rule was a lawful exercise of VA's authority. *See Abortion Services* at *1. We concluded that it was and published an opinion that the new VA rule was consistent with the VHCA's authorization of general reproductive health care for veterans under section 106. *See id.* at *1, *10. We explained that "[t]he text of section 106 specifies that its exclusions" for abortions "only limit VA's authority 'under [that] section,'" but we believed that "[t]hose exclusions do 'not limit VA's authority to provide care under any other provision of law,'" such as 38 U.S.C. § 1710. *Id.* at *7 (second alteration in original) (citations omitted). Under our interpretation of VA authority, there seemed to be no limit to VA's discretion for determining that abortion was "needed" for veterans. *See id.* at *9 (citing 38 U.S.C. § 1710(a)(1)–(3)). Although we were focused on whether VA's regulations were reasonable exercises of the Secretary's "broad discretion," *id.*, our opinion's logic suggested that VA could lawfully provide abortions for nearly any reason and at any stage of pregnancy—including after fetal viability and until birth—even in states that had otherwise enacted laws against abortion, *see id.* at *1, *4–7.

VA has now retreated from the 2022 interim final rule and proposed a new rule restoring VA's medical benefits package and CHAMPVA coverage to their pre-2022 states. *See* 90 Fed. Reg. at 36,416–17. Nevertheless, VA has continued to express doubt about the legal basis for its 2022

interim final rule and the scope of VA's legal authority. *See id.* at 36,416. You have now asked us to reconsider whether VA may provide abortion services under any provision of chapter 17 of title 38 of the U.S. Code.

**II.**

"We do not lightly depart from our precedents, and we have given the views expressed in our prior opinion careful and respectful consideration." *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling*, 42 Op. O.L.C. 158, 159 (2018) ("*Wire Act*"). But considering "the plain language of the statute," *id.*, we are compelled to conclude that VA may not provide abortions under any provision of chapter 17 of title 38 of the U.S. Code, contrary to the conclusion of our 2022 opinion.

**A.**

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Expenditure of Appropriated Funds for Informational Video News Releases*, 28 Op. O.L.C. 109, 119 (2004) (citation omitted). "When the words of a statute are unambiguous, this first canon is also the last." *Transmission of Electoral-College Certificates by "Registered Mail,"* 44 Op. O.L.C. 138, 141 (2020) (cleaned up).

The 2022 interim final rule cannot be reconciled with the VHCA's plain text. As explained above, VA offers medical benefits packages pursuant to its general authority to "furnish hospital care and medical services which the Secretary determines to be needed" for qualified veterans. 38 U.S.C. § 1710(a)(1). "[T]he Secretary has broad discretion to determine the precise hospital or medical services to be supplied." *Abortion Services* at *5 (citation omitted). But that discretion is not limitless. Section 106(a) of the VHCA makes clear that VA may "not" provide "infertility services, abortions, or pregnancy care (including prenatal and delivery care), except for such care relating to a pregnancy that is complicated or in which the risks of complication are increased by a service-connected condition." 106 Stat. at 4947. That language is unambiguous.

Our prior opinion acknowledged this prohibition but evaded its implications. We advised that VA may still provide abortion services "pursuant to its general treatment authority" because section 106's restriction limits

VA's authority only "'under [that] section.'" *Abortion Services* at *7–8 (alteration in original) (citation omitted). But that conclusion did not follow. Section 106 applies whenever VA "furnish[es] hospital care and medical services under chapter 17 of title 38 . . . to women." VHCA § 106(a), 106 Stat. at 4947. VA's general treatment authority—section 1710—falls under chapter 17 of title 38 of the U.S. Code. The "section" at issue in the VHCA—section 106—thus governs VA's general authority to furnish medical care, including under 38 U.S.C. § 1710. So VA cannot invoke its general treatment authority under section 1710 to avoid the VHCA's abortion limitation. In fact, section 106 of the VHCA was codified as a note to section 1710. *See* 106 Stat. at 4947; 38 U.S.C. § 1710 note (1992).

If VA could provide abortions under its general authority to provide medical care, section 106's exclusions would be meaningless. But "Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it." *Fischer v. United States*, 144 S. Ct. 2176, 2184 (2024). After all, "general language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012) (alteration and citation omitted). The statute before us unambiguously commands that VA may not provide abortions when furnishing medical care under 38 U.S.C. § 1710 or any other provision in chapter 17 of title 38.[3]

[3] It is irrelevant that, when section 106 of the VHCA was codified in 1992, section 1710 was only one of the provisions governing VA's medical benefits authority. At the time, section 1712 allowed VA to provide certain ambulatory and outpatient services, whereas section 1710 applied primarily to the provision of hospital, nursing home, and domiciliary care. One could argue that because section 106 was codified as a note after section 1710, its limitation to "this section" could perhaps refer only to section 1710, and that VA could have provided abortions under section 1712. But as we have explained, that is not the best reading of the statute, because "this section" in section 106 most naturally refers to the reproductive health services authorized by section 106. Moreover, Congress in 1996 consolidated section 1712 into section 1710 to create a unified provision for VA's medical benefits authority, and there is no doubt that section 106 limits VA's authority under 38 U.S.C. § 1710. *See* Pub. L. No. 104-262, § 101, 110 Stat. 3177, 3178 (1996). When Congress consolidated those provisions, it did not repeal section 106, confirming that the abortion restriction applies to all hospital care and medical services provided pursuant to chapter 17.

An alternative interpretation of the VHCA would be incongruous with other provisions of federal law, such as those restricting federal employees' activities relating to abortion. *See, e.g.*, 18 U.S.C. § 552; 19 U.S.C. § 1305. It would also "contradict[] decades of Federal policy against forced taxpayer funding for abortion." 90 Fed. Reg. at 36,416. We endeavor to read federal statutes consistently with other federal laws dealing with the same subject, absent indications of congressional intent to the contrary. "'Basic principles of statutory interpretation require' construing statutory provisions 'in harmony,'" not setting statutory provisions at cross-purposes. *Whether Eluding Inspection Under 8 U.S.C. § 1325(a)(2) Is a Continuing Offense*, 49 Op. O.L.C. __, at *8 (June 21, 2025) (quoting *Jones v. Hendrix*, 143 S. Ct. 1857, 1868 (2023)).

Neither can the complicated-pregnancy exception to section 106 of the VHCA be used to justify VA's performance of abortions. *See* VHCA § 106(a)(3), 106 Stat. at 4947 (excluding "infertility services, abortions, or pregnancy care (including prenatal and delivery care), except for such care relating to a pregnancy that is complicated or in which the risks of complication are increased by a service-connected condition"). That exception applies only to pregnancy care, not abortions. To start, the phrase "such care" must refer to pregnancy care, because "such" "refer[s] to the last antecedent." *Black's Law Dictionary* (6th ed. 1990). Moreover, by referring to "such care relating to a pregnancy," the exception tracks the language of the last antecedent—"pregnancy care." The last-antecedent canon instructs that, as here, "a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Lockhart v. United States*, 577 U.S. 347, 351 (2016) (alteration and citation omitted); *accord Wire Act*, 42 Op. O.L.C. at 164–65; Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 144, 152 (2012).

The series-qualifier canon—which teaches that a limiting phrase sometimes applies to an entire list—does not overcome our semantic reading or the last-antecedent's default rule. Although a modifier may sometimes "sweep beyond the nearest referent" when readers are accustomed to applying the modifier to each item, *Wire Act*, 42 Op. O.L.C. at 166, that is not the case here. Applying the "care relating to pregnancy" exception to each of section 106's enumerated exclusions would nonsensically extend an exception about "care relating to a pregnancy that is complicated" to

"infertility services," even though infertility services necessarily precede pregnancy. Nor does the fact that a comma separates the list from the limiting phrase change our conclusion, because the comma merely offsets an "unexpected internal modifier[]." *Id.*; *see also U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) ("No more than isolated words or sentences is punctuation alone a reliable guide for discovery of a statute's meaning.").

Nothing about our interpretation of section 106 undermines VA's authority to provide infertility services or authorized pregnancy care, however. Since enacting section 106, Congress authorized VA to provide infertility services, *see* Pub. L. No. 114-223, § 260, 130 Stat. 857, 897 (2016); approved a medical benefits package that included pregnancy care, *see* Deborah Sampson Act of 2020, Pub. L. No. 116-315, § 5101(b)(1), 134 Stat. 5021, 5022 (2021); created maternity care coordination programs at VA, *see* Pub. L. No. 117-69, 135 Stat. 1495 (2021); and authorized care for newborn children born to women receiving maternity care from VA, *see* 38 U.S.C. § 1786. These later-enacted laws irreconcilably conflict with, and were designed to supersede, the specific prohibitions on those services expressed in section 106 of the VHCA. *See Carcieri v. Salazar*, 555 U.S. 379, 395 (2009) ("[A]n implied repeal will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act . . . 'is clearly intended as a substitute.'" (citation omitted)). But none of these authorities supersedes section 106 with respect to abortions—that bar has been unmodified since it was enacted in 1992. And because Congress has shown that it knows how to supplant the prohibitions in section 106, it is implausible that Congress repealed section 106's abortion restriction by mere implication.

**B.**

Our 2022 opinion also found support for the 2022 interim final rule in the history of VA's regulations. But to the extent that history is relevant, it reinforces our reading of section 106. "Until 2022, VA had never interpreted its authority under the 1999 extensive revisions to title 38 as allowing abortions." 90 Fed. Reg. at 36,416 n.1. Indeed, "[t]he regulatory determination that abortion is not a 'needed' service for veterans was accepted by every Secretary and Presidential administration for over 20 years." *Id.* at 36,416; *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S.

120, 146 (2000) (noting that the agency at issue had "never asserted [the] authority . . . until it promulgated the regulations at issue"). In 2022, VA for the first time "claimed to discover in a long-extant statute an unheralded power" to provide abortions, *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022) (alteration and citation omitted)—notwithstanding a clear indication that Congress intended to proscribe just that.

Our 2022 opinion tried to blunt the force of this history in two ways. *First*, it observed that "VA did not explain the rationale" behind its exclusion of abortion. *Abortion Services* at *6 (citation omitted). But it would have made little sense for VA to explain why abortions are not medically "needed," 38 U.S.C. § 1710(a)(1)–(3), when section 106 forecloses VA from providing abortion services altogether.

*Second*, we noted that VA "for decades offered general pregnancy care and certain infertility services under its general treatment authority," *Abortion Services* at *7 (cleaned up), even though section 106 proscribes the provision of such services. From that, we concluded that VA had long interpreted section 106 not to limit its general treatment authority under 38 U.S.C. § 1710, and that this interpretation was "entitled to 'considerable weight.'" *Id.* (citation omitted). But this argument, too, cannot overcome the unambiguous text of the statute. After all, "statutes . . . have a single, best meaning." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266–68 (2024). Although "the contemporary and consistent views" of an agency "can provide evidence of the law's meaning," *Bondi v. VanDerStok*, 145 S. Ct. 857, 874 (2025), we may not ascribe great weight to a regulation "that conflicts with the statutory language it purports to implement," *City & County of San Francisco v. EPA*, 145 S. Ct. 704, 720 (2025). That VA previously has offered general pregnancy care and some infertility services under its general treatment authority demonstrates at most that VA sometimes departed from section 106's constraints—not that those constraints do not exist. And as we have explained, the better reading of section 106's text is that VA may not provide abortions pursuant to its general treatment authority.

### C.

The 2022 interim final rule offered two additional bases for why VA could provide certain abortion services under federal law: ratification and implied repeal. Our prior opinion did not expressly invoke these reasons

in defense of its conclusion, but we have considered them for completeness. Neither persuades.

**1.**

The 2022 interim final rule asserted that "Congress has ratified VA's interpretation that section 106 of the VHCA does not limit the medical care that the VA may provide pursuant to its authority under 38 U.S.C. 1710." 87 Fed. Reg. at 55,289. The argument works as follows. Section 106 limited VA's ability to provide "pregnancy care," among other services. *See* VHCA § 106(a)(3), 106 Stat. at 4947. But "general pregnancy and delivery services were included in the medical benefits package when it was established in 1999 pursuant to VA's authority in 38 U.S.C. 1710." 87 Fed. Reg. at 55,289 (citing 38 C.F.R. § 17.38(a)(1)(xiii) (1999)). In the Deborah Sampson Act of 2020, Congress could have—but did not—clarify that VA's provision of pregnancy care was unlawful. Instead, Congress created "a central office" to, among other things, "encourag[e] the activities of the Veterans Health Administration with respect to the provision, evaluation, and improvement of health care services provided to women veterans by the Department." Pub. L. No. 116-315, § 5101(b)(1), 134 Stat. at 5022 (codified at 38 U.S.C. § 7310(b)(1)). And Congress specified that its use of the term "health care" in this context was designed to encompass the services "included in the medical benefits package provided by the Department" as of the date of enactment in early 2021. *Id.* § 5101(b)(2) (codified at 38 U.S.C. § 7310 note). "Given that VA's medical benefits package as of that date included services that were excluded from the coverage of [VHCA's] Section 106"—namely, pregnancy care, the argument goes—"Congress ratified VA's interpretation that it may provide for [abortions] pursuant to its authority under 38 U.SC. 1710, notwithstanding section 106." 87 Fed. Reg. at 55,289.

This argument is a nonstarter. At most, Congress incorporated and authorized the pregnancy care services that VA "included in the medical benefits package" as of January 2021. It did not ratify VA's legal interpretation of section 106 or any purported authority to provide abortion services. To the contrary, the medical benefits package in January 2021 expressly *excluded* abortion services. *See* 38 C.F.R. § 17.38(c) (2019). Because "[a]bortion presents a profound moral issue on which Americans hold sharply conflicting views," *Dobbs v. Jackson Women's Health Org.*,

142 S. Ct. 2228, 2240 (2022), we are especially hesitant to infer from Congress's approval of pregnancy care that it blessed such a capacious and controversial interpretation of VA's treatment authority under 38 U.S.C. § 1710. After all, medical care offered in the medical benefits package is provided only when "needed to promote, preserve, or restore the health of the individual." 38 C.F.R. § 17.38(b). Consistent with the purposes underlying section 106, Congress might reasonably have deemed abortions to be antithetical to the goal of promoting, preserving, or restoring the health of individual veterans. *See, e.g.*, *Dobbs*, 142 S. Ct. at 2284 (acknowledging the government's "legitimate interest[]" in, among other things, "the protection of maternal health and safety" (citations omitted)); *Gonzales v. Carhart*, 550 U.S. 124, 158–59 (2007) (recognizing an interest in preventing the "[s]evere depression and loss of esteem [that] can follow" an abortion). We thus cannot conclude that Congress's approval of pregnancy care in the January 2021 medical benefits package ratified a qualitatively distinct class of services not offered in that package—services relating to abortions. If there is any inference to be drawn from the Deborah Sampson Act, it runs in the opposite direction of our 2022 opinion.

**2.**

The 2022 interim final rule also posited that "[t]he Veterans' Health Care Eligibility Reform Act [of 1996] effectively overtook section 106 of the VHCA." 87 Fed. Reg. at 55,289; *see also* Pub. L. No. 104-262, 110 Stat. 3177 (1996) ("VHCERA"). This argument fails for much the same reason as the congressional ratification argument. VHCERA amended 38 U.S.C. § 1710(a) to establish new eligibility criteria for veterans. *See* VHCERA § 101(a), 110 Stat. at 3178. But it said nothing at all about the abortion limitation in section 106 the VHCA. In fact, VHCERA *did* expressly repeal or amend other provisions of the 1992 Act, but left section 106 untouched. *See id.* § 302(a)(2), 110 Stat. at 3193 (amending section 201 and repealing section 204 of the VHCA); *id.* § 324, 110 Stat. at 3197 (amending sections 107(a) and (b) of the VHCA).

Basic principles of statutory interpretation counsel against reading VHCERA as an implied repeal of VHCA section 106. "When confronted with two Acts of Congress allegedly touching on the same topic," interpreters "must . . . strive 'to give effect to both.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (citation omitted). In such a situation, "we come

armed with the strong presumption that repeals by implication are disfavored and that Congress will specifically address pre-existing law when it wishes to suspend its normal operations in a later statute." *Id.* (cleaned up); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 240 (2009) (requiring "a clear expression . . . of Congress' intent to repeal" before concluding that a provision has been repealed by implication). That presumption carries substantial force here. Abortion is deeply controversial, *see Dobbs*, 142 S. Ct. at 2240, so we would not expect Congress to "use oblique or elliptical language to empower" VA to provide abortion services in the face of VHCA's clear prohibition, *West Virginia*, 142 S. Ct. at 2609.

## III.

"We do not depart from our past views lightly." *Reconsidering the Application of the Hyde Amendment to the Provision of Transportation for Women Seeking Abortions*, 49 Op. O.L.C. __, at *17 (July 11, 2025). But after careful consideration, we think it appropriate to do so here. "[A]s with any system of precedent, reconsideration of our prior opinions is appropriate where, for example, we have identified errors in the supporting legal reasoning." *Id.* (cleaned up); *see also Wire Act*, 42 Op. O.L.C. at 178; *id.* at 178 n.15 (collecting examples). We have described already the legal errors in our 2022 opinion, and the reasoning with which we disagree was conspicuously shallow in its attention to the text and scope of section 106, among other flaws. Further, the magnitude of any reliance interests vis-à-vis our 2022 opinion is minimal. That opinion "is of relatively recent vintage," and it "departed from established [VA] practice"—spanning decades—of not providing abortion services. *Wire Act*, 42 Op. O.L.C. at 179. Restoring the status quo ante will not be unnecessarily destabilizing. "We acknowledge that some may have relied on the views expressed in our" previous opinion, but "in light of our conclusion about the plain language of the statute, we do not believe that such reliance interests are sufficient to justify continued adherence" to that decision. *Id.* at 180.[4]

[4] Government officers and employees may have relied upon our prior advice when providing abortions, notwithstanding contrary state law. We note that "[t]he Constitution's Supremacy Clause generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *United States v. Washington*, 142 S. Ct.

VA may not provide abortion services under any provision of chapter 17 of title 38, including 38 U.S.C. § 1710. Because the statutory scheme supporting the provision of care to CHAMPVA beneficiaries is also part of chapter 17, the same rule applies to the CHAMPVA program. *See* 38 U.S.C. § 1781(b). The portions of our opinion in *Abortion Services* that advised otherwise are hereby withdrawn and superseded by this opinion.

JOSHUA J. CRADDOCK
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

1976, 1982 (2022). And the entrapment-by-estoppel defense "applies to a defendant who reasonably relies on the assurance of a government official that specified conduct will not violate the law." *United States v. Votrobek*, 847 F.3d 1335, 1344 (11th Cir. 2017) (citation omitted); *accord United States v. Miles*, 748 F.3d 485, 489 (2d Cir. 2014). These doctrines ensure that when this Office reasonably advises an officer or employee that his conduct is immune from state regulation and he reasonably relies on that legal advice, that employee generally will remain immune from state-law liability, even if the advice is later found to be erroneous. Although we believe our earlier opinion's analysis of VA's statutory authority was erroneous, our withdrawal of that opinion in relevant part does not upset these reliance interests.

## 38 U.S.C. § 1710(a)

**§1710. Eligibility for hospital, nursing home, and domiciliary care**

**(a)**

(1) The Secretary (subject to paragraph (4)) shall furnish hospital care and medical services which the Secretary determines to be needed—

(A) to any veteran for a service-connected disability; and

(B) to any veteran who has a service-connected disability rated at 50 percent or more.

(2) The Secretary (subject to paragraph (4)) shall furnish hospital care and medical services, and may furnish nursing home care, which the Secretary determines to be needed to any veteran—

(A) who has a compensable service-connected disability rated less than 50 percent or, with respect to nursing home care during any period during which the provisions of section 1710A(a) of this title are in effect, a compensable service-connected disability rated less than 70 percent;

(B) whose discharge or release from active military, naval, air, or space service was for a disability that was incurred or aggravated in the line of duty;

(C) who is in receipt of, or who, but for a suspension pursuant to section 1151 of this title (or both a suspension and the receipt of retired pay), would be entitled to disability compensation, but only to the extent that such veteran's continuing eligibility for such care is provided for in the judgment or settlement provided for in such section;

(D) who is a former prisoner of war, who was awarded the medal of honor under section 7271, 8291, or 9271 of title 10 or section 491 of title 14, or who was awarded the Purple Heart;

(E) who is a veteran of—

(i) the Mexican border period;

(ii) World War I; or

(iii) World War II;

(F) who is a toxic-exposed veteran, in accordance with subsection (e); or

(G) who is unable to defray the expenses of necessary care as determined under section 1722(a) of this title.

(3) In the case of a veteran who is not described in paragraphs (1) and (2), the Secretary may, to the extent resources and facilities are available and subject to the provisions of subsections (f) and (g), furnish hospital care, medical services, and nursing home care which the Secretary determines to be needed.

(4) The requirement in paragraphs (1) and (2) that the Secretary furnish hospital care and medical services, the requirement in section 1710A(a) of this title that the Secretary provide nursing home care, the requirement in section 1710B of this title that the Secretary provide a program of extended care services, and the requirement in section 1745 of this title to provide nursing home care and prescription medicines to veterans with service-connected disabilities in State homes shall be effective in any fiscal year only to the extent and in the amount provided in advance in appropriations Acts for such purposes.

(5) During any period during which the provisions of section 1710A(a) of this title are not in effect, the Secretary may furnish nursing home care which the Secretary determines is needed to any veteran described in paragraph (1), with the priority for such care on the same basis as if provided under that paragraph.

## Pub. L. No. 102-585, §106, 106 Stat. 4947 (1992)

**§106. Health Care Services for Women.**

**(a) GENERAL AUTHORITY.**—In furnishing hospital care and medical services under chapter 17 of title 38, United States Code, the Secretary of Veterans Affairs may provide to women the following health care services:

(1) Papanicolaou tests (pap smears).

(2) Breast examinations and mammography.

(3) General reproductive health care, including the management of menopause, but not including under this section infertility services, abortions, or pregnancy care (including prenatal and delivery care), except for such care relating to a pregnancy that is complicated or in which the risks of complication are increased by a service-connected condition.

**(b) RESPONSIBILITIES OF DIRECTORS OF FACILITIES.**—The Secretary shall ensure that directors of medical facilities of the Department identify and assess opportunities under the authority provided in title II of this Act to (1) expand the availability of, and access to, health care services for women veterans under sections 1710 and 1712 of title 38, United States Code, and (2) provide counseling, care, and services authorized by this title.