**No. 26-1861**

United States Court of Appeals
for the Federal Circuit

**MINORITY VETERANS OF AMERICA**,
*Petitioner*,
v.

**SECRETARY OF VETERANS AFFAIRS**,

*Respondent*.

Petition for Review Pursuant to 38 U.S.C. § 502

# BRIEF OF AMICUS CURIAE VET VOICE FOUNDATION IN SUPPORT OF PETITIONER MINORITY VETERANS OF AMERICA

Maria T. Ciacci
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
One New York Plaza
New York, NY 10004
(212) 859-8000

Katherine L. St. Romain
Elizabeth J. Kalanchoe
Jonathan A. Picado
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
801 17th St. NW
Washington, DC 20006
(202) 639-7000

*Counsel for Amicus Curiae Vet Voice Foundation*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for Amicus Curiae Vet Voice Foundation certifies the following:

1. Full names of all entities represented by undersigned counsel in this case: Vet Voice Foundation.
2. Full names of all real parties in interest for the entities: not applicable.
3. Parent corporations and publicly held companies that own 10% or more of stock in the represented party: none.
4. The names of all law firms and the partners or associates that (a) appeared for the party now represented by me in the originating court or agency or (b) are expected to appear in this court (and who have not or will not enter an appearance in this case): none.
5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal: none.
6. The names of any organizational victim of alleged criminal activity or debtors in a bankruptcy action: not applicable.

Dated: November 6, 2026

*/s/ Katherine L. St. Romain*
Katherine L. St. Romain
*Counsel for Amicus Curiae*
*Vet Voice Foundation*

# TABLE OF CONTENTS

Table of Authorities ........................................................................................... iii

Statement of Interest ..............................................................................................x

Introduction ..............................................................................................................1

Argument ...................................................................................................................4

I. THE 2025 RULE SUBJECTS VETERANS TO THE MOST RESTRICTIVE FEDERAL ABORTION CARE PROGRAM. .....................4

II. THE 2025 RULE DENIES PREGNANT VETERANS, A HIGH-RISK PATIENT GROUP, ACCESS TO ESSENTIAL HEALTH SERVICES. ......7

A. Veterans Seeking Reproductive Care from VA Often Carry a Heavy Mental Health Burden and Have Increased Physical Health Risks. ........9

B. Suicide Risk Is Markedly Elevated for Pregnant Veterans Seeking VA Health Care Services. .........................................................................11

C. Medical Evidence Shows That Abortions Do Not Negatively Impact the Mental Health of Patients Seeking Abortion Care. ...............................14

III. VETERANS' HEALTH AND QUALITY OF CARE SUFFER WHEN THEY ARE FORCED TO SEEK CARE OUTSIDE VA. ...........................15

A. A Growing Number of Women Veterans Rely on VA to Provide High-Quality, Culturally Competent Health Care. ........................................16

1. VA Provides High-Quality Health Care to Its Veteran Patients. ....18

2. VA Is Uniquely Positioned to Provide the Culturally Competent Care Required to Produce Optimal Health Outcomes. ...................21

B. Requiring Pregnant Veterans to Seek Community Abortion Care Undermines VA's Integrated Care Model. ..........................................23

C. Pregnant Veterans Will Incur Significant Costs to Access Community Abortion Care, or May Be Unable to Access Such Care At All. ..........26

1. Many Women Veterans Live in Rural Areas Without Access to Community Reproductive Health Care Providers. .........................26

2. Many Pregnant Veterans Seeking Abortion Care Will Need to Travel Out of State, Which May Be Financially Impossible. .........27

Conclusion ..............................................................................................................29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dobbs v. Jackson Women's Health Organization*,
597 U.S. 215 (2022).......................................................................................2

**Statutes**

10 U.S.C. § 1093 .........................................................................................6

38 U.S.C. § 111 ..........................................................................................28

**Regulations**

28 C.F.R. § 551.23 .......................................................................................7

**Publications and Periodicals**

Aimee M. Sanders, *Training Rural Workforce to Care for Women Veterans - VA Continues Its Mission*, U.S. Dep't of Veterans Affs. (Jan. 17, 2026)...............................................................................26

Anita A. Vashi et al., *Community Emergency Care Use by Veterans in an Era of Expanding Choice*, 7 JAMA Network Open e241626 (2024)...................................................................................................18

Caitlin Russell, *"It's My Dark Secret": A Qualitative Study on the Abortion Experiences of US Active-Duty Servicewomen,* 58 Persps. on Sexual & Reprod. Health 159 (2026) ...............................................6

Carrie M. Farmer et al., RAND Corp., *Recommended Standards for Delivering High-Quality Care to Veterans with Invisible Wounds* (2022)...................................................................................................21

Claire A. Hoffmire et al., *Suicidal Ideation and Suicide Attempts Among Women Veterans Using VA Reproductive Health Care: Prevalence and Associations with Fertility-, Pregnancy- and Parenting-related Factors*, 34 Women's Health Issues 528 (2024) ...........12, 24

Colleen Judge-Golden et al., *Prior Abortions and Barriers to Abortion Access Reported By Pregnant Women Veterans*, 37 J. Gen. Internal Med. 816 (Supp. III 2022) .......... 17

Courtney Kube & Minyvonne Burke, *VA Performs Its First Abortion Weeks After Saying it Would in Certain Cases*, NBC News (Sept. 22, 2022) .......... 16

Ctr. Reprod. Rts., *Fact Sheet: Abortion Access for Veterans* (Jan. 14, 2026) .......... 17

Dana Schultz et al., *Improving Support for Veteran Women: Veterans' Issues in Focus*, RAND (Sept. 15, 2022) .......... 25

David J. Shulkin, *Why VA Health Care Is Different*, 33 Fed. Prac. 9 (2016) .......... 18

Deidre A. Quinn et al., *Describing Adverse Pregnancy Events and Pregnancy-Associated Death Among Veterans*, 34 J. Women's Health 166 (2025) .......... 12, 23, 24

Dep't of Veterans Affs., Off. of Inspector Gen., *Review of Veterans Health Administration Reproductive Health Services* (Sept. 28, 2023) .......... 26

Dwight C. Evans et al., *Effect of the Implementation of an Enterprise-wide Electronic Health Record on Productivity in the Veterans Health Administration*, Health Econ., Policy, and Law 163 (2006) .......... 25

Edward C. Lieu & Wen W. Shen, *The Hyde Amendment: An Overview*, U.S. Libr. of Cong. .......... 5

Eleanor Bimla Schwarz et al., *Counseling of Female Veterans About Risks of Medication-Induced Birth Defects*, 28 J. Gen. Internal Med. S598 (2012) .......... 13

Eleanor Bimla Schwarz et al., *Induced Abortion Among Women Veterans: Data from the ECUUN Study*, 97 Contraception 47 (2018) .......... 27

Elizabeth L. George et al., *Outcomes of Women Undergoing Noncardiac Surgery in Veterans Affairs Compared with Non-Veterans Affairs Care Settings*, 159 JAMA Surgery 501 (2024) .......... 19, 21

Ellen Poleshuck et al., *Barriers to Accessing Care Among Rural Women Veterans: A Qualitative Study with Veterans, Peer Specialists, and Primary Care Professionals*, 22 Psych. Serv. 358 (2025) ....................27

Eric A. Apaydin et al., *Veterans Health Administration (VA) vs. Non-VA Healthcare Quality: A Systematic Review*, 38 J. Gen. Internal Med. 2179 (2023) ....................18

Geetha Shivakumar et al., *Patterns of Treatment Utilization Across the Perinatal Period in the Center for Maternal and Infant Outcomes and Research in Translation (COMFORT) Veterans Study*, 30 J. of Women's Health 882, 884 (2021)....................11, 13

Guttmacher Inst., *Fact Sheet: The Hyde Amendment: A Discriminatory Ban on Insurance Coverage of Abortion* (Sept. 2026) ....................5

Hamideh Bayrampour et al., *The Risk of Relapse of Depression During Pregnancy After Discontinuation of Antidepressants: A Systematic Review and Meta-Analysis*, 81 J. Clinical Psychiatry e1 (2020)....................12

Indian Health Serv., *Use of Indian Health Service Funds for Abortions*, Circular No. 22-15, § 4 (June 30, 2022) ....................6

Isabel S. Platt et al., *Societal Costs of Total Abortion Bans in 14 US States After Dobbs*, 116 Am. J. Pub. Health 683 (2026) ....................28

Joan L. Combellick et al., *Perinatal Mental Health and Pregnancy-Associated Mortality: Opportunities for Change*, 27 Archives Women's Mental Health 417 (2024) ....................11, 13, 24

Joan L. Combellick et al., *Severe Maternal Morbidity Among a Cohort of Post-9/11 Women Veterans*, 29 J. Women's Health 577 (2020)....................16, 17, 22, 23

Jodie G. Katon et al., *Prenatal Care for Women Veterans Who Use Department of Veterans Affairs Health Care*, 25-4 Women's Health Issues 377 (2015) ....................9, 10, 23, 27

Jodie G. Katon et al., *Reproductive Health of Women Veterans: A Systematic Review of the Literature from 2008 to 2017*, 36 Seminars Reprod. Med. 315 (2018)....................9, 11

Kayla Williams, *Veterans' Access to Reproductive Healthcare: Enhance Equity Now, Testimony Before the House Veterans Affairs Committee*, Center for New Am. Sec. (July 1, 2020)....................5, 6

Kenneth W. Kizer et al., *The Urgent Need to Address VHA Community Care Spending and Access Strategies - "Red Team" Executive Roundtable Report* (Mar. 30, 2024)....................21

Lee S. Cohen et al., *Relapse of Major Depression During Pregnancy in Women Who Maintain or Discontinue Antidepressant Treatment*, 295 JAMA 499 (2006)....................12

Lisa S. Callegari & Sonya Borrero, *Abortion Care for Veterans-A Historic Step Forward*, 3 JAMA Health F. 1 (Nov. 1, 2022)....................4, 11

Lucinda B. Leung et al., *Veterans Health Administration Investments in Primary Care and Mental Health Integration Improved Care Access*, 8 Health Aff. 1281 (Aug. 2019)....................20

M. Antonia Biggs et al., *Women's Mental Health and Well-Being 5 Years After Receiving or Being Denied an Abortion*, 74 JAMA Psychiatry 169 (2017)....................14

Maeve E. Wallace et al., *Health Care Use and Health Consequences of Geographic Lack of Access to Abortion and Maternity Care*, 51 Birth 363 (2024)....................26

Mariah Blegen et al., *Comparing Quality of Surgical Care Between the US Department of Veterans Affairs and Non-Veterans Affairs Settings: A Systematic Review*, 237 Veterans Affs. & Surgical Quality 352 (2023)....................18

Megan Howard et al., *Exploring the Prevalence of Antidepressant Medication Discontinuation Among Pregnant Veterans*, 27 Archives Women's Mental Health 89 (2024)....................10, 11, 13

Michele Hugin & Jonathan G. Shaw, *Obstetric Outcomes in U.S. Veterans: Emerging Knowledge, Considerations, and Gaps*, 37 Seminars Reprod. Med. 17 (2019)....................11, 23, 26

New Eng. J. of Med. et al., Editorial, *The Dangerous Threat to Roe v. Wade*, 381 NEJM 979 (2019)....................8

Petra W. Rasmussen & Carrie M. Farmer, *The Promise and Challenges of VA Community Care: Veterans' Issues in Focus*, 10 RAND Health Q. (2023)....................18, 21, 25

Press Release, U.S. Dep't of Veterans Affairs, *Nationwide Patient Survey Shows VA Hospitals Outperform Non-VA Hospitals* (June 14, 2023)....................18

Press Release, U.S. Dep't of Veterans Affairs, *New VA Mission Statement Recognizes Sacred Commitment to All Veterans, Their Families, Caregivers and Survivors* (Mar. 16, 2023)....................3

Rebecca Anhang Price et al., *Comparing Quality of Care in Veterans Affairs and Non-Veterans Affairs Settings*, J. Gen. Internal Med. 1631 (2018)....................18

Rebecca Grekin et al., *Predictors of Veterans Affairs Health Service Utilization By Women Veterans During Pregnancy*, 30 Women's Health Issues 292 (2020)....................17

Rebecca Kheel, *VA Says It Performed 88 Abortions in the Past Year, But Congress Again Threatens Subpoenas in Pursuit of More Details* (Oct. 19, 2023)....................16

Rosalinda V. Maury et al., *Women in the Military: Transition, Employment, and Higher Education After Service*, Inst. for Veterans & Mil. Families, Syracuse Univ. (Mar. 2020)....................28

Rosalyn Schroeder et al., *Trends in Abortion Services in the United States, 2017-2023*, Advancing New Standards in Reprod. Health (2024)....................28

Sarah Klein, *The Veterans Health Administration: Implementing Patient-Centered Medical Homes in the Nation's Largest Integrated Delivery System*, 16 The Commonwealth Fund Pub. No. 1537 (Sept. 2011)....................19, 20

Steven H. Brown et al., *Use of Electronic Health Records in Disaster Response: The Experience of Department of Veterans Affairs After Hurricane Katrina*, 97 Am. J. Pub. Health S136 (Supp. I 2007)....................25

Terri Tanielian et al., *Ready to Serve: Community-Based Provider Capacity to Deliver Culturally Competent, Quality Mental Health Care to Veterans and Their Families*, RAND Corp. 8 (2014)....................22

Tracey Ledoux et al., *Characteristics of Pregnant Veterans: A Descriptive Retrospective Medical Record Study*, 191 Mil. Med. e481 (2026)....................9, 10, 22

U.S. Dep't Veterans Affairs, *Regulatory Impact Analysis for RIN 2900-AS31(P), Reproductive Health Services* 6 (July 30, 2025)....................8

U.S. Dep't of Veterans Affs., Women Veterans Health Care, *Facts and Statistics: Women Are the Fastest Growing Group in the Veteran Population*....................17, 27

U.S. Gov't Accountability Off., GAO-24-106209, *Veterans Health: VA Should Improve Its Monitoring of Severe Maternal Complications and Mental Health Screenings* 10 (2024)....................10, 12, 24

Ushma D. Upadhyay et al., *State Abortion Policies and Medicaid Coverage of Abortion are Associated with Pregnancy Outcomes Among Individuals Seeking Abortion Recruited Using Google Ads: A National Cohort Study*, 274 Soc. Sci. & Med. 113747 (2021)....................29

Vanessa Marshall et al., *The Focus They Deserve: Improving Women Veterans' Health Care Access*, 31 Women's Health Issues 399 (2021)....................19

World Health Org., *Abortion* (Dec. 8, 2025)....................8

**Other Authorities**

Departments of Labor, Health & Human Services and Education and Related Agencies Appropriations Act, Pub. L. No. 117-328, div. H, § 507(a), 136 Stat. 4459 (2022) ........ 5

Federal Bureau of Prisons, Program Statement 5200.09, CN-1, Female Offender Manual (July 31, 2025) ........ 7

*Reconsidering the Authority of the Department of Veterans Affairs to Provide Abortion Services*, 49 Op. O.L.C. __ (Dec. 18, 2025) ........ 14, 15

Reproductive Health Services, 87 Fed. Reg. 55287 (Sept. 9, 2022) ........ 1, 2

Reproductive Health Services, 90 Fed. Reg. 61310 (Dec. 31, 2025) ........ 1, 2, 3, 4, 5, 6, 7, 8, 14, 15, 16, 17, 23, 24, 25, 28, 29

## STATEMENT OF INTEREST

Vet Voice Foundation ("Vet Voice") is a Washington, D.C.-based nonprofit, nonpartisan organization dedicated to mobilizing veterans to lead and advocate for a stronger, more just America, supporting better lives and livelihoods for veterans and their families, and protecting our freedoms. Vet Voice has a particular interest in ensuring that policies affecting veterans reflect the realities of their military service. Vet Voice seeks to empower veterans across the country to become civic leaders and policy advocates, harnessing the energy and drive of dedicated individuals who have fought for our country and putting that energy and drive to work at home and in their communities on important issues they face, including health care. This includes advocating for adequate and gender-specific health care for women veterans, who are the fastest-growing population of veterans using Veterans Health Administration services.[1]

---

[1] In accordance with Federal Rule of Appellate Procedure 29, all parties have consented to the filing of this *amicus* brief. No party's counsel authored this brief either in whole or in part. No party or party's counsel contributed any money intended to fund preparing or submitting this brief, and no person or organization—other than *amicus curiae* and its counsel—contributed money that was intended to fund preparing or submitting the brief.

# INTRODUCTION

On December 31, 2025, the United States Department of Veterans Affairs ("VA") issued a final rule that imposed on veterans the most restrictive abortion care regime of any federal institution. *See* Reproductive Health Services, 90 Fed. Reg. 61310 (Dec. 31, 2025) (codified at 38 C.F.R. § 17.38) (the "2025 Rule"). Under the 2025 Rule, VA is prohibited from providing any abortion care or counseling, with only a narrow exception for abortion care provided where "necessary to save the life of the pregnant veteran (such as treatment for ectopic pregnancies or miscarriages) . . . ." 2025 Rule, 90 Fed. Reg. at 61311. The 2025 Rule does not codify the exception to VA's abortion ban *for veterans*, it is only codified for beneficiaries; thus, the exception appears for veterans only in the nonbinding preamble. *Id.* Without codification, VA asserts that life-saving treatment for conditions such as ectopic pregnancy and miscarriage falls outside the definition of abortion and thus can still be provided. *See id.*

The 2025 Rule comes as an inexplicable about-face by VA. Just over three years prior to issuing the 2025 Rule, on September 9, 2022, VA implemented a regulation that permitted VA to provide abortion counseling and narrowly expanded access to abortion care for veterans and beneficiaries of the Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") (hereinafter, "beneficiaries"). *See* Reproductive Health Services, 87 Fed. Reg.

55287 (Sep. 9, 2022), *finalized without changes*, 89 Fed. Reg. 15451 (Mar. 4, 2024) (codified at 38 C.F.R. § 17.38) (the "2022 Rule").

VA promulgated the 2022 Rule "to help to ensure that, irrespective of what laws or policies States may impose" in the wake of the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), veterans and beneficiaries would "be able to obtain abortions, if determined needed by a health care professional, when the life or the health of the pregnant veteran would be endangered if the pregnancy were carried to term or the pregnancy is the result of an act of rape or incest." 2022 Rule, 87 Fed. Reg. at 55288 (noting standard for beneficiaries receiving care is "medically necessary and appropriate"). The 2022 Rule further "remove[d] the exclusion on abortion counseling" because "[s]uch counseling is essential to ensure that veterans may make informed decisions about their care." *Id.* at 55292. Although VA previously recognized the importance of access to abortion counseling and expanded abortion care, it now ignores its own findings and once again imposes a total ban on abortion counseling and a near-total ban on abortion care.

The 2025 Rule is thus inconsistent with both VA's own prior findings and its mission "to care for those who have served our nation's military and for their

families, caregivers, and survivors."[2] The 2025 Rule should not be permitted to stand for a number of reasons, including the following.

***First***, the regime imposed by the 2025 Rule is more restrictive than any other federal health care program.

***Second***, women veterans, and in particular pregnant veterans, experience mental health conditions—such as depression, anxiety, and posttraumatic stress disorder—at dramatically higher rates than the general population. These conditions, which are associated with military-related traumas, including military sexual trauma, are linked with adverse health and pregnancy outcomes. Accordingly, the elimination of abortion counseling and near-elimination of abortion care directly threatens the health of veterans whose complex clinical profiles suggest a particular need for comprehensive pregnancy counseling and abortion care, where desired by the patient.

***Third***, pregnant veterans seeking abortion care will be forced out of the VA health system that has innovated holistic care solutions tailored for veterans, and increasingly for women veterans, into a community health care system that is often not equipped to provide the unique care that veterans require. Without the

---

[2] Press Release, U.S. Dep't of Veterans Affairs, *New VA Mission Statement Recognizes Sacred Commitment to All Veterans, Their Families, Caregivers and Survivors* (Mar. 16, 2023), https://news.va.gov/press-room/new-va-mission-statement-recognizes-sacred-commitment-to-all-veterans-their-families-caregivers-and-survivors/.

protections of the prior VA regime, these veterans likely will incur significant financial costs, as many live in rural areas or states with total or six-week gestational limit bans and will need to travel considerable distances to secure abortion counseling and care. Given these circumstances, some women veterans may be forced to forgo abortion care or counseling altogether.

For these reasons, and those set forth below, Vet Voice respectfully urges the Court to grant the petition for review.

## ARGUMENT

### I. THE 2025 RULE SUBJECTS VETERANS TO THE MOST RESTRICTIVE FEDERAL ABORTION CARE PROGRAM.

By prohibiting abortion counseling and limiting abortion care to a narrow, life-saving exception, the 2025 Rule denies veterans abortion care that remains available to populations covered by other federal health care programs. Thus, the near-total abortion ban imposed by the 2025 Rule has returned VA to "the most stringent abortion policy of any federal institution" by excluding "abortion counseling, referral, provision, and coverage without any exceptions."[3]

The 2025 Rule is more restrictive than the care that can be provided to civilians based on the Hyde Amendment, a legislative provision that, as part of federal appropriation bills, restricts the use of federal funds for abortion care in

---

[3] Lisa S. Callegari & Sonya Borrero, *Abortion Care for Veterans—A Historic Step Forward*, 3 JAMA Health F. 1, 1 (Nov. 1, 2022).

programs such as Medicare, Medicaid, and the Children's Health Insurance Program ("CHIP").[4] The current iteration of the Hyde Amendment contains exceptions for pregnancies that are the result of an act of rape or incest, and where the abortion is provided to save the life of the pregnant person.[5] Thus, under the 2025 Rule, women veterans who have served and sacrificed for our country, and who are pregnant due to an act of rape or incest, have less access to essential health care than similarly situated civilian recipients of Medicare, Medicaid, CHIP, and other federal programs.[6]

The disparity is particularly stark for servicemembers transitioning from active duty to veteran status. The statutory regime governing the scope of care that can be provided through the Department of Defense ("DOD"), which is comparable

---

[4] *See* Guttmacher Inst., *Fact Sheet: The Hyde Amendment: A Discriminatory Ban on Insurance Coverage of Abortion* (Sep. 2026), https://www.guttmacher.org/fact-sheet/hyde-amendment; *see also* Kayla Williams, *Veterans' Access to Reproductive Healthcare: Enhance Equity Now, Testimony Before the House Veterans Affairs Committee*, Center for New Am. Sec. (July 1, 2020), https://www.cnas.org/publications/congressional-testimony/veterans-access-to-reproductive-healthcare-enhance-equity-now (testifying that, under analogous pre-2022 scheme, "VA's medical benefits package limits care even more narrowly than the Hyde Amendment, excluding abortions and abortion counseling with no exemptions").

[5] *See* Edward C. Lieu & Wen W. Shen, *The Hyde Amendment: An Overview*, U.S. Libr. of Cong., https://www.congress.gov/crs-product/IF12167.

[6] *Compare* 2025 Rule, 90 Fed. Reg. at 61311*, with* Departments of Labor, Health & Human Services and Education and Related Agencies Appropriations Act, Pub. L. No. 117-328, div. H, § 507(a), 136 Stat. 4459, 4908 (2022) (codifying Hyde Amendment).

to the Hyde Amendment, permits abortion care in circumstances the 2025 Rule excludes.[7] DOD's health care program, TRICARE, provides abortion care "where the life of the mother would be endangered if the fetus were carried to term or in a case in which the pregnancy is the result of an act of rape or incest." 10 U.S.C. § 1093(a). Under the 2025 Rule, veterans thus lose access to care available to active-duty servicemembers and their dependents. The consequences of that loss are unconscionable:

> a woman could leave active duty because she was sexually assaulted, and, expecting to receive the same level of care she could get in the military, walk into VA the next day as a veteran but no longer be able to access the care she and her provider agree is vital to her well-being.[8]

The disparity is not limited to military health care. Other federal programs likewise permit abortion care that VA denies veterans under the 2025 Rule. For example, the Indian Health Service, which provides health care to Native Americans, authorizes funding for abortions consistent with the Hyde Amendment.[9]

---

7 Williams, *supra* note 4, at 4; *see* Caitlin Russell, *"It's My Dark Secret": A Qualitative Study on the Abortion Experiences of US Active-Duty Servicewomen*, 58 Persps. on Sexual & Reprod. Health 159, 164 (2026), https://pmc.ncbi.nlm.nih.gov/articles/PMC13247853/pdf/PSRH-58-159.pdf.

8 Williams, *Veterans' Access to Reproductive Healthcare*, at 4.

9 Indian Health Serv., *Use of Indian Health Service Funds for Abortions*, Circular No. 22-15, § 4 (June 30, 2022), https://www.ihs.gov/ihm/circulars/2022/use-of-indian-health-service-funds-for-abortions/.

Even individuals incarcerated for federal offenses have greater access to essential reproductive health care than veterans. Unlike veterans receiving health care through VA, federal inmates have access to abortion counseling. 28 C.F.R. § 551.23(b) ("The Warden shall offer to provide each pregnant inmate with medical, religious, and social counseling to aid her in making the decision whether to carry the pregnancy to full term or to have an elective abortion."). The Bureau of Prisons also covers abortion expenses, including transportation, when the pregnancy results from rape or incest or endangers the mother's life. 28 C.F.R. § 551.23(c), as implemented by Federal Bureau of Prisons, Program Statement 5200.09, CN-1, Female Offender Manual (July 31, 2025).

Thus, under the 2025 Rule, veterans have less access to abortion counseling and care than any other population receiving federally funded health care. This is a far cry from VA's mission of providing care to veterans who have put their lives on the line for our nation.

## II. THE 2025 RULE DENIES PREGNANT VETERANS, A HIGH-RISK PATIENT GROUP, ACCESS TO ESSENTIAL HEALTH SERVICES.

The 2025 Rule prohibits VA personnel, including clinicians, from providing pregnant veterans with health care that is recognized by medical authorities within the United States and abroad as "essential." The editors of the New England Journal of Medicine, one of the most widely respected medical journals in the country (if not the world), together with leading organizations in obstetrics, gynecology, and

maternal-fetal medicine have stated that "[a]ccess to legal and safe pregnancy termination . . . is essential to the public health of women everywhere."[10] The World Health Organization also identifies comprehensive abortion care, including abortion counseling, as an essential health care service.[11]

The constellation of mental and physical health conditions tending to affect veterans makes comprehensive abortion care even more critical. As further explained below, pregnant veterans receiving reproductive care through VA disproportionately carry mental health conditions, which can be exacerbated by pregnancy or cause other negative health effects. Indeed, VA has acknowledged that this population of veterans is "***known to be at high risk for complications of pregnancy including severe maternal morbidity and pregnancy associated death***."[12] VA nonetheless enacted the 2025 Rule, imperiling the health and lives of these veterans by denying them counseling to discuss the full range of pregnancy-related care and denying abortion care even when needed to avoid dire health consequences.

---

10 New Eng. J. of Med. et al., Editorial, *The Dangerous Threat to Roe v. Wade*, 381 NEJM 979, 979 (2019), https://www.nejm.org/doi/pdf/10.1056/NEJMe1910174.

11 World Health Org., *Abortion* (Dec. 8, 2025), https://www.who.int/news-room/fact-sheets/detail/abortion.

12 U.S. Dep't Veterans Affairs, *Regulatory Impact Analysis for RIN 2900-AS31(P), Reproductive Health Services* 6 (July 30, 2025) (emphasis added).

### A. Veterans Seeking Reproductive Care from VA Often Carry a Heavy Mental Health Burden and Have Increased Physical Health Risks.

The prevalence of mental health diagnoses, including depression, anxiety, and posttraumatic stress disorder ("PTSD"), is substantially greater among pregnant veterans than their civilian counterparts. One recent study found that 77% of pregnant veterans had at least one mental health diagnosis, compared to 16% of women of childbearing age nationally.[13] Additionally, the study found 59% of pregnant veterans had a depression diagnosis versus 10.3% nationally; 52% had an anxiety diagnosis versus 20% nationally; and 44% had a PTSD diagnosis versus 8% nationally.[14]

These staggering statistics are echoed in other studies. A nationally representative survey found that women veterans who used VA prenatal benefits self-reported diagnosed depression at a rate of 62.5%, compared with the general population's pregnancy depression rates of 8% to 12%.[15] Indeed, the majority of

---

[13] Tracey Ledoux et al., *Characteristics of Pregnant Veterans: A Descriptive Retrospective Medical Record Study*, 191 Mil. Med. e481, e484 (2026).

[14] *Id.*

[15] Jodie G. Katon et al., *Prenatal Care for Women Veterans Who Use Department of Veterans Affairs Health Care*, 25-4 Women's Health Issues 377, 380 (2015) [hereinafter "Katon et al., *Prenatal Care for Women Veterans*"]; *see also* Jodie G. Katon et al., *Reproductive Health of Women Veterans: A Systematic Review of the Literature from 2008 to 2017*, 36 Seminars Reprod. Med. 315, at pdf p. 2 (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6613775/pdf/nihms-1035441.pdf [hereinafter "Katon et al., *A Systematic Review*"] (finding that mental illness among women veterans was "[a] recurrent finding" and "highly prevalent").

pregnant veterans carry *multiple* concurrent psychiatric diagnoses.[16]

"The high rates of mental health morbidity" among pregnant veterans "are concerning because depression and PTSD are associated with an increased risk of adverse outcomes" for patients.[17] Evidence shows that "veterans with depression or post-traumatic stress disorder (PTSD) may be at increased risk for gestational diabetes and hypertensive disorders such as preeclampsia—a pregnancy-related high blood pressure disorder that can lead to the onset of seizures or coma."[18] PTSD is also "associated with preterm birth, compromised fetal growth" and "miscarriage"; in fact, miscarriage among pregnant veterans has been recorded at "almost double what is experienced by civilian women in the United States."[19] These risks are compounded by other characteristics of the pregnant veteran population, whose members generally "tend to experience pregnancy at older ages, which

---

16 M. Howard et al., *Exploring the Prevalence of Antidepressant Medication Discontinuation Among Pregnant Veterans*, 27 Archives of Women's Mental Health 89, 93 (2024) (noting comorbidity is severe and common: In one chart-review study, 67% of pregnant veterans had multiple comorbid mental health diagnoses, and 27.6% carried depression, anxiety, and PTSD simultaneously).

17 Katon et al., *Prenatal Care for Women Veterans*, at 379.

18 U.S. Gov't Accountability Off., GAO-24-106209, *Veterans Health: VA Should Improve Its Monitoring of Severe Maternal Complications and Mental Health Screenings* 10 (2024), https://www.gao.gov/assets/gao-24-106209.pdf [hereinafter "GAO, *Veterans Health*"].

19 Ledoux et al., 191 Mil. Med. at e482–483.

independently elevates the risk of pregnancy-related complications."[20]

These studies tell the same alarming story—mental health struggles are significantly more prevalent among women veterans compared to women non-veterans.[21] As a result, pregnant veterans are at an increased risk of adverse health outcomes and, as explained below, even death.

B. Suicide Risk Is Markedly Elevated for Pregnant Veterans Seeking VA Health Care Services.

The higher incidence of mental health conditions among pregnant veterans

[20] Callegari & Borrero, *supra* note 3, at 1. *Cf.* Michele Hugin & Jonathan G. Shaw, *Obstetric Outcomes in U.S. Veterans: Emerging Knowledge, Considerations, and Gaps*, 37 Seminars Reprod. Med. 17, 17 (2019) (finding that "[v]eteran women report poorer health and have greater incidence of chronic physical and mental health issues").

[21] "This mental health burden . . . may be influenced by the high prevalence of stresses and traumas experienced by women who have served in the military." Joan L. Combellick et al., *Perinatal Mental Health and Pregnancy-Associated Mortality: Opportunities for Change*, 27 Archives Women's Mental Health 417, 418 (2024) [hereinafter "Combellick et al., *Perinatal Mental Health*"]; *see* Megan Howard et al., *Exploring the Prevalence of Antidepressant Medication Discontinuation Among Pregnant Veterans*, 27 Archives Women's Mental Health 89, 89, 93 (2024) ("Female veterans experience high rates of MH [mental health] disorders, due in part to military-related traumatic exposures, such as military sexual trauma (MST) and deployment to combat theaters." (citation omitted)). One study found, for example, that over half of the 594 women veterans study participants reported military sexual harassment, and nearly one-third reported rape. Geetha Shivakumar et al., *Patterns of Treatment Utilization Across the Perinatal Period in the Center for Maternal and Infant Outcomes and Research in Translation (COMFORT) Veterans Study*, 30 J. of Women's Health 882, 884 (2021). Another comprehensive review found that approximately 50% of women veterans using VA health care report experiencing sexual violence, and up to one-third report experiencing military sexual assault specifically. Katon et al., *A Systematic Review*, at pdf p. 8.

also creates increased risk of maternal death by suicide.[22] VA's national administrative data show an estimated pregnancy-associated mortality rate among veterans of 76 deaths per 100,000 live births, nearly double the highest reported non-VA national rate.[23] Meanwhile, younger women veterans of reproductive age have the highest suicide rates among all women veterans, with the risk concentrated among veterans who are seeking reproductive health care from VA.[24]

This elevated suicide risk is compounded for pregnant veterans who stop taking prescribed mental health medications during pregnancy. Discontinuation of psychiatric medication during pregnancy, particularly for veterans with severe or recurrent mental health conditions, significantly increases the risk of relapse and crisis.[25] These risks are especially pronounced where the patient has "multiple

[22] GAO, *Veterans Health*, at 10–11 & n.26.

[23] Deidre A. Quinn et al., *Describing Adverse Pregnancy Events and Pregnancy-Associated Death Among Veterans*, 34 J. Women's Health 166, 170 (2025).

[24] Claire A. Hoffmire et al., *Suicidal Ideation and Suicide Attempts Among Women Veterans Using VA Reproductive Health Care: Prevalence and Associations with Fertility-, Pregnancy- and Parenting-related Factors*, 34 Women's Health Issues 528, 529 (2024).

[25] Lee S. Cohen et al., *Relapse of Major Depression During Pregnancy in Women Who Maintain or Discontinue Antidepressant Treatment*, 295 JAMA 499, 504–05 (2006), https://jamanetwork.com/journals/jama/fullarticle/202291; *see also* Hamideh Bayrampour et al., *The Risk of Relapse of Depression During Pregnancy After Discontinuation of Antidepressants: A Systematic Review and Meta-Analysis*, 81 J. Clinical Psychiatry e1, e1 (2020) (finding that "antidepressant discontinuation is associated with an increased risk of suicide attempts").

mental health comorbidities," which, as noted, is often the case in the pregnant veteran population.[26] Studies have found that many (if not most) pregnant veterans discontinue use of their non-teratogenic[27] mental health prescription medications at pregnancy onset, and do so without a documented risk-benefit discussion with their prescribing VA clinician.[28] Perhaps for this reason, the decision by pregnant veterans to discontinue mental health medications during pregnancy usually appears unrelated to medical risk.[29]

As such, it is clear that pregnant veterans with mental health conditions would benefit from *more* robust counseling in connection with their pregnancies, mental

---

[26] Combellick et al., *Perinatal Mental Health*, *supra* note 21, at 421.

[27] Non-teratogenic medications are not known to cause birth defects, functional impairments, or death in a developing embryo or fetus. *See* Eleanor Bimla Schwarz et al., *Counseling of Female Veterans About Risks of Medication-Induced Birth Defects*, 28 J. Gen. Internal Med. S598, S601 (2012).

[28] Megan Howard et al., *Exploring the Prevalence of Antidepressant Medication Discontinuation Among Pregnant Veterans*, 27 Archives Women's Mental Health 89, 93, 95 (2024) (65.6% discontinued; 54.2% without clinical input); Shivakumar et al., *supra* note 21, at 887 (42% discontinued); Combellick et al., *Perinatal Mental Health*, *supra* note 21, at 420 (finding that, among veterans with active perinatal mental health conditions who died during pregnancy or within one year afterward, 81% were prescribed psychotropic medication, and 38% of those women stopped most or all such medications during pregnancy).

[29] *See* Howard et al., 27 Archives Women's Mental Health at 93–94 (finding discontinuation was not correlated to mental health burden or any other variable in patient charts).

health conditions, and pregnancy options. Yet, the 2025 Rule mandates the opposite—at the potential cost of women veterans' lives.

C. Medical Evidence Shows That Abortions Do Not Negatively Impact the Mental Health of Patients Seeking Abortion Care.

The 2025 Rule relies in part on the Department of Justice's Office of Legal Counsel's formal opinion ("DOJ Opinion"), which concluded that VA does not have the statutory authority to provide abortion care or counseling. *Reconsidering the Authority of the Department of Veterans Affairs to Provide Abortion Services*, 49 Op. O.L.C. __, at *2 (Dec. 18, 2025). However, the DOJ Opinion's analysis is flawed. One issue with DOJ's analysis is that it relies on the unsupported contention that receiving a desired abortion will cause "severe depression and loss of esteem[.]" *Id.* at *11 (quoting *Gonzales v. Carhart*, 550 U.S. 124, 158–59 (2007) (citation modified)). This proposition lacks any empirical support.

In fact, data show that being *denied* an abortion has a demonstrable negative effect on mental health. One well-regarded longitudinal cohort study followed nearly 1,000 patients who either received or were denied a desired abortion from 30 abortion facilities across 21 states, first interviewing each patient one week after seeking an abortion and then semiannually for the next five years.[30] The authors concluded that their findings "do not support policies that restrict women's access

[30] *See* M. Antonia Biggs et al., *Women's Mental Health and Well-Being 5 Years After Receiving or Being Denied an Abortion*, 74 JAMA Psychiatry 169, 170 (2017).

to abortion on the basis that abortion harms women's mental health."[31] Instead, the data underscore the importance of accessible abortion care for a woman's mental health. One week after seeking an abortion but being denied one, women reported significantly more anxiety symptoms, lower self-esteem and lower life satisfaction than women who received a wanted abortion.[32] The study found that a history of mental health conditions and trauma was the most significant predictor of adverse outcomes following abortion-seeking, and that women with such a history may have poorer mental health outcomes if denied an abortion than if they receive one.[33]

It follows that the many women veterans seeking reproductive health care from VA who have a mental health condition and history of trauma are more likely to suffer adverse mental health effects when they are denied an abortion.

## III. VETERANS' HEALTH AND QUALITY OF CARE SUFFER WHEN THEY ARE FORCED TO SEEK CARE OUTSIDE VA.

By forcing veterans to seek abortion counseling and care outside VA, the 2025 Rule threatens both the continuity of their care and their ability to obtain it. The 2022 Rule permitted veterans to access culturally competent, high-quality abortion counseling and, under narrow circumstances, abortion care from VA, which is considered the "national health care system best qualified to address the unique

[31] *Id.* at 169–70.

[32] *Id.* at 169.

[33] *Id.* at 176.

needs of veterans."[34] Shortly after the 2022 Rule was implemented, veterans and beneficiaries began accessing abortion care and counseling as prescribed by that rule through VA medical networks.[35] However, under the 2025 Rule, pregnant veterans seeking comprehensive pregnancy counseling and abortion care will be forced to go to community providers, which will lead to fragmented care and delays in—or outright denial of—care for the many women veterans who live in rural areas or states that impose restrictive abortion policies.

A. A Growing Number of Women Veterans Rely on VA to Provide High-Quality, Culturally Competent Health Care.

While the overall veteran population is expected to shrink over the coming decades, the number of women veterans is expected to grow. As of 2026, the United States is estimated to have 17,260,286 veterans, of whom 2,124,052 (12.3%) are

---

34 Joan L. Combellick et al., *Severe Maternal Morbidity Among a Cohort of Post-9/11 Women Veterans*, 29 J. Women's Health 577, 583 (2020) [hereinafter "Combellick et al., *Severe Maternal Morbidity*"].

35 *See, e.g.*, Courtney Kube & Minyvonne Burke, *VA Performs Its First Abortion Weeks After Saying it Would in Certain Cases*, NBC News (Sep. 22, 2022), https://www.nbcnews.com/health/health-news/va-performs-first-abortion-weeks-saying-certain-cases-rcna49007; Rebecca Kheel, *VA Says It Performed 88 Abortions in the Past Year, But Congress Again Threatens Subpoenas in Pursuit of More Details*, Military.com (Oct. 19, 2023), https://www.military.com/daily-news/2023/10/19/va-says-it-performed-88-abortions-past-year-congress-again-threatens-subpoenas-pursuit-of-more.html (reporting that VA provided 88 abortions in the year after implementing the 2022 Rule, and identifying exception under which each abortion was performed).

women.[36] By 2046, the United States is expected to have only 12,184,598 veterans, of whom 2,161,122 (17.7%) will be women.[37] The fastest-growing subpopulation of VA health care patients is women of reproductive age.[38] And, more than any other group, young women veterans tend to rely on VA health care services.[39]

VA's reversion to a complete ban on abortion counseling and near-total ban on abortion care is an abdication of its responsibility to the growing women veteran population. This abdication is particularly troubling given the "high rate of mental health problems among women veterans who experienced severe maternal morbidity events" and VA's "significant success in addressing the mental health needs of women veterans."[40] Through the 2025 Rule, VA has refused to provide care that it

---

[36] U.S. Dep't of Veterans Affs., Women Veterans Health Care, *Facts and Statistics: Women Are the Fastest Growing Group in the Veteran Population,* https://www.va.gov/VETDATA/docs/Demographics/New_Vetpop_Model/1L_VetPop2023_National_NCVAS.xlsx (last visited Oct. 17, 2026) [hereinafter "U.S. Dep't of Veterans Affs., Women Veterans Health Care, *Facts and Statistics*"].

[37] *Id.*

[38] *See* Rebecca Grekin et al., *Predictors of Veterans Affairs Health Service Utilization By Women Veterans During Pregnancy*, 30 Women's Health Issues 292, 293 (2020); Ctr. Reprod. Rts., *Fact Sheet: Abortion Access for Veterans* (Jan. 14, 2026), https://reproductiverights.org/resources/fact-sheet-abortion-access-for-veterans/.

[39] *See* Grekin et al., 30 Women's Health Issues at 293; *see also* Colleen Judge-Golden et al., *Prior Abortions and Barriers to Abortion Access Reported By Pregnant Women Veterans*, 37 J. Gen. Internal Med. 816, 816 (Supp. III 2022).

[40] Combellick et al., *Severe Maternal Morbidity*, at 581.

is uniquely positioned to deliver in a high-quality, veteran-centric manner that accounts for the greater mental health burden carried by pregnant veterans.

1. *VA Provides High-Quality Health Care to Its Veteran Patients.*

The Veterans Health Administration ("VHA"), a component of VA, "is an integrated health care system" that provides "veteran-centric" care to more than 9 million veterans through "171 medical centers and 1,113 outpatient sites."[41] VA monitors the performance of its medical facilities and studies whether the care delivered at VA facilities is on par with the care provided by non-VA community providers. These studies consistently show that VA provides surgical, perioperative, internal and external, and mental health care for its veteran patients that is equal to or better than that provided by community providers.[42]

---

[41] *See* Petra W. Rasmussen & Carrie M. Farmer, *The Promise and Challenges of VA Community Care: Veterans' Issues in Focus*, 10 RAND Health Q. (2023), https://www.rand.org/pubs/periodicals/health-quarterly/issues/v10/n3/09.html; David J. Shulkin, *Why VA Health Care Is Different*, 33 Fed. Prac. 9, 9 (2016); Anita A. Vashi et al., *Community Emergency Care Use by Veterans in an Era of Expanding Choice*, 7 JAMA Network Open e241626 (2024), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2815840.

[42] *See* Mariah Blegen et al., *Comparing Quality of Surgical Care Between the US Department of Veterans Affairs and Non-Veterans Affairs Settings: A Systematic Review*, 237 Veterans Affs. & Surgical Quality 352, 353–54 (2023); *see also* Rebecca Anhang Price et al., *Comparing Quality of Care in Veterans Affairs and Non-Veterans Affairs Settings*, J. Gen. Internal Med. 1631, 1633, 1636 (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6153237/pdf/11606_2018_Article_4433.pdf; Eric A. Apaydin et al., *Veterans Health Administration (VA) vs. Non-VA Healthcare Quality: A Systematic Review*, 38 J. Gen. Internal Med. 2179, 2186 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10361919/pdf/11606_2023_Article_8207.pdf; *see also* Press Release, U.S. Dep't of Veterans Affairs,

This is true regardless of patient gender.[43] And, in fact, since 2006, VA has "increased attention on gender differences in quality and performance measures," and made concerted efforts to improve women veterans' health care access by implementing "gender-sensitive comprehensive primary care, and gender-specific specialty services, maternity care coordination, the development of separate women's health clinics, and improving contracted care with community providers."[44]

Moreover, VA has developed innovative approaches to patient care tailored to the needs of its veteran patient population. Around 2010, VA transitioned from a traditional clinic primary care approach to patient-aligned care teams ("PACT").[45] The PACT model relies on teams of four medical professionals, including a primary

---

*Nationwide Patient Survey Shows VA Hospitals Outperform Non-VA Hospitals* (June 14, 2023), https://news.va.gov/press-room/nationwide-patient-survey-shows-va-hospitals-outperform-non-va-hospitals/ (reporting "VA hospitals outperformed non-VA hospitals on all 10 core patient satisfaction metrics").

[43] *See* Elizabeth L. George et al., *Outcomes of Women Undergoing Noncardiac Surgery in Veterans Affairs Compared with Non-Veterans Affairs Care Settings*, 159 JAMA Surgery 501, 501 (2024).

[44] Vanessa Marshall et al., *The Focus They Deserve: Improving Women Veterans' Health Care Access*, 31 Women's Health Issues 399, 400 (2021), www.whijournal.com/action/showPdf?pii=S1049-3867%2820%2930157-2 (citation modified).

[45] Sarah Klein, *The Veterans Health Administration: Implementing Patient-Centered Medical Homes in the Nation's Largest Integrated Delivery System*, 16 The Commonwealth Fund Pub. No. 1537, at 2 (Sep. 2011).

care provider, a registered nurse, a licensed practical nurse, and a medical clerk, who collaboratively provide holistic care to a panel of around 1,200 patients by prioritizing frequent touchpoints with supporting team members over traditional, sporadic face-to-face physician visits.[46] The PACT care model has led to closer coordination between veterans' primary and specialty care providers, decreased wait times for care, and higher patient satisfaction.[47]

Additionally, since 2007, VA has improved its mental health care infrastructure through a primary care-mental health integration ("PC-MHI") program that embeds mental health specialists in primary care clinics, where mental health conditions are often initially diagnosed.[48] This program has increased mental health care access and utilization for patients with mild-to-moderate conditions, as well as patients with more serious mental health conditions.[49]

---

46 *Id.* at 4–5.

47 *See id.* at 16.

48 Lucinda B. Leung et al., *Veterans Health Administration Investments in Primary Care and Mental Health Integration Improved Care Access*, 8 Health Aff. 1281, 1281 (Aug. 2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC11540560/pdf/HESR-59-0.pdf.

49 *Id.* at 1286.

In sum, "[v]eterans are a unique patient population that benefits from the tailored care processes and resources the VHA has developed which are not and cannot be offered to the same extent or availability in the private sector."[50]

2. *VA Is Uniquely Positioned to Provide the Culturally Competent Care Required to Produce Optimal Health Outcomes.*

As a general matter, many in the veteran community believe that "a basic understanding of the military is necessary to establish rapport with a veteran or service member and to properly screen for appropriate exposures, experiences, and conditions."[51] VA delivers this vital cultural competence, as "VHA providers are well-versed in veteran culture and the conditions that are prevalent among veterans."[52] On the other hand, it is broadly understood, including among senior leadership at VA, that community health care providers typically do not "demonstrate an understanding of military culture nor competency in diagnosing and treating the diverse, specialized, and often highly complicated health care needs of Veterans," "which is often critical to providing quality care for Veterans."[53]

---

50 George et al., 159 JAMA Surgery at 507.

51 Carrie M. Farmer et al., RAND Corp., *Recommended Standards for Delivering High-Quality Care to Veterans with Invisible Wounds*, 19 (2022), https://www.rand.org/pubs/research_reports/RRA1728-1.html.

52 Rasmussen & Farmer, 10 RAND Health Q.

53 Kenneth W. Kizer et al., *The Urgent Need to Address VHA Community Care Spending and Access Strategies — "Red Team" Executive Roundtable Report*, 4, 8 (Mar. 30, 2024), https://static1.squarespace.com/static/68a3a7a086f56252a95e0de0

This understanding is borne out in the data. A survey of community mental health providers revealed that 70% of health care professionals working in a military or VA setting had a high military cultural competency level, while only 24% of those working in a TRICARE network and 8% of those without any military or TRICARE affiliation attained this level of competency.[54] The same holds true in the context of obstetric care: non-VA reproductive health care providers are "largely unprepared to comprehensively care" for pregnant women veterans.[55] For example, the majority of such providers "never or rarely ask their patients about military service, have limited knowledge of military stressors, are unaware of veteran-specific resources, and can not identify health conditions that commonly affect veterans."[56]

Accordingly, when pregnant veterans seeking abortion care are pushed out of VA and into a community care setting, they are less likely to receive care tailored to

---

/t/68c04f635541fd29b4c46448/1784315133026/Red-Team-Executive-Roundtable-Report.pdf; *see* Ledoux et al., 191 Mil. Med. at e484 (observing that even "VA has suggested that community providers lack expertise to meet the needs of Veterans").

[54] Terri Tanielian et al., *Ready to Serve: Community-Based Provider Capacity to Deliver Culturally Competent, Quality Mental Health Care to Veterans and Their Families*, RAND Corp. 8, 11 (2014), https://www.rand.org/content/dam/rand/pubs/research_reports/RR800/RR806/RAND_RR806.pdf.

[55] Combellick et al., *Severe Maternal Morbidity*, at 578.

[56] *Id.*; Ledoux et al., 191 Mil. Med. at e482 (fewer than 50% of community obstetric providers "screen for mental health issues common among Veterans" and fewer than 20% "understand how military culture and history may affect mental and physical health").

their unique needs and more likely to suffer the attendant negative health implications associated with such care.

B. Requiring Pregnant Veterans to Seek Community Abortion Care Undermines VA's Integrated Care Model.

The 2025 Rule not only deprives pregnant veterans of access to high-quality and culturally competent abortion care services through VA, but also exacerbates the harm by promoting fragmentation of care. Under the 2025 Rule, pregnant veterans will be forced to seek abortion care from community providers, which will create gaps both in the care provided to these veterans, particularly those with mental health conditions, and in their medical records.

VA's increasing attention to integrated care, as seen through its adoption of the PACT care model and PC-MHI program, acknowledges that close collaboration among a patient's care providers facilitates optimal health outcomes. In recent years, VA has redoubled its efforts to reduce fragmentation of obstetric care, nearly all of which is referred to community providers because VA facilities, at most, offer limited prenatal care and none support labor and delivery services.[57] For example, VA requires each VA medical center to designate a maternity care coordinator ("MCC") to serve as a liaison between VA and non-VA providers for pregnant and

---

[57] Combellick et al., *Severe Maternal Morbidity*, at 578; Hugin & Shaw, 37 Seminars Reprod. Med. at 18; Katon et al., *Prenatal Care for Women Veterans*, at 378; Quinn et al., 34 J. Women's Health at 167.

postpartum veterans.[58] However, under the 2025 Rule, neither MCCs nor any other VA staff or providers are permitted to help coordinate abortion counseling or care for pregnant veterans seeking those services. By preventing VA providers from coordinating abortion counseling and care with community providers, the 2025 Rule undermines VA's wraparound care model and creates precisely the fragmentation VA has otherwise sought to reduce.

Further, research by VA personnel and others has suggested that closer integration between mental health and reproductive health providers could reduce pregnancy-associated suicide deaths.[59] Yet the 2025 Rule ensures that VA mental health providers and community reproductive health care providers caring for the same pregnant veteran will not coordinate care and, as a result, neither provider will fully understand the veteran's complex mental health burden. Both VA and non-VA providers will be missing critical context and knowledge and unable to provide fully informed, adequate care.

Moreover, the lack of coordination between VA and community abortion care providers will likely have a continuing impact on pregnant veterans' care at VA.

---

[58] *See* GAO, *Veterans Health*, at 2–3.

[59] Combellick et al., *Perinatal Mental Health*, *supra* note 21, at 420, 423; Hoffmire et al., *supra* note 24, at 529, 535. A "pregnancy-associated death" is a "[d]eath of [a] pregnant person during or within one year of pregnancy outcome . . . ." Quinn et al., 34 J. Women's Health at 169.

One of the unique strengths of VA health care is its enterprise-wide electronic health record system, which makes patient records accessible across the entire VA network and enables providers to communicate regarding each patient's care.[60] But the challenge of maintaining comprehensive medical records when VA refers veteran care to community-based providers is well documented.[61] This problem will no doubt be more pronounced where, as is the case for abortion-related care under the 2025 Rule, VA disclaims any involvement and the veteran is responsible for ensuring the community provider's records are added to her VA electronic health record. This creates a continuing harm to the veteran, as incomplete medical records create "a risk that patients will not receive adequate follow-up care and treatment, nor will their care be coordinated in an integrated manner, which is a noted benefit of VA health care."[62]

---

60 *See* Steven H. Brown et al., *Use of Electronic Health Records in Disaster Response: The Experience of Department of Veterans Affairs After Hurricane Katrina*, 97 Am. J. Pub. Health S136, S136 (Supp. I 2007), https://pmc.ncbi.nlm.nih.gov/articles/PMC1854987/pdf/0970136.pdf; Dwight C. Evans et al., *Effect of the Implementation of an Enterprise-wide Electronic Health Record on Productivity in the Veterans Health Administration*, Health Econ., Policy, and Law 163, 164 (2006).

61 *See, e.g.*, Rasmussen & Farmer, 10 RAND Health Q. (discussing the lack of a systemic process for community-based providers to share records with VA).

62 Dana Schultz et al., *Improving Support for Veteran Women: Veterans' Issues in Focus*, RAND (Sep. 15, 2022), https://www.rand.org/pubs/perspectives/PEA1363-3.html.

C. Pregnant Veterans Will Incur Significant Costs to Access Community Abortion Care, or May Be Unable to Access Such Care At All.

The geographic distribution of women veterans suggests that many will struggle to find local community abortion care providers. For the considerable number of women veterans living in states that restrict abortion care, and who must instead locate an out-of-state provider, the cost of the procedure and travel likely will place abortion care beyond reach.

1. *Many Women Veterans Live in Rural Areas Without Access to Community Reproductive Health Care Providers.*

Nearly a quarter of all veterans live in rural areas with limited access to community reproductive health care providers, including abortion care clinics or clinicians.[63] Women veterans in these areas already struggle with "transportation, finances and childcare, cultural barriers, [and] long travel distance to clinics" for

[63] *See* Dep't of Veterans Affs., Off. of Inspector Gen., *Review of Veterans Health Administration Reproductive Health Services* at 6 (Sep. 28, 2023), https://www.vaoig.gov/sites/default/files/reports/2024-02/VAOIG-22-03931-226.pdf; Hugin & Shaw, 37 Seminars Reprod. Med. at 21; Maeve E. Wallace et al., *Health Care Use and Health Consequences of Geographic Lack of Access to Abortion and Maternity Care*, 51 Birth 363, 366–67 (2024); *see also* Aimee M. Sanders, *Training Rural Workforce to Care for Women Veterans – VA Continues Its Mission*, U.S. Dep't of Veterans Affs. (Jan. 17, 2026), https://news.va.gov/144566/training-rural-workforce-for-women-veterans (noting that "many rural regions face shortages of obstetrician-gynecology services").

non-abortion-related health care, and these barriers will impede their access to abortion care, as well.[64]

#### 2. *Many Pregnant Veterans Seeking Abortion Care Will Need to Travel Out of State, Which May Be Financially Impossible.*

As of 2023, roughly 40% of women veterans lived in states with total abortion bans or six-week gestational age bans, which is before most women know they are pregnant.[65] These veterans, therefore, would need to travel out of state to secure abortion care. However, doing so may be prohibitively expensive, as the population of pregnant veterans seeking abortion care is more likely to have experienced homelessness or housing instability, earn less than $40,000 per year, be single, and already have at least one child.[66] The cost for a pregnant veteran to travel out of state to receive abortion care will range from at least $1,743 to $4,618—amounting

---

[64] Ellen Poleshuck et al., *Barriers to Accessing Care Among Rural Women Veterans: A Qualitative Study with Veterans, Peer Specialists, and Primary Care Professionals*, 22 Psych. Serv. 358, at pdf p. 7 (2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC11892032/pdf/nihms-2055696.pdf.

[65] *See* U.S. Dep't of Veterans Affs., Women Veterans Health Care, *Facts and Statistics*.

[66] Eleanor Bimla Schwarz et al., *Induced Abortion Among Women Veterans: Data from the ECUUN Study*, 97 Contraception 47, at pdf p. 5 (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC5732058/pdf/nihms915509.pdf; *see* Katon et al., *Prenatal Care for Women Veterans*, at 379 (pregnant veterans who use VA health benefits, on average, "have lower levels of employment and education and greater mental health morbidity").

to 3% to 8% of the average woman veteran's gross annual income.[67] The necessary travel costs to secure abortion care permissible under the 2022 Rule, including food and lodging, may have been reimbursable by VA. *See* 38 U.S.C. § 111(a) ("[T]he Secretary may pay the actual necessary expense of travel (including lodging and subsistence), or in lieu thereof an allowance based upon mileage . . . for the purpose of examination, treatment, or care."). In contrast, the 2025 Rule will force veterans living in restrictive states, who are pregnant due to an act of rape or incest, or whose health is endangered by carrying the pregnancy to term, to cover the full cost of travel and care.

As such, the costs to travel to and access abortion care, combined with the logistical challenges of traveling out of state, arranging childcare, and taking time off work (or in some cases losing employment due to missing work), will likely

---

[67] *See* Isabel S. Platt et al., *Societal Costs of Total Abortion Bans in 14 US States After Dobbs*, 116 Am. J. Pub. Health 683, 688 (2026), https://ajph.aphapublications.org/doi/epdf/10.2105/AJPH.2025.308411 (estimated cost for out-of-state travel is $1,593 per person); Rosalyn Schroeder et al., *Trends in Abortion Services in the United States, 2017-2023* at 16, Advancing New Standards in Reprod. Health (2024), https://www.ansirh.org/sites/default/files/2024-08/AFD%20Trends%20in%20Abortion%20Services%20in%20the%20United%20States%202017-2023_Final%20UPDATED.pdf (median cost for medication abortion ranges from $150–$800, first-trimester procedural abortion ranges from $495–$1,150, and second-trimester abortion services range from $440–$3,025); Rosalinda V. Maury et al., *Women in the Military: Transition, Employment, and Higher Education After Service*, Inst. for Veterans & Mil. Families, Syracuse Univ. (Mar. 2020), https://surface.syr.edu/nanna/record/12828/files/ADS_Women_in_the_Military_Transition__Employment__and_Higher_Education_After_Service.pdf (reporting that women veterans, on average, earn $56,760 per year).

result in pregnant veterans delaying care to gather the resources required to overcome these hurdles, or forgoing abortion care entirely.[68]

## CONCLUSION

For these reasons, the 2025 Rule will detrimentally impact pregnant women veterans, who as a population tend to carry a heavy mental health burden, in part due to the high incidence of military sexual trauma, which can lead to adverse pregnancy outcomes. The 2025 Rule will further force pregnant women veterans into health systems that are not designed to provide culturally competent care, often far from the veteran's home, and at a cost that may be prohibitive. Because the 2025 Rule does not care for those who have borne the battle for their country, as VA has promised to do, *amicus* Vet Voice respectfully urges the Court to grant the petition and find in favor of Petitioner.

---

[68] *See* Ushma D. Upadhyay et al., *State Abortion Policies and Medicaid Coverage of Abortion are Associated with Pregnancy Outcomes Among Individuals Seeking Abortion Recruited Using Google Ads: A National Cohort Study*, 274 Soc. Sci. & Med. 113747, at 2 (2021) (summarizing studies finding that "[h]aving to travel long distances for an abortion can lead to delays in abortion care, higher costs, and increased emotional burdens," and financial costs of the procedure and travel "are often insurmountable").

Dated: November 6, 2026

Respectfully submitted,

*/s/ Katherine L. St. Romain*

Katherine L. St. Romain
Elizabeth J. Kalanchoe
Jonathan A. Picado
Fried, Frank, Harris, Shriver & Jacobson LLP
801 17th St. NW
Washington, DC 20006
(202) 639-7000

Maria T. Ciacci
One New York Plaza
New York, NY 10004
(212) 859-8000

*Counsel for Amicus Curiae Vet Voice Foundation*

## CERTIFICATE OF SERVICE

I certify that this brief was served on all counsel of record by notice of electronic filing with the Court's CM/ECF system.

Dated: November 6, 2026

Respectfully submitted,

*/s/ Katherine L. St. Romain*
Katherine L. St. Romain

*Counsel for Amicus Curiae*
*Vet Voice Foundation*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Circuit Rule 29 and Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,962 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2); and

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: November 6, 2026

*/s/ Katherine L. St. Romain*
Katherine L. St. Romain

*Counsel for Amicus Curiae Vet Voice Foundation*