No. 2026-1861

# IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MINORITY VETERANS OF AMERICA,
*Petitioner*,

v.

SECRETARY OF VETERANS AFFAIRS,
*Respondent*

On Petition for Review Pursuant to 38 U.S.C. § 502

# BRIEF OF AMICI STATES OF CALIFORNIA, MASSACHUSETTS, ARIZONA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAI‘I, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, and WASHINGTON IN SUPPORT OF PETITIONER AND GRANT OF THE PETITION FOR REVIEW

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*
ALLYSON SLATER
*Director, Reproductive Justice Unit*
ABIGAIL GABRIELI
*Assistant Attorney General*
COMMONWEALTH OF MASSACHUSETTS
ATTORNEY GENERAL'S OFFICE
One Ashburton Place
Boston, MA 02108
Tel: (617) 963-2811
allyson.slater@mass.gov
abigail.gabrieli@mass.gov

ROB BONTA
*Attorney General of California*
NELI N. PALMA
*Senior Assistant Attorney General*
ANNA RICH
*Supervising Deputy Attorney General*
MARTINE N. D'AGOSTINO
*Deputy Attorney General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-0292
Martine.DAgostino@doj.ca.gov

November 6, 2026

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2026-1861

**Short Case Caption** Minority Vet. of Am. v. Secretary of Vet. Affairs

**Filing Party/Entity** States of California, Massachusetts, Arizona, Colorado, Connecticut, District of Columbia, Delaware, Hawaii, Illinois, Maine, Maryland, Minnesota, North Carolina, Nevada, New Mexico, New York, Oregon, Rhode Island, Virginia, Vermont, and Washington

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/06/2026

Signature: /s/ Martine D'Agostino

Name: Martine D'Agostino

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| State of California | | |
| State of Massachusetts | | |
| State of Arizona | | |
| State of Colorado | | |
| State of Connecticut | | |
| State of Delaware | | |
| District of Columbia | | |
| State of Hawaii | | |
| State of Illinois | | |
| State of Maine | | |
| State of Maryland | | |

☑ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☒ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| State of Michigan | | |
| State of Minnesota | | |
| State of Nevada | | |
| State of New Jersey | | |
| State of New Mexico | | |
| State of New York | | |
| State of North Carolina | | |
| State of Oregon | | |
| State of Rhode Island | | |
| State of Vermont | | |
| Commonwealth of Virginia | | |

State of Washington ☐ Additional pages attached

# TABLE OF CONTENTS

**Page**

Introduction and Interests of Amici States .................................................. 1
Argument.................................................................................................... 3
I. The Rule Causes Harm in Amici States .................................... 3
II. The Rule's Purported Life-Only Exception Will Cause Confusion for Providers and Harm to Veterans and Their Families ........................................................................... 11
A. The Rule's Ambiguity About When Life-Saving Abortions Are Permitted Will Harm Veterans ............. 12
B. The Rule's Limited Exception Is Tantamount to a Ban in Almost All Cases, Risking Veterans' Lives and Health ...................................................................... 15
III. The Rule's Elimination of Exceptions for Patient Health, Rape, and Incest Is Out of Step with State and Federal Standards ......................................................................... 19
A. The Rule Is More Extreme than State-Based Restrictions.................................................................. 19
B. The Rule Is Inconsistent with Federal Law .................. 22
IV. Eliminating Abortion Counseling Harms Veterans and Their Families............................................................................ 24
Conclusion ........................................................................................... 29

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Cobbs v. Grant*
8 Cal. 3d 229 (1972) .......... 26

*Harnish v. Children's Hosp. Med. Ctr.*
387 Mass. 152 (1982) .......... 26

*Oklahoma Call for Reprod. Just. v. Drummond*
2023 OK 24 .......... 20

*Perez v. Mortg. Bankers Ass'n*
575 U.S. 92 (2015) .......... 24

*Pro. Servs. Supplier, Inc. v. United States*
45 Fed. Cl. 808 (2000) .......... 13

*Russello v. United States*
464 U.S. 16 (1983) .......... 13

*St. Luke's Health Sys., Ltd. v. Labrador*
782 F. Supp. 3d 953 (D. Idaho 2025) .......... 16

**Statutes**

10A N.C. Admin. Code. 13B.3302(7) .......... 26

410 ILCS 50/3 .......... 26

745 ILCS 70/6–6.1 .......... 26

10 U.S.C. § 1093 .......... 22

38 U.S.C. § 1710 .......... 4

38 U.S.C. § 1781 .......... 4

38 U.S.C. § 1784A .......... 23

## TABLE OF AUTHORITIES
## (continued)

**Page**

38 U.S.C. § 7331 .......... 25

42 U.S.C. § 1395dd .......... 23

2025 Tenn. Pub. Acts Chapter 217 .......... 21

2023 Tenn. Pub. Acts Chapter 313 .......... 21

2025, 2025 Ark. Acts No. 387 .......... 22

Ala. Code § 26-23H-3(6) .......... 19

Ariz. Admin. Code § R9-10-101(116) .......... 26

Ariz. Rev. Stat. § 36-215 .......... 26

Ark. Code Ann. § 5-61-303 .......... 20

Ark. Code § 5-61-303–04 .......... 22

Ark. Code § 5-61-403–04 .......... 22

Ark. Code § 5-61-304 .......... 20

Cal. Code Regs. Title 22, § 70707 .......... 26

Colo. Rev. Stat. § 25-58-102 .......... 26

Del. Code Title 18, § 6801 .......... 26

Emergency Medical Treatment and Labor Act .......... 23

Haw. Rev. Stat. § 671-3 .......... 26

Idaho Code § 18-622 .......... 20

Ky. Rev. Stat. § 311.723 .......... 21

2025 Ky. Acts 761, 783–84 .......... 21

## TABLE OF AUTHORITIES
## (continued)

**Page**

Mass. Code Regs. § 2.07(26) ........ 26

Mass. Gen. Laws Chapter 111 § 70E ........ 26

Minn. Stat. § 144.651(9) ........ 26

Miss. Code § 41-41-45 ........ 20

Mother Act ........ 21

N.J. Stat. 26:2H-12.8 ........ 26

Nev. Rev. Stat. § 449A.106 ........ 26

Okla. Stat. Title 21, § 861 ........ 20, 21

Or. Rev. Stat. § 677.097 ........ 26

S.C. Code § 44-41-640 ........ 20

S.D. Codified Laws § 22-17-5.1 ........ 20

S.D. Codified Laws § 34-23A-1 ........ 21

S.D. Codified Laws § 34-23A-1 ........ 20

Tenn. Code § 39-15-213 ........ 21

2025 Tex. Gen. Laws 1694 ........ 21

Tex. Health & Safety Code § 170A.002 ........ 21

Tex. Health & Safety Code § 170A.0022 ........ 21

Vt. Stat. Title 12, § 1909 ........ 26

Vt. Stat. Title 18, § 1852 ........ 26

Wash. Rev. Code §§ 7.70.050–060 ........ 26

## TABLE OF AUTHORITIES
**(continued)**

**Page**

**REGULATIONS**

38 C.F.R. § 17.32 .......... 25

38 C.F.R. § 17.272 .......... 11, 13

38 C.F.R. § 17.419 .......... 25

38 CFR 17.38 .......... 12

38 CFR pt. 17 .......... 1

87 Fed. Reg. 55287 .......... 7, 15, 22, 25

89 Fed. Reg. 5451 .......... 25

90 Fed. Reg. 36415 .......... 9

90 Fed. Reg. 61310 .......... *passim*

**OTHER AUTHORITIES**

Anna-Grace Lilly, et al., *Our Hands are Tied: Abortion Bans and Hesitant Medicine,* SOCIAL SCIENCE & MEDICINE (350) (June 2024) .......... 12

Carey Pulverman & Suzannah Creech, *The Impact of Sexual Trauma on the Sexual Health of Women Veterans: A Comprehensive Review* 22 TRAUMA VIOLENCE ABUSE 656, 671 (2021) .......... 7

Ceshae C. Harding et al., *Maternal chronic hypertension in women* veterans, 59 HEALTH SERV. RSCH. e14277, 6 (2024) .......... 7

Christopher R. Tamborini & Patrick J. Purcell, *Female Veterans: Socioeconomic Characteristics and Disability Patterns Among Social Security Beneficiaries*, SOCIAL SECURITY BULLETIN, Vol. 83, No. 2 (2023) .......... 18

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Colleen Judge-Golden et al., *Prior Abortions and Barriers to Abortion Access Reported by Pregnant Women Veterans*, 37 J. GEN. INTERNAL MED. S816, S817 (2022) .......... 9

Daniel Liaou et al., *Medicaid Expansion and Veterans' Reliance on the VA for Depression* Care, 39 FED. PRACT. 436 .......... 10

Diana Greene Foster et al., *Socioeconomic Outcomes of Women Who Receive and Women Who Are Denied Wanted Abortions in the United States United States*, 108 AM. J. OF PUB. HEALTH 407, 409–413 (2018) .......... 18

Eleanor Bimla Schwarz et al., *Induced Abortion among Women Veterans: Data from the ECUUN study*, 97 CONTRACEPTION 41 (2017) .......... 7

Eleanor Bimla Schwarz et al., *Provision of Potentially Teratogenic Medications to Female Veterans of Childbearing* Age, 48 MED. CARE 834, 837 (2010) .......... 8

Maria I. Rodriguez, et al., *Management of Spontaneous Abortion Among Commercially Insured Individuals in the United States After Dobbs v. Jackson*, 336 J. OF THE AM. MED. ASS'N 48 (2026) .......... 16

Jean Yoon et al., *Veterans' Reliance on VA Care by Type of Service and Distance to VA for Nonelderly VA-Medicaid Dual Enrollees*, 57 MED. CARE 225, 227 (2019) .......... 10

Joan L. Combellick et al., *Improving the Maternity Care Safety Net: Establishing Maternal Mortality Surveillance for Non-Obstetric Providers and* Institutions, 21 INT'L J. ENV'T RSCH. & PUB. HEALTH 37, e5–e8 (2023) .......... 8

Joan L. Combellick et al., *Severe Maternal Morbidity Among a Cohort of Post-9/11 Women* Veterans, 29 J WOMEN'S HEALTH 577 (2020) .......... 8

## TABLE OF AUTHORITIES
## (continued)

**Page**

Jodie Katon et al., *Gestational Diabetes and Hypertensive Disorders of Pregnancy Among Women Veterans Deployed in Service of Operations in Afghanistan and* Iraq, 23 J. WOMEN'S HEALTH 792, 796–98 (2014)........8

Jonathan G. Shaw et al., *Post-traumatic Stress Disorder and Antepartum Complications: A Novel Risk Factor for Gestational Diabetes and* Preeclampsia, 31 PAED. & PERINAT. EPIDEMIOL. 185, 190 (2017)........7

Jonathan G. Shaw et al., *Selection of Higher Risk Pregnancies into VHA Programs*, 53 HEALTH SERVS. RSCH. 5260, 5269–70 (2018)........8

Maria Rosario G. Araneta et al., *Conception and pregnancy during the Persian Gulf War: the risk to women veterans*, 14 ANN. EPIDEMIOL. 109, 111–114 (2004)........8

Patrick N. O'Mahen & Laura A. Petersen, *Effects of State-level Medicaid Expansion on Veterans Health Administration Dual Enrollment and Utilization*, 58 MED. CARE 526 (2020)........10

Sarah Friedman, et al., *Gynecologist Supply Deserts Across the VA and In the Community* J. INTERNAL. MED. (August 30, 2022)........17

Sophia Landlay, et al., *Abortion Bans and Pregnancy-Related Care Across Physician Specialties: A Qualitative Study*, JAMA NETW OPEN, Vol. 9, No. 6 (2026)........17

Veterans Affs., VHA Directive 1315, *Access to VHA Clinical Programs for Veterans Participating in State-Approved Marijuana Programs* § 1 (July 28, 2023)........28

## INTRODUCTION AND INTERESTS OF AMICI STATES

On December 31, 2025, the Department of Veterans Affairs (the "VA") published a Final Rule that adopted as final, without changes, a Proposed Rule "to reinstate the exclusions on abortions and abortion counseling from the medical benefits package" provided to veterans and their dependents. Reproductive Health Services, 90 Fed. Reg. 61310 (amending 38 CFR Part 17), Appx1 (the "Rule"). Pursuant to Federal Circuit Rule 29 and Federal Rule of Appellate Procedure 29(a)(2), the Signatory States of California, Massachusetts, Arizona, Colorado, Connecticut, Delaware, District of Columbia, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Virginia, and Washington ("Amici" or "Amici States") submit this brief in support of Petitioner. Amici States focus on the Rule's divergence from state and federal standards for abortion ban exceptions, and the harms that the Rule will cause to veterans. The VA's failure to consider these harms is arbitrary and capricious, and the Rule should be held unlawful and set aside.

The Amici States met with the VA and the Office of Management and Budget on April 8, 2025, to explain why the Proposed Rule would harm veterans and their families in Amici States. At that meeting and in follow-up submissions, Amici provided voluminous evidence outlining why veterans and their beneficiaries

should retain the access to care and counseling that the VA has supported since 2022. The VA's subsequent three-page Proposed Rule addressed none of it.[1] Amici therefore submitted a comment letter on September 3, 2025 that again explained why the Proposed Rule's exclusions were dangerous, extreme, and legally and medically unjustified.[2] Nevertheless, the 2025 Final Rule was approved without changes.

The Rule declined to address the evidence-based harms and reliance interest raised by Amici States and other commenters, which render the Rule arbitrary and capricious. *See* 90 Fed. Reg. at 61312, Appx3 (summarily dismissing as "policy" arguments). Amici States now write to highlight those evidence-based harms and reliance interests, which demonstrate how the Rule's deficiencies will directly cause physical, mental, and financial harms to veterans and their families.

For example, the Rule's lack of an express exception allowing for abortion in cases where a veteran's life is threatened—an exception that the Rule preamble repeatedly assures the public exists yet refuses to codify—creates ambiguity about whether veterans can receive needed care. Because the VA *has* amended the Civilian Health and Medical Program (CHAMPVA) coverage to include an

[1] California et al., Comment of 21 States and the District of Columbia in Opposition to Proposed Rule Banning Abortion (Sept. 3, 2025), Appx1341 ("Multistate Letter").

[2] *Id.*, Appx1342.

explicit life exception, the Rule risks that VA providers will wrongly assume there to be *no* such exception for veterans.

Further, post-*Dobbs* experience teaches that clinicians struggle to interpret, administer, and apply life-only exceptions and that such exceptions create hesitancy to intervene in all but the most extreme cases. The Rule compounds these difficulties by declining to offer any guidance about which conditions would be considered life-threatening, and by arbitrarily (and counterintuitively) classifying treatments for ectopic pregnancy and miscarriage as "not abortions"—a tactic the Rule itself acknowledges as "semantic." 90 Fed. Reg. at 61315, Appx6.

Amici also write to explain that eliminating abortion counseling for veterans and their beneficiaries will delay much-needed emergency care, put lives at risk, and deny patients' medical autonomy in blatant violation of informed consent norms.

## ARGUMENT

### I. THE RULE CAUSES HARM IN AMICI STATES

Amici States are home to 8,019,299 veterans, including 951,837 women veterans and many of the estimated 11,000 transgender men who are veterans.[3]

[3] Dep't of Vet. Affs., *population_demographics.csv*, VA Open Data Portal (Sept. 8, 2026), https://www.data.va.gov/dataset/population_demographics-csv/vt4g-2kai/; Gary J. Gates & Jody L. Herman, *Transgender Military Service in the United States*, THE WILLIAMS INST., at 4 (May 2014),

(continued…)

Many rely on the VA's commitment "to care for those who have served in our nation's military and for their families, caregivers, and survivors" to remain healthy and thriving members of Amici States' communities.[4] 3,812,612 veterans within Amici States are enrolled in the VA healthcare system,[5] and a further 279,864 State residents are enrolled as CHAMPVA insurance beneficiaries.[6] Last year, 41% of all patient visits within the VA system[7] occurred at the 619 VA care sites[8] and the community care facilities inside our borders. Having served our nation faithfully, Amici States' veterans now trust the federal government to keep the faith by providing eligible veterans with needed healthcare directly through the VA and supporting their survivors and caregivers through CHAMPVA insurance. 38 U.S.C. §§ 1710, 1781.

---

https://www.williamsinstitute.law.ucla.edu/wp-content/uploads/Transgender-Military-Service-May-2014.pdf.

[4] Dep't of Vet. Affs., *I CARE: VA's Mission*, https://www.department.va.gov/icare/.

[5] Dep't of Vet. Affs., *Healthcare*, VA Open Data Portal (Sept. 8, 2026), https://www.data.va.gov/dataset/Healthcare/eqqx-vnqk/.

[6] Sidath Viranga Panangala, Cong. Rsch. Serv., RS22483, *Health Care for Dependents and Survivors of Veterans* (2024), https://www.congress.gov/crs-product/RS22483.

[7] Dep't of Vet. Affs., *Healthcare*, VA Open Data Portal (Sept. 8, 2026), https://www.data.va.gov/dataset/Healthcare/eqqx-vnqk/.

[8] Dep't of Vet. Affs., *VA_Facilities_Aggregated_and_Order_FY2026Q2*, VA Open Data Portal (Sept. 8, 2026), https://www.data.va.gov/dataset/VA_Facilities_Aggregated_and_Order_FY2026Q2/utdz-tyv6.

The Rule harms both Amici States' residents, many of whom are now left without adequate access to necessary medical services, and Amici States themselves, whose already-strained reproductive healthcare safety nets may bear the costs of VA's broken promises on abortion. Refusing to support medically necessary abortions for the 425,965 women veterans of reproductive age in Amici States[9] while also restricting their providers' ability even to share when abortion may be an appropriate course of treatment undermines these residents' access to care many Amici States protect. The VA's unsupported assumption that veterans in states without "high levels of abortion restrictions . . . would seek abortions elsewhere if this benefit was not offered by VA"[10] ignores how financial barriers, not legal ones, have impeded abortion access since long before *Dobbs*.[11] Many

---

[9] Dep't of Vet. Affs., *VetPop2023 State Data, 6L*, VA Open Data Portal (Aug. 11, 2026), https://www.datahub.va.gov/dataset/VetPop2023-State-Data-6L/f43c-vb9n/.

[10] Dep't of Vet. Affs., Regulatory Impact Analysis for RIN 2900-AS31(F), Reproductive Health Services (Dec. 18, 2025), Appx1513 ("2025 RIA").

[11] *See, e.g.*, Guttmacher Inst., *Abortion Out of Reach: The Exacerbation of Wealth Disparities After Dobbs v. Jackson Women's Health Organization* (2023), https://www.guttmacher.org/article/2023/01/abortion-out-reach-exacerbation-wealth-disparities-after-dobbs-v-jackson-womens (cited in Nat'l Women's Law Center, Comment in Response to Proposed Rule (Sept. 3, 2025), Appx1295 ("NWLC Letter")).

commenters warned that withdrawing the benefit would leave veterans in *every* state struggling to afford care—but the VA largely declined to address that data.[12]

The 2025 Rule cut a financial lifeline on which hundreds of veterans and their beneficiaries relied for critical care under the most wrenching circumstances. Abortion care can be prohibitively expensive for many Americans: 43% of reproductive age American women lack the savings to cover the median self-pay cost of $563 for a medication abortion—let alone higher costs of surgical procedures and travel.[13] Women veterans are disproportionately likely to live in poverty,[14] and poverty itself is the variable most associated with the need for

---

[12] *Compare* Advanc'g New Standards in Reprod. Health, USCF, Comment on Proposed Rule VA-2025-VHA-0073-0002 (Sept. 2, 2025), Appx1203 ("ANSIRH Letter") *with* 90 Fed. Reg. at 61316, Appx7.

[13] Mabel Felix, Laurie Sobel, & Alina Salganicoff, *A Closer Look at Rape and Incest Exceptions in States with Abortion Bans and Early Gestational Restrictions*, KAISER FAMILY FOUNDATION (Aug. 7, 2024), https://www.kff.org/policy-watch/rape-incest-exceptions-abortion-bans-restrictions (cited in Multistate Letter, Appx1348); Rosalyn Schroeder et al., Advanc'g New Standards in Reprod. Health, UCSF, *Trends in Abortion Services in the United States, 2017–2023* at 16 (2024), https://www.ansirh.org/sites/default/files/2026-04/COMPLIANT_AFD%20Trends%20in%20Abortion%20Services%20in%20the%20United%20States%202017-2023_Final%20UPDATED.pdf (cited in ANSIRH Letter, Appx1204); *see also* Repro. Freedom All., Letter Re: Comments on Reproductive Health Services (Sept. 3, 2025), Appx1300-1301 ("Governors' Letter").

[14] *See* Multistate Letter, Appx1358 (citing *Women Veterans: The Journey Ahead*, DISABLED AM. VETERANS (2018), https://www.dav.org/wp-content/uploads/2018_Women-Veterans-Report-Sequel.pdf).

abortion care among women veterans.[15] Compounding the problem, military service exposes veterans to hazards like sexual assault, traumatic stress, and chemical exposure that raise the likelihood they will need an abortion.[16] For example, between 23% and 33% of women veterans report military sexual trauma, which can lead both to unwanted, traumatic pregnancies and lasting health consequences that complicate future pregnancies.[17] Veterans of reproductive age experience elevated rates of health conditions that heighten pregnancy risks, including chronic post-traumatic stress disorder, severe hypertension, and chronic kidney disease.[18] Their pregnancies are more likely than those of their civilian

---

[15] Eleanor Bimla Schwarz et al., *Induced Abortion among Women Veterans: Data from the ECUUN study*, 97 CONTRACEPTION 41, 46 (2017) (cited in Minority Veterans of America, Comment on Proposed Rule: Reproductive Health Services (Sept. 3, 2025), Appx1226 ("MVA Letter")).

[16] 87 Fed. Reg. at 55291, Appx625; Dep't of Vet. Affs. & Dep't of Def., *VA/DoD Clinical Practice Guideline for the Management of Pregnancy* 12–13 (2023), https://www.healthquality.va.gov/HEALTHQUALITY/guidelines/WH/up/VA-DOD-CPG-Pregnancy-Full-CPG_508.pdf (cited in MVA Letter, Appx1223). *See also* 2025 RIA, Appx1513.

[17] Carey Pulverman & Suzannah Creech, *The Impact of Sexual Trauma on the Sexual Health of Women Veterans: A Comprehensive Review*, 22 TRAUMA VIOLENCE ABUSE 656, 671 (2021) (cited in Multistate Letter, Appx1358).

[18] *VA/DoD Guideline for Pregnancy*, *supra* note 16, at 12–13; *see also* Nat'l Org. for Women–New York City, Letter RE: Reproductive Health Services (Sept. 3, 2025), Appx1367-1370 ("NOW-NYC Letter"); MVA Letter, Appx1222-1225; Jonathan G. Shaw et al., *Post-traumatic Stress Disorder and Antepartum Complications: A Novel Risk Factor for Gestational Diabetes and Preeclampsia*, 31 PAED. & PERINAT. EPIDEMIOL. 185, 190 (2017) (cited in Multistate Letter, Appx1356-1357); Ceshae C. Harding et al., *Maternal chronic hypertension in*

(continued…)

peers to feature complications like preeclampsia, hypertension, and gestational diabetes and to end in tragic outcomes such as ectopic implantation, miscarriage, and maternal death.[19] Additionally, veterans are disproportionately likely to be diagnosed with diseases like cancer for which recommended treatments can cause miscarriage or birth defects and which may require abortion to begin receiving urgent care.[20] In short, veterans are both less likely to be able to afford abortion care and more likely to need it.

---

*women veterans*, 59 HEALTH SERV. RSCH. e14277, 6 (2024) (cited in MVA Letter, Appx1223).

[19] Joan L. Combellick et al., *Improving the Maternity Care Safety Net: Establishing Maternal Mortality Surveillance for Non-Obstetric Providers and Institutions*, 21 INT'L J. ENV'T RSCH. & PUB. HEALTH 37, e5–e8 (2023) (cited in Planned Parenthood Federation of America, Letter RE: Reproductive Health Services (Sept. 3, 2025), Appx1329); Joan L. Combellick et al., *Severe Maternal Morbidity Among a Cohort of Post-9/11 Women Veterans,* 29 J. WOMEN'S HEALTH 577, 578 (2020) (cited in *id.*); Maria Rosario G. Araneta et al., *Conception and pregnancy during the Persian Gulf War: the risk to women veterans*, 14 ANN. EPIDEMIOL. 109, 111–114 (2004); Jodie Katon et al., *Gestational Diabetes and Hypertensive Disorders of Pregnancy Among Women Veterans Deployed in Service of Operations in Afghanistan and Iraq*, 23 J. WOMEN'S HEALTH 792, 796–98 (2014) (cited in NOW-NYC Letter, Appx1373); Jonathan G. Shaw et al., *Selection of Higher Risk Pregnancies into VHA Programs*, 53 HEALTH SERVS. RSCH. 5260, 5269–70 (2018) (cited in *id.*, Appx1374).

[20] NWLC Letter, Appx1286; Eleanor Bimla Schwarz et al., *Provision of Potentially Teratogenic Medications to Female Veterans of Childbearing Age*, 48 MED. CARE 834, 837 (2010); *cf.* Daniel Grossman et al., Advanc'g New Standards in Reprod. Health, UCSF, *Care Post-Roe: Documenting Cases of Poor-Quality Care Since the Dobbs Decision* 22 (Sept. 2024), https://www.ansirh.org/sites/default/files/2024-09/ANSIRH%20Care%20Post-Roe%20Report%209.04.24_FINAL%20EMBARGOED_0.pdf (reporting incident where breast cancer treatment delayed because abortion ban's limited exceptions

(continued…)

The 2022 Rule protected these patients. Before VA providers and CHAMPVA began facilitating abortions in cases of rape, incest, and threat to patient life or health, 21% of veterans who had been able to access abortions outside the VA system reported facing barriers like costs, lack of insurance coverage, and stigmatizing and discouraging medical "advice" from VA providers.[21] Under the 2022 Rule, an average of 140 patients a year were able to receive medically necessary abortions, while an unknown number were empowered by neutral informational counseling from trusted providers to make informed decisions about their care beyond the VA and CHAMPVA insurance. Reproductive Health Services, 90 Fed. Reg. 36415, 36416 n.2 (proposed Aug. 4, 2025), Appx1098. In its first year in effect, 73% of the patients who received care suffered from pregnancies that threatened their health, 17% were survivors of rape, and 10% faced life-threatening pregnancies.[22]

---

prevented patient from receiving abortion necessary to start chemotherapy) (cited in Governors' Letter, Appx1298).

[21] Colleen Judge-Golden et al., *Prior Abortions and Barriers to Abortion Access Reported by Pregnant Women Veterans,* 37 J. GEN. INTERNAL MED. S816, S817 (2022) (cited in MVA Letter, Appx1223).

[22] Rebecca Kheel, *VA Says It Performed 88 Abortions in the Past Year, But Congress Again Threatens Subpoenas in Pursuit of More Details*, MILITARY.COM (Oct. 19, 2023), https://www.military.com/daily-news/2023/10/19/va-says-it-performed-88-abortions-past-year-congress-again-threatens-subpoenas-pursuit-of-more.html.

The 2025 Rule now denies care to nine in ten of those patients—shifting costs onto care subsidized by Amici States. Compared to their male peers, female veterans enrolled in VA health care are significantly more likely either to have no insurance coverage or to rely on subsidized care such as Medicaid for any services they need beyond the VA.[23] For instance, at least 69,700 women veterans already rely in some part on Amici States' Medicaid programs.[24] Further, research has documented that state-subsidized programs predictably absorb demand in areas where VA providers have struggled to fulfill patient needs, including OB-GYN care.[25] Given these patterns, governors from many Amici States warned the VA that—although they remained "committed to providing abortion access to all who need it"—"this proposed rule comes at a time when state governments are facing

---

[23] DEP'T OF VET. AFFS., 2025 SURVEY OF VETERAN ENROLLEES' HEALTH AND USE OF HEALTH CARE 26–27 (2026), https://department.va.gov/vha/wp-content/uploads/sites/65/2026/07/2025-Survey-of-Veteran-Enrollees-Findings-Report_Final_.pdf.

[24] Kiera Peoples & Katherine Gallagher Robbins, Nat'l P'ship for Women & Fams., *Republicans' Proposed Medicaid Cuts Would Harm Women Veterans* (May 2025), https://nationalpartnership.org/report/medicaid-cuts-harm-women-veterans/ (analyzing American Community Survey 2019–2023 dataset).

[25] Jean Yoon et al., *Veterans' Reliance on VA Care by Type of Service and Distance to VA for Nonelderly VA-Medicaid Dual Enrollees*, 57 MED. CARE 225, 227 (2019) (documenting that women veterans' use of VA-provided OB-GYN care decreased after Medicaid enrollment); *cf.* Daniel Liaou et al., *Medicaid Expansion and Veterans' Reliance on the VA for Depression Care*, 39 FED. PRACT. 436, 439 (2022). *See also* Patrick N. O'Mahen & Laura A. Petersen, *Effects of State-level Medicaid Expansion on Veterans Health Administration Dual Enrollment and Utilization*, 58 MED. CARE 526 (2020).

unprecedented strain on their budgets, leaving limited resources."[26] But the VA ignored the governors' concerns in favor of euphemistically asserting that veterans would simply "seek abortions elsewhere"—without ever acknowledging that "elsewhere" means Amici States' state health insurance programs, public hospitals, emergency departments, and community clinics.[27]

## II. The Rule's Purported Life-Only Exception Will Cause Confusion for Providers and Harm to Veterans and Their Families

The Rule also harms veterans and their families by eliminating CHAMPVA coverage for abortion care "except when a physician certifies that the life of the mother would be endangered if the fetus were carried to term," 38 C.F.R. § 17.272(a)(58), and by adopting a nominally parallel exception for VA-provided care that is limited to uncodified, explanatory text in the Federal Register asserting that "care to pregnant women in life-threatening circumstances will continue to be covered," 90 Fed. Reg. at 61312, Appx3. As multiple commenters, including Amici States, explained, the Proposed Rule's "life-only exception" would harm maternal physical and mental health, create uncertainty for healthcare providers that harmfully delays care, negatively impact veterans and their families

[26] Governors' Letter, Appx1300-1301.
[27] 2025 RIA, Appx1513.

financially, and disproportionately affect veterans, who are at higher risk for sexual abuse compared to the general population.

### A. The Rule's Ambiguity About When Life-Saving Abortions Are Permitted Will Harm Veterans

The Rule harms veterans by sowing confusion about whether life-saving care can be rendered to veterans at all, and, if so, under what circumstances. Such clarity is critical because life-only exceptions have already proved difficult for providers, particularly against the backdrop of potential professional sanctions, loss of licensure, or criminal penalties if they get it wrong.[28]

First, the Rule contains no explicit life exception for VA-provided care for veterans, but does include a life exception for CHAMPVA coverage for their survivors and dependents. After commenters raised concerns about the Rule's failure to codify the life exception for veterans in the VA's medical benefits package, the VA explained in the Preamble of the Final Rule that its proposal would "revert[] the regulatory text of 38 CFR 17.38 to the same language that was

[28] *See* Mabel Felix, et al., *Criminal Penalties for Physicians in State Abortion Bans*, KFF (March 4, 2025), https://www.kff.org/womens-health-policy/criminal-penalties-for-physicians-in-state-abortion-bans/ (cited in NWLC Letter, Appx1287); Anna-Grace Lilly, et al., *Our Hands are Tied: Abortion Bans and Hesitant Medicine,* 350 SOCIAL SCIENCE & MEDICINE 116912, e4 (2024) (discussing the impact of Tennessee's abortion ban on provider decision-making and quoting provider on the life exception: "It's so vague, how am I supposed to know how close to death's door someone needs to be before I feel comfortable jeopardizing my freedom and my ability to raise and provide for my family?").

in place [in the past].” 90 Fed. Reg. at 61313, Appx4. But, at the same time, the Rule expressly allows CHAMPVA coverage of abortion care “when a physician certifies that the life of the mother would be endangered if the fetus were carried to term” for veterans’ survivors and dependents. 38 C.F.R. § 17.272(a)(58). The listing of the life exception in one section and its omission in another could be confused as evidence of the VA’s intent to exclude such an exception. *See Russello v. United States*, 464 U.S. 16, 23 (1983) (“Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.”); *Pro. Servs. Supplier, Inc. v. United States*, 45 Fed. Cl. 808, 812 n. 6 (2000) (applying *Russello*’s holding to regulation). The VA’s statement that it found “no reason to believe that it will be hard for VA providers to apply that language now just as they did for over 20 years before the September 9, 2022 change” ignores the reason provided by many commenters, including Amici: the heightened stakes of codifying such an exception in the post-*Dobbs* legal landscape. 90 Fed. Reg. at 61313, Appx4; *cf.* Multistate Letter, Appx1342-1343, Appx1346.

Second, the Rule compounds the confusion by stating, again in uncodified Preamble text, that “procedures necessary to save the life of the pregnant veteran (such as treatment for ectopic pregnancies or miscarriages) are not considered”

abortions and so "remain permissible" for VA providers. 90 Fed. Reg. at 61311, Appx2. But in standard parlance, those life-saving "procedures" required for management of ectopic pregnancy and miscarriage, as well as other pregnancy complications, *are* "abortions."[29] Indeed, the VA itself "recognize[d] that there may be a semantic aspect to exempting life-saving procedures by not calling them 'abortions.'" 90 Fed. Reg. at 61315, Appx6. Amici States had already warned the VA that its Proposed Rule created ambiguity over whether such life-saving procedures were allowed. Multistate Letter, Appx1342-1345. Nevertheless, instead of confirming explicitly that abortion may be the standard of care required in certain medical emergencies, the VA simply stated that its semantic proposal was "abundantly clear." 90 Fed. Reg. at 61315, Appx6.

The regulatory text should conform to the VA's representations regarding what medical care is permitted and leave no room for doubt. By including an explicit exception for one group and not another and by creating confusion about

[29] *See, e.g.*, Am. Coll. of Obst'ns & Gynec'sts, *Facts Are Important: Understanding Ectopic Pregnancy*, https://www.acog.org/advocacy/facts-are-important/understanding-ectopic-pregnancy; *Fact Check-Termination of pregnancy can be necessary to save a woman's life, experts say*, REUTERS (Dec. 27, 2021), https://www.reuters.com/article/factcheck-abortion-false/fact-check-termination-of-pregnancy-can-be-necessary-to-save-a-womans-life-experts-say-idUSL1N2TC0VD (explaining that, for example, placental abruption presents a risk of hemorrhage, which, if left untreated, threatens the pregnant person's life and that preeclampsia, if not treated quickly, can lead to death) (cited in Multistate Letter, Appx1344).

which conditions warrant life-saving care, the Rule runs the very real risk that providers will read the language of the regulation and conclude that *no* exception for veterans exists—even when a patient's life is endangered. These stakes demand the VA codify a rule whose exceptions *are* "abundantly clear"—not just assert it has done so. 90 Fed. Reg. at 61315, Appx6.

### B. The Rule's Limited Exception Is Tantamount to a Ban in Almost All Cases, Risking Veterans' Lives and Health

Providing and covering abortions only when pregnant patients' lives are threatened turns the Rule into a de facto ban, because no bright-line rule defines a life-threatening situation. The VA's suggestion that pre-2022 VA provider practice demonstrates the feasibility of applying life-only exceptions fails to acknowledge how *Dobbs* has changed the landscape. *Compare* 90 Fed. Reg. at 61313, Appx4 *with* Multistate Letter, Appx1344-1346, Appx1352-1359. But today, for the more than 400,000 women veterans who live in states that ban or severely restrict abortion, a VA clinician's judgment about whether a complication is sufficiently "life-threatening" may decide whether they receive care at all—or even the information that such care could be appropriate. Multistate Letter, Appx1352; *see also infra* Section IV. Under these circumstances, as the VA acknowledged in 2022, "the absence of clarity as to exactly what care is covered . . . may result in a chilling effect on the provision of care." Reproductive Health Services, 87 Fed. Reg. 55287, 55293 (Sept. 9, 2022) (interim final rule), Appx627. Because "[n]o

clinical bright line necessarily defines when a condition transitions from merely health-threatening to life-threatening," physicians operating under ill-defined life exceptions in ban states have now delayed care until sepsis, hemorrhage, and even death.[30] VA healthcare providers now face the same impossible task of determining when a patient's life is sufficiently "endangered" to avoid not just internal VA discipline but also state criminal and civil liability.[31]

As Amici informed the VA, providers' experiences since *Dobbs* show that abortion bans have regularly interfered with their ability to provide emergency care, resulting in at least seven documented deaths—and an actual death toll that may be much higher.[32] Abortion bans and restrictions on access have also driven

---

[30] Am. Coll. of Obst'ns & Gynec'sts et al., Comment Letter on Proposed Rule RIN 2900-AS31 (Sept. 3, 2025), Appx1383 ("Medical Organizations Letter"). *See also* Am. Med. Ass'n, Letter Re: RIN 2900-AS31 (Sept. 2, 2025), Appx1171 ("AMA Letter") ("no bright line in medicine . . . determine[s] when a condition goes from endangering a patient's health to jeopardizing her life"); Multistate Letter, Appx1344-1346, Appx1353.

[31] *See* Anna-Grace Lilly, *supra* note 28*; see also St. Luke's Health Sys., Ltd. v. Labrador*, 782 F. Supp. 3d 953, 975–76 (D. Idaho 2025) ("Although the Idaho Supreme Court has said that a pregnant woman's death need not be 'imminent' to qualify under the life-saving exception, the Defense of Life Act plainly requires that an abortion is 'necessary to prevent the death.' If 'imminent' is not the standard, how close must the woman be to death for the abortion to be 'necessary'? There is no way for physicians to know, and the price of falling on the wrong side of the line is a felony conviction.").

[32] Multistate Letter, Appx1353-1354; *see generally Life of the Mother: How Abortion Bans Lead to Preventable Deaths*, ProPublica, https://www.propublica.org/series/life-of-the-mother.

providers to deviate dangerously from the standard of care.[33] Physicians, concerned about risks to their licenses or even jail time, delay lifesaving care until the pregnant person's life is in obvious jeopardy.[34] Such delays put pregnant people at risk of sepsis, hemorrhage, stroke from uncontrolled hypertension in preeclampsia and eclampsia cases, and other life- and health-threatening complications.[35] Providers may require additional, unnecessary diagnostic confirmation before they will intervene, which increases the burden on the health system and delays care further.[36] Given the severe staffing shortages at VA

---

[33] Maria I. Rodriguez, et al., *Management of Spontaneous Abortion Among Commercially Insured Individuals in the United States After Dobbs v. Jackson*, 336 J. OF THE AM. MED. ASS'N 48 (2026) (post-*Dobbs* abortion bans associated with increases in expectant management and decreases in medication management of spontaneous abortion).

[34] Sophia Landlay, et al., *Abortion Bans and Pregnancy-Related Care Across Physician Specialties: A Qualitative Study*, 9 JAMA NETW OPEN e2619644 (2026) (discussing delays in care and deviations in standard practice for early pregnancy loss, ectopic pregnancy, molar pregnancy, preterm prelabor rupture of membranes, and maternal comorbidities); Andrea Suozzo and Agnel Phillip, *Ectopic Pregnancy Deaths Have Nearly Doubled. It's Worse in States with Abortion Bans*, ProPublica (Sept. 9, 2026), https://www.propublica.org/article/ectopic-pregnancy-deaths-doubled-analysis.

[35] Matt Lavietes, *Texas Abortion Ban Caused Pregnant Woman's Death*, NBC News (Sept. 17, 2026), https://www.nbcnews.com/news/us-news/pregnant-womans-death-texas-caused-states-abortion-ban-lawsuit-says-rcna598303 (discussing lawsuit filed by family of Tierra Walker, a Texas patient who died after being denied an abortion despite displaying symptoms of preeclampsia, a severe pregnancy complication that is treated with abortion).

[36] Landlay, et al., *supra* note 34.

hospitals, particularly in women's healthcare, additional testing or diagnostics will only exacerbate existing strains on the VA healthcare systems.[37]

Additionally, by denying veterans and their families access to necessary healthcare, the Rule threatens their economic security. Research shows that women who are denied an abortion are more likely than those who received an abortion to experience economic hardship and insecurity lasting years.[38] Ban-state veterans who do obtain care outside of the VA health system are more likely to need more complex and costly care because of the delays caused by state restrictions.[39] Added costs—for travel to obtain medical care and/or for out-of-pocket care—will compound an already difficult situation for women veterans, who are already more likely than their male counterparts to live in poverty.[40]

---

[37] Sarah Friedman, et al., *Gynecologist Supply Deserts Across the VA and In the Community,* J. GEN. INTERNAL MED. (August 30, 2022) (cited in Multistate Letter, Appx1354); Dep't of Vet. Affs., Office of Inspector General, Office of Healthcare Inspections, Veterans Health Administration, *OIG Determination of Veterans Health Administration's Severe Occupational Staffing Shortages Fiscal Year 2025*, https://www.vaoig.gov/sites/default/files/reports/2025-08/vaoig-25-01135-196-final.pdf.

[38] *See, e.g.*, Diana Greene Foster et al., *Socioeconomic Outcomes of Women Who Receive and Women Who Are Denied Wanted Abortions in the United States*, 108 AM. J. OF PUB. HEALTH 407, 409–413 (2018) (cited in Multistate Letter, Appx1357).

[39] Melody Schreiber, *'There's no place to go': providers see more abortions later in pregnancy as bans spread in US*, THE GUARDIAN (Aug. 30, 2026), https://www.theguardian.com/world/2026/aug/30/abortion-bans-later-procedures.

[40] Multistate Letter, Appx1357-1358; Christopher R. Tamborini & Patrick J. Purcell, *Female Veterans: Socioeconomic Characteristics and Disability Patterns*

(continued…)

In short, the Rule threatens the very lives of the veterans who depend on the VA for healthcare and harms their physical and mental health and financial security.

## III. THE RULE'S ELIMINATION OF EXCEPTIONS FOR PATIENT HEALTH, RAPE, AND INCEST IS OUT OF STEP WITH STATE AND FEDERAL STANDARDS

Despite the VA's suggestion that limiting abortion to life-threatening cases "is no more restrictive than the state laws that permit an abortion to save the mother's life," 90 Fed. Reg. at 61316, Appx7, or rules in other federal programs, *id.* at 61314, Appx5, the Rule represents an extreme and dangerous outlier.

### A. The Rule Is More Extreme than State-Based Restrictions

Just three states share the VA's policy of permitting abortions only for life-threatening circumstances—and even these states all codified key exemptions that the VA left silent.[41] Of the thirteen states that have banned abortion at every stage of pregnancy, eight exempt care necessary to protect the pregnant patient's health

*Among Social Security Beneficiaries*, Social Security Bulletin, Vol. 83, No. 2 (2023), https://www.ssa.gov/policy/docs/ssb/v83n2/v83n2p1.html.

[41] Guttmacher Inst., *State Bans on Abortion Throughout Pregnancy* (last updated Sept. 17, 2026), https://www.guttmacher.org/state-policy/explore/state-policies-abortion-bans; Kaiser Fam. Found., *Policy Tracker: Exceptions to State Abortion Bans and Early Gestational Limits* (last updated Oct. 16, 2026), https://www.kff.org/womens-health-policy/exceptions-in-state-abortion-bans-and-early-gestational-limits; Multistate Letter, Appx1347-1348 (also citing then-current versions of both Guttmacher and KFF trackers).

and five exempt cases of rape and/or incest.[42] Alabama's ban, for example, still allows abortion when "[i]n reasonable medical judgment, the child's mother has a condition that so complicates her medical condition that it necessitates the termination of her pregnancy to avert her death or to avert serious risk of substantial physical impairment of a major bodily function." Ala. Code § 26-23H-3(6). Many states with health exceptions also enumerate conditions that presumptively qualify. *E.g.*, S.C. Code § 44-41-640(C) (explicitly non-exhaustive list of eleven qualifying conditions, including ectopic and molar pregnancy, severe preeclampsia, placental abruption, and miscarriage). Even states without health exceptions still often permit abortion in cases of rape. Idaho Code § 18-622; Miss. Code § 41-41-45(2)–(3). Only three states limit abortion throughout pregnancy *solely* to life-threatening circumstances. Ark. Code § 5-61-304(a); S.D. Codified Laws § 22-17-5.1; Okla. Stat. tit. 21, § 861.[43]

The Rule's dangerous silences on key exceptions break with even these three states and render it the nation's most extreme provision. Two of the three life-only states explicitly exempt treatment for ectopic pregnancy and miscarriage from their statutory definitions of abortion. Ark. Code Ann. § 5-61-303(1)(B); S.D. Codified Laws § 34-23A-1(b)–(c). And the third still considered it paramount to exempt

---

[42] *Id.*
[43] *See also* Guttmacher Inst., *supra* note 41.

care "necessary to preserve [the patient's] life" expressly—unlike the VA. Okla. Stat. tit. 21, § 861; *see supra* Section II.A. That state's Supreme Court concluded that its ban was only constitutional *because* its "criminal element" was "only half the story": "As much as [the statute] had always outlawed abortion it also always acknowledged a limited exception . . . recogniz[ing] a woman's right to obtain an abortion in order to preserve her life." *Oklahoma Call for Reprod. Just. v. Drummond*, 2023 OK 24, ¶ 8, 526 P.3d 1123, 1130.

As Amici informed the VA, experience has pushed bans in the opposite direction from the Final Rule: following deaths and near-deaths, even the strictest states have begun clarifying and broadening exceptions. Multistate Letter, Appx1347. For instance, Texas's 2025 Life of the Mother Act amended the state ban's exceptions to clarify that a qualifying risk need not "be imminent," a "life-threatening physical condition is not necessarily one actively injuring the patient," and removing an ectopic pregnancy or miscarried fetus constitutes "reasonable medical judgment." Life of the Mother Act, 89th Leg., R.S., ch. 758, 2025 Tex. Gen. Laws 1694 (as codified at Tex. Health & Safety Code §§ 170A.002(c-1)–(c-2), 170A.0022). Similarly, Tennessee amended its law twice to carve out ectopic and molar pregnancies and identify conditions that may satisfy "[s]erious risk of substantial and irreversible impairment of a major bodily function," such as previable rupture of membranes and severe preeclampsia. Act of Apr. 28, 2023,

2023 Tenn. Pub. Acts ch. 313 and Act of Apr. 17, 2025, 2025 Tenn. Pub. Acts ch. 217 (as codified at Tenn. Code § 39-15-213(a)).[44] And when Arkansas added a safe harbor for physicians' exercise of "reasonable medical judgment" in evaluating life-threatening pregnancies, the legislature made explicit that providing such "guidance and clarifications *in state law*" itself was important to "ensure[] that physicians and medical facilities will continue to administer appropriate emergency medical treatment to save the lives of pregnant women in medical emergencies." Act of Mar. 20, 2025, 2025 Ark. Acts No. 387 (codified at Ark. Code §§ 5-61-303–04, -403–04) (emphasis added). But the VA moved the other way from these states: defying commenter concerns at every turn, it eliminated its health exception, declined to identify qualifying conditions or explain how providers can "certify" a pregnancy is life-threatening, and relegated its exception for conditions that threaten veterans' lives to an uncodified preamble. 90 Fed. Reg. at 61313, 61325, 61327, Appx4, Appx16, Appx18.

### B. The Rule Is Inconsistent with Federal Law

The Rule is also an outlier federally. Each of the other programs the VA cited to show that "Congress has repeatedly articulated restrictions on abortion" permits abortion in more circumstances. 90 Fed. Reg. at 61314, Appx5. For instance, the

---

[44] *See also* Act of Mar. 20, 2026, 2026 S.D. Laws ch. 99, § 2 (codified at S.D. Codified Laws § 34-23A-1); Love Them Both Act, ch. 121, § 21, 2025 Ky. Acts 761, 783–84 (codified at Ky. Rev. Stat. § 311.723).

Hyde Amendment, which governs programs like Medicaid, exempts not just conditions that "place the woman in danger of death" but also pregnancies that result from rape or incest. 87 Fed. Reg. at 55290, Appx624 (quoting Consolidated Appropriations Act, 2022, Pub. L. No. 117–103, div. H, §§ 506–507, 136 Stat. 49). The Federal Employees Health Benefits Program and TRICARE offer those same exceptions. 10 U.S.C. § 1093(a); 90 Fed. Reg. at 61314, Appx5; Multistate Letter, Appx1351. The Rule's divergence from TRICARE is particularly notable, as veterans returning home after active duty are no longer "eligible for, or receive, the same benefits relating to abortions and abortion counseling" they had while in uniform. 90 Fed. Reg. at 61314, Appx5.

The Rule likewise diverges from various federal standards Congress has set for emergency care. For instance, the Emergency Medical Treatment and Labor Act (EMTALA) requires every Medicare-participating hospital with an emergency department to stabilize an "emergency medical condition" that could "reasonably be expected" to "plac[e] the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy" in "the absence of immediate medical attention." 42 U.S.C. § 1395dd(a)–(b)(1), (e)(1); *see* Multistate Letter, Appx1348-1349. Notably, the VA's corresponding statute requires VA emergency departments in similar circumstances to stabilize "emergency medical conditions"—defined with the same health-based language as

EMTALA. 38 U.S.C. § 1784A(a)–(b)(1), (e)(2). Congress thus requires the VA to stabilize pregnant patients facing threats to their *health* in certain emergencies. Rather than reckon with these Congressional standards, the VA dismissed EMTALA for its legal inapplicability and simply described 38 U.S.C. § 1784A as its "own *similar* authority," with which it allegedly "complies" and which the Rule "will not impact." 90 Fed. Reg. at 61317, Appx8 (emphasis added).

## IV. Eliminating Abortion Counseling Harms Veterans and Their Families

Lastly, the Rule's elimination of abortion counseling deprives veterans and their families of the ability to make informed healthcare decisions, undermining their autonomy, health, and trust in providers. The Rule both ends CHAMPVA coverage of such counseling and threatens to silence the VA providers to whom veterans turn for everyday medical guidance. Veterans may now not even be told about the availability of abortion care *outside* the VA health system, even when it constitutes treatment for health-threatening conditions such as certain cancers during pregnancy—and even in states where abortion is legal.[45] Many commenters, including Amici States, explained that the Rule falls short of legal and medical standards for informed consent. Multistate Letter, Appx1359-1360. Rather than

[45] 90 Fed. Reg. at 61323, Appx14 (unless the life-threatening exception is met, "VA will not discuss options for abortions outside VA and will not refer veterans and CHAMPVA beneficiaries to abortions outside VA").

adequately "consider[ing] and respond[ing] to significant comments," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015), the VA referred to inapplicable justifications for eliminating abortion *care* when briefly discussing *counseling* and asserted that the Rule somehow satisfies informed consent, without explanation. 90 Fed. Reg. at 61323, 61326, Appx14, Appx17. But the VA may not deny abortion counseling to hundreds of thousands of veterans and their families as an afterthought.

The 2025 Rule effectively denies many veterans within Amici States' borders access to neutral informational counseling in violation of legal and medical norms around informed consent. Multistate Letter, Appx1359-1360. In 2022, the VA referred to its own informed consent statutory and regulatory mandates after stating that abortion counseling "is needed to ensure that [veterans] can make informed decisions about their health care." 87 Fed. Reg. at 55292, Appx626 (citing 38 U.S.C. § 7331 and 38 C.F.R. § 17.32); *see also* Reproductive Health Services, 89 Fed. Reg. 15451, 15467–68 (Mar. 4, 2024), Appx657-658 (citing and quoting same). Those mandates reflect the widespread legal understanding that patients must be told their options to give informed consent. Implementing Congress's command that "to the maximum extent practicable, all [VA] patient care . . . shall be carried out only with the full and informed consent of the patient," 38 U.S.C. § 7331, VA regulations require that each "practitioner must explain in language

understandable to the patient . . . as appropriate . . . reasonable and available alternatives," 38 C.F.R. § 17.32(c)(2).

Amici States' experience regulating the everyday practice of medicine confirms that informational counseling is a bedrock component of informed consent.[46] For example, the Massachusetts Patient Bill of Rights guarantees informed consent, and state regulations require practitioners to "disclose[] and explain[] to the patient's satisfaction . . . reliable evidence of the expected benefit and risk of each alternative, free from any impermissible bias." Mass. Gen. Laws ch. 111, § 70E; 243 Mass. Code Regs. § 2.07(26); *see also Harnish v. Children's Hosp. Med. Ctr.*, 387 Mass. 152, 154–55, 439 N.E.2d 240, 242 (1982) (informed consent safeguards the right to bodily integrity; "[k]nowing exercise of this right requires knowledge of the available options"). Similarly, California recognizes that each patient has the right to "receive as much information about any proposed treatment or procedure as the patient may need in order to give informed consent," which "shall include . . . alternate courses of treatment or nontreatment." Cal. Code Regs. tit. 22, § 70707(b)(5); *see also Cobbs v. Grant*, 8 Cal. 3d 229, 243 (1972) (physician's obligations to patient include "duty of reasonable disclosure of the

[46] Amici cite these state authorities simply to illustrate how universal this understanding of informed consent is, not to argue that they bind VA providers, who are exempt from state requirements "that prevent[] or unduly interfere[]" with their practice under 38 C.F.R. § 17.419.

available choices"). *See also, e.g.*, Ariz. Admin. Code § R9-10-101(116)(a); Ariz. Rev. Stat. § 36-2153(A); Colo. Rev. Stat. §§ 25-58-102(1)(a)–(b); 6 Code Colo. Regs. 1011-1-2(1.33)(C); Del. Code tit. 18, § 6801(5); Haw. Rev. Stat. § 671-3; 410 ILCS 50/3; 745 ILCS 70/6–6.1; Md. Code, Health-Gen. §19-342(d)(19); Minn. Stat. § 144.651(9); N.J. Stat. 26:2H-12.8(2)(d); 10A N.C. Admin. Code 13B.3302(7); Or. Rev. Stat. § 677.097(1)(b); Vt. Stat. tit. 12, § 1909(a)(1); Vt. Stat. tit. 18, § 1852(a)(3)–(4); Wash. Rev. Code §§ 7.70.050–060.

During the rulemaking process, the nation's leading medical organizations warned the VA that barring clinicians from discussing abortion violates their ethical obligations to their patients.[47] The American Medical Association summarized the consensus view that "[d]enying veterans and their families the ability to receive critical information about their health and the risks and benefits of different courses of action contradicts established medical ethics that prioritize patient autonomy and informed consent."[48] Practitioners widely accept that sharing "the burdens, risks, and expected benefits of all options" is the prerequisite for

---

[47] *See* 90 Fed. Reg. at 61326, Appx17 (summarizing comments); *e.g.*, AMA Letter, Appx1172; Medical Organizations Letter, Appx1384; Am. Acad. of Fam. Phys'ns, AAFP Comments to VA on Reproductive Health Services (Aug. 27, 2025), Appx1156-1157; Soc'y for Maternal-Fetal Med., Letter Re: Reproductive Health Services (Sept. 2, 2025), Appx1170; Phys'ns for Reprod. Health, Letter Re: Reproductive Health Services (Sept. 2, 2025), Appx1197-1198.

[48] AMA Letter, Appx1172.

informed consent.[49] For reproductive healthcare, that standard requires pregnancy counseling that covers *all* options—including abortion.[50]

The VA's only response to all these concerns was that providers forbidden from counseling patients about conditions that threaten their health but not (yet) their lives can quietly suggest they "should seek . . . information and care outside of VA." 90 Fed. Reg. at 61323, Appx14. This inadequate suggestion ignores VA providers' special role as the primary or even sole source of medical care for many veterans—a role that the VA has previously acknowledged in allowing them to counsel patients about care the VA itself does not provide or even condone, such as medical marijuana.[51] It also overlooks how ill-defined bans have already chilled clinicians' willingness to discuss abortion at all—sometimes with fatal results, as Amici States warned the VA. Multistate Letter, Appx1359. Instead of addressing

---

[49] Am. Med. Ass'n, *Code of Medical Ethics* Op. 2.1.1, https://code-medical-ethics.ama-assn.org/ethics-opinions/informed-consent (cited in Center for Reproductive Rights, Letter Re: RIN 2900-AS31 (Aug. 29, 2025), Appx1139).

[50] *See, e.g.*, Am. Acad. of Fam. Phys'ns, Am. Acad. of Pediatrics, Am. Coll. of Obst'ns & Gynec'sts, & Am. Coll. of Phys'ns, *Joint Principles for Protecting the Patient-Physician Relationship* (May 23, 2018), https://www.acponline.org/acp-newsroom/joint-principles-for-protecting-the-patient-physician-relationship; Am. Coll. of Obst'ns & Gynec'sts Comm. on Ethics, *Committee Statement No. 29: Person-Centered Pregnancy Options Counseling*, https://www.acog.org/clinical/guidance/committee-statement/2026/07/person-centered-pregnancy-options-counseling/.

[51] Dep't of Veterans Affs., VHA Directive 1315, *Access to VHA Clinical Programs for Veterans Participating in State-Approved Marijuana Programs* § 1 (July 28, 2023).

such concerns, the Rule leaves veterans and their families on their own to make crucial medical decisions, navigate confusing webs of restrictions, and manage treatment logistics—or go without necessary care altogether.

## CONCLUSION

Amici States respectfully request that this Court grant Minority Veterans of America's petition and vacate and set aside the Final Rule.

Dated: November 6, 2026

Respectfully submitted,

*s/Allyson Slater**

**Consent given for electronic signature under Fed. Cir. R. 32(g)(3)(A).*

**ANDREA JOY CAMPBELL**
*Attorney General of Massachusetts*
Allyson Slater
*Director, Reproductive Justice Unit*
Abigail Gabrieli
*Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
Tel: (617) 963-2811
allyson.slater@mass.gov
abigail.gabrieli@mass.gov

*/s/ Martine D'Agostino*

**ROB BONTA**
*Attorney General of California*
Neli N. Palma
*Senior Assistant Attorney General*
Anna Rich
*Supervising Deputy Attorney General*
Martine N. D'Agostino
*Deputy Attorney General*
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-0292
Martine.DAgostino@doj.ca.gov

**KRISTIN K. MAYES**
*Attorney General of Arizona*
2005 N. Central Avenue
Phoenix, AZ 85004

**AARON D. FORD**
*Attorney General of Nevada*
100 North Carson Street
Carson City, NV 89701

**PHILIP J. WEISER**
*Attorney General of Colorado*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

**WILLIAM TONG**
*Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

**KATHLEEN JENNINGS**
*Attorney General of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

**BRIAN L. SCHWALB**
*Attorney General for the District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

**ANNE E. LOPEZ**
*Attorney General of Hawai'i*
425 Queen Street
Honolulu, HI 96813

**KWAME RAOUL**
*Attorney General of Illinois*
115 South LaSalle Street
Chicago, IL 60603

**JENNIFER DAVENPORT**
*Attorney General of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

**RAÚL TORREZ**
*Attorney General of New Mexico*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501

**LETITIA JAMES**
*Attorney General of New York*
28 Liberty Street
New York, NY 10005

**JEFF JACKSON**
*Attorney General of North Carolina*
114 W. Edenton Street
Raleigh, NC 27603

**DAN RAYFIELD**
*Attorney General of Oregon*
1162 Court Street NE
Salem, OR 97301

**PETER F. NERONHA**
*Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

**AARON M. FREY**
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333-0006

**CHARITY R. CLARK**
*Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

**ANTHONY G. BROWN**
*Attorney General of Maryland*
200 Saint Paul Place
Baltimore, Maryland 21202

**JAY JONES**
*Attorney General of Virginia*
202 North Ninth Street
Richmond, Virginia 23219

**DANA NESSEL**
*Attorney General of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

**NICHOLAS W. BROWN**
*Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504

**KEITH ELLISON**
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King
Jr. Blvd.
St. Paul, MN 55155

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2026-1861

**Short Case Caption:** Minority Vet. of Am. v. Secretary of Vet. Affairs

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 6743 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 11/06/2026

Signature: /s/ Martine D'Agostino

Name: Martine D'Agostino

Save for Filing