No. 26-01861

# United States Court of Appeals
# For the Federal Circuit

MINORITY VETERANS OF AMERICA,

*Petitioner,*

v.

SECRETARY OF VETERANS AFFAIRS,

*Respondent.*

Petition for review of the final rule promulgated
by the U.S. Department of Veterans Affairs pursuant to 38 U.S.C. Section 502

**BRIEF OF *AMICI CURIAE* AMERICAN COLLEGE OF OBSTETRICIANS & GYNECOLOGISTS, AMERICAN ACADEMY OF FAMILY PHYSICIANS, AMERICAN COLLEGE OF MEDICAL GENETICS AND GENOMICS, AMERICAN COLLEGE OF PREVENTIVE MEDICINE, AMERICAN GYNECOLOGICAL & OBSTETRICAL SOCIETY, AMERICAN SOCIETY FOR REPRODUCTIVE MEDICINE, COUNCIL OF UNIVERSITY CHAIRS OF OBSTETRICS AND GYNECOLOGY, SOCIETY FOR ADOLESCENT HEALTH AND MEDICINE, SOCIETY FOR MATERNAL-FETAL MEDICINE, AND SOCIETY OF GYNECOLOGIC SURGEONS IN SUPPORT OF PETITIONER MINORITY VETERANS OF AMERICA**

Molly Meegan
AMERICAN COLLEGE OF OBSTETRICIANS & GYNECOLOGISTS
409 12th Street, SW
Washington, DC 20024

Tyler G. Newby
FENWICK & WEST LLP
One Front Street, Floors 31-33
San Francisco, CA 94111
(415) 875-2300
tnewby@fenwick.com

(202) 863-2581
mmeegan@acog.org

*Counsel for* Amicus Curiae *American College of Obstetricians and Gynecologists in Support of Petitioner Minority Veterans of America*

Kara L. Grandin
Priya Kamath*
FENWICK & WEST LLP
902 Broadway, 18th Floor
New York, NY 10010
(212) 430-2600
kgrandin@fenwick.com
pkamath@fenwick.com

*Counsel for* Amici Curiae

**admission pending*

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 26-01861

**Short Case Caption** Minority Veterans of America v. Secretary of Veterans Affairs

**Filing Party/Entity** Amici curiae, American College of Obstetricians & Gynecologists et al.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/06/2026

Signature: /s/ Tyler G. Newby

Name: Tyler G. Newby

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| American College of Obstetricians & Gynecologists (ACOG) | | |
| American Gynecological & Obstetrical Society | | |
| American College of Medical Genetics and Genomics | | |
| Society for Maternal-Fetal Medicine | | |
| Council of University Chairs of Obstetrics and Gynecology | | |
| American Society for Reproductive Medicine | | |
| American Academy of Family Physicians | | |
| Society of Gynecologic Surgeons | | |
| Society for Adolescent Health and Medicine | | |
| American College of Preventative Medicine | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Tyler G. Newby (Fenwick & West LLP)<br>Counsel for all Amici Curiae | Kara L. Grandin (Fenwick & West LLP)<br>Counsel for all Amici Curiae | Priya Kamath (Fenwick & West LLP)<br>Counsel for all Amici Curiae |
| Molly Meegan (ACOG)<br>Counsel for Amicus Curiae ACOG | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* .......... 1

STATEMENT OF COMPLIANCE WITH RULE 29(a) .......... 4

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 6

ARGUMENT .......... 8

I. The 2025 Rule Acutely Burdens Veterans and Their Families, Who Face Unique Barriers to Health Care. .......... 8

A. The 2025 Rule Compounds Existing Health Concerns for Veterans and CHAMPVA Beneficiaries. .......... 9

B. The 2025 Rule Denies MST Survivors Care Available to Active-Duty Service Members. .......... 11

C. The 2025 Rule Will Disproportionately Impact Veterans and Beneficiaries in Abortion-Restrictive States, and Those Who Already Face Barriers to Care. .......... 12

II. The 2025 Rule's Restrictions Undermine Medical Training at VA and Threaten to Worsen Staffing Shortages. .......... 15

A. Restrictions like the 2025 Rule Limit Required Clinical Training and Undermine Clinician Experience. .......... 16

B. Restrictions Threaten to Exacerbate VHA's Existing Staffing Shortages and Reduce Access to Care. .......... 17

III. The 2025 Rule Restricts Access to Life-Saving Health Care Without Medical Justification. .......... 19

A. Abortion Is Safe and Essential Health Care. .......... 19

B. The 2025 Rule's Restrictions Interfere with Clinical Judgment About When Abortion Is Medically Necessary. .......... 25

IV. The 2025 Rule's Abortion Counseling Ban Undermines Informed Consent and Ethical Care. .......... 28

A. Informed Consent and Shared Decision-Making Require Accurate, Complete Information About All Pregnancy Options. .......... 29

B. The 2025 Rule Deprives Veterans and Beneficiaries of Information Needed to Make Informed Decisions. .......... 30

C. The 2025 Rule Departs from Accepted Medical Standards and VA's Own Findings, and Conflicts with Core Principles of Medical Ethics. ....... 32

CONCLUSION ....... 35

# TABLE OF AUTHORITIES

**CASES**

*Gonzales v. Carhart*,
550 U.S. 124 (2007) .......... 2

*Simopoulos v. Virginia*,
462 U.S. 506 (1983) .......... 1

*Stenberg v. Carhart*,
530 U.S. 914 (2000) .......... 1

**STATUTES**

10 U.S.C. § 1093 .......... 11

38 U.S.C. § 1710(a) .......... 6

38 U.S.C. § 1781 .......... 6

38 U.S.C. § 7301 .......... 6

**REGULATIONS**

38 C.F.R. § 17.32(c) .......... 30

38 C.F.R. § 17.38 .......... 6, 7

38 C.F.R. § 17.38(b) .......... 6, 32

38 C.F.R. § 17.38(c)(1) .......... 30

38 C.F.R. § 17.272(a)(58) .......... 7

87 Fed. Reg. 55287 (Sept. 9, 2022) .......... *passim*

89 Fed. Reg. 15451 (Mar. 4, 2024) .......... *passim*

90 Fed. Reg. 61310 (Dec. 31, 2025) .......... *passim*

## RULES

Federal Circuit Rule 29 .......... 4

Federal Rule of Appellate Procedure 29 .......... 1, 4

## OTHER AUTHORITIES

Abrams, *The Facts About Abortions and Mental Health*, American Psychological Association (updated Apr. 2023), https://www.apa.org/monitor/2022/09/news-facts-abortion-mental-health .......... 22

Accreditation Council for Graduate Medical Education, *Program Requirements for Graduate Medical Education in Obstetrics and Gynecology* (revised Sept. 29, 2025), https://www.acgme.org/globalassets/pfassets/programrequirements/2026-prs/220_obstetricsgynecology_2026.pdf .......... 16

ACOG, *Abortion Can Be Medically Necessary* (Sept. 25, 2019), https://www.acog.org/news/news-releases/2019/09/abortion-can-be-medically-necessary .......... 22

ACOG, Clinical Consensus No. 1, *Pharmacologic Stepwise Multimodal Approach for Postpartum Pain Management*, 138 Obstetrics & Gynecology 507 (Sept. 2021, reaff'd 2025) .......... 24

ACOG, Clinical Practice Guideline No. 8, *First and Second Stage Labor Management*, 143 Obstetrics & Gynecology 144 (Jan. 2024) .......... 24

ACOG, *Code of Professional Ethics* (Dec. 2018), https://aaplog.org/wp-content/uploads/2022/05/code-of-professional-ethics-of-the-american-college-of-obstetricians-and-gynecologists.pdf .......... 25

ACOG, Committee Opinion No. 390, *Ethical Decision Making in Obstetrics and Gynecology*, 110 Obstetrics & Gynecology 1479 (Dec. 2007, reaff'd 2019) .......... 29, 30, 33, 34

ACOG, Committee Opinion No. 819, *Informed Consent and Shared Decision Making in Obstetrics and Gynecology*, 137 Obstetrics & Gynecology e34 (Feb. 2021) .......... 29, 30, 34

ACOG, Committee Statement No. 12, *Health Care for Women and Gender-Diverse Active-Duty and Reserve Uniformed Service Members and Veterans*, 144 Obstetrics & Gynecology e144 (Dec. 2024) ....................31

ACOG, Committee Statement No. 16, *Increasing Access to Abortion*, 145 Obstetrics & Gynecology e86 (Feb. 2025) ....................13

ACOG, Committee Statement No. 29, *Person-Centered Pregnancy Options Counseling*, 148 Obstetrics & Gynecology e68 (2026) ....................30

ACOG, *FAQs: Bleeding During Pregnancy* (Aug. 2022), https://www.acog.org/womens-health/faqs/bleeding-during-pregnancy ....................23

ACOG, Obstetric Care Consensus No. 7, *Placenta Accreta Spectrum*, 132 Obstetrics & Gynecology e259 (Dec. 2018, reaff'd 2021) ....................23, 24

ACOG, Obstetric Care Consensus No. 10, *Management of Stillbirth*, 135 Obstetrics & Gynecology e110 (Mar. 2020, reaff'd 2021) ....................24

ACOG, Obstetric Care Consensus No. 11, *Pregnancy at Age 35 Years or Older*, 140 Obstetrics & Gynecology 348 (2022), https://doi.org/10.1097/AOG.0000000000004873 ....................10

ACOG, Position Statement, *Abortion Training and Education in a Post-Dobbs Landscape* (Feb. 2025), https://www.acog.org/advocacy/position-statements/abortion-training-and-education-in-a-post-dobbs-landscape/ ....................16, 17

ACOG, Practice Bulletin No. 183, *Postpartum Hemorrhage*, 130 Obstetrics & Gynecology e168 (Oct. 2017, reaff'd 2025) ....................24

ACOG, Practice Bulletin No. 190, *Gestational Diabetes Mellitus*, 131 Obstetrics & Gynecology e49 (Feb. 2018, reaff'd 2025) ....................22, 23

ACOG, Practice Bulletin No. 198, *Prevention and Management of Obstetric Lacerations at Vaginal Delivery*, 132 Obstetrics & Gynecology e87 (Sept. 2018, reaff'd 2025) ....................24

ACOG, Practice Bulletin No. 200, *Early Pregnancy Loss*, 132 Obstetrics & Gynecology e197 (Nov. 2018, reaff'd 2021) ....................23

ACOG, Practice Bulletin No. 217, *Prelabor Rupture of Membranes*, 135 Obstetrics & Gynecology e80 (Mar. 2020) ....................23

ACOG, Practice Bulletin No. 222, *Gestational Hypertension and Preeclampsia*, 135 Obstetrics & Gynecology e237 (June 2020) ..........22, 23

ACOG, Statement of Policy, *Abortion Policy*, https://www.acog.org/advocacy/statements-of-policy/abortion-policy/ (amended & reaffirmed July 2025) ....................19

ACOG, Statement of Policy, *Legislative Interference with Patient Care, Medical Decisions, and the Patient-Physician Relationship* (Feb. 2025), https://www.acog.org/advocacy/statements-of-policy/legislative-interference-with-patient-care-medical-decisions-and-the-patient-physician-relationship/ ....................25, 33

Advancing New Standards in Reproductive Health, *Safety of Abortion in the United States*, Issue Brief No. 6 (Dec. 2014) ....................21

American Society for Gastrointestinal Endoscopy, *Complications of Colonoscopy*, 74 Gastrointestinal Endoscopy 745 (2011) ....................21

Biggs et al., *Women's Mental Health and Well-Being 5 Years After Receiving or Being Denied an Abortion: A Prospective, Longitudinal Cohort Study*, 74 JAMA Psychiatry 169 (2017) ....................21

Center for Reproductive Rights, *Fact Sheet: Abortion Access for Veterans* (Jan. 14, 2026), https://reproductiverights.org/resources/fact-sheet-abortion-access-for-veterans/ ....................13

Centers for Disease Control and Prevention, *Four in 5 Pregnancy-Related Deaths in the U.S. are Preventable* (Sept. 19, 2022), https://archive.cdc.gov/#/details?url=https%3A%2F%2Fwww.cdc.gov%2Fmedia%2Freleases%2F2022%2Fp0919-pregnancy-related-deaths.html ....................27

Centers for Disease Control and Prevention, *National Vital Statistics Reports Vol. 73, No. 2, Births: Final Data for 2022* (2024), https://www.cdc.gov/nchs/data/nvsr/nvsr73/nvsr73-02-tables.pdf ....................24

Chinn et al., *Health Equity Among Black Women in the United States*, 30 J. Women's Health 212 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8020496/pdf/jwh.2020.8868.pdf ....................15

Clark, *Environmental and Occupational Risks to Reproductive Health in Women Service Members and Veterans*, 13 Frontiers Pub. Health 1 (Aug. 13, 2025), https://doi.org/10.3389/fpubh.2025.1628858 ....................9

Cohen & Bonifield, *Texas Woman Almost Dies Because She Couldn't Get an Abortion*, CNN (Nov. 16, 2022), https://www.cnn.com/2022/11/16/health/abortion-texas-sepsis/index.html....................27, 28

Cole et al., *Sickle Cell Crises in Pregnancy: Fetal and Neonatal Implications*, 24 Neoreviews e452 (July 2023) ....................22

Commonwealth Fund, *The U.S. Maternal Health Divide: The Limited Maternal Health Services and Worse Outcomes of States Proposing New Abortion Restrictions* (Dec. 14, 2022), https://www.commonwealthfund.org/publications/issue-briefs/2022/dec/us-maternal-health-divide-limited-services-worse-outcomes ....................14

Coppola et al., *Rates and Patterns of Intimate Partner Violence Among Service Members and Veterans*, 41 J. of Interpersonal Violence 8709 (2026), https://journals.sagepub.com/doi/10.1177/08862605251370402....................10

Dunn et al., *Impact of Family Planning Decisions Among Women in the U.S. Military*, 122 Fertility & Sterility e103 (2024) (abstract no. O-248), https://www.fertstert.org/article/S0015-0282%2824%2901940-X/fulltext....................10

Editors of the New England Journal of Medicine et al., *The Dangerous Threat to* Roe v. Wade, 381 New Eng. J. Med. 979 (2019)....................19

Forbes et al., *Soc'y for Maternal-Fetal Med. Position Statement: Access to Abortion Care*, 231 Am. J. Obstetrics & Gynecology B7 (2024)....................19

Foster et al., *Socioeconomic Outcomes of Women Who Receive and Women Who Are Denied Wanted Abortions in the United States*, 112 Am. J. Pub. Health 1290 (2022) .......... 13

Gierisch et al., *Intimate Partner Violence: Prevalence Among U.S. Military Veterans and Active Duty Servicemembers and a Review of Intervention Approaches*, VA (Aug. 2013), https://www.hsrd.research.va.gov/publications/esp/partner_violence.cfm .......... 10

Griffin, *Abortion Rights Activists in Idaho Find Their Pitch: Bring Back the Doctors*, N.Y. Times (Sept. 18, 2026) .......... 18

Gunja et al., *The U.S. Maternal Mortality Crisis Continues to Worsen: An International Comparison*, The Commonwealth Fund (Dec. 1, 2022), https://www.commonwealthfund.org/blog/2022/us-maternal-mortality-crisis-continues-worsen-international-comparison .......... 15

Guttmacher Institute, *Monthly Abortion Provision Study,* https://www.guttmacher.org/monthly-abortion-provision-study?state=US&year=2025 (accessed Oct. 23, 2026) .......... 19

Harding et al., *Maternal Chronic Hypertension in Women Veterans*, 59 Health Serv. Rsch. 1 (2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC10915474/ .......... 9

Hoyert, *Maternal Mortality Rates in the United States, 2021*, CDC (Mar. 2023), https://www.cdc.gov/nchs/data/hestat/maternal-mortality/2021/maternal-mortality-rates-2021.pdf .......... 14

Jerman et al., *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008*, Guttmacher Inst. (May 2016) .......... 13

Jones & Jerman, *Population Group Abortion Rates and Lifetime Incidence of Abortion: United States, 2008-2014*, 107 Am. J. Pub. Health 1904 (2017) .......... 19

Jones et al., *Abortion Incidence and Service Availability in the United States, 2020*, 54 Perspectives on Sexual and Reproductive Health 128 (2022) .......... 24

Kiely et al., *Pregnancy and Pulmonary Hypertension: A Practical Approach to Management*, 6 Obstetric Med. 144 (2013) ....................22

Klink et al., *Veterans Affairs Graduate Medical Education Expansion Addresses U.S. Physician Workforce Needs*, 97 Academic Medicine 1144 (Aug. 2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9311468/ ....................16

Kortsmit et al., CDC, *Abortion Surveillance–United States, 2019*, 70 MMWR Surveillance Summaries No. SS-9 (Nov. 26, 2021) ....................20

Matsuo et al., *Alport Syndrome and Pregnancy*, 109 Obstetrics & Gynecology 531 (Feb. 2007) ....................22

MedlinePlus, *D and C* (May 29, 2026), https://medlineplus.gov/ency/article/002914.htm ....................17

Muñoz et al., *Reproductive Coercion and Intimate Partner Violence Victimization Among a Racially and Ethnically Diverse Young Adult Sample*, 38 J. of Interpersonal Violence 1 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC9592682/ ....................11

Nambiar et al., *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less with Complications in 2 Texas Hospitals After Legislation on Abortion*, 227 Am. J. Obstetrics & Gynecology 648 (July 2022) ....................27

National Academies of Sciences, Engineering, and Medicine, *The Safety and Quality of Abortion Care in the United States* 10 (2018) ....................20, 21

National Institute of Child Health and Human Development, *Maternal Morbidity and Mortality*, https://www.nichd.nih.gov/health/topics/factsheets/maternal-morbidity-mortality (accessed Nov. 4, 2026) ....................15

National Partnership for Women & Families, *Intimate Partner Violence Endangers Pregnant People and Their Infants* (May 2021), https://nationalpartnership.org/report/intimate-partner-violence/ ....................11

National Veterans Homeless Support, *Veterans and Poverty: Understanding the Problem, Supporting the Solutions* (July 31, 2025), https://nvhs.org/veteran-poverty-understanding-the-problem/ ....................14

Njoku et al., *Listen to the Whispers Before They Become Screams: Addressing Black Maternal Morbidity and Mortality in the United States*, 11 Healthcare 1 (Feb. 3, 2023), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9914526/pdf/healthcare-11-00438.pdf ....................15

Physicians for Reproductive Health, *Abortion Training Policy Primer* (Aug. 2024), https://prh.org/wp-content/uploads/2024/10/policy-fact-sheet-abortion-training.pdf ....................15, 17

RAND, *Landmark Women's Reproductive Health Survey Shows Need for Improvements in DoD Reproductive Health Care* (Sept. 13, 2022), https://www.rand.org/news/press/2022/09/13.html ....................12

Raymond & Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215 (2012) ....................21

Raymond et al., *First-Trimester Medical Abortion with Mifepristone 200 mg and Misoprostol: A Systematic Review*, 87 Contraception 26 (2013) ....................20

Silver et al., *SMFM Consult Series #64: Systemic Lupus Erythematosus in Pregnancy*, Soc'y for Maternal-Fetal Med. (Mar. 2023) ....................22

Sims et al., *Pregnancy Outcomes of Women Veterans with Autoimmune Disease*, 5.1 Women's Health Rep. 650 (2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11462423/ ....................9

Steenland et al., *Pregnancy- and Abortion-Related Mortality in the US, 2018-2021*, JAMA Network (Jan. 21, 2026) ....................21

Stout & Otto, *Pregnancy in Women with Valvular Heart Disease*, 93 Heart Rev. 552 (May 2007), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1955531/pdf/552.pdf ....................22

Turk et al., *"I Went Into This Field to Empower Other People, and I Feel Like I Failed": Residents Experience Moral Distress Post-Dobbs*, 16 J. of Graduate Med. Educ. 271 (June 2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11173027/ .......................................18

U.S. Armed Forces Health Surveillance Division, *Update: Infertility Among Active Component Service Women, U.S. Armed Forces, 2019–2023*, 32 MSMR 19 (May 2025), https://www.health.mil/Reference-Center/Reports/2025/05/01/MSMR-Vol-32-No-5-May-2025 ...........................10

U.S. Census Bureau, Veteran Status, American Community Survey, https://data.census.gov/table/ACSST1Y2023.S2101?q=S2101 (accessed Nov. 4, 2026) .........................................................................14

Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175 (2015) .....................................................................................20, 25

VA, *About the Department*, https://department.va.gov/about/ (accessed Oct. 30, 2026) .........................................................................8

VA, *About Us*, https://department.va.gov/vha/about-us/ (accessed Nov. 2, 2026) ................................................................................16

VA, *Everyone Counts in the Effort to End Veteran Homelessness in the United States*, https://department.va.gov/homeless/point-in-time-pit-count/ (accessed Nov. 4, 2026) ..........................................................14

VA, *Military Sexual Trauma* (updated Sept. 12, 2025), https://www.womenshealth.va.gov/topics/military-sexual-trauma.asp ...........................................................................................8, 12

VA, *Office of Academic Affiliations*, https://department.va.gov/vha/academic-affiliations (accessed Oct. 23, 2026) ............................................................................................16

VA, *OIG Report of Veterans Health Administration's Responses on Severe Occupational Staffing Shortages Fiscal Year 2026* (Sept. 11, 2026), https://www.vaoig.gov/sites/default/files/reports/2026-09/vaoig-26-01046-271_-_final.pdf .................................................................17

VA, *Veterans Using VA Benefits Experience High Rates of Adverse Pregnancy Events and Pregnancy-Associated Death, with Black Veterans Most at Risk*, Health Systems Research Publication Brief (Sept. 20, 2024), https://www.hsrd.research.va.gov/research/citations/pubbriefs/articles.cfm?RecordID=1275 ........ 9

White et al., *Complications from First-Trimester Aspiration Abortion: A Systematic Review of the Literature*, 92 Contraception 422 (2015) ........ 20

Zane et al., *Abortion-Related Mortality in the United States, 1998-2010*, 126 Obstetrics & Gynecology 258 (2015) ........ 20

*Amici curiae* respectfully submit this brief in support of Petitioner Minority Veterans of America's petition for review of the final rule promulgated by the U.S. Department of Veterans Affairs ("VA") on December 31, 2025. *See* Reproductive Health Services, 90 Fed. Reg. 61310 (Dec. 31, 2025) (the "2025 Rule"). Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this brief.

## INTEREST OF *AMICI CURIAE*

American College of Obstetricians and Gynecologists (ACOG) is a nonprofit organization of more than 60,000 members that serves as the nation's leading group of physicians providing evidence-based obstetric and gynecologic care. ACOG's membership includes over 1,500 clinicians in its Armed Forces District representing active-duty service members. ACOG advocates equitable, exceptional, and respectful care for all; maintains the highest standards of clinical practice and continuing education for members; promotes patient education; and increases awareness of issues facing patients, families, and communities. Courts have repeatedly cited ACOG's briefs and practice guidelines and recognized ACOG as a leading source of authoritative scientific data regarding childbirth and abortion. *See, e.g.*, *Stenberg v. Carhart*, 530 U.S. 914, 932-36 (2000) (referring to ACOG as among the "significant medical authority" supporting the comparative safety of the abortion procedure at issue); *Simopoulos v. Virginia*, 462 U.S. 506, 517 (1983) (citing ACOG

when discussing "accepted medical standards" for obstetric-gynecologic services); *Gonzales v. Carhart*, 550 U.S. 124, 170-71, 175-80 (2007) (Ginsburg, J., dissenting) (referring to ACOG as "experts" and citing ACOG's brief).

American Academy of Family Physicians (AAFP) is one of the largest national medical organizations, representing nearly 125,000 family physicians and medical students. AAFP seeks to improve the health of patients, families, and communities by advocating for public health and supporting members in providing continuous, comprehensive care to all.

American College of Medical Genetics and Genomics (ACMG) is the only nationally recognized medical professional organization solely dedicated to improving health through the clinical and laboratory practice of medical genetics and genomics, and the only U.S. medical specialty society representing the full spectrum of medical genetics disciplines. ACMG guides the safe and effective integration of genetics and genomics into medicine and health care, improving personal and public health.

American College of Preventive Medicine (ACPM) is a professional medical society representing approximately 2,000 physicians, dedicated to the practice of preventive medicine and improving the health and quality of life of individuals, families, and communities through disease prevention and health promotion. ACPM

supports the evidence-based practice of medical care and comprehensive reproductive health services.

American Gynecological & Obstetrical Society (AGOS) is a professional organization composed of over 500 nationally prominent scholars and leaders in obstetrics, gynecology, and women's health, dedicated to advancing women's health through excellence in research, education, and medical practice. AGOS promotes excellence in women's health care through advocacy for research and clinical training, the development of academic leaders, and a commitment to diversity and inclusion.

American Society for Reproductive Medicine (ASRM) is a professional society of approximately 8,000 members dedicated to advancing the science and practice of reproductive medicine.

Council of University Chairs of Obstetrics and Gynecology (CUCOG) is a diverse, inclusive, and cohesive community of OB-GYN chairs advancing women's health. CUCOG supports OB-GYN chairs' leadership and professional development through networking and sharing of best practices to ensure members' departments' clinical and academic success.

Society for Adolescent Health and Medicine (SAHM) is a multidisciplinary organization committed to promoting optimal health and well-being for all adolescents and young adults by supporting health and medicine professionals

through the advancement of clinical practice, care delivery, research, advocacy, and professional development.

Society for Maternal-Fetal Medicine (SMFM) is the professional society for maternal-fetal medicine subspecialists, who are obstetricians with additional training in high-risk pregnancies. SMFM provides education, promotes research, and advocates optimal, equitable perinatal outcomes for all people who desire and experience pregnancy and access to all medically appropriate treatment options for those with high-risk pregnancies.

Society of Gynecologic Surgeons (SGS) is a nonprofit professional medical organization dedicated to advancing the field of gynecologic surgery through education, research, and promoting excellence in surgical care. SGS supports evidence-based practices and policies that improve the quality, safety, and accessibility of gynecologic health care for patients.

VA's 2025 Rule threatens to severely restrict—if not effectively eliminate—access to abortion care at VA facilities. *Amici* have a compelling interest in this case because safeguarding access to essential reproductive health care is central to their missions and vital to the health of the communities their members serve.

## STATEMENT OF COMPLIANCE WITH RULE 29(a)

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) and Federal Circuit Rule 29(a), *amici* state: (i) no party's counsel authored this brief in whole or

in part; (ii) no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and (iii) no person—other than *amici*, their members, or their counsel—contributed money that was intended to fund the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

It is well established in the medical community that accessible, legal abortion care and counseling are integral to comprehensive health care. Medical circumstances during pregnancy can change quickly, and treatment must be tailored to each patient's unique needs. Sound medical care requires that physicians be free to exercise their clinical judgment and to counsel patients candidly. Under the 2025 Rule—which imposes a near-total ban on abortion care and a total ban on abortion counseling—VA clinicians are barred from providing the care and counseling their patients need.

VA provides medical care to veterans through the Veterans Health Administration ("VHA") and covers certain of their spouses, children, and caregivers through the Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA"). 38 U.S.C. §§ 1710(a), 1781, 7301. The Secretary determines which services are "needed" and includes them in a "Medical Benefits Package." *Id.* §§ 1710(a)(1)-(3); 38 C.F.R. § 17.38. Care in the Medical Benefits Package is furnished when "appropriate health care professionals" determine that it is "needed to promote, preserve, or restore" an individual's health and is "in accord with generally accepted standards of medical practice." 38 C.F.R. § 17.38(b).

Historically, abortion care and counseling were excluded from the Medical Benefits Package. That changed in 2022, when the Secretary, based on evidence of

medical necessity, issued an interim final rule authorizing abortion care in two circumstances: where a pregnancy threatened a patient's life or health or resulted from rape or incest. *See* 87 Fed. Reg. 55287, 55287-88 (Sept. 9, 2022), *finalized* 89 Fed. Reg. 15451 (Mar. 4, 2024) (together, the "2022 Rule"). The Secretary also amended regulations to permit abortion counseling, concluding it was necessary to ensure patients could make informed health care decisions. *Id.*

VA reversed course with the 2025 Rule, which imposes a near-total abortion ban by removing both of the 2022 Rule's exceptions allowing abortion care. 2025 Rule at 61310-11. VA says that "procedures necessary to save the life of the pregnant veteran … remain permissible." *Id.* at 61311. Yet it declined to codify any exception to that effect, creating a discrepancy with CHAMPVA regulations, which contain an express exception extending coverage to abortions when "the life of the mother would be endangered." *Compare* 38 C.F.R. § 17.38 *with id.* § 17.272(a)(58). The 2025 Rule also bans abortion counseling, based on the Secretary's determination that it "is not needed or medically necessary and appropriate." 2025 Rule at 61323.

The 2025 Rule endangers the health of the communities that *amici*'s members serve in four ways. *First*, it acutely burdens veterans and their families, who already face unique barriers to health care. *Second*, it undermines medical training and threatens to worsen staffing shortages. *Third*, it restricts access to safe and life-saving health care without medical justification and interferes with clinical

judgment. *Fourth*, it impedes informed decision-making by prohibiting counseling, contrary to the principles of informed consent.

Decisions about when to end a pregnancy belong to patients, guided by their physicians and medical evidence. The 2025 Rule replaces those decisions with a blanket ban, leaving veterans and their families to bear the consequences. *Amici* respectfully ask the Court to set aside the 2025 Rule in its entirety.

## ARGUMENT

### I. The 2025 Rule Acutely Burdens Veterans and Their Families, Who Face Unique Barriers to Health Care.

VA's mission is to "care for those who have served in our nation's military and for their families, caregivers, and survivors."[1] Veterans and their families rely on VA, whose providers are uniquely positioned to understand their distinct and complex health needs. By restricting access to essential abortion care and counseling, the 2025 Rule breaks VA's promise: in some instances, it increases patients' health risks; it denies abortion care and counseling to veterans whose pregnancies result from military sexual trauma ("MST")[2]; and it leaves some patients without any viable reproductive health care options.

---

[1] VA, *About the Department*, https://department.va.gov/about/ (accessed Oct. 30, 2026).

[2] MST refers to sexual assault or threatening sexual harassment experienced during military service. VA, *Military Sexual Trauma* (updated Sept. 12, 2025), https://www.womenshealth.va.gov/topics/military-sexual-trauma.asp.

### A. The 2025 Rule Compounds Existing Health Concerns for Veterans and CHAMPVA Beneficiaries.

The 2025 Rule's abortion care and counseling restrictions endanger pregnant veterans, whose military service has already made pregnancy riskier. Veterans experience chronic medical and mental health conditions at disproportionately high rates, including post-traumatic stress disorder ("PTSD"), chronic hypertension, and autoimmune diseases, which may negatively affect pregnancy health and contribute to adverse pregnancy outcomes.[3] Military service often involves exposure to environmental and industrial hazards, which may increase the risk of miscarriage, preterm birth, and congenital anomalies for those who become pregnant while serving.[4] Pregnancy can be especially dangerous for veterans who sustained injuries on active duty and live with service-connected disabilities.[5] Finally, many active-

---

[3] Harding et al., *Maternal Chronic Hypertension in Women Veterans*, 59 Health Serv. Rsch. 1, 2 (2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC10915474/; Sims et al., *Pregnancy Outcomes of Women Veterans with Autoimmune Disease*, 5.1 Women's Health Rep. 650, 651 (2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11462423/.

[4] Clark, *Environmental and Occupational Risks to Reproductive Health in Women Service Members and Veterans*, 13 Frontiers Pub. Health 1, 1-2 (Aug. 13, 2025), https://doi.org/10.3389/fpubh.2025.1628858.

[5] VA, *Veterans Using VA Benefits Experience High Rates of Adverse Pregnancy Events and Pregnancy-Associated Death, with Black Veterans Most at Risk*, Health Systems Research Publication Brief (Sept. 20, 2024), https://www.hsrd.research.va.gov/research/citations/pubbriefs/articles.cfm?RecordID=1275.

duty service members delay starting a family because of military service demands,[6] which can push pregnancies later in life, when age-related complications such as gestational diabetes and preeclampsia are more likely.[7] For some veterans, these risks may make abortion care necessary to protect their health or life.

Veterans also face disproportionately high rates of intimate partner violence ("IPV"): nearly 50% of veterans experience IPV in their lifetime.[8] Circumstances common to military service, including multiple deployments, family separation and reintegration, and histories of head trauma, mental illness, and substance abuse, can heighten the risk of IPV among service members and veterans.[9] Reproductive

[6] Dunn et al., *Impact of Family Planning Decisions Among Women in the U.S. Military*, 122 Fertility & Sterility e103 (2024) (abstract no. O-248), https://www.fertstert.org/article/S0015-0282%2824%2901940-X/fulltext; U.S. Armed Forces Health Surveillance Div., *Update: Infertility Among Active Component Service Women, U.S. Armed Forces, 2019–2023*, 32 MSMR 19, 19 (May 2025), https://www.health.mil/Reference-Center/Reports/2025/05/01/MSMR-Vol-32-No-5-May-2025.

[7] ACOG, Obstetric Care Consensus No. 11, *Pregnancy at Age 35 Years or Older*, 140 Obstetrics & Gynecology 348, 350 (2022), https://doi.org/10.1097/AOG.0000000000004873.

[8] Coppola et al., *Rates and Patterns of Intimate Partner Violence Among Service Members and Veterans*, 41 J. of Interpersonal Violence 8709, 8719 (2026), https://journals.sagepub.com/doi/10.1177/08862605251370402.

[9] Gierisch et al., *Intimate Partner Violence: Prevalence Among U.S. Military Veterans and Active Duty Servicemembers and a Review of Intervention Approaches*, VA, at 11 (Aug. 2013), https://www.hsrd.research.va.gov/publications/esp/partner_violence.cfm.

coercion, a form of IPV, is closely linked to unintended pregnancy,[10] and pregnancy in turn can heighten the risk of violence.[11] For veterans experiencing IPV, timely access to abortion counseling and care may be critical to safety. The 2025 Rule nonetheless bars VA clinicians from discussing abortion options with these patients, and denies abortion care even when a pregnancy results from assault.

### B. The 2025 Rule Denies MST Survivors Care Available to Active-Duty Service Members.

The 2025 Rule creates an arbitrary discrepancy: active-duty service members receiving care through the Department of Defense and the Military Health System have broader access to reproductive health care than veterans because they may access abortion care in cases of rape or incest.[12] Therefore, an active-duty member who becomes pregnant as the result of sexual violence may obtain an abortion, while the same individual who learns of the pregnancy only after returning to civilian life would be turned away by VA. In other words, a service member transitioning from

---

[10] Muñoz et al., *Reproductive Coercion and Intimate Partner Violence Victimization Among a Racially and Ethnically Diverse Young Adult Sample*, 38 J. of Interpersonal Violence 1, 2 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC9592682/.

[11] National Partnership for Women & Families, *Intimate Partner Violence Endangers Pregnant People and Their Infants* (May 2021), https://nationalpartnership.org/report/intimate-partner-violence/.

[12] 10 U.S.C. § 1093.

military to civilian life after experiencing sexual violence might be able to access reproductive health care one day and not the next for no medical reason.

Such a scenario is not improbable; one in three women veterans experiences MST,[13] which may result in pregnancy. Denying veterans abortion care and counseling under such circumstances risks retraumatizing them. Attention to MST is important for detecting and treating affected veterans. In fact, VA has built MST-specific screening and treatment programs precisely because it recognizes these veterans need specialized care.[14] The 2025 Rule moves in the opposite direction, withholding counseling and care when veterans may need it most.

### C. The 2025 Rule Will Disproportionately Impact Veterans and Beneficiaries in Abortion-Restrictive States, and Those Who Already Face Barriers to Care.

Abortion restrictions deepen inequities and disproportionately affect patients of color, those living in rural areas, and those with limited economic resources—patients who have historically had the least access to care and the greatest rates of maternal morbidity and mortality. The 2025 Rule threatens to exacerbate these inequities.

---

[13] VA, *MST*, *supra* note 2. Active-duty service women are more likely than civilians to report an unintended pregnancy. *See* RAND, *Landmark Women's Reproductive Health Survey Shows Need for Improvements in DoD Reproductive Health Care*, at 2 (Sept. 13, 2022), https://www.rand.org/news/press/2022/09/13.html.

[14] VA, *MST*, *supra* note 2.

Patients who would otherwise seek abortion care from VA may now be discouraged, or prohibited, from doing so. Women of reproductive age are the fastest-growing group of VA users, and more than 400,000 women veterans live in states that severely restrict or ban abortion care.[15] Under the 2022 Rule, VA may have been the only place these veterans could receive health- and life-saving abortion care and counseling in their home states. The 2025 Rule nearly eliminates that access. Some patients may be able to afford care at non-VA facilities, but traveling long distances and paying out of pocket may not be viable for lower-income patients.[16] Travel imposes financial burdens—transit and lodging costs, childcare coverage, and absences from work—that patients with limited means cannot bear.[17] Such burdens weigh heavily on veterans—about 7.6% lived below

[15] Center for Reproductive Rights, *Fact Sheet: Abortion Access for Veterans* (Jan. 14, 2026), https://reproductiverights.org/resources/fact-sheet-abortion-access-for-veterans/.

[16] Nationwide, 75% of abortion patients are low income. Jerman et al., *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008*, Guttmacher Inst. (May 2016).

[17] *See* ACOG, Committee Statement ("C.S.") No. 16, *Increasing Access to Abortion*, 145 Obstetrics & Gynecology e86, e90-92 (Feb. 2025); Foster et al., *Socioeconomic Outcomes of Women Who Receive and Women Who Are Denied Wanted Abortions in the United States*, 112 Am. J. Pub. Health 1290, 1291 (2022) (socioeconomic harms persist for patients unable to obtain abortion care).

the poverty line in 2023,[18] and an estimated 32,495 experienced homelessness in 2025.[19]

Health outcomes in states with abortion restrictions similar to the 2025 Rule are instructive. Compared with states where abortion is accessible, states that have restricted abortion care have higher rates of maternal mortality and infant death, and greater racial inequities across their health care systems.[20] These outcomes are especially concerning given that the U.S. maternal mortality rate for 2021 was 32.9 deaths per 100,000 live births[21] (more than three times the rate of most other high-

[18] U.S. Census Bureau, Veteran Status, American Community Survey, Table S2101, https://data.census.gov/table/ACSST1Y2023.S2101?q=S2101 (accessed Nov. 4, 2026); National Veterans Homeless Support, *Veterans and Poverty: Understanding the Problem, Supporting the Solutions* (July 31, 2025), https://nvhs.org/veteran-poverty-understanding-the-problem/.

[19] VA, *Everyone Counts in the Effort to End Veteran Homelessness in the United States*, https://department.va.gov/homeless/point-in-time-pit-count/ (accessed Nov. 4, 2026).

[20] Commonwealth Fund, *The U.S. Maternal Health Divide: The Limited Maternal Health Services and Worse Outcomes of States Proposing New Abortion Restrictions* (Dec. 14, 2022), https://www.commonwealthfund.org/publications/issue-briefs/2022/dec/us-maternal-health-divide-limited-services-worse-outcomes.

[21] Hoyert, *Maternal Mortality Rates in the United States, 2021*, Ctrs. for Disease Control and Prevention ("CDC"), at 3 (Mar. 2023), https://www.cdc.gov/nchs/data/hestat/maternal-mortality/2021/maternal-mortality-rates-2021.pdf.

income countries[22]), and rates were even higher for patients of color.[23] Black patients face a higher risk of death than any other racial group due to several causes, including systemic racism and implicit bias within the health care system.[24] The 2025 Rule threatens to exacerbate these inequities, endangering patient health and leaving veterans without access to essential health care. Veterans who served this nation should not be denied the health care they were promised and have earned.

## II. The 2025 Rule's Restrictions Undermine Medical Training at VA and Threaten to Worsen Staffing Shortages.

VA is one of the nation's largest trainers of residents and medical students. In states with restrictions similar to the 2025 Rule, residents struggle to receive comprehensive abortion education and hands-on training.[25] While the 2022 Rule

---

[22] Gunja et al., *The U.S. Maternal Mortality Crisis Continues to Worsen: An International Comparison*, The Commonwealth Fund (Dec. 1, 2022), https://www.commonwealthfund.org/blog/2022/us-maternal-mortality-crisis-continues-worsen-international-comparison (showing data for 2020).

[23] Nat'l Inst. of Child Health and Hum. Dev., *Maternal Morbidity and Mortality*, https://www.nichd.nih.gov/health/topics/factsheets/maternal-morbidity-mortality (accessed Nov. 4, 2026); s*ee also* Chinn et al., *Health Equity Among Black Women in the United States*, 30 J. Women's Health 212, 215 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8020496/pdf/jwh.2020.8868.pdf.

[24] Njoku et al., *Listen to the Whispers Before They Become Screams: Addressing Black Maternal Morbidity and Mortality in the United States*, 11 Healthcare 1, 1 (Feb. 3, 2023), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9914526/pdf/healthcare-11-00438.pdf.

[25] Physicians for Reprod. Health, *Abortion Training Policy Primer*, at 2 (Aug. 2024), https://prh.org/wp-content/uploads/2024/10/policy-fact-sheet-abortion-training.pdf.

allowed VHA facilities in those states to help fill that gap, the 2025 Rule widens it by further restricting access to reproductive health care training.

### A. Restrictions like the 2025 Rule Limit Required Clinical Training and Undermine Clinician Experience.

The Accreditation Council for Graduate Medical Education ("ACGME") requires OB-GYN residency programs to provide "access to clinical experience in the provision of abortions."[26] In states where such experience is unlawful, residency programs must provide access to training in a different jurisdiction.[27]

As the largest integrated health care system in the country,[28] VHA plays a vital role in physician training by partnering with medical schools and offering clinical rotations.[29] Restrictions like the 2025 Rule jeopardize residents' access to training in abortion care and counseling,[30] leaving them with inadequate hands-on

---

[26] ACGME, *Program Requirements for Graduate Medical Education in Obstetrics and Gynecology*, at 30 (revised Sept. 29, 2025), https://www.acgme.org/globalassets/pfassets/programrequirements/2026-prs/220_obstetricsgynecology_2026.pdf.

[27] *Id*. at 30-31.

[28] VA, *About Us*, https://department.va.gov/vha/about-us/ (accessed Nov. 2, 2026).

[29] VA, *Office of Academic Affiliations*, https://department.va.gov/vha/academic-affiliations (accessed Oct. 23, 2026); *see also* Klink et al., *Veterans Affairs Graduate Medical Education Expansion Addresses U.S. Physician Workforce Needs*, 97 Academic Medicine 1144, 1144-50 (Aug. 2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9311468/.

[30] ACOG, Position Statement, *Abortion Training and Education in a Post-Dobbs Landscape* (Feb. 2025), https://www.acog.org/advocacy/position-statements/abortion-training-and-education-in-a-post-dobbs-landscape/.

experience and exposure to reproductive health care procedures.[31] The consequences of this inexperience are not limited to abortion care—the same skills are often necessary to treat life-threatening pregnancy complications. For example, a physician inexperienced in dilation and curettage procedures will also be less prepared to manage miscarriages or diagnose uterine cancer.[32]

These restrictions also undercut medical training more broadly because medicine is an interdisciplinary field. Hampering any provider's access to comprehensive reproductive health care training compromises that provider's overall ability to deliver high-quality, evidence-based care.

### B. Restrictions Threaten to Exacerbate VHA's Existing Staffing Shortages and Reduce Access to Care.

All 139 VHA facilities report severe staffing shortages.[33] By narrowing the care clinicians can provide, creating uncertainty about when abortion care is permitted, and compromising ethical obligations and informed consent (*see infra*

---

[31] *Id.*; *see also* Physicians for Reprod. Health, *supra* note 25, at 2.

[32] MedlinePlus, *D and C* (May 29, 2026), https://medlineplus.gov/ency/article/002914.htm.

[33] VA, *OIG Report of Veterans Health Administration's Responses on Severe Occupational Staffing Shortages Fiscal Year 2026* (Sept. 11, 2026), https://www.vaoig.gov/sites/default/files/reports/2026-09/vaoig-26-01046-271_-_final.pdf.

Sections III-IV), the 2025 Rule stands to make it harder for VA to recruit and retain clinicians.

In a recent survey, OB-GYN residents described abortion care restrictions as creating "a big conflict of interest between the patient's well-being and what we feel is right for the patient" and the legal requirements.[34] VA providers may be especially confused because the 2025 Rule's ban on abortion care and counseling conflicts with the regulation's requirement that care be provided "in accord with generally accepted standards of medical practice"—which the medical community agrees should include abortion care (*see infra* Section III) and informed consent achieved through transparent counseling (*see infra* Section IV). Physicians should not be forced into the untenable position of choosing between making the right decision for a patient and risking professional consequences for misinterpreting the 2025 Rule. Forcing that choice may drive clinicians away from VA, worsening existing shortages and reducing access to care for all veterans and beneficiaries relying on VHA, including those seeking care unrelated to pregnancy.[35]

---

[34] Turk et al., *"I Went Into This Field to Empower Other People, and I Feel Like I Failed": Residents Experience Moral Distress Post-Dobbs*, 16 J. of Graduate Med. Educ. 271, 274-75 (June 2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11173027/.

[35] *See* Griffin, *Abortion Rights Activists in Idaho Find Their Pitch: Bring Back the Doctors*, N.Y. Times (Sept. 18, 2026) (number of OB-GYNs in Idaho has "fallen sharply" since the state enacted a total abortion ban with criminal penalties, leaving about half the counties without an OB-GYN).

## III. The 2025 Rule Restricts Access to Life-Saving Health Care Without Medical Justification.

The 2025 Rule reverses VA's 2022 finding, grounded in medical evidence, that abortion is needed care when a patient's life or health is endangered. VA cites no medical evidence for this reversal, and the evidence it once credited has not changed. Abortion is safe and common, and the 2025 Rule interferes with physicians' clinical judgment about medical necessity.

### A. Abortion Is Safe and Essential Health Care.

The medical community recognizes abortion as safe and essential reproductive health care.[36] Abortion care is common—over one million abortions were provided nationwide in 2025,[37] and an estimated one quarter of American women have an abortion by age 45.[38]

[36] *See, e.g.*, Editors of the New England Journal of Medicine et al., *The Dangerous Threat to* Roe v. Wade, 381 New Eng. J. Med. 979 (2019); ACOG, Statement of Policy, *Abortion Policy*, https://www.acog.org/advocacy/statements-of-policy/abortion-policy/ (amended & reaffirmed July 2025); Forbes et al., *Soc'y for Maternal-Fetal Med. Position Statement: Access to Abortion Care*, 231 Am. J. Obstetrics & Gynecology B7 (2024).

[37] Guttmacher Inst., *Monthly Abortion Provision Study,* https://www.guttmacher.org/monthly-abortion-provision-study?state=US&year=2025 (accessed Oct. 23, 2026).

[38] Jones & Jerman, *Population Group Abortion Rates and Lifetime Incidence of Abortion: United States, 2008-2014*, 107 Am. J. Pub. Health 1904, 1908 (2017).

Evidence conclusively demonstrates that abortion is one of the safest medical interventions and that complications are rare, averaging around 2%.[39] Most complications are minor and easily treatable,[40] and major complications are exceptionally rare, occurring in just 0.23% of instances across gestational ages and methods.[41] The risk of death from abortion care is even lower: nationally, fewer than one in 100,000 patients die from an abortion-related complication.[42] Wisdom-tooth removals, tonsillectomies, and colonoscopies carry a greater risk of

---

[39] Nat'l Acad. of Scis., Eng'g, Med. ("NASEM"), *The Safety and Quality of Abortion Care in the United States* 10, 55, 60 (2018); Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175, 181 (2015) (finding 2.1% abortion-related complication rate).

[40] Upadhyay, *supra* note 39, at 181; White et al., *Complications from First-Trimester Aspiration Abortion: A Systematic Review of the Literature*, 92 Contraception 422, 434 (2015).

[41] Upadhyay, *supra* note 39, at 175; *see also* White, *supra* note 40, at 434; Raymond et al., *First-Trimester Medical Abortion with Mifepristone 200 mg and Misoprostol: A Systematic Review*, 87 Contraception 26, 30 (2013).

[42] Kortsmit et al., CDC, *Abortion Surveillance – United States, 2019*, 70 MMWR Surveillance Summaries No. SS-9, 29 tbl.15 (Nov. 26, 2021) (finding a mortality rate from 0.00041% to 0.00078% for approximately five-year periods from 1978 to 2014); Zane et al., *Abortion-Related Mortality in the United States, 1998-2010*, 126 Obstetrics & Gynecology 258, 261 (2015) (noting an approximate 0.0007% mortality rate for abortion).

complications or mortality.[43] Moreover, the "risk of death associated with childbirth [is] approximately 14 times higher" than for abortion.[44]

Abortion care does not increase long-term health risks of major medical conditions, including secondary infertility, pregnancy-related hypertensive disorders, preterm birth, or mental health disorders.[45] Long-term studies show women who obtained wanted abortions had "similar or better mental health outcomes than those who were denied" one, with no greater risk of depression, anxiety, or post-traumatic stress.[46] Likewise, the American Psychological

---

43 Advancing New Standards in Reproductive Health, *Safety of Abortion in the United States*, Issue Brief No. 6, at 1-2 (Dec. 2014) (2.1% of abortions result in complications compared to 7% of wisdom-tooth extractions, 8-9% of tonsillectomies); Am. Soc'y for Gastrointestinal Endoscopy, *Complications of Colonoscopy*, 74 Gastrointestinal Endoscopy 745, 745 (2011) (33% of colonoscopies result in minor complications).

44 Raymond & Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 216 (2012). A more recent study found the risk of death associated with childbirth is about 44-70 times higher than that associated with abortion. *See* Steenland et al., *Pregnancy- and Abortion-Related Mortality in the US, 2018-2021*, JAMA Network at 4 (Jan. 21, 2026).

45 NASEM, *supra* note 39, at 133-53.

46 Biggs et al., *Women's Mental Health and Well-Being 5 Years After Receiving or Being Denied an Abortion: A Prospective, Longitudinal Cohort Study*, 74 JAMA Psychiatry 169, 171-73, 177 (2017).

Association concluded that "having an abortion is not linked to mental health problems, but restricting access to safe, legal abortions does cause harm."[47]

Continuing a pregnancy to term, by contrast, carries much higher risks by imposing significant physiological changes that "can exacerbate underlying or preexisting conditions … and can severely compromise health."[48] For example, pregnancy can worsen sickle-cell disease, triggering severe anemia, blood clots, and stroke.[49] It can aggravate Alport syndrome (kidney disease), lupus, pulmonary hypertension, and heart valve disease, sometimes in patients with no prior cardiac symptoms.[50] Diabetes may worsen to the point of blindness, and gestational

---

[47] Abrams, *The Facts About Abortions and Mental Health*, American Psychological Association (updated Apr. 2023), https://www.apa.org/monitor/2022/09/news-facts-abortion-mental-health.

[48] ACOG, *Abortion Can Be Medically Necessary* (Sept. 25, 2019), https://www.acog.org/news/news-releases/2019/09/abortion-can-be-medically-necessary.

[49] *See* Cole et al., *Sickle Cell Crises in Pregnancy: Fetal and Neonatal Implications*, 24 Neoreviews e452 (July 2023).

[50] *See* Matsuo et al., *Alport Syndrome and Pregnancy*, 109 Obstetrics & Gynecology 531, 531-32 (Feb. 2007); Stout & Otto, *Pregnancy in Women with Valvular Heart Disease*, 93 Heart Rev. 552, 552 (May 2007), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1955531/pdf/552.pdf; Silver et al., *SMFM Consult Series #64: Systemic Lupus Erythematosus in Pregnancy*, Soc'y for Maternal-Fetal Med., at B42-46 (Mar. 2023); Kiely et al., *Pregnancy and Pulmonary Hypertension: A Practical Approach to Management*, 6 Obstetric Med. 144, 146 (2013); ACOG, Practice Bulletin ("P.B.") No. 190, *Gestational Diabetes Mellitus*, 131 Obstetrics & Gynecology e49, e49 (Feb. 2018, reaff'd 2025); ACOG, P.B. 222, *Gestational Hypertension and Preeclampsia*, 135 Obstetrics & Gynecology e237, e239 (June 2020).

diabetes, which complicates approximately 7% of pregnancies, increases the risk of developing diabetes later in life.[51] Additional dangerous complications include:

- **Preterm prelabor rupture of membranes (“PPROM”)**, which can cause serious infection and sepsis[52];
- **Miscarriage**, which occurs in approximately 10% of clinically recognized pregnancies and can cause excessive blood loss and infection[53];
- **Excessive bleeding** from placenta accreta spectrum (a potentially life-threatening complication that occurs when the placenta cannot detach)[54];
- **Gestational hypertension and preeclampsia**, which, globally, complicate 2% to 8% of pregnancies and are among the leading causes of maternal death[55]; and

---

[51] ACOG, P.B. 190, *supra* note 50, at e49.

[52] *See generally* ACOG, P.B. 217, *Prelabor Rupture of Membranes*, 135 Obstetrics & Gynecology e80 (Mar. 2020).

[53] *See generally* ACOG, P.B. 200, *Early Pregnancy Loss*, 132 Obstetrics & Gynecology e197 (Nov. 2018, reaff’d 2021).

[54] *See generally* ACOG, *FAQs: Bleeding During Pregnancy* (Aug. 2022), https://www.acog.org/womens-health/faqs/bleeding-during-pregnancy; ACOG, Obstetric Care Consensus (“O.C.C.”) No. 7, *Placenta Accreta Spectrum*, 132 Obstetrics & Gynecology e259 (Dec. 2018, reaff’d 2021).

[55] *See generally* ACOG, P.B. 222, *supra* note 50, at e237.

- **Placental abruption**, which can cause severe bleeding, cardiac arrest, or kidney failure, and accounts for up to 10% of stillbirths.[56]

Labor and delivery carry their own significant risks, including hemorrhage, hysterectomy, cervical laceration, and debilitating postpartum pain.[57] Approximately one in three U.S. births is by cesarean delivery, a major surgery with increased risk of complications.[58]

By restricting access to safe, legal abortion care, the 2025 Rule may also increase the likelihood that people will attempt to self-manage abortions through unsafe methods.[59] Others may continue a pregnancy longer than recommended,

[56] ACOG, O.C.C. 10, *Management of Stillbirth*, 135 Obstetrics & Gynecology e110, e116 (Mar. 2020, reaff'd 2021).

[57] *See generally* ACOG, P.B. 183, *Postpartum Hemorrhage*, 130 Obstetrics & Gynecology e168 (Oct. 2017, reaff'd 2025); ACOG, O.C.C. 7, *supra* note 54, at e259-60; ACOG, P.B. 198, *Prevention and Management of Obstetric Lacerations at Vaginal Delivery*, 132 Obstetrics & Gynecology e87 (Sept. 2018, reaff'd 2025); ACOG, Clinical Consensus No. 1, *Pharmacologic Stepwise Multimodal Approach for Postpartum Pain Management*, 138 Obstetrics & Gynecology 507 (Sept. 2021, reaff'd 2025).

[58] CDC, *National Vital Statistics Reports Vol. 73, No. 2, Births: Final Data for 2022*, at Table I–16 (2024), https://www.cdc.gov/nchs/data/nvsr/nvsr73/nvsr73-02-tables.pdf; ACOG, Clinical Practice Guideline No. 8, *First and Second Stage Labor Management*, 143 Obstetrics & Gynecology 144, 144-45 (Jan. 2024).

[59] *See* Jones et al., *Abortion Incidence and Service Availability in the United States, 2020*, 54 Perspectives on Sexual and Reproductive Health 128, 138 (2022).

increasing the risk of complications, injury, or death.[60] Given these risks, abortion must remain available as a safe treatment option.

### B. The 2025 Rule's Restrictions Interfere with Clinical Judgment About When Abortion Is Medically Necessary.

As illustrated above, abortion care is sometimes necessary to protect a patient's health or life. Determining when that is the case requires individualized clinical judgment grounded in the patient-physician relationship, which is the foundation of medical practice. ACOG's *Code of Professional Ethics* states that "the welfare of the patient must form the basis of all medical judgments" and OB-GYNs should "exercise all reasonable means to ensure that the most appropriate care is provided."[61] Because caring for pregnant patients—especially in emergencies—is complex, physicians must exercise judgment, honed through years of education and experience, to provide evidence-based care consistent with clinical guidance and responsive to each patient's needs.[62]

---

[60] Upadhyay, *supra* note 39, at 181.

[61] ACOG, *Code of Professional Ethics*, at 2 (Dec. 2018), https://aaplog.org/wp-content/uploads/2022/05/code-of-professional-ethics-of-the-american-college-of-obstetricians-and-gynecologists.pdf.

[62] *See* ACOG, Statement of Policy, *Legislative Interference with Patient Care, Medical Decisions, and the Patient-Physician Relationship* (Feb. 2025), https://www.acog.org/advocacy/statements-of-policy/legislative-interference-with-patient-care-medical-decisions-and-the-patient-physician-relationship/.

The 2025 Rule forces physicians to subordinate their ethical obligations and medical judgment. While the 2025 Rule's preamble states that life-saving procedures are permissible, VA declined to address the broader circumstances in which delaying abortion can cause serious injury or permanent impairment.[63] Moreover, this life-saving exception is not codified in the Medical Benefits Package (even though a comparable exception is codified for CHAMPVA beneficiaries), leaving physicians uncertain about whether, when, and for whom life-saving abortion care is permitted.

Compounding this uncertainty, the preamble purports to distinguish between life-threatening and health-threatening circumstances without providing a clear, codified standard. But even a bright-line rule cannot substitute for the nuanced judgment of physicians who know that circumstances can change suddenly, and abortion may become medically necessary in an emergency.

Rigid legal restrictions stymie clinical judgment and delay emergency care. For pregnant patients facing health- or life-threatening conditions, timing is essential. Rapid treatment improves patient outcomes, while delays in emergency care can be traumatic, permanently impair fertility, and increase the risk of serious

---

[63] By contrast, the 2022 Rule identifies serious conditions, such as preeclampsia and intrauterine infections, and recognizes "there are situations when pregnancy termination … is the only medical intervention that can preserve a patient's health." 2022 Rule at 55291-92.

injury or death.[64] Legally mandated expectant management—waiting to see whether a patient's health deteriorates enough that the physician is comfortable abortion would comply with the law—is associated with significant maternal morbidity.[65] It also puts physicians in an impossible position, forcing them to ignore their judgment and—contrary to their training and ethical obligations—withhold critical treatment until a patient's life is sufficiently endangered. This can lead to devastating results: in Texas, Amanda Zurawski suffered PPROM at just 18 weeks.[66] Although doctors knew the fetus could not survive and that she would develop a dangerous infection, they waited to treat her for fear of violating Texas' restrictive abortion law.[67] Three days later, because of this delay, she developed sepsis, nearly died, and suffered heavy scarring to her uterus, making another pregnancy challenging (if not

---

[64] *See*, *e.g.*, CDC, *Four in 5 Pregnancy-Related Deaths in the U.S. are Preventable* (Sept. 19, 2022), https://archive.cdc.gov/#/details?url=https%3A%2F%2Fwww.cdc.gov%2Fmedia%2Freleases%2F2022%2Fp0919-pregnancy-related-deaths.html.

[65] Nambiar et al., *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less with Complications in 2 Texas Hospitals After Legislation on Abortion*, 227 Am. J. Obstetrics & Gynecology 648, 649 (July 2022). Moreover, state-mandated expectant management produced serious maternal morbidity in 57% of patients, versus 33% with immediate termination. *Id.*

[66] Cohen & Bonifield, *Texas Woman Almost Dies Because She Couldn't Get an Abortion*, CNN (Nov. 16, 2022), https://www.cnn.com/2022/11/16/health/abortion-texas-sepsis/index.html.

[67] *Id.*

impossible).[68] The 2025 Rule, which makes no exception for threats to a patient's health and does not codify a life exception for veterans, risks similar devastating consequences—a veteran needing immediate care could suffer serious harm or death because of the uncertainty and ensuing delay the 2025 Rule creates.

Abortion care is safe, common, and, for many patients, the best medical choice. There is no legitimate basis to interfere with a physician's ability to provide an abortion when the physician and patient conclude it is medically appropriate. Regulations that restrict abortion care are inconsistent with contemporary medical practice and lack scientific or medical grounding.

## IV. The 2025 Rule's Abortion Counseling Ban Undermines Informed Consent and Ethical Care.

The 2025 Rule removes abortion counseling from the Medical Benefits Package, thereby barring veterans and CHAMPVA beneficiaries from having frank and confidential conversations through which they can understand their diagnosis, prognosis, and options. For medical professionals, those conversations are not optional: they are integral to the informed consent on which ethical care depends. By interfering with honest communication between patients and physicians, the 2025 Rule deprives patients of the ability to make fully informed decisions and forces clinicians to act against their professional and ethical obligations.

---

[68] *Id.*

### A. Informed Consent and Shared Decision-Making Require Accurate, Complete Information About All Pregnancy Options.

Informed consent is a patient's "willing acceptance of a medical intervention" after adequate disclosure from a physician.[69] Grounded in patient autonomy, self-determination, and bodily integrity, informed consent equips patients to choose the best course of care by giving them the information decisions require: their diagnosis; recommended interventions; the available alternatives, including forgoing treatment; and the burdens, risks, and benefits of each.[70] It requires that patients receive information that is adequate, accurate, and understandable; that they be free to ask questions; and that they make an intentional, voluntary choice.[71]

Shared decision-making puts these principles into practice through a patient-centered, individualized discussion of the benefits and risks of available options in light of the patient's values and priorities.[72] Patients are encouraged to share information, express preferences, and help shape a treatment plan—an approach that

---

[69] ACOG, Committee Opinion ("C.O.") No. 390, *Ethical Decision Making in Obstetrics and Gynecology*, 110 Obstetrics & Gynecology 1479, 1483 (Dec. 2007, reaff'd 2019).

[70] ACOG, C.O. 819, *Informed Consent and Shared Decision Making in Obstetrics and Gynecology*, 137 Obstetrics & Gynecology e34, e34-e35 (Feb. 2021).

[71] *Id.*

[72] *Id.* at e36.

reflects the highest ethical standards for informed consent and has been shown to improve patient knowledge, understanding of risk, outcomes, and satisfaction.[73]

In pregnancy, this approach takes the form of person-centered pregnancy options counseling: clinicians provide accurate, unbiased, evidence-based information while seeking to understand the "patient's values, beliefs, preferences, concerns."[74] This helps patients understand their circumstances, ask questions, and make voluntary decisions aligned with their priorities. VA's own regulations embody these principles, conditioning treatment on informed consent and requiring disclosure of the nature, benefits, risks, and alternatives to a proposed treatment. *See* 38 C.F.R. § 17.32(c). For pregnant patients, pregnancy options counseling is how those requirements are met.

### B. The 2025 Rule Deprives Veterans and Beneficiaries of Information Needed to Make Informed Decisions.

The 2025 Rule expressly excludes "abortion counseling" from the Medical Benefits Package. 38 C.F.R. § 17.38(c)(1). This necessarily removes abortion counseling from the "appropriate information" providers must disclose under VA's own informed consent requirements. *Id.* § 17.32(c). In other words, by prohibiting

---

[73] *Id.*

[74] *See* ACOG, C.S. 29, *Person-Centered Pregnancy Options Counseling*, 148 Obstetrics & Gynecology e68, e68 (2026); *see also* ACOG, C.O. 819, *supra* note 70, at e34-e36.

clinicians from discussing abortion as a medical option, the 2025 Rule withholds the very information informed consent requires. Consider a pregnant veteran with severe preeclampsia or newly diagnosed cancer requiring prompt treatment—circumstances in which, as VA has recognized, abortion may be the only intervention that can preserve the patient's life or health. *See* 2022 Rule at 55291-92. Under the 2025 Rule, clinicians cannot provide that information, and patients are forced to make consequential medical decisions without the full counsel of clinicians who know their history and options best.

These harms further burden patients with unique health needs. As VA has observed, veterans experience high rates of chronic medical and mental health conditions that can increase pregnancy-related risks. *See* 2022 Rule at 55295. ACOG likewise emphasizes that clinicians caring for service members and veterans should be knowledgeable about "family planning, including prepregnancy counseling, available fertility services, abortion options, and contraceptive methods," and attuned to conditions such as PTSD, MST, and IPV, which are "more prevalent in these populations."[75] For these patients, frank and complete counseling from a trusted clinician is especially important.

---

[75] ACOG, C.S. 12, *Health Care for Women and Gender-Diverse Active-Duty and Reserve Uniformed Service Members and Veterans*, 144 Obstetrics & Gynecology e144, e148 (Dec. 2024).

The 2025 Rule's failure to define "abortion counseling" compounds these harms. VA acknowledged one commenter's warning that, without a definition, clinicians would be uncertain what they may discuss, chilling their speech and restricting therapeutic dialogue, but declined to adopt one. *See* 2025 Rule at 61323. As a result, clinicians will be unsure whether describing the risks of continuing a high-risk pregnancy, answering a patient's direct question, or offering a referral is prohibited, and may err toward silence. Such uncertainty is "confusing and chilling to both patients and health care professionals."[76] And because informed consent requires discussion of alternatives, that uncertainty threatens it even for the life-preserving care the 2025 Rule's preamble says remains available.

### C. The 2025 Rule Departs from Accepted Medical Standards and VA's Own Findings, and Conflicts with Core Principles of Medical Ethics.

The abortion counseling ban is not grounded in medical evidence. The 2025 Rule states that "abortion counseling is not needed or medically necessary and appropriate," 2025 Rule at 61323, but cites no clinical evidence or guidance. That determination is difficult to reconcile with VA's own requirement that covered care be provided "in accord with generally accepted standards of medical practice." 38 C.F.R. § 17.38(b). It also contradicts VA's prior finding that abortion counseling is necessary for patients to make "fully informed healthcare decision[s]" and serves

[76] ACOG, C.S. 16, *supra* note 17, at e86.

three critical purposes: helping pregnant individuals decide about an unwanted pregnancy, implement that decision, and control their future fertility. 2022 Rule at 55292. The 2025 Rule abandons these findings without explanation.

The ban also conflicts with widely accepted core principles of medical ethics by undermining the patient-physician relationship, forcing clinicians to violate principles of beneficence and non-maleficence—the obligations to promote patients' well-being and avoid harm[77]—and requiring clinicians to ignore the principle of respect for patient autonomy.

First, the counseling ban undermines the patient-physician relationship, which "is essential to the provision of safe, patient-centered medical care and should be protected from unnecessary governmental intrusion."[78] That relationship depends on frank, confidential counseling grounded in the patient's best medical interests and the best available scientific evidence.[79] ACOG has thus long opposed laws and regulations requiring physicians to give or withhold specific information, warning that such mandates erode trust between patients and clinicians. Clinicians retain an ethical obligation to provide evidence-based, patient-tailored, comprehensive

[77] ACOG, C.O. 390, *supra* note 69, at 1481.

[78] ACOG, Statement of Policy, *supra* note 62.

[79] *Id.*

information sufficient for informed decision-making, and the 2025 Rule forces VA clinicians to set this obligation aside.

Second, the ban conflicts with clinicians' duties of beneficence and non-maleficence. These duties bear on nearly every treatment decision, because the benefits and risks of interventions must be weighed knowledgeably.[80] Clinicians fulfill these duties through patient-centered counseling; forcing clinicians to withhold information patients need to protect their health contravenes both.

Finally, the ban disregards respect for patient autonomy, "one of the four pillars of principle-based medical ethics," which is a foundation of informed consent: a patient, adequately informed about her condition and available therapies, freely chooses treatment or nontreatment.[81] Patients cannot meaningfully choose among options they have not been told about. By forcing clinicians to withhold information about abortion, the ban limits veterans' and their families' ability to make informed health care decisions. In short, pregnancy options counseling is a basic element of evidence-based, ethical care. The abortion counseling ban strips it from the care VA provides veterans and their families—without a medical basis and contrary to VA's own prior findings.

---

[80] ACOG, C.O. 390, *supra* note 69, at 1481-82.

[81] ACOG, C.O. 819, *supra* note 70, at e35.

## CONCLUSION

For these reasons, the Court should set aside the 2025 Rule in its entirety.

Dated: November 6, 2026

Respectfully submitted,

FENWICK & WEST LLP

By: */s/ Tyler G. Newby*

Tyler G. Newby
One Front Street, Floors 31-33
San Francisco, CA 94111
(415) 875-2300
tnewby@fenwick.com

Kara L. Grandin
Priya Kamath*
FENWICK & WEST LLP
902 Broadway, 18th Floor
New York, NY 10010
(212) 430-2600
kgrandin@fenwick.com
pkamath@fenwick.com

*Counsel for* Amici Curiae

**admission pending*

**CERTIFICATE OF SERVICE AND FILING**

I certify that I served a copy on counsel of record on November 6, 2026, by Electronic Means (by CM/ECF).

Dated: November 6, 2026

FENWICK & WEST LLP

By: */s/ Tyler G. Newby*
Tyler G. Newby

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Circuit Rule 29(b). This brief contains 6,999 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

Dated: November 6, 2026

FENWICK & WEST LLP

By: *_/s/ Tyler G. Newby_*
Tyler G. Newby

*Counsel for* Amici Curiae