No. 2026-1861

IN THE

# United States Court of Appeals

FOR THE FEDERAL CIRCUIT

MINORITY VETERANS OF AMERICA,

*Petitioner,*

—v.—

SECRETARY OF VETERANS AFFAIRS,

*Respondent.*

*PETITION FOR REVIEW PURSUANT TO 38 U.S.C. § 502*

**BRIEF OF TWENTY-EIGHT REPRODUCTIVE RIGHTS, HEALTH, AND JUSTICE ORGANIZATIONS AS AMICI CURIAE**

DEBEVOISE & PLIMPTON LLP
SHANNON ROSE SELDEN
KATHRYN C. SABA
ANNA M. RENNICH
66 Hudson Blvd. E.
New York, New York 10001
(212) 909-6000
*Counsel to Amici Curiae*

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.7, counsel to *amici curiae* certifies the following:

1. The full name of every party or *amicus curiae* represented by me is:

Center for Reproductive Rights
Power to Decide
Abortion Action Missouri
All* Above All
American Civil Liberties Union
Americans United for Separation of Church and State
Avow Texas
Catholics for Choice
Gender Justice
Guttmacher Institute
Ibis Reproductive Health
Lambda Legal Defense and Education Fund, Inc.
Lawyering Project
Legal Momentum, The Women's Legal Defense and Education Fund
Lift Louisiana
Live Free Autonomy Collective
Michigan Voices
National Abortion Federation
National Council of Jewish Women
National Health Law Program
National Network of Abortion Funds
National Partnership for Women & Families
Nurses for Sexual and Reproductive Health
Planned Parenthood Federation of America
Pregnancy Justice
Pro-Choice North Carolina
Reproductive Freedom for All

Texas Equal Access Fund

2. The name of the real party in interest represented by me is:

   Not applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the *amici curiae* represented by me are:

   Not applicable.

4. The names of all law firms and the partners or associates that appeared for the *amicus curiae* now represented by me in the trial court or agency or are expected to appear and have not already entered an appearance in this court are:

   Not applicable.

5. There are no related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a).

6. *Amici Curiae* have no information identifying organizational victims in criminal cases and debtors and trustees in bankruptcy cases as required under Fed. R. App. P. 26.1(b) and 26.1(c).

Dated: Nov. 6, 2026 /s/ *Shannon Rose Selden*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ ii

TABLE OF CONTENTS ........ iv

TABLE OF AUTHORITIES ........ v

STATEMENT OF INTEREST OF THE AMICI CURIAE ........ 1

ARGUMENT ........ 5

I. The 2025 Rule Leaves Many Veterans and Their Families Without Any Viable Access to Abortion Care. ........ 5

  A. The 2025 Rule Removes a Critical Protection Post-*Dobbs*. ........ 5

  B. The 2025 Rule Renders Care Inaccessible to Many Veterans and Their Families. ........ 8

II. By Eliminating Access to Abortion Care and Counseling Through VA, the 2025 Rule Harms Veterans' Health. ........ 9

  A. The 2025 Rule Endangers Maternal Health by Delaying Medically Necessary Care. ........ 9

  B. Abortion Bans Heighten the Harm That Can Arise from Maternal Mental Health Conditions. ........ 20

  C. Abortion Bans Leave a Disproportionate Number of People of Color and Other Marginalized Communities Without Adequate Care, Resulting in More Adverse Medical Outcomes. ........ 22

  D. The 2025 Rule's Exception for Life-Endangering Circumstances Does Not Prevent These Harms. ........ 24

III. VA's Rulemaking Underestimates Both the Immediate and Long-Term Costs of Eliminating Abortion Care. ........ 26

  A. VA's RIA Underestimates Immediate Costs. ........ 26

  B. The RIA Fails to Account for the Lasting Socioeconomic Impact on Patients Denied Abortion Care. ........ 29

CONCLUSION ........ 31

CERTIFICATE OF COMPLIANCE ........ 32

# TABLE OF AUTHORITIES

## CASES

*Adkins v. Idaho*,
No. 23-CV-14744, slip op. (Idaho Dist. Ct. Apr. 11, 2025) .......... 12

*Dobbs v. Jackson Women's Health Organization*,
597 U.S. 215 (2022) .......... 6

*Okla. Call for Reprod. Just. v. Drummond,*
526 P.3d 1123 (Okla. 2023) .......... 13

*Roe v. Wade*,
410 U.S. 113 (1973) .......... 6

## STATUTES

Fla. Stat. § 390.0111(1) .......... 28

Ga. Code Ann. § 16-12-141 .......... 28

Okla. Stat. tit. 21, § 861 .......... 13

## REGULATIONS

38 C.F.R. § 17.38 .......... 3, 6

38 C.F.R. § 17.272 .......... 3, 6

## OTHER AUTHORITIES

Advancing New Standards in Reprod. Health, *The Turnaway Study*
(last visited Oct. 15, 2026) .......... 30

Khalood Al-abri, Dawn Edge & Christopher J. Armitage, *Prevalence and Correlates of Perinatal Depression*, 58 Soc. Psychiatry & Psychiatric Epidemiology 1581 (2023) .......... 21

Am. Coll. of Obstetricians & Gynecologists, *Early Pregnancy Loss*,
132 Obstetrics & Gynecology e197 (2015) .......... 11

Am. Coll. of Obstetricians & Gynecologists, ACOG Practice Bulletin No. 222, *Gestational Hypertension and Preeclampsia*, 135 Obstetrics & Gynecology e237 (2020) ........ 10

Am. Coll. of Obstetricians & Gynecologists, Committee Statement No. 16, *Increasing Access to Abortion*, 145 Obstetrics & Gynecology e86 (2025) ........ 10

Am. Coll. of Obstetricians & Gynecologists, ACOG Clinical Consensus No. 1, *Pharmacologic Stepwise Multimodal Approach for Postpartum Pain Management*, 138 Obstetrics & Gynecology 507 (2021) ........ 10

Am. Coll. of Obstetricians & Gynecologists, *Postpartum Hemorrhage*, 130 Obstetrics & Gynecology e168 (2017) ........ 11

Am. Coll. of Obstetricians & Gynecologists, ACOG Committee Opinion No. 794, *Quantitative Blood Loss in Obstetric Hemorrhage*, 134 Obstetrics & Gynecology e150 (2019) ........ 10

Am. Coll. of Obstetricians & Gynecologists, *Understanding Ectopic Pregnancy* (last visited Oct. 28, 2026) ........ 11–12

Am. Coll. of Obstetricians & Gynecologists & Soc'y for Maternal-Fetal Med., Obstetrics Care Consensus No. 7, *Placenta Accreta Spectrum*, 132 Obstetrics & Gynecology e259 (2018) ........ 10–11

Chinmayi Aryasomayajula et al., *Impact of Limiting Reproductive Rights of Pregnant Individuals with Cancer in the United States*, 181 Gynecologic Oncology 183 (2024) ........ 20

Karen Carlson et al., *Perinatal Depression*, StatPearls (Jan. 22, 2025) ........ 21

Andreea A. Creanga et al., *Racial and Ethnic Disparities in Severe Maternal Morbidity: A Multistate Analysis, 2008-2010*, 210 Am. J. Obstetrics & Gynecology 435.e1 (2014) ........ 23

Ctr. for Reprod. Rts., *After Roe Fell Factsheet* (Sept. 29, 2026) ........ 6–7

Ctr. for Reprod. Rts., *Clients' Stories: EMTALA Complaints Against Texas Hospitals* (Jan. 27, 2026) ........ 16

Ctr. for Reprod. Rts., *Clients' Stories: EMTALA Complaints Against Texas Hospitals, Kelsie Norris-De La Cruz* (Jan. 27, 2026) ............................17

Ctr. for Reprod. Rts., *Complaint Against Oklahoma Hospital for Denying Life-Saving Abortion Care* (Oct. 30, 2026)..................................13, 26

Ctr. for Reprod. Rts., *Complaints Against Texas Hospitals for Denying Emergency Care for Ectopic Pregnancies* (May 7, 2026)...........................16, 26

Ctr. for Reprod. Rts., *Fact Sheet: Abortion Access for Veterans* (Jan. 14, 2026) ..........................................................................................22

Ctr. for Reprod. Rts., *Mothers Denied Abortions Sue State of Oklahoma* .....................................................................................................13

Ctr. for Reprod. Rts., *New Study Finds Oklahoma Hospitals Unable to Provide Clear and Accurate Information on Emergency Obstetric Care* (Apr. 25, 2023) ..........................................................................13

Ctr. for Reprod. Rts., *The Plaintiffs and Their Stories: Zurawski v. State of Texas* (Nov. 14, 2023) ......................................................14, 26

Shailja Dayal et al., *Preterm and Term Prelabor Rupture of Membranes (PPROM and PROM)*, StatPearls (Oct. 31, 2024) ..................13–14

Eugene Declercq & Laurie C. Zephyrin, *Maternal Mortality in the United States*, *2025*, Commonwealth Fund (July 2025)..................................24

Developments in the Law-Labor and Employment, Chapter Four: *The Labor and Delivery of Reproductive Justice for Workers: The Post-Dobbs Workforce*, 136 Harv. L. Rev. 1676 (2023) ...........................................31

Sharmila Devi, *Abortion Restrictions Have a Negative Impact on Cancer Care*, 25 Lancet Oncology 1408 (2024) ..............................................20

Diana Greene Foster et al., *Socioeconomic Outcomes of Women Who Receive and Women Who Are Denied Wanted Abortions in the United States*, 108 Am. J. Pub. Health 407 (2018)..........................................30

Daniel Grossman et al., Advancing New Standards in Reprod. Health, *Care Post-Roe: Documenting Cases of Poor-Quality Care Since the Dobbs Decision* (2024) .......................................................................12, 14

Moti Gulersen et al., *Racial and Ethnic Disparities in Birth Rates Following the Dobbs Decision: A Retrospective Analysis by State Abortion Policy*, 54 J. Perinatal Med. 1065 (2026) .......... 24–25

Guttmacher Inst., *Abortion in the United States* (Mar. 2026) .......... 24

Guttmacher Inst., *The Hyde Amendment: A Discriminatory Ban on Insurance Coverage of Abortion* (Sept. 2026) .......... 28

Maetal E. Haas-Kogan et al., *Associations Between State-Level Abortion Restrictions and Postpartum Depression Symptoms from a United States Nationwide Cohort*, 55 Lancet Reg'l Health - Ams., Mar. 2026 .......... 22

Stephanie V. Hall et al., *Association Between State Abortion Restrictiveness and Perinatal Depression*, 34 J. Women's Health 835 (2025) .......... 21

Barbara Hansen et al., *Disparate Risk Factors Among Pregnant Veterans Using Veterans Administration Health Benefits for Community-Based Obstetrical Care*, 189 Mil. Med. E49 (2024) .......... 18

Tristan Horrom, *Gestational Diabetes and Preeclampsia Rates Higher in Women with PTSD*, VA (Apr. 26, 2017) .......... 19

Donna L. Hoyert, *Maternal Mortality Rates in the United States, 2024*, Nat'l Ctr. for Health Stat. (2026) .......... 24

In Our Own Voice: Nat'l Black Women's Reprod. Just. Agenda, *Policy as Power: Providing a Path Toward Black Reproductive Justice* (2025) .......... 31

Cassandra Jaramillo & Kavitha Surana, *A Woman Died After Being Told It Would Be a "Crime" to Intervene in Her Miscarriage at a Texas Hospital*, ProPublica (Oct. 30, 2024) .......... 15–16

Camille Kidd, Shaina Goodman & Katherine Gallagher Robbins, *State Abortion Bans Threaten Nearly 7 Million Black Women, Exacerbate the Existing Black Maternal Mortality Crisis*, Nat'l P'ship for Women & Fams. (May 2024) .......... 25

Elizabeth Kukura, *Pregnancy Risk and Coerced Interventions after Dobbs*, 76 SMU L. Rev. 105 (2023) .......... 18

Pooja Lakshmin, *Rape, Pregnancy, and Mental Health: What the Politics Ignores*, Medscape (Sept. 16, 2019) ....................22

Sophia Landay et al., *Abortion Bans and Pregnancy-Related Care Across Physician Specialties: A Qualitative Study*, 9 JAMA Network Open, June 22, 2026 ....................25

Denys T. Lau, Jihong Liu & Marian Moser Jones, *Post-Dobbs Era: Evolving Abortion Care Restrictions and Public Health Impact*, 116 Am. J. Pub. Health 317 (2026)....................26

Maya Manian, *The Impact of Dobbs on Health Care Beyond Wanted Abortion Care*, 51 J.L. Med. & Ethics 592 (2023) ....................20

Sarah Miller, Laura R. Wherry & Diana Greene Foster, *The Economic Consequences of Being Denied an Abortion* (Nat'l Bureau of Econ. Rsch., Working Paper No. 26662, 2020) ....................30–31

Anastasia Moloney, *Why Black Women Bear Brunt of Strict U.S. Abortion Laws*, Context (Sept. 23, 2022) ....................25

Kellie Mullany et al., *Overview of Ectopic Pregnancy Diagnosis, Management, and Innovation*, J. Women's Health, Mar. 2023 ....................16

Lucy Ogbu-Nwobodo et al., *Mental Health Implications of Abortion Restrictions for Historically Marginalized Populations*, 387 New Eng. J. Med. 1613 (2022) ....................24

Sidath Viranga Panangala, Cong. Rsch. Serv., RS22483, *Health Care for Dependents and Survivors of Veterans* (2024)....................7

Sarah E. Peiffer et al., *Increase in Health Care Utilization of Texas Infants with Congenital Anomalies Following Senate Bill 8*, 288 J. Pediatrics 114283 (2026) ....................29

Petition for Review Pursuant to 38 U.S.C. § 502, *Minority Veterans of Am. v. Sec'y of Veterans Affs.*, No. 26-1861 (Fed. Cir. May 15, 2026) ....................26

Physicians for Human Rights, *Cascading Harms: How Abortion Bans Lead to Discriminatory Care Across Medical Specialties* (2025)....................4

Planned Parenthood & In Our Own Voice: Nat'l Black Women's Reprod. Just. Agenda, *Red Alert: Abortion Access is at Stake for Nearly Half of U.S. Women and People Who Can Become Pregnant* (Oct. 1, 2021) ....................24

Lizzie Presser et al., *Texas Banned Abortion. Then Sepsis Rates Soared*, ProPublica (Feb. 20, 2025) ....................17

Verity Ramirez et al., *Antiabortion Laws and Implications for Patients With Cardiovascular Disease in Pregnancy*, 7 JAMA Cardiology 781 (2022) ....................18

Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215 (2012) ....................10

Reproductive Health Services, 87 Fed. Reg. 55,287 (Sept. 9, 2022) ..6–7, 11, 18, 22

Reproductive Health Services, 90 Fed. Reg. 61,310 (Dec. 31, 2025).......3, 6, 29–30

Maria I. Rodriguez et al., *Management of Spontaneous Abortion Among Commercially Insured Individuals in the United States After Dobbs v Jackson*, 336 JAMA 48 (2026) ....................17

Erika L. Sabbath et al., *US Obstetrician-Gynecologists' Perceived Impacts of Post–Dobbs v Jackson State Abortion Bans*, 7 JAMA Network Open, Jan. 2024 ....................12, 25

Selena Simmons-Duffin, *Her miscarriage left her bleeding profusely. An Ohio ER sent her home to wait*, NPR (Nov. 15, 2022) ....................15

Soc'y for Maternal-Fetal Med. et al., *Society for Maternal-Fetal Medicine Consult Series #71: Management of Previable and Periviable Preterm Prelabor Rupture of Membranes*, 231 Am. J. Obstetrics & Gynecology B2 (2024) ....................11, 14

Maria W. Steenland et al., *Pregnancy- and Abortion-Related Mortality in the US, 2018-2021*, 9 JAMA Network Open, Jan. 2026 ....................10

Kavitha Surana et al., *A "Striking" Trend: After Texas Banned Abortion, More Women Nearly Bled to Death During Miscarriage*, ProPublica (July 1, 2025) ....................17

Kavitha Surana, *She Faced a Life-Threatening Miscarriage. Under Arkansas' Abortion Ban, Even Calls to the Governor's Office Didn't Help*, ProPublica (May 26, 2026) .......... 16

Jared S. Sussman, Cong. Rsch. Serv., R47191, *Department of Veterans Affairs: Abortion Policy* (2023) .......... 6–7

Kelly M. Treder, Ndidiamaka Amutah-Onukagha & Katharine O. White, *Abortion Bans Will Exacerbate Already Severe Racial Inequities in Maternal Mortality*, 33 Women's Health Issues 328 (2023) .......... 23–24

Ushma D. Upadhyay et al., *Denial of Abortion Because of Provider Gestational Age Limits in the United States*, 104 Am. J. Pub. Health 1687 (2014) .......... 9

Ushma D. Upadhyay et al., *State Abortion Policies and Medicaid Coverage of Abortion are Associated with Pregnancy Outcomes Among Individuals Seeking Abortion Recruited Using Google Ads: A National Cohort Study*, 274 Soc. Sci. & Med., Apr. 2021 .......... 8, 28

VA, *Congressionally Mandated Report: Locations Where Women Veterans Are Using Health Care from the Department of Veterans Affairs* (2026) .......... 7

VA, *How Common is PTSD in Veterans?* (last updated Sept. 25, 2026) .......... 19

VA, *Mental Health Conditions Among VHA Patients* (2024) .......... 22

VA, *More Than 50,000 Women Veterans Enrolled in VA Health Care Over Past 365 Days, Marking the Largest Enrollment Year Ever for Women Veterans* (June 12, 2024) .......... 7

VA, *Office of Women's Health Annual Report* (May 13, 2026) .......... 6

VA, Regulatory Impact Analysis of RIN 2900-AS31(P) (2025) .......... 27–29

VA, *Table 6L: VetPop2023 Living Veterans by State, Age Group, Sex, 2023-2053* (last visited Oct. 27, 2026) .......... 28

VA Chief Strategy Off., *2025 Survey of Veteran Enrollees' Health and Use of Health Care* (June 2026) .......... 2, 6

Tracy A. Weitz & Malcolm Wilson Schwartz, *Later Abortion Care Availability, Quoted Self-Pay Prices, and State Medicaid Acceptance*, 9 JAMA Network Open, June 2026 ..........8, 29

Women Veterans Health Care, VA, *Facts and Statistics* (last visited Nov. 3, 2026)..........23

Liana R. Woskie et al., *Obstetric-Related Emergency Medical Treatment and Labor Act Violations and No Health Exception Bans*, JAMA Health Forum (Dec. 5, 2025) ..........26

Robert W.C. Young et al., *Supporting the PACT Act: Top cancers diagnosed in young veterans who deployed to Iraq and Afghanistan*, 2 Surgical Oncology Insight (Dec. 2025)..........20

## STATEMENT OF INTEREST OF THE AMICI CURIAE[1]

*Amici* are twenty-eight organizations committed to supporting autonomy, independent decision-making, respectful treatment, and access to quality reproductive healthcare for all. *Amici* work on behalf of individuals seeking access to care and/or work to advance the legal rights that protect and expand access to and decisions about quality reproductive healthcare. *Amici* have seen the importance of abortion access to individuals' health and bodily autonomy, and respectfully submit that their perspectives and experiences, and the stories of individuals they share here, illuminate the immense harm caused by abortion bans and may assist the Court. A full list of *amici* signatories appears in the Certificate of Interest.

## SUMMARY OF ARGUMENT

The Department of Veterans Affairs' ("VA") December 31, 2025 final rule (the "2025 Rule") jeopardizes the public health of the veteran community by removing essential forms of reproductive care—abortion counseling and access to nearly all abortion care—from the benefits offered to veterans and their families.

---

[1] *Amici Curiae* file this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure. All parties to the appeal have consented to the filing of this brief. No party's counsel authored this brief in any part. Neither party contributed financial support intended to fund the preparation or submission of this brief. No other individual(s) or organization(s) contributed financial support intended to fund the preparation or submission of this brief.

As Petitioner explains, through the Veterans Health Administration ("VHA"), VA provides "a complete medical and hospital service" for veterans and is the largest integrated healthcare system in the country. VA serves millions of veterans each year, across all fifty states. The services VA provides to veterans are called the "Medical Benefits Package," and comprise a wide range of basic and preventive care; inpatient and outpatient medical, surgical, and mental healthcare; prescription drugs; emergency care; and periodic medical exams. VA also offers insurance coverage to spouses and dependents of veterans who meet eligibility criteria through the Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA").

VA healthcare is an essential benefit for veterans and their dependents, who rely on it for cost-effective and accessible care of all kinds—including reproductive care. Of the veterans and dependents who rely on VA for comprehensive medical care, hundreds of thousands are women of reproductive age.[2] Beginning in 2022, those women and girls[3] could rely on VHA and

---

[2] VA Chief Strategy Off., *2025 Survey of Veteran Enrollees' Health and Use of Health Care* 19 § 2.1.2, fig. 2-2 (June 2026), https://department.va.gov/vha/wp-content/uploads/sites/65/2026/07/2025-Survey-of-Veteran-Enrollees-Findings-Report_Final_.pdf (finding that 11% of veteran enrollees are women, 37% of whom are of reproductive age).

[3] Although this brief sometimes refers to "women's" reproductive healthcare, *amici* recognize that individuals who do not identify as women, including

CHAMPVA for abortion care and counseling. The 2025 Rule changed that. It has eliminated an essential form of reproductive care, subject only to a narrow and unworkable exception for cases in which continuing the pregnancy would endanger a patient's life.[4]

VA is far from the first government entity to institute broad restrictions on abortion care. Twenty states drastically limit abortion care, banning it fully or early in pregnancy, with unworkable and inadequate exceptions. Yet very few of those states have gone as far as VA in limiting exceptions only to cases where a woman's life is in danger. Through their experience working with women and providers under draconian state laws, *amici* have seen that abortion bans have devastating consequences for women's health. Abortion bans prevent providers from offering essential, medically necessary treatment—even in dire health circumstances. Under abortion bans resembling the 2025 Rule, patients have died because they were unable to receive timely care. Others have suffered serious trauma, lasting harm, and preventable health complications because their care was delayed due to state abortion bans that prevent treatment until a patient's life is

---

transgender men and non-binary persons, also may become pregnant and are equally in need of adequate reproductive care.

[4] Reproductive Health Services, 90 Fed. Reg. 61,310, 61,311 (Dec. 31, 2025) (codified at 38 C.F.R. §§ 17.38, 17.272); 38 C.F.R. § 17.272(a)(58) (2026).

endangered. Evidence shows that abortion bans impact physical and mental health and undermine the economic security and well-being of mothers and their families.

The dire consequences of abortion bans are even worse for the population that the 2025 Rule most directly affects: veterans, who are at a higher risk of many conditions that can make pregnancy particularly complicated or dangerous. Compounding this concern, the veteran community includes many Black and Indigenous women, who are at greater risk of pregnancy-related complications and death when compared to non-Hispanic white women, as well as people living in medically underserved communities, whose health suffers demonstrably more when care is denied or delayed.[5]

The perilous consequences of state abortion bans are both a harbinger of the harms the 2025 Rule will continue to inflict if this Court does not take prompt action and a reason why the 2025 Rule is so dangerous: for many women in the veteran community who live in states with bans, VA provided their only viable option for abortion care and counseling. As reproductive rights organizations that have tracked the intersection of law and reproductive health over decades, with the central goal of ensuring access to safe, essential reproductive care for those who

---

[5] *See* Physicians for Human Rights, *Cascading Harms: How Abortion Bans Lead to Discriminatory Care Across Medical Specialties* 22 (2025) https://phr.org/wp-content/uploads/2025/09/Cascading-Harms-Research-Brief_PHR_September-2025.pdf.

need it, *amici* are deeply concerned for the many patients who depend on VA for healthcare and who have lost a critical component of reproductive care under the 2025 Rule.

Access to safe abortion care is essential to the physical, mental, and socioeconomic health of women and their families. As further explained below, because VA has failed to account for the ways in which denying care through the 2025 Rule endangers the lives and health of veterans and their dependents, deepens existing inequities, and both immediate pregnancy-related and long-term socioeconomic costs, *amici* respectfully urge this Court to grant Petitioner's request for review.

## ARGUMENT

### I. The 2025 Rule Leaves Many Veterans and Their Families Without Any Viable Access to Abortion Care.

#### A. The 2025 Rule Removes a Critical Protection Post-*Dobbs*.

VA is the main healthcare provider for millions of veterans and their families, including hundreds of thousands of women and girls who may require

abortion care. Women are a growing share of veterans and VHA enrollees,[6] and a substantial percentage of those enrollees are of reproductive age.[7]

Although VA has not always provided access to abortion care, it became an essential resource for comprehensive reproductive care for veterans and their families after the U.S. Supreme Court overruled *Roe v. Wade,* 410 U.S. 113 (1973), in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), leaving women vulnerable to the patchwork of abortion bans and restrictions that states swiftly enacted in the absence of nationwide constitutional protections. Twenty states ban or severely restrict provision of abortion care post-*Dobbs*.[8] In 2022, VA recognized that state bans on abortion care "creat[e] urgent risks to the lives and health of pregnant veterans."[9] VA responded with the 2022 Rule,

---

6 VA, *Office of Women's Health Annual Report* 8–9 (May 13, 2026), https://www.govinfo.gov/app/details/CMR-VA1-00201571 (reporting that in 2024 women represented 13% of veterans, projected to increase to 22% by 2048).

7 VA Chief Strategy Off., *supra* note 2, at fig. 2-2.

8 This brief uses "abortion ban" for simplicity, to refer to the various state laws severely restricting the provision of abortion care. *See After Roe Fell Factsheet*, Ctr. for Reprod. Rts., https://reproductiverights.org/wp-content/uploads/2026/09/September-2026-After-Roe-Fell-Factsheet.pdf (last updated Sept. 29, 2026).

9 *See* Reproductive Health Services, 87 Fed. Reg. 55,287, 55,288 (Sept. 9, 2022) (to be codified at 38 C.F.R. §§ 17.38, 17.272), *rescinded by* 90 Fed. Reg. 61,310 (Dec. 31, 2025); *see also* Jared S. Sussman, Cong. Rsch. Serv., R47191, *Department of Veterans Affairs: Abortion Policy* 2 (2023), https://www.congress.gov/crs-product/R47191#fn14.

guaranteeing VHA users access to abortion counseling and abortion care when a pregnancy endangered the patient's life or health, or resulted from rape or incest.[10] In doing so, VA played a critical role in ensuring that veterans and their families would have at least some options for care wherever they lived, including in states with highly restrictive laws.

Today, many of the women and girls who depend on VA for reproductive care live in states where abortion bans or restrictions essentially eliminate other sources of abortion care. VA data indicates that 50% of women veterans enrolled in VHA healthcare and 54% of CHAMPVA beneficiaries live in the twenty states that ban or heavily restrict abortion.[11] VHA enrollment has surged in Texas, Florida, Georgia, and North Carolina, which have highly restrictive laws.[12] In these states and others, VA used to provide access to critical abortion care that enrollees could not access elsewhere.

---

[10] *See* 87 Fed. Reg. at 55,288.

[11] VA, *Congressionally Mandated Report: Locations Where Women Veterans Are Using Health Care from the Department of Veterans Affairs* 5 (2026), https://www.govinfo.gov/content/pkg/CMR-VA1-00201622/pdf/CMR-VA1-00201622.pdf; Sidath Viranga Panangala, Cong. Rsch. Serv., RS22483, *Health Care for Dependents and Survivors of Veterans* 13-14 tbl. B-1 (2024); *After Roe Fell Factsheet*, *supra* note 8.

[12] *See* VA, *More Than 50,000 Women Veterans Enrolled in VA Health Care Over Past 365 Days, Marking the Largest Enrollment Year Ever for Women Veterans* (June 12, 2024, at 14:00 ET), https://news.va.gov/pressroom/50k-women-veterans-enrolled-in-va-healthcare-over-past-365-day/.

### B. The 2025 Rule Renders Care Inaccessible to Many Veterans and Their Families.

VA enrollees forced to seek abortion care outside the system face severe barriers, as alternatives are prohibitively expensive and difficult to access. Many patients cannot afford the procedure on their own,[13] and may struggle to navigate the private healthcare system and find a provider other than their trusted VA physician. Those barriers are even greater for veterans and families who live in one of the twenty states with severe restrictions or bans, where alternative sources of care are limited or absent. The need for abortion care is time-sensitive; as barriers and delays compound throughout the course of a pregnancy, options narrow, finding a provider becomes more difficult, and costs increase.[14] Women in restrictive states who seek abortion care often must travel out of state to reach a provider; for those who can travel, the cost and burden of travel, lodging, missed work, and childcare can mean care comes too late.[15]

---

[13] Ushma D. Upadhyay et al., *State Abortion Policies and Medicaid Coverage of Abortion are Associated with Pregnancy Outcomes Among Individuals Seeking Abortion Recruited Using Google Ads: A National Cohort Study*, 274 Soc. Sci. & Med., Apr. 2021, at 2, https://perma.cc/L3ZH-ZARU.

[14] *See* Tracy A. Weitz & Malcolm Wilson Schwartz, *Later Abortion Care Availability, Quoted Self-Pay Prices, and State Medicaid Acceptance*, 9 JAMA Network Open, June 2026, at 6 (finding median prices for an abortion were $3,000 at 23 weeks and $17,250 at 33 weeks).

[15] Ushma D. Upadhyay et al., *Denial of Abortion Because of Provider Gestational Age Limits in the United States*, 104 Am. J. Pub. Health 1687, 1689

## II. By Eliminating Access to Abortion Care and Counseling Through VA, the 2025 Rule Harms Veterans' Health.

### A. The 2025 Rule Endangers Maternal Health by Delaying Medically Necessary Care.

By depriving the many women who depended on VA of abortion care and counseling, the 2025 Rule harms women's health. In *amici*'s extensive experience, abortion bans with unworkable and inadequate exceptions like the 2025 Rule harm women's health by (i) depriving women of safe and essential reproductive care, which includes abortion; (ii) causing treatment to be delayed or denied throughout pregnancy, including for complications and preexisting conditions; and (iii) preventing timely and medically appropriate treatment for urgent medical conditions, such as cancer, that cannot safely be treated during pregnancy.

#### 1. The 2025 Rule Prevents Women from Receiving Complete and Essential Reproductive Care Through VA.

In eliminating abortion care, VA deprives veterans of an essential component of reproductive healthcare that protects the physical and mental health of women in a host of ways. Abortion is extremely safe—far safer than continuing a pregnancy.[16] The overall risk of complications is low and "far outpaced by

---

(2014) (finding that 85.4% of women turned away due to gestational limits did not go to another clinic due to procedure and travel costs).

[16] Am. Coll. of Obstetricians & Gynecologists, Committee Statement No. 16, *Increasing Access to Abortion*, 145 Obstetrics & Gynecology e86, e89 (2025).

comparable complication rates of childbirth for every complication type."[17] In fact, women are at least ***44.3 times*** more likely to die of complications from pregnancy than from abortion.[18] During pregnancy and childbirth, women are at an increased risk of hemorrhage, infection, and injury to other organs.[19] Pregnancy and childbirth cause significant physiological changes that can exacerbate underlying conditions and severely compromise health.[20] These conditions can quickly worsen and evolve into dangerous situations requiring critical care—care that includes abortion. The 2025 Rule denies women this safe, effective, and medically appropriate care through VHA and CHAMPVA.

---

[17] *Id.*

[18] Maria W. Steenland et al., *Pregnancy- and Abortion-Related Mortality in the US, 2018-2021*, 9 JAMA Network Open, Jan. 2026, at 1, 4-5.

[19] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 216–17 (2012).

[20] *See, e.g.*, Am. Coll. of Obstetricians & Gynecologists, ACOG Clinical Consensus No. 1, *Pharmacologic Stepwise Multimodal Approach for Postpartum Pain Management*, 138 Obstetrics & Gynecology 507, 509 (2021); Am. Coll. of Obstetricians & Gynecologists, ACOG Practice Bulletin No. 222, *Gestational Hypertension and Preeclampsia*, 135 Obstetrics & Gynecology e237, e237–e242 (2020); Am. Coll. of Obstetricians & Gynecologists, ACOG Committee Opinion No. 794, *Quantitative Blood Loss in Obstetric Hemorrhage*, 134 Obstetrics & Gynecology e150, e151, e154 (2019); Am. Coll. of Obstetricians & Gynecologists & Soc'y for Maternal-Fetal Med., Obstetrics Care Consensus No. 7, *Placenta Accreta Spectrum*, 132 Obstetrics & Gynecology e259, e259–260 (2018).

### 2. The 2025 Rule Causes Delays in and Denial of Treatment for Pregnancy Complications.

*Amici* are concerned that the 2025 Rule fails to take pregnancy complications and treatment adequately into account. Pregnancy can expose patients to complications that may become life-threatening, including preterm premature rupture of membranes ("PPROM"), second-trimester hemorrhage, molar pregnancy, and ectopic pregnancy.[21] Abortion is often the standard of care for such complications. Yet, the 2025 Rule fails to adequately consider the need for treatment, or that delaying or denying treatment can turn a pregnancy complication

[21] *See* Reproductive Health Services, 87 Fed. Reg. 55,287, 55,291 (Sept. 9, 2022) (to be codified at 38 C.F.R. § 17); *see also* Soc'y for Maternal-Fetal Med. et al., *Society for Maternal-Fetal Medicine Consult Series #71: Management of Previable and Periviable Preterm Prelabor Rupture of Membranes*, 231 Am. J. Obstetrics & Gynecology B2, B2–B3 (2024) (identifying substantial morbidity and mortality risk from PPROM and noting treatment difficulties post-*Dobbs*); Am. Coll. of Obstetricians & Gynecologists, *Postpartum Hemorrhage*, 130 Obstetrics & Gynecology e168, e169 (2017) (identifying severe morbidity and mortality risk of obstetric hemorrhage); Am. Coll. of Obstetricians & Gynecologists, *Early Pregnancy Loss*, 132 Obstetrics & Gynecology e197, e201 (2015) (recommending urgent surgical evacuation for miscarriage accompanied by hemorrhage, hemodynamic instability, or infection); *Understanding Ectopic Pregnancy*, Am. Coll. of Obstetricians & Gynecologists, https://www.acog.org/advocacy/facts-are-important/understanding-ectopic-pregnancy/ (last visited Oct. 28, 2026) (explaining that ectopic pregnancy can become life-threatening, and that abortion bans can delay or prevent treatment).

into a life-threatening emergency that causes physical trauma and lasting mental health harm, ***if the patient's life can even be saved***.[22]

Prohibitions on abortion care, even with life endangerment exceptions, prevent patients from receiving necessary and timely treatment for pregnancy complications.[23] Instead, patients are forced to wait—often through excruciating conditions. Even patients with "significant bleeding or evidence of inevitable pregnancy loss in the second trimester, who would have been offered a timely abortion prior to *Dobbs*," are now made to wait until there is no fetal cardiac activity.[24] For example, in Oklahoma, multiple abortion bans with conflicting exceptions have deterred providers from treating patients facing medical emergencies.[25] One patient in the state was refused an abortion by two separate

---

[22] *See generally Adkins v. Idaho*, No. 23-CV-14744 slip op. at 8-12 (Idaho Dist. Ct. Apr. 11, 2025).

[23] Erika L. Sabbath et al., *US Obstetrician-Gynecologists' Perceived Impacts of Post–Dobbs v Jackson State Abortion Bans*, 7 JAMA Network Open, Jan. 2024, at 3, https://doi.org/10.1001/jamanetworkopen.2023.52109.

[24] Daniel Grossman et al., Advancing New Standards in Reprod. Health, *Care Post-Roe: Documenting Cases of Poor-Quality Care Since the Dobbs Decision* 7–8 (2024), https://www.ansirh.org/sites/default/files/2026-04/COMPLIANT_ANSIRH%20Care%20Post-Roe%20Report%209.04.24_FINAL%20EMBARGOED_0.pdf.

[25] Oklahoma's pre-*Roe* ban, Okla. Stat. tit. 21, § 861, criminalizes abortion unless "necessary to preserve [the woman's] life." The Oklahoma Supreme Court has held that the state constitution protects a right to abortion when a medical condition will endanger the patient's life at any point in pregnancy. *Okla. Call for Reprod. Just. v. Drummond*, 526 P.3d 1123, 1130 (Okla. 2023). Still,

hospitals after she was diagnosed with a partial molar pregnancy, a ***nonviable*** and potentially cancerous condition that can cause severe bleeding, preeclampsia, and death. At the second hospital, staff informed the patient that they could not treat her unless her condition worsened; they advised her to "wait in the parking lot" until she "crashed" or her blood pressure rose so high that she was "about to have a heart attack."[26]

Second-trimester PPROM—a pregnancy complication that can lead to infections (including sepsis), placental abruption, hemorrhage, and in some cases death[27]—may also require abortion care. In states where abortion remains protected by law, women experiencing PPROM are offered immediate termination of pregnancy.[28] Where the law restricts abortion care as the 2025 Rule does,

---

hospitals' unclear policies on when they will offer abortion care show that exceptions are not protecting access in Oklahoma. *See* Ctr. for Reprod. Rts., *New Study Finds Oklahoma Hospitals Unable to Provide Clear and Accurate Information on Emergency Obstetric Care* (Apr. 25, 2023), https://reproductiverights.org/news/oklahoma-hospitals-abortion-study/; *see also* Ctr. for Reprod. Rts., *Mothers Denied Abortions Sue State of Oklahoma*.

[26] Ctr. for Reprod. Rts., *Complaint Against Oklahoma Hospital for Denying Life-Saving Abortion Care*, (last updated Oct. 30, 2026).

[27] Shailja Dayal et al., *Preterm and Term Prelabor Rupture of Membranes (PPROM and PROM)*, StatPearls, https://www.ncbi.nlm.nih.gov/books/NBK532888/ (last updated Oct. 31, 2024).

[28] Soc'y for Maternal-Fetal Med. et al., *supra* note 21, at B5.

however, patients with PPROM are left untreated. Providers in ban states report sending patients home even "after rupture of membranes was confirmed," and telling them "to return when labor started or when they experienced signs of infection,"[29] at which point the patient's condition may have deteriorated from a serious but manageable complication into a life-threatening emergency. One physician described a case of a patient who had ruptured membranes at sixteen to eighteen weeks' gestation but was denied an abortion because of a newly effective ban. She was sent home and developed a severe infection requiring management in the intensive care unit.[30] The patient experienced a miscarriage and required a procedure to remove her placenta;[31] she endured an extended ordeal of infection, surgery, and blood loss that could have been avoided but for her state's abortion ban.

Medically indicated treatment for miscarriage also has been increasingly denied or delayed where abortion care is banned. In Ohio, a patient reported bleeding profusely for hours and had ultrasounds showing that her fetus had no

---

[29] Grossman et al., *supra* note 24, at 7; *see also* Ctr. for Reprod. Rts., *The Plaintiffs and Their Stories: Zurawski v. State of Texas*, https://reproductiverights.org/news/zurawski-v-texas-plaintiffs-stories-remarks/ (Nov. 14, 2023).

[30] Grossman et al., *supra* note 24, at 7.

[31] *Id.*

cardiac activity. She was nevertheless sent home, where she lost consciousness and received treatment after being rushed to the emergency room in an ambulance.[32] Another patient in Texas was denied timely care even when her miscarriage was diagnosed as "inevitable" because her medical team stated they had to "wait until there was no heartbeat" before intervening.[33] For approximately forty hours, doctors waited while her cervix remained open and her uterus was exposed to bacteria. Once healthcare providers no longer detected fetal cardiac activity, they induced delivery. But the delay had already allowed infection to take hold: the patient developed sepsis and died three days later.[34]

Treatment in Texas for ectopic pregnancy—the leading cause of first-trimester maternal mortality nationwide, accounting for up to 10% of all

---

[32] Selena Simmons-Duffin, *Her miscarriage left her bleeding profusely. An Ohio ER sent her home to wait*, NPR (Nov. 15, 2022), https://www.npr.org/sections/health-shots/2022/11/15/1135882310/miscarriage-hemorrhage-abortion-law-ohio.

[33] Cassandra Jaramillo & Kavitha Surana, *A Woman Died After Being Told It Would Be a "Crime" to Intervene in Her Miscarriage at a Texas Hospital*, ProPublica (Oct. 30, 2024), https://www.propublica.org/article/josseli-barnica-death-miscarriage-texas-abortion-ban.

[34] *Id.*; *see also* Kavitha Surana, *She Faced a Life-Threatening Miscarriage. Under Arkansas' Abortion Ban, Even Calls to the Governor's Office Didn't Help*, ProPublica (May 26, 2026), https://www.propublica.org/article/arkansas-abortion-ban-miscarriage-care.

pregnancy-related deaths[35]—is yet another example of the dangers of bans like the 2025 Rule. Even though Texas expressly permits removal or treatment of ectopic pregnancy (which is not classified as an "abortion"), its abortion bans have chilled physicians' willingness to provide even this permitted form of emergency care.[36] In one case, a patient sought emergency care after weeks of worsening pain and bleeding, and hospital staff documented signs of ectopic pregnancy.[37] Yet, two on-call OB-GYNs attempted to discharge her untreated. By the time another physician operated, most of one fallopian tube had to be removed, compromising her future fertility.[38]

The data is striking. After Texas's 2021 six-week ban on care took effect, "[t]he rate of sepsis shot up more than 50% for women hospitalized when they lost

---

35 Kellie Mullany et al., *Overview of Ectopic Pregnancy Diagnosis, Management, and Innovation*, J. Women's Health, Mar. 2023, at 1.

36 Ctr. for Reprod. Rts., *Complaints Against Texas Hospitals for Denying Emergency Care for Ectopic Pregnancies*, https://reproductiverights.org/cases/texas-emtala-complaints/ (last updated May 7, 2026).

37 Ctr. for Reprod. Rts., *Clients' Stories: EMTALA Complaints Against Texas Hospitals*, https://reproductiverights.org/cases/texas-emtala-complaints/ (last updated Jan. 27, 2026).

38 Ctr. for Reprod. Rts., *Clients' Stories: EMTALA Complaints Against Texas Hospitals, Kelsie Norris-De La Cruz*, https://reproductiverights.org/cases/texas-emtala-complaints/complainants-stories/ (last updated Jan. 27, 2026).

their pregnancies in the second trimester."[39] The number of blood transfusions during emergency room visits for first-trimester miscarriage also increased by 54%, reflecting people being unnecessarily delayed or denied miscarriage care.[40] While it is too early for equivalent data on the 2025 Rule, the evidence shows that patients suffer catastrophic harms from pregnancy complications when abortion care is banned except in life-endangering situations.

#### 3. Abortion Bans Delay Necessary Treatment for Patients Whose Preexisting Conditions Make Pregnancy Dangerous, a Particular Danger for Veterans.

The population directly affected by the 2025 Rule—veterans and their families—is particularly vulnerable to the dangers that abortion bans can pose. Veterans have higher rates of the preexisting conditions that make pregnancy more dangerous,[41] including cardiovascular disease, severe hypertension, chronic renal

---

[39] Lizzie Presser et al., *Texas Banned Abortion. Then Sepsis Rates Soared*, ProPublica (Feb. 20, 2025), https://www.propublica.org/article/texas-abortion-ban-sepsis-maternal-mortality-analysis.

[40] Maria I. Rodriguez et al., *Management of Spontaneous Abortion Among Commercially Insured Individuals in the United States After Dobbs v Jackson*, 336 JAMA 48, 49 (2026) ("Blood transfusions among patients hospitalized for pregnancy loss in Texas increased 15% above expected levels after the total abortion ban."); Kavitha Surana et al., *A "Striking" Trend: After Texas Banned Abortion, More Women Nearly Bled to Death During Miscarriage*, ProPublica (July 1, 2025), https://www.propublica.org/article/texas-abortion-ban-miscarriage-blood-transfusions.

[41] 87 Fed. Reg. at 55,291 ("Pregnancy poses significant physiological changes on an individual's body, which can exacerbate underlying or preexisting

disease, autoimmune disease, and neurological disorders.[42] For patients with these conditions, pregnancy can both worsen the existing illness and cause new ones[43]—and veterans experience these conditions at higher rates than civilians. For example, veterans have higher rates of post-traumatic stress disorder ("PTSD"),[44] which VA's Office of Research and Development has reported may be a risk factor for gestational diabetes and preeclampsia, common pregnancy complications that can seriously harm the parent and child if untreated.[45] Veterans also experience greater rates of severe hypertension and cardiovascular disease, conditions that

---

conditions, like renal or cardiac disease, and can severely compromise health or even cause death."); Barbara Hansen et al., *Disparate Risk Factors Among Pregnant Veterans Using Veterans Administration Health Benefits for Community-Based Obstetrical Care*, 189 Mil. Med. E49, E51 (2024).

[42] Elizabeth Kukura, *Pregnancy Risk and Coerced Interventions after Dobbs*, 76 SMU L. Rev. 105, 110 (2023), https://scholar.smu.edu/cgi/viewcontent.cgi?article=4954&context=smulr.

[43] *See id.* at 111; *see also* Verity Ramirez et al., *Antiabortion Laws and Implications for Patients With Cardiovascular Disease in Pregnancy*, 7 JAMA Cardiology 781, 781 (2022) (noting that for patients with cardiovascular disease, pregnancy can exacerbate preexisting conditions including cardiomyopathies and arrhythmias, or lead to acquired conditions, including peripartum cardiomyopathy, and that in "peripartum cardiomyopathy with recovered ejection fraction, there is a 20% chance of recurrent heart failure with subsequent pregnancies.").

[44] VA, *How Common is PTSD in Veterans?* (last updated Sept. 25, 2026), https://www.ptsd.va.gov/understand/common/common_veterans.asp.

[45] Tristan Horrom, *Gestational Diabetes and Preeclampsia Rates Higher in Women with PTSD*, VA (Apr. 26, 2017), https://www.research.va.gov/currents/0417-pregnancy.cfm.

increase maternal health risks—including risk of death—during pregnancy. For patients with these conditions who would seek termination to avoid worsening harms, the 2025 Rule's narrow life-endangerment exception offers no protection until their condition becomes life-threatening.

#### 4. Abortion Bans Prevent Treatment for Serious Non-Obstetric Conditions.

Veterans and their families may be particularly vulnerable to yet another risk of abortion bans—the inability to treat conditions unrelated to pregnancy, because doing so requires terminating a pregnancy or would endanger the pregnancy and run afoul of the legal prohibition. Pregnant women may face myriad other health complications, from car accidents to cancer, that can require immediate treatment that is incompatible with a healthy pregnancy. In states with bans that lack meaningful health exceptions, life- and health-preserving treatment is often delayed—depriving women of medically indicated, life-saving care that would otherwise be available.[46] For example, one in three oncology fellows believes abortion restrictions negatively impact cancer care, including by creating treatment delays.[47] Bans can prevent initiating treatment required to treat leukemia, which

---

[46] *See* Maya Manian, *The Impact of Dobbs on Health Care Beyond Wanted Abortion Care*, 51 J.L. Med. & Ethics 592, 595 (2023).

[47] Sharmila Devi, *Abortion Restrictions Have a Negative Impact on Cancer Care*, 25 Lancet Oncology 1408, 1408 (2024).

must begin promptly to be effective,[48] and can impede treatment for autoimmune and rheumatic diseases where the drugs involved can harm or terminate a pregnancy.[49] To the extent members of the veteran community suffer from non-pregnancy conditions that may require such treatment,[50] under the 2025 Rule, they are unable to discuss their options with VA medical providers or access the care they need.

### B. Abortion Bans Heighten the Harm That Can Arise from Maternal Mental Health Conditions.

The veteran community affected by the 2025 Rule is also likely to suffer from the known dangers to mental health that abortion bans and restrictions inflict. Mental health conditions are known consequences of pregnancy and childbirth, and are known to be worse when abortion care is banned and unavailable. Pregnancy and childbirth are risk factors for adverse mental health outcomes, including

[48] *See* Manian, *supra* note 46, at 595; *see also* Chinmayi Aryasomayajula et al., *Impact of Limiting Reproductive Rights of Pregnant Individuals with Cancer in the United States*, 181 Gynecologic Oncology 183, 184 (2024) (noting that every month in delay can increase the risk of maternal death by up to 13%).

[49] Manian, *supra* note 46, at 597.

[50] For example, young women veterans deployed to Iraq or Afghanistan experienced higher-than-typical rates of leukemia. Robert W.C. Young et al., *Supporting the PACT Act: Top cancers diagnosed in young veterans who deployed to Iraq and Afghanistan*, 2 Surgical Oncology Insight, (Dec. 2025) at tbl. 3, https://www.surgoncinsight.org/article/S2950-2470(25)00084-2/fulltext.

depression and anxiety.[51] Further, pregnant women in states with highly restrictive abortion laws have greater odds of experiencing perinatal depression than women in states with less restrictive abortion policies.[52] Veterans also have high rates of preexisting mental health conditions, such as PTSD, which pregnancy can exacerbate.[53] These harms are demonstrably worse when the pregnancy results from rape or incest,[54] and manifest more severely when women are forced to carry

---

51 *See* Karen Carlson et al., *Perinatal Depression*, StatPearls (Jan. 22, 2025), https://www.ncbi.nlm.nih.gov/books/NBK519070/ ("Perinatal depression is a prevalent and potentially severe mood disorder that affects approximately 1 in 7 people during pregnancy or within the first year after childbirth."); Khalood Al-abri, Dawn Edge & Christopher J. Armitage, *Prevalence and Correlates of Perinatal Depressio*n, 58 Soc. Psychiatry & Psychiatric Epidemiology 1581, 1581, 1586 (2023) (reporting mean global prevalence estimates of perinatal depression, antenatal depression, and postnatal depression as 26.3%, 28.5%, and 27.6%, respectively).

52 *See* Stephanie V. Hall et al., *Association Between State Abortion Restrictiveness and Perinatal Depression*, 34 J. Women's Health 835, 837–838 (2025).

53 87 Fed. Reg. 55,287, 55,291 (Sept. 9, 2022) (to be codified at 38 C.F.R. § 17) ("Veterans of reproductive age, in particular, have high rates of chronic medical and mental health conditions that may increase the risks associated with pregnancy."). *See also* Ctr. for Reprod. Rts., *Fact Sheet: Abortion Access for Veterans* (Jan. 14, 2026), https://reproductiverights.org/resources/fact-sheet-abortion-access-for-veterans/ ("Many veterans also experience severe post-traumatic stress disorder (PTSD), which can be exacerbated by pregnancy and may require abortion care to preserve the health or life of the veteran."); VA, *Mental Health Conditions Among VHA Patients* 1 (2024), https://www.mentalhealth.va.gov/suicide_prevention/docs/FSTP-Mental-Health-Conditions-Among-VHA-Patients.pdf.

54 *See* Pooja Lakshmin, *Rape, Pregnancy, and Mental Health: What the Politics Ignores*, Medscape (Sept. 16, 2019),

unintended or unwanted pregnancies to term.[55] Depriving members of the veteran community of abortion care and counseling, even in cases of rape, may cause or worsen mental health crises in addition to posing risks to life and physical health.

### C. Abortion Bans Leave a Disproportionate Number of People of Color and Other Marginalized Communities Without Adequate Care, Resulting in More Adverse Medical Outcomes.

The effects of the 2025 Rule do not fall evenly. Women of color, who account for approximately 43% of women VHA users,[56] already experience disproportionately high rates of severe maternal morbidity, as well as elevated risks of certain pregnancy-related complications, such as PPROM, preeclampsia, hypertensive disorders, gestational diabetes, and postpartum hemorrhage.[57] Denying abortion care disproportionately burdens women of color forced to carry pregnancies to term, exposing them to potentially life-threatening health

---

https://www.medscape.com/viewarticle/918068 (noting that unintended pregnancy, including from rape, worsens mental health outcomes and that abortion restrictions may compound trauma by prolonging contact with rapists asserting parental rights).

[55] *See* Maetal E. Haas-Kogan et al., *Associations Between State-Level Abortion Restrictions and Postpartum Depression Symptoms from a United States Nationwide Cohort*, 55 Lancet Reg'l Health - Ams., Mar. 2026, at 2.

[56] *Facts and Statistics*, Women Veterans Health Care, VA, https://www.womenshealth.va.gov/materials-and-resources/facts-and-statistics.asp (last visited Nov. 3, 2026).

[57] *See* Andreea A. Creanga et al., *Racial and Ethnic Disparities in Severe Maternal Morbidity: A Multistate Analysis, 2008-2010*, 210 Am. J. Obstetrics & Gynecology 435.e1, 435.e1–2 (2014).

complications.[58] Black and Indigenous women already experience maternal mortality at significantly higher rates than white patients,[59] and abortion restrictions following *Dobbs* threaten to widen that gap.[60]

Women of color, who account for a majority of those seeking abortion care,[61] can also face systemic barriers that bans intensify, including economic insecurity, lack of health insurance, difficulty finding childcare, difficulty traveling to other states, language barriers for non-English speakers, and immigration-related

---

58 *See* Kelly M. Treder, Ndidiamaka Amutah-Onukagha & Katharine O. White, *Abortion Bans Will Exacerbate Already Severe Racial Inequities in Maternal Mortality*, 33 Women's Health Issues 328, 329–31 (2023).

59 Donna L. Hoyert, *Maternal Mortality Rates in the United States, 2024*, Nat'l Ctr. for Health Stat. 1, 4 fig. 2 (2026), https://www.cdc.gov/nchs/data/hestat/hestat113.htm; Eugene Declercq & Laurie C. Zephyrin, *Maternal Mortality in the United States, 2025*, Commonwealth Fund (July 2025), https://www.commonwealthfund.org/publications/issue-briefs/2025/jul/maternal-mortality-united-states-2025.

60 *See* Treder et al., *supra* note 58, at 330; *see also* Lucy Ogbu-Nwobodo et al., *Mental Health Implications of Abortion Restrictions for Historically Marginalized Populations*, 387 New Eng. J. Med. 1613, 1614–15 (2022) (noting disproportionate impacts of abortion restrictions on women of color and marginalized communities); Planned Parenthood & In Our Own Voice: Nat'l Black Women's Reprod. Just. Agenda, *Red Alert: Abortion Access is at Stake for Nearly Half of U.S. Women and People Who Can Become Pregnant* (Oct. 1, 2021) (explaining that abortion restrictions disproportionately harm Black, Latino, and Indigenous people because systemic racism, poverty, limited access to healthcare, and discriminatory public policy create substantial barriers to care).

61 *Abortion in the United States*, Guttmacher Inst. (Mar. 2026), https://www.guttmacher.org/fact-sheet/induced-abortion-united-states.

concerns, such as checkpoints within 100 miles of the U.S. border.[62] The 2025 Rule exacerbates these barriers by eliminating care through VHA, through which many veterans of color obtain healthcare.

### D. The 2025 Rule's Exception for Life-Endangering Circumstances Does Not Prevent These Harms.

The experiences of patients in states with abortion bans also demonstrate that narrow exceptions to bans are not enough to mitigate the significant risks to patients' lives, health, and future fertility that bans pose. Narrow exceptions leave providers uncertain about when care is legally permitted and fearful of potential criminal penalties.[63] Consequently, providers in states with bans have reported postponing treatment for repeat testing or hospital administrator sign-off,[64]

---

[62] *See* Moti Gulersen et al., *Racial and Ethnic Disparities in Birth Rates Following the Dobbs Decision: A Retrospective Analysis by State Abortion Policy*, 54 J. Perinatal Med. 1065, 1066 (2026) (discussing barriers faced by Hispanic populations); Camille Kidd, Shaina Goodman & Katherine Gallagher Robbins, *State Abortion Bans Threaten Nearly 7 Million Black Women, Exacerbate the Existing Black Maternal Mortality Crisis*, Nat'l P'ship for Women & Fams. (May 2024), https://nationalpartnership.org/report/state-abortion-bans-threaten-black-women/; Anastasia Moloney, *Why Black Women Bear Brunt of Strict U.S. Abortion Laws*, Context (Sept. 23, 2022), https://www.context.news/socioeconomic-inclusion/why-black-women-bear-brunt-of-strict-us-abortion-laws.

[63] Sabbath et al., *supra* note 23, at 2–3.

[64] Sophia Landay et al., *Abortion Bans and Pregnancy-Related Care Across Physician Specialties: A Qualitative Study*, 9 JAMA Network Open, June 22, 2026, at 4 https://doi.org/10.1001/jamanetworkopen.2026.19644. ("Across

increasing the risk of hemorrhage, rupture, and emergency surgery.[65] Providers' confusion and fear reflect that narrow exceptions are fundamentally incompatible with the realities of making complex and patient-specific medical determinations about when treatment is needed.[66] Fear and confusion are compounded by the fact that VA refused to codify the life-endangerment exception under the Medical Benefits Package. VA care under the 2025 Rule is compromised in exactly these ways, to the serious detriment of the many veterans who depend on it.

---

clinical scenarios, physicians reported delays in treatment driven by legal uncertainty and the need for diagnostic confirmation prior to intervention.").

65 *See, e.g.,* Ctr. for Reprod. Rts., *Complaint Against Oklahoma Hospital for Denying Life-Saving Abortion Care*, *supra* note 26; Ctr. for Reprod. Rts., *Complaints Against Texas Hospitals for Denying Emergency Care for Ectopic Pregnancies*, *supra* note 36; Ctr. for Reprod. Rts., *The Plaintiffs and Their Stories: Zurawski v. State of Texas*, *supra* note 29.

66 *See* Pet. for Review Pursuant to 38 U.S.C. § 502, *Minority Veterans of Am. v. Sec'y of Veterans Affs.*, No. 26-1861, at 17 (Fed. Cir. May 15, 2026); *see also* Denys T. Lau, Jihong Liu & Marian Moser Jones, *Post-Dobbs Era: Evolving Abortion Care Restrictions and Public Health Impact*, 116 Am. J. Pub. Health 317, 317 (2026) ("Clinicians in restrictive states report delays in treating miscarriages, ectopic pregnancies, and cancer because of their own legal fears and confusion."); Liana R. Woskie et al., *Obstetric-Related Emergency Medical Treatment and Labor Act Violations and No Health Exception Bans*, JAMA Health Forum (Dec. 5, 2025), at 8–9 (finding increased obstetric-related EMTALA violations in states with no meaningful health exception and linking legal and institutional uncertainty to delays in care).

## III. VA's Rulemaking Underestimates Both the Immediate and Long-Term Costs of Eliminating Abortion Care.

Beyond the hardships discussed above, the Regulatory Impact Analysis ("RIA")[67] and, therefore, the Rule severely underestimate both the immediate costs of eliminating abortion care and the long-term societal costs of carrying unwanted pregnancies to term.

### A. VA's RIA Underestimates Immediate Costs.

VA's RIA (i) overestimates how many VA patients will obtain abortions elsewhere, thereby underestimating VA's costs for pregnancy-related and newborn care; (ii) disregards delays caused by the counseling ban; and (iii) omits the cost of care for pregnancy-related conditions that affect the patient's health but not her life.

VA estimates that 60% of patients denied abortion care through VA will obtain it elsewhere,[68] based on an inaccurate classification of which states have "high levels of abortion restrictions." For example, the RIA does not include Florida and Georgia as states with "high levels of abortion restrictions," even though those states have among the most restrictive laws in the country and ban

---

67 VA, Regulatory Impact Analysis of RIN 2900-AS31(P) 5 (2025), https://www.regulations.gov/document/VA-2025-VHA-0073-0001 [hereinafter 2025 Rule RIA].

68 *Id.* at 5.

abortion after six weeks' gestation.[69] Florida and Georgia respectively have the second and fifth largest populations of women veterans in the nation.[70] By excluding those states, the RIA omits a substantial portion of women veterans who are likely to be unable to obtain care outside VA.

Even veterans who live in, or can travel to, states where abortion remains legal have no guarantee of access. Many private insurance plans do not cover abortion, and under the Hyde Amendment, Medicaid does not cover abortion except in cases of life endangerment, rape, or incest unless a state provides its own funding.[71] Many patients cannot afford the out-of-pocket costs of the procedure, let alone associated travel and lodging.[72]

---

69 *Id.*; Fla. Stat. § 390.0111(1); Ga. Code Ann. § 16-12-141 (banning abortion where cardiac activity is detectable, typically at six weeks).

70 VA, *Table 6L: VetPop2023 Living Veterans by State, Age Group, Sex, 2023-2053*, https://www.va.gov/VETDATA/docs/Demographics/New_Vetpop_Model/6L_VetPop2023_State_NCVAS.xlsx (last visited Oct. 27, 2026).

71 Upadhyay et al., *State Abortion Policies*, *supra* note 13, at 3–4; *The Hyde Amendment: A Discriminatory Ban on Insurance Coverage of Abortion*, Guttmacher Inst. (last updated Sept. 2026), https://www.guttmacher.org/fact-sheet/hyde-amendment (stating that twenty-nine states and the District of Columbia do not provide Medicaid abortion coverage beyond the Hyde exceptions).

72 Upadhyay et al., *State Abortion Policie*s, *supra* note 13, at 4–5. VA acknowledged these barriers to care in its final rulemaking but stated that it would treat such effects "qualitatively" and thus omitted them from its costs analysis. *See* 90 Fed. Reg. 61,310, 61,321.

VA also appears to have made no assessment of whether the counseling ban could delay care, pushing patients beyond state gestational limits or into later, more costly care.[73] VA's assumption that patients in non-restrictive states will simply obtain care elsewhere ignores these well-documented barriers to access. More likely, the Rule will result in the continuation of more high-risk pregnancies and higher demand for intensive maternal and post-natal care.[74] But the RIA does not quantify any increase in per-patient pregnancy, delivery, and postpartum costs attributable to the Rule.[75] VA has thus likely significantly underestimated the Rule's immediate costs.

---

[73] *See generally* 2025 Rule RIA, *supra* note 67; Weitz & Schwartz, *supra* note 14, at 6.

[74] *See generally* Sarah E. Peiffer et al., *Increase in Health Care Utilization of Texas Infants with Congenital Anomalies Following Senate Bill 8*, 288 J. Pediatrics 114283 (2026), https://doi.org/10.1016/j.jpeds.2025.114823 (finding that following passage of Texas SB8, the proportion of infant inpatient admissions for congenital anomalies increased from 17.1% to 19.0% and total charges for congenital anomaly admissions increased by $1.89 billion).

[75] *See generally*, 2025 Rule RIA, *supra* note 67. In its final rulemaking, VA again acknowledged that "delays or reliance on later gestation care, including emergency care, can affect the type of care that may be provided to a veteran or beneficiary as well as increase the potential for financial impacts." 90 Fed. Reg. at 61,321. But VA dismissed these costs, stating that "even if higher later gestation or emergency care costs were included in the RIA, they would not change the overall characterization or the necessity for the rulemaking." *See id.*

### B. The RIA Fails to Account for the Lasting Socioeconomic Impact on Patients Denied Abortion Care.

The RIA also ignores that forcing women to carry unwanted pregnancies to term causes them, their existing children, and their families lasting socioeconomic harm, which falls disproportionately on vulnerable populations.

The Turnaway Study—a longitudinal study of 1,000 patients nationwide who either received or were denied abortions based on gestational limits—documents these persistent consequences.[76] Patients denied abortion experienced reduced full-time employment and greater likelihood of poverty and reliance on public benefits over the following four years,[77] a reduced likelihood of having prime credit in the following two years,[78] and a twofold increase in average unpaid debts in the following four years.[79] The RIA's failure to account for these impacts renders its analysis incomplete.

---

[76] *See generally The Turnaway Study*, Advancing New Standards in Reprod. Health, https://www.ansirh.org/research/ongoing/turnaway-study (last visited Oct. 15, 2026).

[77] Diana Greene Foster et al., *Socioeconomic Outcomes of Women Who Receive and Women Who Are Denied Wanted Abortions in the United States*, 108 Am. J. Pub. Health 407, 407-13 (2018).

[78] Sarah Miller, Laura R. Wherry & Diana Greene Foster, *The Economic Consequences of Being Denied an Abortion* 36 (Nat'l Bureau of Econ. Rsch., Working Paper No. 26662, 2020).

[79] *Id.*

These harms also compound existing inequalities. Because financial barriers are among the primary obstacles to abortion care, the consequences of denial (including higher rates of workforce exclusion) fall most heavily on those already struggling to make ends meet—and disproportionately on individuals of color.[80] The RIA's omission of these disparate impacts further undermines its analysis.

***

[80] Developments in the Law-Labor and Employment, Chapter Four: *The Labor and Delivery of Reproductive Justice for Workers: The Post-Dobbs Workforce*, 136 Harv. L. Rev. 1676, 1678–80 (2023); *see also* In Our Own Voice: Nat'l Black Women's Reprod. Just. Agenda, *Policy as Power: Providing a Path Toward Black Reproductive Justice*, 10–11 (2025).

## **CONCLUSION**

By eliminating abortion counseling and nearly all abortion care for the many veterans and their families who depend on VA for healthcare – at a moment when many are without alternatives and already at risk under state law – the 2025 Rule deeply compromises the VA's ability to provide appropriate healthcare to veterans and their families. It endangers the women who served this country, and the families of those who served, by depriving them of safe and essential reproductive care when and where they need it most. For that reason, and all of the foregoing reasons, this Court should strike down the 2025 Rule.

Dated: Nov. 6, 2026
New York, NY

Respectfully submitted,

/s/ *Shannon Rose Selden*
Shannon Rose Selden
Debevoise & Plimpton LLP
*Counsel to Amici Curiae*
66 Hudson Blvd. E.
New York, NY 10001
(212) 909-6000
srselden@debevoise.com

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of FRAP 29(a)(5) and Fed. Cir. R. 32(b) because it contains 6,956 words, excluding the parts of the brief exempt by FRAP 32(f) and Fed. Cir. R. 32(b)(2).

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

Dated: Nov. 6, 2026
New York, NY

/s/ *Shannon Rose Selden*

Shannon Rose Selden
Debevoise & Plimpton LLP
*Counsel to Amici Curiae*
66 Hudson Blvd. E.
New York, NY 10001
(212) 909-6000
srselden@debevoise.com